EXHIBIT 18

# EXHIBIT 1

AGREEMENT
AND
WORKING RULES

BETWEEN

ALCOA USA CORP.

AND

UNITED STEELWORKERS

Local Nos. 420, 104

*

Plants located at:

MASSENA, NEW YORK
**WARRICK, INDIANA**

**SEPTEMBER 19, 2019**

CONTENTS Page

Article I. Recognition, Successorship and
 Application of Agreement ...........................…   8

 Section 1. Recognition and Successorship .................   8
 Section 2. Application of Agreement ......................…   10

Article II. Other Agreements .........................…   10

 Section 3...................................................…   10
 Section 4 ................................................…   10
 Section 5.................................................…   11
 Section 6.................................................…   11

Article III. Check-off and Maintenance
 Of Union Membership ...............................…   11

Article IV. Continuation of Wage Rates,
 Standard Hourly Rates, and Performance Pay Plan …   14

 **Section 7**....................................................…   14

Article V. New and Changed Job Classifications ............   15

 Section 8. New Job Classifications ............................   15
 Section 9. Changed Job Classifications ......................   15
 Section 10. Exclusions ...............................   17

Article VI. Overtime and Premium Pay Provisions ..........   17

 Section 11. Daily Overtime ..........................   17
 Section 12. Sunday Work and Holidays ......................   17
 Section 13. Sixth or Seventh Consecutive Day .........   19
 Section 14. Weekly Overtime .....................................…   19
 Section 15. General Rules .........................................   20
 Section 16. Shift and Schedule Premiums .................…   20

Article VII. Vacations ...................................…   22

Article VIII. Seniority .......................................…   26

Page

Section 17. Termination of Seniority ............................ 28
Section 18. Probationary Employees ......….…........... 29
Section 19. Local Rules ......................................... 29
Section 20. General ............................................... 29

Article IX. Reduction of Forces ...................…..…........ 30

Article X. Job Assignment ................................. 34

Article XI. Recall and Restoration of Forces .................... 34

Article XII. Exceptions to the Application of Seniority .... 36

Article XIII. New Job or Vacancy ........................... 37

Section 21. Bidding Within the Department ............... 37
Section 22. Filling the Vacancy from
        Without the Department ........................... 38

Article XIV. Leaves of Absence ........................... 39

Article XV. Non-Discrimination ...........................…..… 40

Article XVI.  Layoff, Dismissal, Etc. ............................ 40

Article XVII.  Incomplete Day's Work ............................ 41

Article XVIII.  Procedure for Handling Grievances ......... 41

**Section 23.  Grievance Procedure** ............................... 41
Section 24.  Limitations ................................…. 43
Section 25.  Access to Plants ...................................... 43

Article XIX.  Arbitration ................................. 44

Section 26.  Scope ...................................... 44
Section 27.  Board of Arbitration ............................. 44
Section 28.  Duties of Board ...................................... 44
Section 29.  Awards ................................... 45

Page

Section 30.  Finality of Awards ..................................  45
Section 31.  Jurisdiction of Board ............................  45
Section 32.  Costs .....................................................  46
Section 33.  Rules ....................................................  46
Section 34.  Agreement Against Strikes or Lockouts ..  46

Article XX.  Military Service ...........................................  47

Article XXI.  Supervisors ................................................  47

Section 35.  Seniority and Return to Bargaining Unit ..  47

Article XXII.  Supplemental Unemployment Benefits ..  50

**Section 36.  Weekly Benefits ..................................  50**
**Section 37.  Short Week Benefits ............................  58**
**Section 38.  Finances ...............................................  59**

**Article XXIII.  Group Insurance** ...................................  59

Article XXIV.  Union Bulletin Boards ...........................  62

Article XXV.  Legal Rights ..............................................  62

Article XXVI.  Sanitary Conditions ...............................  62

Article XXVII.  Safety and Health .................................  62

Article XXVIII.  Jury and Witness Pay ..........................  69

Article XXIX.  Bereavement Pay ...................................  69

**Article XXX.  Civil Rights / Diversity &
Inclusion**...................................................…....  70

**Article XXXI.  Period of Agreement** ...........................  71

                                                                    Page

**Appendix I.  Standard Hourly Rates** ...........................…   73

Appendix II.  List of Job Classifications .........................…   75

**Appendix III.  Performance Pay** ..................................…   76

Appendix IV.  Neutrality ...................................…   82

Appendix V.  Alcoa Cooperative Partnership Agreement..   87

**Appendix VI. Interplant Transfer** ....................…   101

Appendix VII. Team Leader & Team Roles.………….   102

**Appendix VIII.  Joint Efforts Agreement**…………….  106

**Index Master Agreement Common Letters**

| | | |
|---|---|---|
| 1 | Joint Health Care Committee……………….. | 109 |
| 2 | Safety and Health Language……………… | 111 |
| 3 | Plant-Level Committees on Health Care & Cost Containment…………………………… | 112 |
| 4 | Dispute Regarding Return to Work from Sick Leave………………………………… | 114 |
| 5 | Joint Training of the Joint Safety & Health Committee Members……………………….. | 116 |
| 6 | SOAR-PAC…………………………………. | 117 |
| 7 | Managed Care Program……………………. | 118 |
| 8 | National Health Care Program………………. | 120 |
| 9 | Contracting Out Site Visits by Joint Labor/Management Team…………………. | 122 |
| 10 | Company/Union Meet Twice During Term of Labor Agreement……………………… | 123 |
| 11 | Alcoholism & Drug Abuse As Treatable Illness………………………………… | 124 |
| 12 | Musculoskeletal Disorders (MSDs)………… | 125 |
| 13 | Workers' Memorial Day……………………. | 126 |
| 14 | Joint Health & Safety Committee Audits…….. | 127 |
| 15 | Adoption of Partnership Agreement & APS…. | 128 |
| 16 | FMLA……………………………………… | 129 |
| 17 | Contracting Out Process…………………… | 130 |
| 18 | Joint Health & Safety Conferences………… | 131 |
| **19** | **Retiree Health Care**………………………… | 133 |

Page

| | | |
|---|---|---|
| **20** | **Employment Security**………………………….. | 142 |
| **21** | **Contracting Out/Employment Security**……. | 144 |
| 22 | Unexpected Forced Overtime…………………. | 146 |
| **23** | **Retirement Notification Incentive**…………….148 | |
| 24 | Total Productive Maintenance (TPM) Program………………………………………… | 150 |
| 25 | Training Resources Evaluation………………. | 151 |
| 26 | Interdepartment Transfers……………………. | 152 |
| 27 | Transfer/Recall……………………………….. | 153 |
| 28 | Burden Rates for Contracting Out…………… | 155 |
| 29 | 64/66 Hour Work Rule………………………. | 156 |
| 30 | 401(k) Company Contributions & Deferrals…. | 157 |
| 31 | Plant Closing Program………………………. | 159 |
| **32** | **Compensation Plan for Future New Hires and Rehires**………………………………….. | 161 |
| 33 | FMLA Absences Impact on Departmental Seniority……………………………………... | 162 |
| 34 | Plant Investment Commitment……………… | 163 |
| 35 | Health Care Coverage During Receipt of S&A Benefits…………………………….. | 164 |
| 36 | Polychlorinated Biphenyl (PCB) Control Program…………………………………….. | 166 |
| 37 | Industrial Hygiene Sampling………………. | 167 |
| 38 | Toxic Materials…………………………….. | 169 |
| 39 | Safety and Health Training………………... | 170 |
| 40 | In-Plant Railroads…………………………. | 173 |
| 41 | Notice of Technological Change…………... | 174 |
| **42** | **Revisions to 2019 Agreements**……………. | 175 |
| 43 | 64/66 Hour Work Rule Modification……... | 176 |
| 44 | Accelerated Apprentice Program………… | 178 |
| 45 | Wellness Programs………………………… | 180 |
| **46** | **Study and Adoption of Medicare Advantage Plan**……………………………………….. | **181** |
| **47** | **Joint Wage Evaluation Review Committee**………………………………… | **183** |
| **48** | **Contact Information while on Layoff Status**……………………………………… | **184** |
| **49** | **Delay in Return to Work from S&A or Workers Compensation**……………………………... | **185** |

## Index Master Agreement Specific Letters  **Page**

| | | |
|---|---|---|
| 1 | Compensation for Doubling Over from Last Shift…………………………………… | 186 |
| 2 | SUB – Scheduling of Work Week…………… | 187 |
| 3 | Meeting New Employees…………………….. | 188 |
| 4 | Wage Rates for Potroom Job Classifications… | 189 |
| 5 | Placement/Retention of Handicapped or Disabled Applicants………………………….. | 190 |
| 6 | Working Third Shift WRT Jury/Witness Duty.. | 191 |
| 7 | Visible Notification of Schedule Change While on Vacation…………………………… | 192 |
| 8 | Appendix II Job Changes/Combinations……... | 193 |
| 9 | Accumulated Seniority without Disciplinary Action……………………………………… | 194 |
| 10 | Employees in Other Employment While on Medical Leave/Absence……………………… | 195 |
| 11 | Supervisor Returning to Bargaining Unit Work………………………………………… | 196 |
| 12 | Skills Gained Through Team Process Training or Non-Traditional Assignments…… | 197 |
| 13 | One-Day-at-a-Time Vacation………………… | 198 |
| 14 | Rules of the Alcoa/USW (ABG) Arbitration Procedure………………………. | 199 |
| 15 | Gag Rule for Arbitration……………………. | 203 |
| 16 | Notice of Overtime…………………………… | 204 |
| 17 | State Article & Section of Labor Agreement in Grievances………………………………… | 205 |
| 18 | Layoff as a Result of Plant Closing………….. | 206 |
| 19 | Supervisors Performing Work……………….. | 207 |
| 20 | Company Seniority…………………………… | 208 |
| 21 | Eligible Earnings…………………………….. | 209 |
| 22 | Group Insurance Coverage & Elected Union Offices…………………………………. | 210 |
| 23 | Reduction of Forces…………………………. | 211 |
| **24** | **Contracting Out Failure to Properly Notify.**. | 212 |
| **25** | **Contracting Out Small Projects**…………… | 213 |

## AGREEMENT

The parties to this Agreement, dated **September 19, 2019**, amending and extending the Agreement of **May 16, 2014**, shall be United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union **on behalf of** its Locals 104 and 420 (hereinafter collectively referred to as the "Union, USW or United Steelworkers") and Alcoa USA Corp. ("Company").

If any plant with a collective bargaining unit subject to this Agreement is transferred to a subsidiary or an affiliate where the Company has greater than a 50% interest, the collective bargaining unit shall continue to be covered by this Agreement and such subsidiary or affiliate shall be a party to this Agreement.

The Company and the Union agree:

## ARTICLE I.  RECOGNITION, SUCCESSORSHIP, AND APPLICATION OF AGREEMENT

### Section 1.  Recognition and Successorship

#### A.  Recognition

The provisions of this Agreement shall apply solely to those employees of the Company at its plants located at Warrick, Indiana; and Massena, New York, for whom the Union has been certified as the exclusive bargaining agency by the National Labor Relations Board, or for whom the Company has recognized the Union as the exclusive bargaining agency.

Where Union representatives of employees are mentioned in this Agreement, any representatives, committees, or officers of the Union that have been certified by the local Union to the plant or Company Management shall be recognized as such Union representatives by the Management.

The Company recognizes and accepts the principles of collective bargaining and, subject to the provisions of this Agreement, is willing at all times to meet the Union representatives for the purpose of discussing hours and working conditions, not in conflict with this Agreement and

8

not determined in negotiations of this Agreement, with the object of reaching a satisfactory understanding.

### B. Successorship

If the Company sells an entire plant, or an organizationally distinct operation thereof, subject to this Labor Agreement, and the purchaser intends to operate the same business at the same location within one (1) year of the sale, the purchase and sale agreement will require the purchaser to:

1. Extend offers of employment only to members of the Company's collective bargaining unit until the purchaser has a full complement of such employees it needs to perform work covered by the Company's collective bargaining unit or until the purchaser has extended offers of employment to all members of the Company's collective bargaining unit;

2. Maintain a preferential applicant pool of members of the Company's collective bargaining unit who are not initially employed by the purchaser pursuant to Item 1 above, and to extend offers of employment only to members of that pool for the purchaser's bargaining unit work, as the purchaser's needs arise, for a period of three (3) months from the commencement of the purchaser's production operations, or until the purchaser has extended offers of employment to all members of the Company's collective bargaining unit whichever occurs first; and

3. Recognize the Union as the collective bargaining representative of the unit that performed bargaining unit work for the Company upon the purchaser hiring a substantial and representative complement of the employees it needs to perform such unit work.

The Company will have completely fulfilled its obligations under this successorship provision if the purchase and sale agreement contains the terms described in Items 1-3,

9

the purchaser makes the offers specified in Item 1 contingent upon the closing of the transaction contemplated in the purchase and sale agreement, and the Company offers its services as a facilitator during negotiations for a labor agreement between the purchaser and the Union. The Company will have no obligation under this successorship provision if the purchaser commits to the Company that it does not intend to operate the same business at the same location within one year of the sale. Moreover, this successorship provision does not apply to the sale of a plant which has been closed for at least six (6) months or to the separate sale of equipment and/or real estate, including buildings, not intended to be operated within one (1) year after sale as the same business at the same location.

**Section 2.  Application of Agreement**

This Agreement shall be binding on both the Company and the Union and shall be faithfully performed by each and shall apply alike to male and female employees.

### ARTICLE II.  OTHER AGREEMENTS

**Section 3.**

No contract or agreement, affecting the employees of the aforesaid plants to whom this Agreement applies, other than any mutually agreed to by the Union and the Company, shall be entered into between the Company and any employee or group of employees or their representative or representatives that will in any way conflict with or supersede this Agreement during its life.

**Section 4.**

Local agreements which were valid under the Master Agreement and in effect prior to December 19, 1959, on matters covered by this Agreement and which are not in conflict with this Agreement, and which apply or interpret the terms of this Agreement, will remain in effect for the period of this Agreement unless modified or terminated by agreement of the local Union and the local Management or unless terminated by either party in accordance with the provisions of the local agreement.

**Section 5.**

  Local agreements on matters not covered by this Agreement are not subject to or affected by this Agreement unless and until a written agreement, so stating, is executed by the local Union and a representative of the International Union and the Local and Pittsburgh Management.

**Section 6.**

  Any local agreement negotiated subsequent to December 19, 1959, applying or interpreting the terms of this Agreement shall be in writing and approved by the local Union and a representative of the International Union and the Plant or Works Manager or his representative in order to be valid in any future application of the terms of this Agreement. Any such agreement negotiated on or after June 1, 1980, shall be subject to the Agreement when in writing, so stating and approved by the local Union and a representative of the International Union and the Plant or Works Manager or his representative.

## ARTICLE III.  CHECK-OFF AND MAINTENANCE OF UNION MEMBERSHIP

  **A.**  The Company will check-off monthly dues, assessments, and initiation fees each as designated by the local secretary-treasurer of the Union, as membership dues in the Union on the basis of individually signed voluntary check-off authorization cards in forms agreed to by the Company and the Union.

  **B.**  New check-off authorization cards will be submitted to the Company through the secretary-treasurer of the local Unions at intervals no more frequently than once each month.  On or before the last day of each month the Union shall submit to the Company a summary list of cards transmitted in each month.

  **C.**  Deductions on the basis of authorization cards submitted to the Company shall commence with respect to dues for the month in which the Company receives such authorization card or in which such card becomes effective, whichever is later.  Dues for a given month shall be deducted

11

from the first pay closed and calculated in the succeeding month.

The local Union may opt for weekly dues deductions. Accordingly, when weekly deductions are in effect, mentions of month or monthly in Paragraphs A, D, F, G, and J of this Article are changed to week or weekly.

**D.**     In cases of earnings insufficient to cover deduction of dues, the dues shall be deducted from the next pay in which there are sufficient earnings, or a double or triple deduction may be made from the first pay of the following month, provided, however, that the accumulation of dues shall be limited to three months.  The local secretary- treasurer of the Union shall be provided with a list of those employed for whom a double or triple deduction has been made.

**E.**     The Union will be notified of the reason for non-transmission of dues in case of interplant transfer, layoff, discharge, resignation, leave of absence, sick leave, retirement, or insufficient earnings.

**F.**     Unless the Company is otherwise notified, the only union membership dues to be deducted for payment to the Union from the pay of the employee who has furnished an authorization shall be for the monthly union dues.  The Company will deduct initiation fees when notified by notation on the lists referred to in Paragraph B of this Article, and assessments as designated by the local secretary-treasurer. With respect to check-off authorization cards submitted directly to the Company, the Company will deduct initiation fees unless specifically requested not to do so by the local secretary-treasurer of the Union after such check-off authorization cards have become effective.  The local secretary-treasurer of the Union shall be provided with a list of those employees for whom initiation fees have been deducted under this Paragraph.

**G.**     The sole authorized representative of the Union for the purpose of certifying the amount of any change in monthly dues or initiation fees to be deducted by the Company shall be the local secretary-treasurer.

**H.**     All employees who at the date of the signing of this Agreement are members of the Union in good standing as

to payment of dues and initiation fees shall maintain membership in the Union in good standing as to payment of dues and initiation fees for the duration of this Agreement as a condition of employment.

    **I.**       Each new employee hired hereafter, shall, as a condition of employment beginning on the 30th day following the beginning of such employment, acquire and maintain membership in the Union in good standing as to payment of dues and initiation fees for the duration of this Agreement.

    **J.**      In states in which the provisions of Paragraphs H and I of this Article may not lawfully be enforced, and in all other states, each employee covered by this Agreement who fails to acquire or maintain membership in the Union shall be required, as a condition of employment, beginning on the 31st day following the beginning of such employment or the date of the signing of this Agreement, whichever is later, to pay to the Union each month a service charge as a contribution toward the administration of this Agreement and the representation of such employee. The service charge for the first month shall be in an amount equal to the Union's regular and usual initiation fee and monthly dues and for each month thereafter, in an amount equal to the regular and usual monthly dues.

    **K.**      If an employee, certified by the Union as a member, asserts within thirty (30) days of the first deduction of his dues that he was not a member as of the date certified, the Union shall, if it desires to contest such assertion, refer the dispute within sixty (60) days to an arbitrator designated by the parties for a final and binding determination. Pending the outcome of such dispute, the deductions will continue, and the funds in question will be impounded by the Company to be disbursed in accordance with the arbitrator's award.

    **L.**      It is understood that the Union will save the Company harmless against any and all claims of liability which may arise out of or by reason of action taken or not taken by the Company in compliance with check-off authorization cards or certified lists of Union membership furnished by or through the Union to the Company.

    **M.**      This Article is subject to such local modification as may be required by the applicable state laws.

13

Performance of this Article at a Works may be withheld or suspended if contrary to applicable state laws. No liability shall attach to the Company because of reliance upon an applicable state law prior to a determination that such law is invalid, either by the Supreme Court of the United States or by the Court of Last Resort of the state in a ruling which is not reviewed by the Supreme Court of the United States.

### ARTICLE IV. CONTINUATION OF WAGE RATES, STANDARD HOURLY RATES, AND PERFORMANCE PAY PLAN

**Section 7.**

#### A. Wage Manual

The Wage Manual which became effective April 1, 1957, as since amended, is hereby incorporated by reference as a part of this Agreement effective **September 19, 2019**, and shall continue in effect for the same term and under the same conditions as this Agreement. The Standard Hourly Rates and the wage rates for the job classifications covered by this Agreement will not be changed for the period of this Agreement except by mutual agreement or except as changes are made under Article V (New and Changed Job Classifications).

#### B. Standard Hourly Rates

A table of Standard Hourly Rates **reflecting a three percent (3.0%) increase to all job grades effective the first full pay period following ratification (September 19, 2019), is attached hereto at the first rate table listed under Appendix I. Effective May 18, 2020, the standard hourly rates for all job grades will be increased by three and twenty-five hundredths percent (3.25%). Effective May 17, 2021, the standard hourly rates for all job grades will be increased by three (3.0%). Effective May 16, 2022, the standard hourly rates for all job grades will be increased by three percent (3.0%).**

### C.  Performance Pay Plan

A Performance Pay Plan for hourly employees represented by the Union to be effective for the plan years **2019** through May 15, **2023** is set forth in Appendix III of this Agreement.

### ARTICLE V.  NEW AND CHANGED JOB CLASSIFICATIONS

**Section 8.  New Job Classifications**

When a new job classification is established:

**A.**      The Company will develop a proposed job description, evaluation, and hourly wage rate for the new job classification.

**B.**      The proposed job description, evaluation, and wage rate, as developed in accordance with the Wage Manual, will be explained to the local Union Job Evaluation Committee with the object of obtaining agreement.  The rate may be installed without agreement subject to adjustment as provided below.

**C.**      When a wage rate for a new job classification is installed, the employee or employees affected or their Union representative or representatives may, at any time within ninety (90) days from receipt of the proposed job description, evaluation, and rate, file a grievance alleging that the classification is improperly described and/or evaluated.  Such grievance shall be initiated at the second step and may be processed under the grievance and arbitration procedures of this Agreement according to the procedures set forth in the Wage Manual.  If such grievance be settled at any step of the grievance procedure or submitted to arbitration, the decision shall be effective as of the date when the employee or employees were assigned to the new job classification subject to the provisions of Section VIII of the Wage Manual.

**Section 9.  Changed Job Classifications**

When the character and type of duties and requirements of a job classification are so changed either all at

15

once or as a result of an accumulation of changes over a period of time as to alter the evaluation of that classification:

      **A.**     The Company will develop a proposed job description, evaluation, and wage rate for the changed job classification.

      **B.**     The proposed job description, evaluation, and wage rate, as developed in accordance with the Wage Manual, will be explained to the local Union Job Evaluation Committee with the object of obtaining agreement. The rate may be installed without agreement subject to adjustment as provided below.

      **C.**     When a wage rate for a changed job classification is installed, the employee or employees affected or their Union representative or representatives may, at any time within ninety (90) days from receipt of the proposed job description, evaluation, and rate, file a grievance alleging that the classification is improperly described and/or evaluated. Such grievance shall be initiated at the second step and may be processed under the grievance and arbitration procedures of this Agreement according to the procedures set forth in the Wage Manual. If such grievance be settled at any step of the grievance procedure or submitted to arbitration, the decision shall be effective as of the date when the employee or employees were assigned to the changed job classification subject to the provisions of Section VIII of the Wage Manual.

      **D.**     In the event that the Company does not develop a job description, evaluation, and wage rate for the changed job classification or in the event that it does not report a change in job duties or content to the Union and it is claimed that the change constitutes a change in the job classification, the Union may file a grievance alleging that the classification is improperly described and/or evaluated. Such grievance shall be initiated at the second step and may be processed under the grievance and arbitration procedures of this Agreement according to the procedures of the Wage Manual. If such grievance be settled at any step of the grievance procedure or submitted to arbitration, the decision shall be effective as of the date the changed job was established, or ninety (90) days prior to the filing of the grievance, whichever was later, subject to the provisions of Section VIII of the Wage Manual except as is otherwise provided for grievances

16

filed under provisions of the Understanding On The Wage Manual, dated April 26, 1973.

**E.**     A change in methods, materials, or functions or additions or deletion of a job may, among other things, constitute a change in duties or requirements.  The Company will notify the local Union Job Evaluation Committee of any significant change in job content whether such change would or would not alter the wage rate provided the Company is aware of such change.

**F.**     In the event that technological changes should take place which result in changes in existing classifications through the creation of significant duties which may be beyond the scope of those performed by employees in the existing bargaining unit, the Company will review the matter with the Union.  If such duties are assigned to employees in the bargaining unit, such employees will be given training opportunities to qualify them to perform the work.

### Section 10.  Exclusions

Production standards are not subject to modification, termination, or establishment by arbitration, although the Arbitration Board may consider evidence relative to production standards.

### ARTICLE VI.  OVERTIME AND PREMIUM PAY PROVISIONS

### Section 11.  Daily Overtime

Time and one-half shall be paid for time worked in excess of eight (8) hours in any one day.

### Section 12.  Sunday Work and Holidays

**A.**     The following days shall be recognized as holidays for the purpose of this Agreement:  New Year's Day, President's Day, Good Friday, Memorial Day, Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day, the day before Christmas Day, and Christmas Day.  When any of these holidays falls on a Sunday, the following day, Monday, will be recognized as the holiday.  If Christmas falls on Monday, the following day,

17

Tuesday, shall be recognized as the "day before Christmas" holiday.

**B.** Employees shall be paid for the holidays providing they meet all of the following eligibility requirements:

**1.** During the payroll week in which the holiday is observed:

(a) The employee works or is on a vacation scheduled under the Vacation Plan (Article VII, Vacations) or is on a layoff because he is not eligible for a vacation at the time of a shutdown during the payroll week during which the holiday occurs, or performs jury service, or is a witness in a court of law, or is qualified for bereavement pay (Article XXIX, Bereavement Pay) on each of his scheduled days in such week, or

(b) The employee is absent due to personal illness or accident and is not eligible for sickness and accident benefits for such week because of the waiting period, provided he is eligible for and receives sickness and accident benefits for such illness or accident for the following week.

**2.** The employee has thirty (30) days' seniority as of the date of the holiday.

**3.** An employee who is scheduled to work on the holiday and is absent without permission for any reason except sickness will not receive holiday pay.

**C.** The holiday pay shall be at the employee's regular hourly rate for eight (8) hours. Overtime and shift premiums are excluded.

**D.** Double time and one-half shall be paid for work performed on the above-named holidays.

**E.** When a week day is substituted for a holiday (which falls within an employee's normal working schedule) and the plant or any part thereof is closed because of the holiday, the employee will be paid time and one-half for the time worked on the day which was substituted for the holiday.

18

**F.**     Time and one-half shall be paid for time worked on Sundays.  Such premium based on the standard hourly wage rate shall be included in any Allowed Time (Article XVII--Incomplete Day's Work) paid on Sundays when no work is available.

### Section 13.  Sixth or Seventh Consecutive Day

**A.**     Time and one-half shall be paid for time worked by any employee on the sixth consecutive day worked in his regularly scheduled work week.

**B.**     Double time shall be paid for time worked by an employee on the seventh consecutive day worked in his regularly scheduled work week.

**C.**     For the purpose of computing consecutive days worked, any holiday listed in Section 12A shall be considered a day worked whether or not work is actually performed. Further, any day for which an employee receives jury or witness pay as provided for in Article XXVIII or receives bereavement pay as provided in Article XXIX shall be considered a day worked whether or not work is actually performed.

**D.**     For the purpose of computing consecutive days worked, a day on which an employee works two (2) or more hours, unless fewer hours are worked due to the employee being excused for union business, or receives pay under Article XVII (Incomplete Day's Work) shall be considered as a day worked except in cases where less than the scheduled number of hours are worked as the result of a labor dispute.

### Section 14.  Weekly Overtime

**A.**     Time and one-half shall be paid for time worked in excess of forty (40) hours in any payroll week (or established work week); however, time worked in excess of eight (8) hours in any week day and such time worked on Sundays, or on a day substituted for a holiday, or on the sixth or seventh consecutive day worked, as may be subjected to overtime, shall be excluded when determining weekly overtime in excess of forty (40) hours.

19

**B.**  When a holiday falls within an employee's normal working schedule, and the plant or any part thereof is closed on the holiday, the hours that would have been worked on the holiday shall be included when determining weekly overtime in excess of forty (40) hours.

## Section 15.  General Rules

**A.**  The Company will distribute such overtime work as is necessary as fairly as possible between employees within the classification affected by this overtime work.

**B.**  If an employee is required to work over eight (8) hours per day or on any day which is not part of his regular schedule, he shall not be required to lose time or lay off from his scheduled days in that payroll week provided there is work to which he would be regularly assigned.  The work days of an employee's work schedule for any work week or the employee's work shift for any work day within that week shall not be changed subsequent to the beginning of such work week except for proper and reasonable cause.

## Section 16.  Shift and Schedule Premiums

**A.**  Shift Premium

A premium rate of thirty-nine (39) cents an hour shall be paid for work performed on the second or afternoon shift and sixty-four (64) cents an hour for work performed on the third or night shift.

**1.**  The shift premium will be included in computing overtime compensation.

**2.**  The shift premium will be included in the rate paid for hours not worked under Article XVII (Incomplete Day's Work) of this Agreement.  For an employee called to work, such premium shall be the highest applicable to any time actually worked on such call-out, and will be applied also to the hours worked during the call-out period.  For an employee permitted to come to work, such premium shall be the premium applied to his shift.

**3.**  An employee scheduled to come to work four (4) hours or more prior to the start of and in addition to his

20

regular shift will receive the applicable shift premium for those hours worked before the start of his regular shift.

**4.**     An employee who continues to work beyond his regular day shift for four (4) hours or more will be paid the afternoon shift premium for all hours worked during the afternoon shift.

**5.**     An employee who continues to work beyond his regular afternoon shift for four (4) hours or more will be paid the night shift premium for all hours worked during the night shift.

**6.**     An employee who continues to work beyond his regular night shift will be paid the night shift premium for all hours worked during the day shift.

**B.**     Schedule Premium

When an employee's regular work schedule over its normal cycle provides for other than consecutive days (up to and including five [5] days), Monday through Friday, except as he may be scheduled for or work additional time on what would normally be a sixth or seventh day, the employee shall be entitled to a schedule premium of thirty (30) cents per hour for each hour in the work week except as provided for in the following Paragraph 1.

**1.**     If the schedule cycle of such employee includes work weeks of Monday through Friday in each of half or more of the work weeks of the schedule cycle, the schedule premium shall not be payable for the Monday through Friday work weeks but shall be payable for the other work weeks of the schedule cycle.

**2.**     The schedule premium referred to in this Section 16 shall be considered an "add-on" and shall not be deemed part of the employee's standard hourly rate.  Such premium shall be paid only for hours worked and shall not be included in the base for calculation of any premium pay, benefit, or other pay additive except overtime and incomplete day's work in accordance with Article XVII.  This provision supersedes any other contract provision relating to the calculation of premium pay, benefit, or pay additive except overtime and incomplete day's work.

21

### ARTICLE VII.  VACATIONS

The following regulations shall govern the Vacation Plan for Hourly Rated Employees.

    **A.**    Eligibility

    **1.**    An employee shall be entitled to a vacation with pay during a calendar year if, at December 31 of the preceding year or at any time while he is working between January 1 and November 30, inclusive, of such calendar year, he has completed one or more years of accumulated departmental seniority and has either (a) worked 1000 or more hours in the immediately preceding 365 days or (b) worked in at least 60% of the preceding 52 weeks, provided during such period the scheduled work weeks have been reduced below five (5) days per week for more than twenty-six (26) weeks. For the purposes of determining whether 1000 or more hours have been worked, time lost during such 365 days due to an injury arising out of company employment, or due to jury or witness duty (Article XXVIII), or due to bereavement leave (Article XXIX), or due to absence from work while on a previous year's vacation or time lost while participating in national negotiations with the Company**,** or due to absence for excused Union business not to exceed 200 hours shall be added to the actual hours the employee worked at the rate of eight (8) hours per day but no more than forty (40) hours per week.

    An employee otherwise eligible, who on November 30 lacks 31 days or less of the required accumulated departmental seniority, will be deemed to have satisfied the seniority requirements for eligibility and for length of vacation.

    **2.**    An employee who in any calendar year obtains a leave of absence for the purpose of entering the Armed Forces, and who provides proof of having entered the Armed Forces in such year, will be credited with hours worked at the rate of eight (8) hours per day but not more than forty (40) hours per week during such leave up to the date of having entered the Armed Forces, for the purpose of determining whether 1000 hours have been worked during the immediately preceding 365 days, and will be credited with accumulated departmental seniority for the balance of such year for the

22

purpose of satisfying the seniority requirements for eligibility and length of vacation for that year.

An employee who after being honorably discharged from the Armed Forces is reinstated pursuant to the Company's Military Service Regulations, shall in the year of his reinstatement to active employment without regard to the hours or weeks worked requirement be entitled to a regular vacation.

**3.** Any employee otherwise entitled to a regular vacation pursuant to this Agreement in the calendar year in which he retires under the terms of the Pension Agreement between the Company and the Union, which makes him eligible for a special retirement payment, but who has not taken such vacation prior to the date of such retirement, shall not be required to take a regular vacation in that calendar year and shall not be entitled to regular vacation pay for that calendar year or in any subsequent year.

**B.** Length of Vacation

An eligible employee who has attained the years of accumulated departmental seniority indicated in the following table in any calendar year during the continuation of this Agreement shall receive a regular vacation (except as otherwise provided) corresponding to such years of accumulated departmental seniority as shown in the following table:

| Accumulated Departmental Seniority | Weeks of Regular Vacation |
|---|---|
| 1 year  but less than  3 years | 1 week |
| 3 years but less than 10 years | 2 weeks |
| 10 years but less than 17 years | 3 weeks |
| 17 years but less than 25 years | 4 weeks |
| 25 years or more | 5 weeks |

The vacation taken shall consist of consecutive days and shall include Sundays and holidays; however, vacations of two, three, or four weeks may consist of separate periods of one week each.

23

**C.**     Return from Vacation

Notwithstanding any provisions of Section 17, an employee who overstays his vacation leave without first notifying his plant management and securing permission for the extension, unless such notification proves to be impractical, may be subject to disciplinary action.

**D.**     Vacation Scheduling

**1.**     The vacation period shall be from January 1 to December 31, inclusive.

**2.**     Time lost by an employee for a period of at least an entire payroll week during the vacation period due to the necessity of reducing the working forces or due to bona fide sickness or injury or due to leave of absence may be applied to any regular vacation time to which such employee is entitled if the employee so requests.

**3.**     It is the intent and purpose of the Vacation Plan that all eligible employees shall receive benefit of a vacation from work.  However, the employee who is required to work instead of taking time off for regular vacation shall be entitled to vacation pay in addition to his regular pay provided he has not had time lost as described applied to all regular vacation time to which he is entitled.

**4.**     In light of the amount of regular vacations provided by this Article, the local Union and the local Management will meet as necessary to review vacation scheduling procedures for the purpose of arriving at mutually satisfactory scheduling arrangements.

**5.**     If no local agreement exists at a plant concerning vacation scheduling procedures, the following provision shall apply:

The employee shall take his vacation as scheduled by the Management but with consideration being given to the employee's wishes as to the time his vacation is to be scheduled.

24

**E.**     Reports

From time to time during the term of this Article, the Company shall furnish the Union on forms and at times to be agreed upon with such information as may be reasonably required for the purpose of enabling it to be properly informed concerning the operation of this Article.

**F.**     Vacation Pay

**1.**     The vacation pay for a vacation of one week shall be the employee's average hours worked per week (not less than 40 hours and not more than 48 hours) multiplied by the employee's average earnings per hour (exclusive of overtime earnings).  The vacation pay for 2, 3, etc., weeks shall be twice, three times, etc., that amount, respectively. The employee's average earnings per hour, as well as the employee's average hours worked per week are averaged over the last payroll quarter which ended 28 days or more prior to the date on which the vacation period begins or the date the vacation is considered as starting.  Excluded from such period will be any week in which a paid holiday is observed, or any week during which the employee receives jury or witness pay, or any week during which he was on a paid vacation.

Vacation pay computed on the basis of a payroll quarter prior to a general wage increase for a vacation, or portion thereof, scheduled after such wage increase in such year shall be adjusted for such increase for the vacation time taken after the effective date of the increase.  The adjustment will consist of the amount by which the hourly rate of the employee's payroll classification is increased as part of such general wage increase.  The adjustment so determined shall be added to those hours of vacation pay entitlement subject to adjustment.

A week shall be deemed to fall in the period in which it commences.

**2.**     The vacation pay will be paid as follows:

(a)     Vacation pay will be paid on the regular pay days for the period of the employee's vacation.  However, an employee may receive the remaining vacation pay in lump sum before he leaves for vacation time off provided such

25

request is made in writing to the Company at least one (1) week prior to the date his vacation is scheduled to start.

(b)     For the employee who requests that regular vacation be applied because of time lost or who works instead of taking time off, as described under D-2 and D-3, the vacation pay shall be paid him on the first regular pay day occurring not less than ten days following the date the employee makes such request.

(c)     In the event of death of an employee who was eligible for a vacation, the entire amount of vacation pay to which he would have been entitled shall be paid to his proper legal representative.

(d)     Any unpaid, accrued vacation will be paid out no earlier than the second payroll week in December for each calendar year covered by this Article.

**G.**     In the event of a war or other national emergency or federal legislation designed to reduce the normal work week below 40 hours, either party may notify the other of a desire to negotiate with respect to an appropriate modification of this Plan or its termination.  In the event of failure to agree within 120 days from such notice, if given as a result of the above-described type of federal legislation, the Plan shall remain in effect subject to the termination provision of the Agreement, but the parties shall be free to strike or lockout in support of their positions with respect to such matters (and no other) notwithstanding the provisions of any other agreement between the parties.

## ARTICLE VIII.  SENIORITY

**A.**     Company Seniority

The company seniority of an employee is measured by years, months, and days from his last date of hire at that Works location.

**B.**     Departmental Seniority

The departmental seniority of an employee in the bargaining unit covered by this Agreement is the sum of the

26

years, months, and days worked in his regular department, plus:

       a.     Absence up to ninety (90) days per calendar year caused by bona fide sickness or accident arising from causes outside his employment;

       b.     Leave of absence up to twenty-one (21) days per calendar year;

       c.     Leave of absence granted to an employee to permit him as a Union representative to negotiate with the Company;

       d.     Layoffs up to ninety (90) days due to lack of work;

       e.     Disciplinary layoffs of seven (7) days or less;

       f.     Absence caused by an occupational compensable injury.

       Except that in the case of an employee with five (5) years or more departmental seniority in the department from which he is absent, the time specified in a, b, and d above shall be a maximum of one year for any continuous absence even though the absence extends beyond one year.

       For the purpose of determining departmental seniority accumulation in the new department under a, b, and d above, employees who are placed in accordance with Article XII, C, will be considered as having in the new department the amount of departmental seniority held in his former regular (own) department.  This provision shall cease to apply whenever the employee has accumulated five (5) or more years of departmental seniority in the new department or voluntarily transfers to a different department, whichever occurs earlier.

       For employees who are required to change departments as a direct result of a combination of departments, creation of a new department, elimination of a department, or moving a job classification or portion thereof from one department to another department, departmental seniority in the new department will be the departmental seniority held in his

27

former regular (own) department. This Paragraph is applicable only in cases where employees are transferred within thirty (30) days following the effective date of the change unless this time limit is modified by mutual agreement.

For employees with ten (10) or more years of accumulated departmental seniority, who are required to change departments involuntarily, departmental seniority in the new department will be the departmental seniority held in their former regular (own) department.

Accumulated departmental seniority shall be the sum of an employee's departmental seniority in all departments of the Company, as determined in accordance with the provisions of this Article, and which has not been terminated as provided in this Article, provided, however, there shall be no pyramiding of departmental seniority in determination of accumulated departmental seniority.

**Section 17. Termination of Seniority**

Company seniority and departmental seniority shall terminate when the employee:

**A.** Quits for any reason;

**B.** Is dismissed or discharged for sufficient and reasonable cause;

**C.** Is absent without leave for a period of six (6) consecutive days or longer on which he is scheduled to work. The Company will notify the Union in writing of such termination. Should a grievance on such termination result, it may be filed initially at the second step of the grievance procedure;

**D.** Fails to report for work as provided for in Article XI;

**E.** Does not report his absence from work due to a bona fide case of sickness or accident arising from causes outside his employment before six (6) days elapse during which he does not report for work, unless such notification proves to be impractical. Should a grievance on such

28

termination result, it may be filed initially at the second step of the grievance procedure;

**F**.    For employees hired or rehired on or after July 1, 2010: is absent from work because of layoff for a period of five (5) years.

Departmental seniority will terminate as provided in other sections of this Agreement.

## Section 18.  Probationary Employees

For the purpose of good selection, the Company shall have the right to place employees on trial for their first seventy-five (75) days worked in order to determine whether they should be kept as an employee.  The Union shall have no right to contest a termination made within the probationary period.

For new employees hired on or after June 1, 2010 for the purpose of good selection, the Company shall have the right to place employees on trial for their first ninety (90) days worked in order to determine whether they should be kept as an employee.  The Union shall have no right to contest a termination made within the probationary period.

## Section 19.  Local Rules

Local rules dealing with seniority and local agreements applying seniority, may be negotiated by the local Management and the local Union, provided such rules and agreements must be consistent with this Agreement.  If such rules or agreements are in writing and signed by the parties, they will be part of the seniority agreements subject to Article II (Other Agreements) of this Agreement.  All such rules or agreements made after August 1, 1962, which are intended to be part of the Agreement shall be in writing, signed by the parties, and given to the Executive Board of the local Union.

## Section 20.  General

**A.**  As promptly as is reasonably possible, the Company will prepare and post in each department a list showing the company and departmental seniority of all employees in that department and will revise such lists at least

once every three (3) months. Copies of these seniority lists will be given to the local Union.

**B.** An employee's company seniority and departmental seniority, as accumulated prior to the date of this Agreement, shall not be in any way changed as a result of the seniority provisions of this Agreement, but commencing as of the date of this Agreement, additions to such company seniority and departmental seniority shall be determined by the application of the provisions of this Article.

### C. Union Officials – Representation

Top company seniority for the purpose of layoffs and restoration of forces shall be granted to local Union officials at each plant on the following basis:

**1.** The president, vice-president, grievance chairman, and other union officials (the latter not to exceed six(6)) regularly dealing directly with the grievance procedure or contract administration and one union representative involved in the administration of the grievance procedure for each one hundred (100) employees in the bargaining agency of the local Union. Each local union will provide works management with a certified list of such union officials. The total number so certified shall not be changed more often than every six (6) months.

**2.** The top company seniority provided in the foregoing shall be applied in the department in which the employee works. No such seniority shall be exercised unless the union official is capable of doing a job which is available in his department.

### ARTICLE IX. REDUCTION OF FORCES

**A.** If, due to a reduction in working forces or a reduction of hours worked in any department, an employee is to be demoted, seniority shall, subject to the exceptions in Article XII, determine which employee shall be demoted. Whether this shall be company or departmental seniority shall be in accordance with agreements between the local plant Management and the local Union, and after a period of ninety (90) days from the date of this Agreement, such local agreement shall not be changed during the life of the

30

Agreement.  In any event, when an employee is laid off in a reduction of forces in a department, company seniority shall govern, subject to the exceptions in Article XII.

**B.**      In the case of reduction of forces in any department, the employees laid off who have maintained their company seniority shall, if qualified and willing, be given preference in employment if available in other departments within the bargaining unit before new employees shall be hired in such other departments.

**C.**      An employee with one year or more of company seniority who is scheduled to be laid off, shall, upon request, be transferred to such other department of the Works as may be decided upon by the Company, provided that in the department to which he is to be transferred:

**1.**      There is work available which the employee is able to perform in a vacancy in one of the classifications listed in the attached Appendix II pertaining to the respective plant location provided there is no employee with greater company seniority then laid off from the Works, or

**2.**      His company seniority is greater than that of an employee working in one of the above-listed classifications, and he is able to do the job, in which case he will replace the employee with the least company seniority in such classifications.  An employee so transferred shall earn departmental seniority as of the date he starts work in the new department.

**D.**      Whenever a reduction of forces or a reduction in hours is necessary, the Company will post the names of the employees to be laid off at least three (3) days, excluding Sundays and holidays, prior to such reduction unless cancellation of orders, changes in customers' requirements, breakdown, accidents, or other emergency makes such notice impossible, in which case the Union will immediately be notified.  A copy of the posted list of employees to be laid off will be given to the local Union at the time of the posting. Any questions or grievance arising from such reduction of forces or hours shall, if possible, be presented within the three (3) day period of any such notice.

**E.**     An employee who has been laid off from his own department and transferred to a department other than his own in the course of a reduction in forces may select that other department as his own providing that the employee has been in that department for at least 30 consecutive days immediately prior to and inclusive of making such selection. The selection must be made in writing while the employee is classified in a job classification in that department.

Any such employees who make such a selection forfeit their seniority in their own department and the department in which they are then working becomes their own department.

**F.**     Where because of a change in process, downsizing or the permanent elimination of an entire operating unit or department or substantial portion thereof, an employee is to be displaced, the local Union and local Plant Management may agree upon such application or modification of this Article IX, (Reduction of Forces), as may be deemed suitable to that particular situation.

**G. 1.**  An employee laid off in any reduction of forces who has maintained his company seniority and for whom no suitable work is available within the bargaining unit within a reasonable period of time shall be given preference as a new employee for employment, if available, in other plants of the Company covered by this Agreement, if he so requests, such preference to be in order of company seniority.

**2.**     The probationary period of Section 18 shall be waived for an individual who is employed under the provisions of this paragraph.

**3.**     An employee so employed under the provisions of this paragraph shall retain departmental seniority accumulated under Article VIII, Paragraph B, in the plant from which he was laid off for the purpose of determining vacation entitlement under Article VII - Vacations, group insurance benefits under Article XXIII and SUB entitlement under Article XXII.  He shall also retain pension service as provided for in the Pension Agreement.

32

**H.**     Moving Expense

**1.**     An employee who is employed pursuant to Paragraph G above in a plant at least 50 miles from the plant from which he was laid off, and who changes his permanent residence as a result thereof, will receive a moving expense allowance promptly after the commencement of his employment at the plant to which he is relocated on the following terms:

(a)     He must make written request for such allowance in accordance with the procedure established by the Company.

(b)     The amount of the moving expense allowance will be determined in accordance with the following:

| Allowance for: Miles Between Plant Locations | Single Employees | Married Employees |
|---|---|---|
| 50 -   99 | $200 | $  600 |
| 100 -  299 | 250 | 650 |
| 300 -  499 | 300 | 750 |
| 500 -  999 | 350 | 950 |
| 1000 - 1999 | 450 | 1,200 |
| 2000 or more | 550 | 1,450 |

(c)     The amount of any such moving expense allowance will be reduced by the amount of any moving expense allowance or its equivalent to which the employee may be entitled under any present or future federal or state legislation; and the amount of such allowance shall be deducted from monies owed by the Company in the form of pay, vacation benefits, supplemental unemployment benefits, pensions, or other benefits if the employee quits, except as it shall be agreed locally that the employee had proper cause, or is discharged for cause any time during the 12 months following the start of such new job.

(d)     A married employee who moves residence without also moving his or her family will be provided the moving allowance for single employees.  In the event such employee later moves his or her family, he or she shall be paid

33

the difference between the single employee moving allowance and the married employee moving allowance.

(e)     Only one moving expense allowance will be paid to the members of a family living in the same residence.

(f)     Only one moving expense allowance, as covered by this Section, shall be allowed an employee in any twelve (12) month period.

## ARTICLE X.  JOB ASSIGNMENT

When an employee is assigned to a higher rated job, he will receive for each assignment the rate of such higher rated job for the time worked on that job or a minimum of one hour's pay at the higher rate, whichever is the greater.

Except in the case of a posted reduction of forces, which is considered a permanent assignment to a lower rated job, an employee who is temporarily assigned to a lower rated job will receive his regular hourly rate of pay for any such transfer of eight (8) working days or less.  For time beyond eight (8) days, the employee will receive the rate of the job to which he is temporarily assigned.

If an employee refuses or fails to accept an assignment of a job other than his regular one either in his own department or by transfer to some other department, he shall not lose his seniority in his own department.

## ARTICLE XI.  RECALL AND RESTORATION OF FORCES

A.     Employees who have been laid off in the course of a reduction of forces shall have recall and restoration rights according to the following procedure and order provided they are able to perform the work subject to Article XII (Exceptions to the Application of Seniority).

1.     Employees who have been previously laid off from their own department in the course of a reduction of forces and who are working in other departments of the Works shall be recalled to their own department in order of company seniority.  Any such employees who refuse to return to their own department forfeit their seniority in their own department

34

and the department in which they are then working becomes their own department.

**2.** All employees then in their own department who were previously classified in job classifications not listed in Appendix II applicable to each Works, and who left any such classifications for reason other than inability to satisfactorily perform the job, shall be restored to openings in those classifications on the basis of seniority. Whether this shall be company or departmental seniority shall be in accordance with agreements between the local plant Management and the local Union, and after a period of ninety (90) days from the date of this Agreement, such local agreement shall not be changed during the life of the Agreement.

**3.** Additional employees needed in that department shall be obtained by recalling employees who have been previously laid off and who are not working in the Works on the basis of company seniority. Any employees who return to their own department as a result of this recall, and were classified in job classifications not listed in Appendix II applicable to each Works, and left any such classifications for reason other than inability to satisfactorily perform the job, shall be restored to those classifications on the basis of seniority. Whether this shall be company or departmental seniority shall be in accordance with agreements between the local plant Management and the local Union, and after a period of ninety (90) days from the date of this Agreement, such local agreement shall not be changed during the life of the Agreement.

**4.** Any opening remaining in job classifications in that department shall be filled through the application of Article XIII (New Job or Vacancy).

**B.** As long as employees are laid off from their own department as a result of reduction of forces, job classification openings involving the addition of personnel to such department shall not be filled through the application of any other provision of this Agreement until the procedures of this Article XI (Recall and Restoration of Forces) have been exhausted. However, this Paragraph shall not prohibit daily assignments to other departments under circumstances in which laid-off employees would not normally be recalled.

35

C. When there is to be a recall or a restoration of forces, the Company will give notice either by registered mail or in person or by other adequate means to the individuals to be recalled or restored and will post in the department the names of the individuals as long in advance as conditions will permit. A copy of the posted list of employees to be recalled or restored will be given to the local Union at the time of the posting.

If an employee previously laid off due to a reduction of forces, and not then working in another department, does not report for work within seventy-two (72) hours (excluding Saturdays, Sundays, and holidays) after such notice is delivered or delivery has been attempted, he shall forfeit his place in that particular recall unless that particular recall is incomplete, but if within a period of ten (10) days after the first notice he so requests it, he shall be given a second and final consideration at the time of the next recall, if any. If an employee has followed the above procedure, he shall not lose his seniority status because of the layoff; otherwise, he shall lose his seniority.

D. Notwithstanding any other provision of this Agreement, this Article XI, Recall and Restoration of Forces, may be changed or modified by the local Management and the local Union, and when accepted by both parties and signed by the International Union, shall be in full force and effect as part of this Agreement.

## ARTICLE XII. EXCEPTIONS TO THE APPLICATION OF SENIORITY

A. The Company may hire, retain, or transfer an employee or recall a laid-off employee regardless of his seniority when and if the services of such employee are essential to the efficient operation of the plant because of his special training or ability, provided he is used on a job making use of such special training or ability and provided such job cannot be properly performed except by resort to this provision. When the Company desires to make use of this provision, the matter shall first be discussed with the Union.

B. In reductions or restorations of forces, an employee may be retained in or recalled to a job classification

when there is no other available employee with greater seniority who is presently qualified to perform the job classification under the conditions existing after the reduction of forces. This exception does not apply as to job classifications for which no training or particular qualifications are required. Local practices or agreements for methods of qualifying employees in connection with reduction of forces are not in conflict with this Paragraph.

**C.** The local plant Union and the local plant Management may mutually agree to assign or retain disabled or handicapped employees in jobs they are able to perform or place handicapped applicants selected by the Company in jobs they are able to perform without regard to seniority. Preference for placement or retention shall be given to handicapped employees whenever practical to do so. Neither party shall unreasonably withhold its approval of such placements or retentions proposed by the other party. No special seniority can be given or awarded to such a placed individual that is not now provided for in Article VIII, Seniority, of the Labor Agreement.

## ARTICLE XIII. NEW JOB OR VACANCY

### Section 21. Bidding Within the Department

When, as covered by this Agreement, a new job classification is created or a vacancy occurs in an existing classification in any department, it shall be posted in that department so that employees in that department may bid for it. Consideration shall be given on the basis of departmental seniority to employees who have bid and are qualified candidates for the job. Such consideration shall be in the following order:

First, to employees in a higher classification in the same line of progression and in a classification horizontally connected within the same line of progression.

Second, to employees in the classification next below the one in which the vacancy exists, and so on down, in accordance with existing lines of progression.

Third, if the vacancy is not filled from employees in the line of progression or if there is no existing line of

37

progression covering the classification, then such consideration shall be given in like manner to other employees in the department.

In a case where a trial on the job is necessary to find out whether the employee with greatest departmental seniority who bid on the vacancy is a qualified candidate for the job then such employee shall, if he or the Company so requests, be given a trial. If such trial shows he is not a qualified candidate for the job, he shall be placed back on his former job without loss of seniority and the next qualified employee who has bid will fill the vacancy. Such a request for a trial must be made within four (4) days after the four (4) day bidding period.

Employees in the department where the vacancy exists will have the right for four (4) days from the date of posting (excluding Sundays and holidays) to bid on the vacancy. The vacancy will remain posted for such period unless adequate bids are obtained sooner.

If, for the period of the posting there is an employee absent on vacation or sick leave or local Union representative on leave of absence under Article VIII, Paragraph B, subparagraph c, with greater departmental seniority than any employee who had bid, and who may be qualified to fill the vacancy, the Company may either:

(a) keep the bid open for such employee on sick leave for twenty-one (21) days or for four (4) days following his return from sick leave, whichever is the lesser, or

(b) for the employee on vacation or on union leave, as described above, keep the bid open for four (4) days beyond the time of his return, or

(c) contact such employee and require him to state whether he wants his name entered as bidding on the vacancy.

**Section 22. Filling the Vacancy From Without the Department**

After such posting period, if the vacancy is not filled from within the department, consideration will then be given to applicants for transfer from other departments. Such consideration shall be on the basis of company seniority. If

there are no such applicants, or no applicant is properly qualified, the vacancy will be filled in any suitable manner.

## ARTICLE XIV.  LEAVES OF ABSENCE

When the requirements of the plant will permit, an employee shall, on his request and for reasonable cause, be granted leave of absence without pay for a limited time with the privilege of renewal.  An employee absent on leave who, without the consent of the Company and the local Union engages in other employment, will be considered as having quit without notice.  Notwithstanding any provision of Section 17 (Termination of Seniority), any employee who overstays a leave of absence without first notifying his plant Management and securing permission for an extension, unless such notification proves to be impractical, may be subject to disciplinary action.

The Company agrees to notify the Union in writing of the granting of any leave of absence, as well as the reason therefore where such leave of absence is greater than thirty (30) days' duration, or of the extension of any leave of absence and the reason for extension of such leave of absence where the total leave is to be greater than thirty (30) days' duration.

Any employee who was duly elected or selected by the Union to an office of the Union and is on a leave of absence without pay for the period of the term of office, as of August 1, 1962, shall not have his company seniority broken and his departmental seniority shall accumulate from August 1, 1962, for the remaining period of his leave in accordance with Article VIII, Paragraph B, Departmental Seniority, as though he were on layoff from the bargaining unit.

Any employee who after August 1, 1962, is duly elected or selected by the Union to an office of the Union, shall be granted upon request a leave of absence without pay for the period of the term of office.  During such leave of absence, the employee's company seniority shall not be broken and his departmental seniority shall accumulate in accordance with Article VIII, Paragraph B, Departmental Seniority, as though he were on layoff from the bargaining unit.  An employee elected or selected as the full-time local Union business agent, or its equivalent (not to exceed one), at plant

39

locations where that position is now occupied or is occupied during the term of the Labor Agreement shall, beginning June 1, 1971, or the date of the start of his leave of absence for such purpose, whichever is later, continue to accumulate departmental seniority only for determining vacation and pension service while he is serving in that capacity and dealing exclusively with matters relative to the local Union representing employees from the plant where his departmental seniority has accrued.

## ARTICLE XV.  NON-DISCRIMINATION

There shall be no discrimination at the time of employment against any prospective employee, nor after employment, by supervisors, superintendents, or any other person in the employ of the Company against any employee because of membership or non-membership in the Union.

It is the continuing policy of the Company and Union that the provisions of this Agreement shall be applied to all employees without regard to race, color, religion, national origin, handicap, Vietnam era service, sex or age, except where sex or age is a bona fide occupational qualification.

Wherever in this Agreement the male or female pronoun is used, such use is intended to apply equally to males and females.

## ARTICLE XVI.  LAYOFF, DISMISSAL, ETC.

When an employee is given a disciplinary penalty involving layoff, dismissal, or discharge, a Union representative will be notified promptly of such action and the reasons therefore.  If the discipline involves dismissal, discharge, or layoff in excess of three (3) days, such notice shall be confirmed in writing as promptly as possible.

A disciplinary layoff in excess of three (3) days, dismissal or discharge shall be preceded by a three (3) day suspension period.  Notification of the full extent of the discipline will be given after the first day but before the end of the three (3) day disciplinary suspension period.  A grievance arising out of a dismissal or discharge may be filed initially at the second step of the grievance procedure.

At each plant, disciplinary suspensions of three (3) days or less for absenteeism or tardiness shall be administrative in nature and shall not result in the affected employee being removed from active work without pay. Disciplinary action of this nature will become a part of the employee's personnel record and will be considered when determining future disciplinary action for the employee. The parties agree that the administrative nature of this discipline does not minimize the impact of the disciplinary action or the need for correction of employee conduct.

If it is determined that disciplinary action was not for proper and just cause, the penalty may be modified or rescinded and restitution of pay may be made within the terms of the grievance procedure and arbitration.

## ARTICLE XVII. INCOMPLETE DAY'S WORK

An employee called to work shall receive not less than eight (8) hours' pay at his regular hourly rate. An employee permitted to come to work at the beginning of his shift without having been notified that there will be no work for him shall receive not less than four (4) hours' pay at his regular hourly rate if he is not put to work, but not less than his regularly scheduled hours of work (not to exceed eight [8] hours) at his regular hourly rate if he is put to work, except in cases resulting from labor disputes.

## ARTICLE XVIII. PROCEDURE FOR HANDLING GRIEVANCES

### Section 23. Grievance Procedure

Should an employee (or former employee within ten [10] working days of his dismissal, discharge, or layoff) feel that he has been treated unjustly, he or his Union representative or representatives may present his grievance to the proper representative of the Company who will give it prompt and thorough consideration. This may include any difference of opinion or dispute between representatives of the Company and the Union representatives regarding interpretation or operation of any provision of this Agreement.

41

An employee's request for grievance representation will be given prompt attention. An effort will be made to obtain a steward as promptly as operating conditions permit.

1. Such grievance shall first be taken up with the appropriate Company department representative(s). Failing satisfactory settlement within three (3) days after the final hearing at this step,

2. The grievance may then be appealed to the highest ranking local representative(s) designated by the Company who shall give an answer within fourteen (14) days.

3. Should such highest ranking local representative of the Company and the Union fail to agree, the grievance in writing may be appealed to the president or other general executive of the Company. **T**he Company shall within **sixty (60)** days after receipt of the appeal to the third step, contact the Union for the purpose of setting a hearing date. Grievances heard at Step 3 shall be answered within forty-five (45) days of the hearing.

All requests for hearings with such local representatives of the Company shall be granted as soon as possible, and in no event later than the following (unless further time is mutually agreed upon):

First Step, two (2) days after first presented.

Second Step, five (5) days after appeal from first step.

All grievances appealed beyond the first step shall be reduced to writing by the Union and all answers thereto by the Company beyond the first step shall be in writing.

All such local plant conferences between any employee and his Union representative or representatives and the local plant Management, which must be held at the local plant during his or her regular working hours, shall be without loss of time to any such employees, provided that not more than two (2) such employees from any one department shall thus leave their work at any one time.

42

The local Union and local Management may agree to such modifications of the first two steps of the grievance as may be appropriate for local conditions.

### Section 24.  Limitations

No wage claim shall be allowed retroactively prior to the date the grievance thereon is presented unless it was not reasonably possible for the claimant to know he had grounds for such claim and in such case shall not be valid for any period greater than thirty (30) days prior to the date the grievance is presented.

If a grievance is not appealed within two weeks from the date a written reply is received at any step, back pay will not accumulate for the time elapsing between the end of such two-week period and the time the appeal is made.

The appeal of grievances to the second or third step of the grievance procedure must be made within ninety (90) days of the receipt of the answer at the previous step.  Grievances appealed after the expiration of such ninety (90) day period will not be processed further except by mutual agreement.

Should the Company fail to comply with the time limitations on hearings or answers at the second step of the grievance procedure, the Union may appeal the grievance to the third step unless the parties agree to an extension of time.

A grievance heard at the third step which is subject to arbitration pursuant to Article XIX may be submitted to arbitration within thirty (30) days of the third step answer or upon expiration of the time in which such answer is due, whichever is earlier.

A retroactive date may or may not be fixed within these limitations.

### Section 25.  Access to Plants

An International representative of the Union shall be granted access to the plants of the Company for the purpose of investigating grievances which are being considered by the Union and the Company at the second or third step of the grievance procedure provided such investigations do not

43

conflict with any government regulations and are in accordance with general rules agreed upon by the Company and the Union.

## ARTICLE XIX.  ARBITRATION

### Section 26.  Scope

Not all grievances are subject to arbitration.  The scope of arbitration and the jurisdiction of the Board of Arbitration are defined in Section 31.

Grievances may be submitted to arbitration by either party after the grievance procedure has been exhausted subject to the following principles and procedure.

### Section 27.  Board of Arbitration

A Board of Arbitration is hereby created consisting of one representative of the International Union, one representative of the Company, and a third party, wholly disinterested, to be appointed by them for such period of time and upon such financial and other terms as may be agreed upon.  Such third party shall be entitled the Umpire.

### Section 28.  Duties of Board

It shall be the duty of the Board to hear disputes on subjects within its jurisdiction certified to it by the Union or the Company after the grievance procedure of the Agreement has been exhausted.  Such hearings shall be held in the following designated locations unless the local parties mutually agree to an alternate location:

| | | |
|---|---|---|
| Massena | - | Syracuse, NY |
| Warrick | - | Louisville, KY |

The Board may, by unanimous vote, designate an agent or agents to hear a case or cases at any Company location and to report such cases in full to the Board with findings of fact, conclusions, and recommendations which the Board shall upon review adopt, reject, or modify.  Grievances concerning termination of seniority under Section 17, Paragraphs C and E and grievances concerning dismissal or discharge under Article XVI shall be given first priority for hearing.

44

Grievances involving continuing liability or other significant issues may be given priority for hearing by agreement between the parties. Both parties will exercise reason and sound judgment in jointly determining whether such grievances should be given priority.

## Section 29. Awards

All decisions or awards of the Board shall be made by majority vote and shall be issued under the sole signature of the Umpire.

Any arbitration decision for dismissal, discharge, and termination grievances must be rendered within 45 days after receipt of the transcript of hearing and any post-hearing submissions.

## Section 30. Finality of Awards

The decisions and awards of the Board shall be final and binding upon the parties.

## Section 31. Jurisdiction of Board

**A.** The Board shall regard the provisions of this Agreement as the basic principles and fundamental law governing the relationship of the parties. The Board's function is to interpret the provisions of the Agreement and to decide cases of alleged violation of such provisions. The Board shall not supplement, enlarge, diminish, or alter the scope or meaning of the Agreement as it exists from time to time, or any provisions therein, nor entertain jurisdiction of any subject matter not covered thereby (except to the extent necessary to determine its jurisdiction). Without limiting the foregoing, the subjects of wages (including incentives) and production standards are by this Section excluded from arbitration, except that wage rates are arbitrable for new or changed job classifications under Article V of this Agreement, and except that questions of compliance with Article IV (Continuation of Wage Rates) are arbitrable.

**B.** Whenever the Board may determine that the subject of a dispute is, or a decision or award thereon would be beyond the Board's jurisdiction, or would contravene this Section 31, it shall dispose of the case by reducing such

45

determination to writing and may then refer the dispute to the parties.

  **C.** The Board shall not take jurisdiction of any dispute or grievance arising under any prior agreements.

## Section 32.  Costs

  The compensation and expenses of the Board representative of each party shall be borne by such party.  The compensation and expenses of the Umpire and any agents designated by the Board to hear cases shall be borne equally by the parties.

  Interest shall be added to back pay awards granted by the Board of Arbitration which are not paid within thirty (30) working days from the date the Company receives the decision.  Such interest at the then prime rate, will begin to accrue on the thirty-first (31st) day unless the Company is able to demonstrate the need for additional time to assemble the necessary data to compute the back pay award in which case such thirty (30) day period will commence with the date the data is available.  Where it is necessary to obtain a clarification of the Board's decision such thirty (30) day period will commence with the date the Company receives clarification of the award.

## Section 33.  Rules

  The Board may by unanimous vote make such rules and regulations for the conduct of its business as do not conflict with these provisions.

## Section 34.  Agreement Against Strikes or Lockouts

  As to any disputes subject to arbitration, the Union agrees that it will not cause nor will its members take part in any strike or work stoppage, and the Company agrees that it will not cause any lockout.

  As to any dispute not subject to arbitration, no strike, work stoppage, or lockout will be caused or sanctioned until negotiations have continued for at least five (5) days at the final step of the bargaining procedure described in Article XVIII (Procedure for Handling Grievances).  Thereafter, any

strike which occurs under such circumstances shall not be deemed to be a violation of this Agreement, which shall continue to remain in full force notwithstanding such strike.

During the life of this Agreement the Union will not cause nor will its members take part in any slow-down or similar interference with production.

The Union agrees that the Company has the right to discipline or discharge anyone guilty of violating the provisions of this Section. In the event of an appeal to the Board of Arbitration of a grievance involving action taken under this paragraph, the Board shall have the right in its discretion to affirm, reverse, or modify the disciplinary penalty.

## ARTICLE XX. MILITARY SERVICE

**A.** The Company agrees to comply with all applicable federal laws relating to the reemployment rights of veterans.

**B.** An employee entitled to reinstatement under this Article who applies for reemployment and who desires to pursue a course of study in accordance with the federal law granting him such opportunity before or after returning to his employment with the Company shall be granted a leave of absence for such purpose.

## ARTICLE XXI. SUPERVISORS

Supervisors shall act in a supervisory capacity and shall not perform work so as to replace regular workers or operators on the job. Superintendents or other supervisors, however, will perform such work, when necessary to instruct other employees, and will perform experimental, development and other research work as may be deemed necessary by the Company. This paragraph does not apply to leaders, gang leaders, and similar squad leaders.

### Section 35. Seniority and Return to Bargaining Unit

Employees who have been promoted to any supervisory jobs from production and maintenance units whose employees are part of the bargaining unit and who are

47

subsequently returned shall be deemed to have seniority and be placed as follows:

**A.**     Company Seniority

In accordance with the terms of this Agreement.

**B.**     Departmental Seniority

**1.**     All employees promoted prior to December 19, 1959, and all employees promoted between December 19, 1959, and August 1, 1962, who at the time of their promotion had accumulated three (3) or more years of company seniority, shall be deemed to have and accumulate departmental seniority in the department in which they are working as supervisors, and to have lost or retained such departmental seniority in case of transfer to another department, in accordance with the provisions of this Agreement, except that such departmental seniority will not be deemed to accumulate in relation to those employees in the department with more company seniority while such employees are laid off beyond the time limitations specified in Article VIII (Seniority), Paragraph B.

**2.**     All employees promoted between December 19, 1959, and August 1, 1962, who at the time of their promotion had accumulated less than three (3) years of company seniority and all employees promoted subsequent to August 1, 1962, shall be deemed to have departmental seniority in accordance with Article VIII (Seniority), Paragraph B, as though they had been on layoff from the bargaining unit.

**C.**     Persons who have not been employees in classifications included in the bargaining unit shall not be deemed to have any company seniority or departmental seniority for the purpose of this Section 35.

**D.**     Placement Upon Return to Bargaining Unit

**1.**     An employee promoted prior to December 19, 1959, and an employee promoted between December 19, 1959, and August 1, 1962, who at the time of his promotion had accumulated three (3) or more years of company seniority,

48

who is demoted from his supervisory position shall be returned to the production or maintenance unit in which he is then working in such supervisory position, and he shall be placed on the job classification in such department to which his seniority entitles him and on which he previously worked, or if he has not worked on any such classification, then on the lowest classification.

2.      An employee promoted between December 19, 1959, and August 1, 1962, who at the time of his promotion had accumulated less than three (3) years of company seniority and an employee promoted subsequent to August 1, 1962, and prior to June 1, 1965, who is demoted from his supervisory position shall be returned to the department from which he was promoted and placed on a job classification to which his seniority entitles him.

3.      An employee promoted on or subsequent to June 1, 1965, but before June 1, 1974, who is demoted from his supervisory position shall be returned to the department from which he was promoted and placed on the lowest job classification then occupied in the department providing his seniority entitles him to such classification, or to a higher classification provided such placement would not involve the displacement of another employee in that classification.

4.      An employee promoted on or subsequent to June 1, 1974, who is demoted from his supervisory position shall be returned to the department from which he was promoted and placed on the lowest job classification then manned in the department providing his seniority entitles him to such classification.

5.      An employee promoted on or after June 1, 1993, who is demoted from a supervisory position, shall be returned to the department from which she was promoted and placed in the lowest job classification then populated in the department providing such placement does not involve the displacement of another employee in the classification.  For the purpose of reduction in forces, the company seniority date for such employee shall be the date of her return to the bargaining unit.

6.      An employee demoted under this Paragraph D who does not have sufficient seniority to remain in such

49

department, shall have rights under Article IX, Paragraph C. Subsequent to such return and placement, the provisions of Article XI, Recall and Restoration of Forces, shall apply to the employee so demoted.

## ARTICLE XXII.  SUPPLEMENTAL UNEMPLOYMENT BENEFITS

This Supplemental Unemployment Benefits Plan is designed to provide a covered employee who becomes wholly or partially unemployed (a) Weekly Benefits to provide income while he is on layoff, and (b) Short Week Benefits for any week in which he is partially unemployed, that is, he works some but less than 32 hours for the Company.

A three-tiered program is established wherein employees **are** grouped depending upon their years of accumulated departmental seniority.  The Tier I Group comprises those employees who have 2 but less than 10 years of accumulated departmental seniority; the Tier II group comprises those employees who have 10 but less than 20 years of accumulated departmental seniority; and the Tier III group comprises those employees who have 20 or more years of accumulated departmental seniority.

### Section 36.  Weekly Benefits

**1.**      Weekly Supplemental Unemployment Benefits shall be payable to employees covered by this Agreement who have two or more years accumulated departmental seniority at the beginning of the layoff.  For purposes of this Article, an employee shall be considered as having been laid off in any week in which, because of lack of work, he is not scheduled or assigned to work for the Company.

**2.**      A layoff shall not include one occasioned by (a) disciplinary reasons; (b) a strike, slow down, work stoppage, picketing, or other labor dispute involving any employee or group of employees of the Company**,** at the Company's plant, or involving the Union whether at the Company's plant or elsewhere; or (c) a hostile act of any foreign government.

**3.**      To qualify for a weekly supplemental benefit in any week, the laid-off employee shall:

 (a) be eligible for a state unemployment benefit (including any state requirement for application) except:

 (i) as the length of layoff may exceed the duration of such state benefits to which he is entitled,

 (ii) if he is compensated or receives a public or private pension payment (other than a pension payment wholly or partially financed by the Company) in an amount which disqualifies him for state benefits,

 (iii) if he is on layoff on account of a shutdown of the plant or department for vacation purposes and is ineligible for vacation pay,

 (iv) if he did not have a sufficient period of work in employment covered by the state system,

 (v) if he fails to receive a state unemployment benefit because he is not physically able to work provided he became disabled while on layoff and after sickness and accident coverage ceased under Article XXIII, and he supplies the same certification of disability as would be required for sickness and accident benefits if such coverage had not ceased.  Any disability benefit paid under or pursuant to a state or federal law with respect to the period for which a Weekly Benefit is paid under this paragraph shall for the purposes of this Article be deemed to be a state unemployment benefit.

 (vi) if he does not receive a state unemployment benefit solely because he is participating in a training program established under or pursuant to federal law.  In such case any income received by him under that program shall be deemed to be a state unemployment benefit.

 (b) have made application for benefits from the Company no later than during the week following the week for which benefits are payable, at a time and place designated by the Company.  The place at which reporting and applying are required will be at or near the location where the employee was last employed.  If such place is an unreasonable distance from the employee's residence, or if he leaves the area to seek work, the Company shall, upon request of the employee in

person, grant permission to report at another company location where an adequate office for such reporting is maintained. If no such office is within reasonable distance, the Company shall, upon request of the employee in person, grant permission to report and apply by mail. An employee applying for a Weekly Benefit pursuant to Paragraph 3 (a) (v) may report and apply by mail. The necessary forms and instructions for making S.U.B. applications by mail shall be supplied by the Company to the employee at the time his request for mail reporting is granted. No employee shall receive a Weekly Benefit until he shows that he received a state unemployment benefit for the week or failed to receive such benefit for a reason which does not disqualify him from receiving a Weekly Benefit. This may be done by showing a state check or by some other method, which must reasonably provide for securing such proof.

      (c)    not be receiving or claiming any sickness or accident or disability benefit, or any pension or retirement benefit wholly or partially financed by the Company, for which he is eligible.

      (d)    not be receiving a week's vacation pay.

      (e)    not be in military service (including training encampments).

      **4.**    Weekly Benefits shall be payable to employees meeting the qualifications of Paragraph 1 and who have not been on continuous layoff for more than two years for periods of layoff not to exceed their weeks of benefits eligibility. The maximum number of weeks of benefits eligibility shall be 52 weeks for Tier I employees, 78 weeks for Tier II employees, and 104 weeks for Tier III employees**; (except as provided in paragraph 11(a) and (b) except however, an employee shall not be eligible for benefits in excess of 52 weeks if such employee has refused to accept an assignment to any appropriate work at the work location where employed**).

      Employees who complete either 10 years of accumulated departmental seniority or 20 years of accumulated departmental seniority shall have their weeks of benefits eligibility increased by 26 at the time they complete each such seniority **provided they are actively at work on that date. If not actively at work on that date, weeks of**

**benefits eligibility shall be so increased at the time such employee returns to active work..**

**For purposes of this Article XXII the phrase "actively at work" means an employee is present at work for the Company. "Actively at work" shall also include an employee who is on vacation scheduled under the Vacation Plan of the Company or is absent from work because of a paid holiday, a paid jury or witness day, a paid bereavement day, a short-term absence due to authorized local union business or an off day within the employee's working schedule provided in all cases such employee was present at work on the last scheduled working day immediately preceding such vacation or absence listed above.**

If an employee is recalled to work, his remaining weeks of benefits eligibility in any subsequent layoffs shall be increased to his Tier maximum at a rate of one-half week for each week thereafter in which he has any of the following hours:

(a)     Hours worked for the Company,

(b)     Hours not worked but for which he is paid, such as vacation hours or hours for which he received jury or witness pay or bereavement pay,

(c)     Hours not worked and not paid for but which were lost because:

(i)     he was performing his duties as a member of the Grievance Committee, or president, vice-president, recording secretary, financial secretary and/or treasurer of a local of the Union which is his collective bargaining representative, or

(ii)     he was absent because of disability for which benefits are payable under a Workers' Compensation or Occupational Disease law or the Company Program of Insurance Benefits.

An employee who receives benefits which are reduced under Paragraph 6 shall be deemed to have used only three-quarters of a week of eligibility unless his benefit was so

53

reduced by one-half or more, in which case he shall be deemed to have used only one-quarter of a week's eligibility. Any employee having less than a full week's eligibility for any week shall be entitled to receive a proportionate benefit for such week.

**5.** (a) The amount of an employee's Weekly Benefit (subject to the provisions of Paragraph 6 through 10 of this Section) shall be **40** hours times the employee's **Standard Hourly Rate for the job grade worked immediately prior to the layoff and multiplied by the applicable percentage shown in the following table:**

| Years of Accumulated Department Seniority | Duration of Benefits, in Weeks | | | |
|---|---|---|---|---|
| | 1-26 | 27-52 | 53-78 | 79-104 |
| 2 but less than 10 | 60% | 40% | | |
| 10 but less than 20 | 80% | 70% | 50% | |
| 20 and over | 90% | 70% | 50% | 50% |

**M**inus the amount of the state unemployment benefit the employee receives or, if he is only partially unemployed, the amount he would have received for that week if totally unemployed.

(b) In the application of (a) above, the following shall apply (subject to the provisions of Paragraphs 6 through 10 of this Section) in cases where the employee's state unemployment benefit is reduced or eliminated because of the receipt of a public or private pension.

(i) Where the employee's state unemployment benefit is reduced solely because of the receipt of a public or private pension, the Weekly Benefit shall be **the same as determined in 5.(a) above** at the time of layoff minus the amount of state unemployment benefit received.

(ii) Where the employee's state unemployment benefit is eliminated solely because of the receipt of a public or private pension and the employee is not in receipt of compensation, the Weekly Benefit shall be **the same as determined in 5.(a) above,** at the time of layoff.

54

(iii)     Where the employee's state unemployment benefit is eliminated because of the receipt of a public or private pension and compensation, but the employee would not have otherwise been disqualified for a state unemployment benefit because of receipt of compensation, the Weekly Benefit shall be as computed in (a) above plus that portion of the public or private pension used in the reduction of the state unemployment benefit.

(iv)     Where the employee's state unemployment benefit is eliminated because of the receipt of a public or private pension but the employee would have otherwise been disqualified for a state unemployment benefit because of the receipt of compensation, the Weekly Benefit shall be as computed in Paragraph 6 (a).

(c)     In the event that Trade Readjustment Act benefits are payable to an employee who is also receiving a state unemployment benefit, such T.R.A. benefits shall not be deducted from the employee's Weekly Benefit.  In those weeks for which no state unemployment benefits are payable, such T.R.A. benefit shall be deducted but limited to the amount of a full state unemployment benefit if it had been payable, assuming the employee in all respects is otherwise qualified for the state unemployment benefit.

**6.** (a)   An employee who is or would be disqualified for state unemployment benefits solely because of the receipt of compensation shall have his benefit as computed in Paragraph 5.**(a)** reduced by the amount by which his compensation exceeds the sum of:

(i)     the state unemployment benefit he would have received for that week if totally unemployed.

(b)     An employee who is or would be ineligible for state unemployment benefits, for a reason other than the receipt of compensation, shall receive a Weekly Benefit equal to the sum of the state unemployment benefit, if any, and the Weekly Benefit which he would have received under Paragraph 5, or subparagraph (a) of this Paragraph 6, except for his ineligibility for a state benefit.

**7.**     The amount of benefits to which a part-time employee is entitled shall be computed as above, except the **40**

55

hours shall be reduced in the proportion that the part-time employee's regularly scheduled hours per week bear to 40. A part-time employee is an employee who, for his own convenience, works less than the regularly scheduled hours.

     **8.**    Notwithstanding the above, an employee who receives a state unemployment benefit, or is ineligible for such benefit solely because of the receipt of compensation or a public or private pension payment as set forth in Paragraph 3 (a) (ii), shall have his Weekly Benefit calculated without a maximum benefit limit. In other weeks, the maximum Weekly Benefit for employees in Tier I, Tier II and Tier III there shall be no maximum Weekly Benefit.

     In case of an employee who accumulates two years' departmental seniority after he has established a state benefit year, he shall be deemed to receive state unemployment benefits for the number of weeks subsequent to his exhaustion of state benefits equal to the number of weeks in that benefit year in which he received state benefits although not yet eligible under this Agreement.

     **9.**    In such instances as the Company determines that state unemployment benefits are not payable to an eligible employee because of the receipt of such supplemental unemployment benefits from the Company, the Company and Union shall determine a suitable alternate method of payment. Such method of payment shall be effective as of the date of the Company's determination that supplementation is not permitted.

     **10. (a) If an employee who would be eligible for a Rule of 65 Retirement under the Pension Agreement effective June 1, 1996, except for the fact that the Company has not yet determined whether he will be offered "Suitable Long-Term Employment" (SLTE) as defined in Appendix A of such Pension Agreement exhausts his weeks of benefits eligibility, the Company shall grant the employee weeks of benefits eligibility to provide Weekly Benefits for which the employee may otherwise be eligible for whatever period of time that it may require to offer SLTE or to determine not to offer SLTE.**

**(b)**      **If an employee who is otherwise eligible or could become eligible for a Rule of 65 Retirement accepts an offer of SLTE at an employment location included in Group A or B of Table IV of the Pension Agreement effective June 1, 1996, and is subsequently laid off at any time during the two-year period following the date on which he starts work at the new employment work location, the employee will be afforded the following additional protection.  If the employee's weeks of benefits eligibility become exhausted, the Company will grant whatever additional weeks of benefits eligibility may be necessary to permit continuation of any Weekly Benefits for which the employee may be otherwise eligible during such layoff.**

**11.**      No weekly benefit of less than $2.00 will be paid, nor will any week of eligibility, or fraction thereof, be canceled for any week in which the Weekly Benefit would have been less than $2.00.

**12.**      An employee is not eligible to receive a Weekly or Short Week Benefit if he receives, or is eligible to receive, a similar benefit under an arrangement provided by an employer with whom he has more service than with the Company.

**13. If pursuant to any federal law, or the law of any state or political subdivision, an employee receives or would be eligible to receive any benefit or payment because of layoff or employment displacement resultant from an energy crisis, such benefit or payment shall be considered and treated as State Unemployment Compensation for the purpose of this Article.**

**14.**      **Effective as soon as can be administratively arranged, the applicable active employee weekly premiums for medical and prescription drug coverage will be deducted by from the Weekly Benefit for the period that such benefits continue during layoff. Thereafter, an employee may be required to pay the applicable active employee premiums for the remaining period she/he is eligible for the continuation of medical and prescription drug coverage during his/her absence.**

**Section 37. Short Week Benefits**

    **1.**    An employee having two or more years of accumulated departmental seniority will receive a Short Week Benefit from the Company for any week in which some but less than 32 hours are worked for the Company, unless the sum of the hours described in Paragraph 2 below equals or exceeds 32.

    **2.**    A Short Week Benefit for a particular week will be calculated by multiplying the employee's standard hourly wage rate by the difference between 32 and the sum of the hours:

    (a)    He worked in the week, and

    (b)    He did not work but for which he was paid by the Company, provided, however, that effective January 1, 1978, for weeks containing more than one holiday, hours for which he was paid for one unworked holiday shall not be counted, and

    (c)    He did not work for reasons other than lack of work.

    **3.**    If the employee applies for a state unemployment benefit for any portion of the week, he must notify the Company of such application and of the total amount of any such benefit received.  One-seventh of the amount of such state unemployment benefit will be deducted from the amount calculated in accordance with Paragraph 2 above for each day of the state benefit week which falls within the payroll week for which the Short Week Benefit is paid.

    **4.**    A Short Week Benefit will be paid to the employee, without application by him, for any week for which he qualifies.

    **5.**    One-half week of eligibility will be canceled for each Short Week Benefit.

    **6.**    If pursuant to any federal law, or the law of any state or political subdivision, an employee receives or would be eligible to receive any benefit or payment because of layoff or employment displacement resultant from an energy crisis,

58

such benefit or payment shall be considered and treated as State Unemployment Compensation for the purpose of this Article.

**Section 38.  Finances**

      **1.**      **Weekly and Short Week Benefits shall be paid directly by the Company.**

      **2.**      All payments shall be made from the general assets of the Company.

      **3.**      Withholding Provision.  If the Company at any time shall be required to withhold any amount from any payment of benefits, by reason of any federal, state, county, or municipal law or regulation, the Company shall have the right to deduct such amount from such payment.

      **4.**      Disputes arising from the application of supplemental unemployment benefits shall be initiated at the second step of the grievance procedure.

## ARTICLE XXIII.  GROUP INSURANCE

      Medical Benefits, Prescription Drug Benefits, Dental Benefits, and Vision Benefits will be provided to eligible active employees and their eligible dependents. The Company will provide Sickness and Accident, Life Insurance, and Accidental Death and Dismemberment benefits to eligible active employees.  The Company will also provide Medical and Prescription Drug Benefits to eligible retirees, surviving spouses, and their eligible dependents and Life Insurance to eligible retirees.

      Separate booklets describing these benefits are incorporated herein and made a part of this Agreement. Effective January 1, **2020**, the agreed upon modifications to all Group Insurance benefits will become effective and incorporated into plan booklets.

### General Provisions Applicable to Article XXIII

      **1.**      It is agreed that if subsequent governmental legislation provides for the reduction or elimination of the

premium for Medicare Part B for any person, the Company shall make a corresponding reduction or elimination to the benefit payment for such Medicare premium for that person and such governmental action shall not require further modification or adjustment in this Article.

2.      It is intended that the provisions for benefits in this Article shall comply with and be in substitution for provisions for similar benefits which are, or shall be, made by any law or laws.  Amounts paid by the Company for such similar benefits either as contributions, taxes, or benefits under any law or laws providing non-occupational insurance benefits shall reduce to that extent the amounts the Company shall pay under this Article and appropriate readjustment shall likewise be made in the benefits.

3.      Unless otherwise provided in this Article, the parties will meet and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein.

4.      Upon the request of either the Company or the International Union, the parties will jointly study the health care program provided by a Health Maintenance Organization Plan (HMO) in any area.  Furthermore, if desired by the International Union, the parties will also jointly study the health care program provided by a qualified Health Maintenance Organization plan that presents to the Company an appropriate request for inclusion in this plan.  A mutual agreement will be sought as to the desirability of providing at no additional cost to the Company an individual choice between an employee's coverage under this Article and similar coverages provided by the Health Maintenance Organization plan under study.  The Company and the International Union will make a mutual determination of the costs in such area of the hospital-surgical-medical benefits provided for individuals by this Article and the costs for individuals of participation in such HMO plan.  In the event the parties agree to provide such an individual choice, then with respect to employees who choose participation in such HMO plan, the Company will deduct from the pay of each such employee the amount, if any, by which the cost of such employee's participation in such plan exceeds the cost in such area of the Managed Care Medical benefits theretofore provided for such employee by

60

this Article, as above determined, and the Company will pay to such plan the cost of such employee's participation in such plan. The parties agree that they will not unreasonably withhold agreement in reaching such mutual determination.

5. Notwithstanding the provisions in 2 and 4 above, when and if, during the term of this Agreement, any employee covered by this Agreement becomes entitled to apply for or to obtain health care or other medical, dental, vision, or surgical benefits by reason of the enactment by the United States or any state of the United States of a Governmental System of health security or medical service program ("Governmental System") for active employees, the parties shall promptly meet and undertake to negotiate a modification of the benefits under this Article of the type and character provided or available under such Governmental System in order to achieve or to assure the following results:

(a) No employee covered by this Article shall suffer any reduction in the level of any of the several health care benefits of this Article.

(b) The Company shall, without cost to the employee, provide a plan of benefits supplementary to those available under such Governmental System to the extent necessary to make each benefit comparable to the corresponding benefit provided under this Article.

(c) When an employee or dependent covered by this Article is required by law to make contributions, whether in the form of direct taxes, personal premiums, levies or otherwise, specifically designated by law toward the cost of benefits under such a Governmental System, the Company, in addition to any contributions required of it by law, shall pay to or on behalf of such employee or dependent any such required contributions to the extent such contributions are for benefits covered by this Article.

(d) The Company will not be required to provide any benefits or make payment for any benefit to the extent that the employee or dependent covered hereby receives or would be able to receive such benefit as a matter of right and without means test of any kind if timely and proper steps had been taken to obtain the benefit or payment for the benefit under such Governmental System.

61

(e)     To preclude any duplicating of benefits to employees or their dependents and to preclude any duplication of costs to the Company including the costs arising from Taxes and contributions of employees paid by the Company.

(f)     To negotiate the disposition of any actual savings disregarding any increase or decrease in administrative cost which may accrue to the Company as a result of any such Governmental System.

## ARTICLE XXIV.  UNION BULLETIN BOARDS

The Company will provide union bulletin boards in the principal departments of, or at other suitable locations in, each plant and will post thereon notices (not larger than legal caption paper) of Union meetings and Union activities as may be submitted by the Union for such posting.

## ARTICLE XXV.  LEGAL RIGHTS

Nothing in this Agreement shall be construed as waiving any right or protection granted to the Company, the Union, or any employee under any applicable federal or state law.

## ARTICLE XXVI.  SANITARY CONDITIONS

It is agreed that it is the responsibility of the Company to continue to furnish and maintain adequate ventilation, toilet facilities, wash bowls, and drinking fountains and facilities.

The Company and the Union shall form a joint subcommittee of the Safety and Health Committee, not to exceed four in number, for the purpose of inspecting the above, not less frequently than once each month.

## ARTICLE XXVII.  SAFETY AND HEALTH

### 1.  General

The Company, in compliance with applicable federal law, shall furnish to each employee employment free from recognized hazards that are causing or are likely to cause death or serious physical harm.  Further, the Company shall

62

comply with occupational safety and health standards promulgated under such law. It is intended that, consistent with the following functions of the safety and health committees, the International Union, Local Unions, union safety and health committees and its officers, employees and agents shall not be liable for any work-connected injuries, disabilities or diseases which may be incurred by employees. In this Safety and Health Article, the Union, through its various representatives, committees, officers, employees and agents, has been accorded certain participatory rights relating to employee safety and health; however, it is not the intention of the parties that these provisions or the Union's exercise of its rights thereunder shall in any way diminish the Company's exclusive responsibility. The Company and the Union will continue to cooperate toward the objective of eliminating accident and health hazards and will encourage employees to use the procedures stated herein in reaching this objective.

## 2. Safety and Health Committee

A representative Safety and Health Committee will function at each of the plants on a joint basis, the number of members to be agreed on locally and the union members to be selected by the Union. The parties shall designate their respective Co-Chairs and advise each other of updated committee membership. The committee shall assist, make recommendations to, and cooperate with the Safety Department of the plant. Departmental safety committees are encouraged to follow the principle of rotating members in order to achieve broad participation. The Union will appoint the union members. Where the union co-chair requests that a specific union departmental committee member be excluded from rotation because of special training or positive contribution to the committee, such request will be granted. At his or her discretion, the Local Union President may serve as an ex-officio member of the committee.

This committee will be guided by the principles of the eight point program set forth below:

**A.** Conduct monthly meetings at such times determined by the Committee Co-Chairs for the sole purpose of discussing accident prevention and the safety and health conditions of the workplace. By mutual agreement the Committee Co-Chairs may schedule special meetings of the

Committee.  Each Co-Chair shall prepare a proposed agenda in advance of the monthly meeting. At the beginning of each monthly meeting, the Committee will review the minutes of the previous month's meeting and review the status of any action items from the previous meeting and update, as appropriate, any unresolved action items.  The Company will keep minutes and provide copies for the committee members. The Committee Co-chairs shall review the minutes prior to publication.  At every third monthly meeting, the committee shall review and evaluate the activities of the previous period at which time the international union staff representative may attend.

     **B.**  Joint Committee members are to make monthly workplace inspections that can include hazard recognition, IFE identification, and observations in the workplace.

     **C.**  Review published plant safety and health reports such as, relevant occupational injury/illness/incident investigations and develop other data which would be useful in identifying occupational injury/illness/incident sources and injury trends.  At least one union representative shall be afforded the opportunity to participate in occupational injury/illness/incident investigations.

     **D.**  Recommend changes or additions to protective equipment or devices for the elimination of hazards.

     **E.**  Participate in the promotion and advertising of safety and health.

     **F.**  Monitor the effectiveness of methods used for elimination, reducing or controlling hazards.  Communicate and **r**eview safety and health matters that have been raised by members of the bargaining unit**.**  Assist the Company with inspections, industrial hygiene surveys and audit activities as needed.

     **G.**  Coordinate with the Management Environmental Steering Committee or the plant's equivalent.

     **H.**  Encourage employees to use procedures established by the Company and the Union to process matters relating to safety and health.

**I.** Review existing safety and health orientation and safety and health training activities for new employees as well as those existing safety and health training activities applicable to present employees who may change job classifications.

The Union shall certify its co-chair from the local bargaining unit. The union co-chair or the co-chair's designee from the Safety and Health Committee and the management co-chair or the co-chair's designee will jointly inspect work areas they deem appropriate on a day immediately prior to each monthly Committee meeting. It is understood that the purpose of the plant inspection is to assist the Company in satisfying its responsibility for work-connected injuries, disabilities, or diseases which may be incurred by employees. The union co-chair or the co-chair's designee from the committee will be accorded timely access to the plant work areas in the conduct of committee responsibilities but a standard of reasonableness must be met in the obtaining of permission to leave that individual's regular job, in the amount of time involved if it is during regular working hours, in the amount of disruption involved if other employees are to be contacted, and in the arranging for advance clearance to be in work areas other than the chair's own. The company co-chair may accompany the union co-chair or the co-chair's designees from the committee during such access.

The Safety Department and departmental management are responsible for effective and accurate injury/illness/incident investigations. Where an injury or incident has life-threatening, life-altering potential or results in lost time, the Safety Department and/or departmental management will send notification to the co-chairs or designees as soon as possible and no later than 24 hours from the time the Safety Department received knowledge of the injury. In the event of life-threatening, life-altering incidents, the union co-chair of the Safety and Health Committee or designee shall be included among those on the list of those to be promptly notified. Such notification is made for the purpose of providing him/her an opportunity to review the circumstances of the accident, which may include a site visit, in preparation for participating in item B of the eight point program.

65

When local plant conferences between any employees (including the union representative or representatives) and the local plant Management are held during his/her or their regular working hours, such conferences shall not result in any loss of time to any such employees.  This would include any special conferences that the co-chairs mutually agree to arrange.  Provided, however, where a superior practice now exists, it shall prevail.

### 3.  Safety and Health Equipment and Facilities

**A.**  The Company will provide personal protective equipment (PPE) when required by applicable occupational safety and health regulations to protect employees from injury/illness.  Such protective devices, wearing apparel, and other equipment necessary to protect employees from injury shall be provided by the Company in accordance with practices now prevailing in each separate plant or as such practices may be improved from time to time by the Company. The Company will discuss significant intended improved practices with the Safety and Health Committee in advance of their implementation.  Such discussions do not necessarily have to precede discussions of the same matters in the grievance procedure.

### 4.  Employee Safety and Health Rights

The Company will continue to provide adequate first-aid facilities and timely access to emergency medical treatment when necessary, as recommended by qualified medical personnel.

An employee hurt in an industrial accident will be paid for time lost during that shift, including any applicable overtime or shift premium, due to time required for medical treatment or due to being sent home for the balance of the shift by the Medical Department.  If the employee is sent to the Plant Medical Department and is required to remain in the Medical Department for medical examination or treatment beyond the end of that shift, such time shall be paid by the Company in accordance with practices now prevailing in each separate plant or as such practices may be improved from time to time by the Company.

66

If an employee shall believe that there exists an unsafe/unhealthy condition, changed from the normal hazards inherent in the operation, so that the employee is in danger of injury, he/she shall notify his/her supervisor of such danger and of the facts relating thereto.  Thereafter, unless there shall be a dispute as to the existence of such unsafe condition, such employee shall have the right, subject to reasonable steps for protecting other employees and the equipment from injury, to be relieved from duty on the job about which he/she has complained, reassigned to an available job, and to return to such job when such unsafe/unhealthy condition shall be remedied.  If the existence of such alleged unsafe/unhealthy condition shall be disputed, the chair, or his/her designee of the Grievance Committee and the plant manager or his/her representative shall immediately investigate such alleged unsafe/unhealthy condition and determine whether it exists.  If they shall not agree and if the chair of the Grievance Committee is of the opinion that such alleged unsafe/unhealthy condition exists, the employee shall have the right to present a grievance in writing to the plant manager or his/her representative.  Such grievance shall be presented without delay directly to the Board of Arbitration under the provisions of Article XIX of this Agreement, which shall determine whether such employee was justified in leaving the job because of the existence of such an unsafe/unhealthy condition.  If an employee is relieved from duty on the job as stated above, the Company will make a reasonable effort to advise any potential replacement of the grounds upon which the job was challenged as unsafe/unhealthy, until the outcome of such dispute is determined.

Other matters pertaining to unsafe and unhealthy conditions may be entered in the grievance procedure on a regular basis or, after notifying the supervisor in charge so that he can investigate and respond within a reasonable time, registering the matter with the Health and Safety Committee if the supervisor's response is unsatisfactory.

## 5.  Advisory and Review Procedures

The Health and Safety Committee may contact and use the Management Environmental Steering Committee, or the plant's equivalent, as a technical and advisory resource in the area of ventilation, temperature control, fumes, smoke, toxic or corrosive substances, flammable materials, chemicals,

solvents, and compounds.  Specifically, the Management Environmental Steering Committee, or the plant's equivalent is available to indoctrinate the Health and Safety Committee in matters pertaining to acceptable health levels and techniques of monitoring environmental control.  It is also expected that the Steering Committee will have occasion to communicate with individual employees and groups of employees concerning implementation of Occupational Safety and Health Act of 1970 or the Federal Mine Safety & Health Act of 1977.  Any unresolved issues may be entered at the second step of the grievance procedure.

Representatives of the International Union Health, Safety and Environment Department and corporate representatives of the Company's Health and Environmental Department may meet annually to review the effectiveness of safety and health activities.

The international director or his/her designee may arrange to make a plant visitation by contacting the corporate office of the vice president of Environment and Health.

The Company will provide the International Union Health, Safety and Environment Department with timely notification of any accident resulting in a fatality to an individual in a location where there are employees represented by a bargaining unit in the United States.  This notification shall include the date of the fatality, the plant location, the bargaining unit, and if known, the circumstances of the fatality.

The Company will provide the International Union Health, Safety and Environment Department with a copy of the fatal or life altering incident report that is given to the local Union concerning any member of its bargaining unit.

Furthermore, the Company will provide each year to the International Health, Safety and Environment Department copies of applicable OSHA Form 300, Logs of Work-Related Injuries and Illnesses and Form 300A, Summary of Occupational Injuries and Illness reports or equivalent (including MSHA's equivalent).

68

## ARTICLE XXVIII.  JURY AND WITNESS PAY

An employee who is called for jury service or as a result of being subpoenaed as a witness in a court of law shall be excused from work for the days on which he serves and he shall receive, for each such day of jury or witness service on which he otherwise would have worked, eight (8) times his average straight time hourly earnings for such days of jury or witness service.  An employee will not receive pay under this Article when it duplicates pay received for time not worked for any other reason.  The employee will present proof of each such day's service.

## ARTICLE XXIX.  BEREAVEMENT PAY

When death occurs in an employee's immediate family (i.e., employee's legal spouse, mother, father, mother-in-law, father-in-law, son, daughter, brother, sister, grandparents, grandchildren, stepparents, stepchildren, stepbrother, stepsister, son-in-law, daughter-in-law, half-brother, or half-sister) an employee, upon request, will be excused for up to three (3) days (or for such fewer days as the employee may be absent) on which he otherwise would have worked.  Such days must fall within one six (6) consecutive day period encompassing either the death or the funeral or the memorial service in lieu of the funeral.  After making written application therefore and providing that the relationship is one which is comprehended herein, the employee shall receive pay for any such scheduled shift (up to eight hours) provided he attends the funeral or memorial service in lieu of the funeral.  Payment shall be made at the employee's regular straight time hourly rate on the last immediately preceding scheduled day worked excluding shift premium, overtime, and incentive earnings.  An employee will not receive funeral pay when it duplicates pay received for time not worked for any other reason.  Time thus paid will be counted as hours worked for purposes of determining overtime or premium pay liability.

## ARTICLE XXX. CIVIL RIGHTS / DIVERSITY & INCLUSION

There shall be no discrimination at the time of employment against any prospective employee, nor after employment, by supervisors, superintendents, or any other person in the employ of the Company against any employee because of membership or nonmembership in the Union.

It is the continuing policy of the Company and Union that the provisions of the Agreement shall be applied to all employees without regard to race, color, religious creed, national origin, disability, Veteran Status, gender or age, except where gender or age is a bona fide occupational qualification. Wherever in this Agreement a masculine pronoun is used, such use is intended to apply equally to males and females.

A Joint Committee on Civil Rights / Diversity & Inclusion shall be established at each plant. The Union shall have no more than three members of the local Union, in addition to the president and a designated representative of the Grievance Committee or Committees. The union members shall be certified to the plant manager by the president of the local Union.

The Company and union members of the Joint Committee shall meet as required. The Joint Committee shall review complaints involving civil rights / diversity & inclusion. In the event a matter taken up by the Joint Committee is not satisfactorily resolved, it may then be dealt with as a grievance. It is not intended by the parties that this Committee shall displace the normal operation of the grievance procedure. The appropriate union representative may file a grievance in the second step of the grievance procedure. The Joint Committee shall have no jurisdiction over the filing and processing of grievances.

When a matter is referred to the Joint Committee, the time limit for filing a grievance will commence with the day following the date of the initial meeting in which the matter was discussed unless mutually extended by the parties as long as the complaint is recorded with the Joint

70

**Committee within thirty (30) days of the incident giving rise to the complaint.**

**When local plant meetings are held between employees, including the union representative or representatives, and company representative of the Joint Committee during their regular working hours, such meetings, shall not result in any loss of time to any such employees.**

### ARTICLE XXXI. PERIOD OF AGREEMENT

Except as otherwise provided below, this Agreement shall terminate 60 days after either party shall give written notice of termination to the other party, but in any event shall not terminate earlier than **11:59 PM CST**, or at the end of the shift starting before **11:59 PM CST**, whichever is later, May 15, **2023.**

If either party gives such notice, it may include therein notice of its desire to negotiate with respect to pensions (existing provisions or agreements as to pensions to the contrary notwithstanding), and the parties shall meet within 30 days thereafter to negotiate with respect to such matters. If the parties shall not agree with respect to such matters by the end of 60 days after the giving of such notice, either party may thereafter resort to strike or lockout as the case may be in support of its position in respect to such matters as well as any other matter in dispute, but not earlier than **11:59 PM CST**, May 15, **2023** (the existing agreements or provisions with respect to pensions to the contrary notwithstanding).

Dated:  **September 19, 2019**

**FOR THE COMPANY:**

N.G. Storm
M.D. Ebbott

**FOR THE UNION:**

Thomas Conway, President
David McCall, Vice President, Administration
Fred Redmond, Vice President, Human Affairs
John Shinn, Secretary-Treasurer
Michael Millsap, Director District 7
Gaylan Prescott, Director District 12
Del Vitale, Director District 4
Timothy Underhill, Local 104
Chris Horn, Local 104
Mark A. Goodfellow, Local 420A

# APPENDIX I – STANDARD HOURLY RATES
## WARRICK

| Job Grade | Rate Effective 9/30/2019 | Rate Effective 5/18/2020 | Rate Effective 5/17/2021 | Rate Effective 5/16/2022 |
|---|---|---|---|---|
| 1 and 2 | 20.657 | 21.328 | 21.968 | 22.627 |
| 3 | 20.936 | 21.616 | 22.264 | 22.932 |
| 4 | 21.216 | 21.906 | 22.563 | 23.240 |
| 5 | 21.496 | 22.195 | 22.861 | 23.547 |
| 6 | 21.774 | 22.482 | 23.156 | 23.851 |
| 7 | 22.056 | 22.773 | 23.456 | 24.160 |
| 8 | 22.337 | 23.063 | 23.755 | 24.468 |
| 9 | 22.614 | 23.349 | 24.049 | 24.770 |
| 10 | 22.896 | 23.640 | 24.349 | 25.079 |
| 11 | 23.174 | 23.927 | 24.645 | 25.384 |
| 12 | 23.454 | 24.216 | 24.942 | 25.690 |
| 13 | 23.734 | 24.505 | 25.240 | 25.997 |
| 14 | 24.013 | 24.793 | 25.537 | 26.303 |
| 15 | 24.293 | 25.083 | 25.835 | 26.610 |
| 16 | 24.573 | 25.372 | 26.133 | 26.917 |
| 17 | 24.854 | 25.662 | 26.432 | 27.225 |
| 18 | 25.134 | 25.951 | 26.730 | 27.532 |
| 19 | 25.414 | 26.240 | 27.027 | 27.838 |
| 20 | 25.695 | 26.530 | 27.326 | 28.146 |
| 21 | 25.974 | 26.818 | 27.623 | 28.452 |
| 22 | 26.253 | 27.106 | 27.919 | 28.757 |
| 23 | 26.532 | 27.394 | 28.216 | 29.062 |
| 24 | 26.812 | 27.683 | 28.513 | 29.368 |
| 25 | 27.093 | 27.974 | 28.813 | 29.677 |
| 26 | 27.373 | 28.263 | 29.111 | 29.984 |
| 27 | 27.651 | 28.550 | 29.407 | 30.289 |
| 28 | 27.932 | 28.840 | 29.705 | 30.596 |
| 29 | 28.212 | 29.129 | 30.003 | 30.903 |
| 30 | 28.492 | 29.418 | 30.301 | 31.210 |
| 31 | 28.771 | 29.706 | 30.597 | 31.515 |
| 32 | 29.049 | 29.993 | 30.893 | 31.820 |
| 33 | 29.330 | 30.283 | 31.191 | 32.127 |
| 34 | 29.611 | 30.573 | 31.490 | 32.435 |
| 35 | 29.891 | 30.862 | 31.788 | 32.742 |
| 36 | 30.169 | 31.149 | 32.083 | 33.045 |
| 37 | 30.451 | 31.441 | 32.384 | 33.356 |
| 38 | 30.730 | 31.729 | 32.681 | 33.661 |
| 39 | 31.009 | 32.017 | 32.978 | 33.967 |
| 40 | 31.290 | 32.307 | 33.276 | 34.274 |
| 41 | 31.574 | 32.600 | 33.578 | 34.585 |
| 42 | 31.855 | 32.890 | 33.877 | 34.893 |
| 43 | 32.135 | 33.179 | 34.174 | 35.199 |
| 44 | 32.417 | 33.471 | 34.475 | 35.509 |
| 45 | 32.698 | 33.761 | 34.774 | 35.817 |
| 46 | 32.979 | 34.051 | 35.073 | 36.125 |

73

| 47 | 33.260 | 34.341 | 35.371 | 36.432 |
| 48 | 33.541 | 34.631 | 35.670 | 36.740 |
| 49 | 33.823 | 34.922 | 35.970 | 37.049 |
| 50 | 34.103 | 35.211 | 36.267 | 37.355 |

# APPENDIX II.

# WARRICK

List of Job Classifications to be used in conjunction with Article IX -- REDUCTION OF FORCES and Article XI -- RECALL AND RESTORATION OF FORCES of this Agreement.

| Division or Department | Job Title |
|---|---|
| Ingot | Laborer |
| Sanitation | Plant Facilities Attendant |

# APPENDIX III.
## PERFORMANCE PAY

During 2014 negotiations, the parties agreed to modify the Performance Pay Plan. The modified plan will provide for participation by hourly employees represented by the Union in the plants located at Massena (West plant), Warrick, Wenatchee, and Point Comfort. Hourly employees represented by the Union in **the** plant located at Gum Springs and any curtailed operation of the above-named plants will participate in the Performance Pay Plan set forth in the 2001 Labor Agreement under the terms of that Plan for the term of the **2019** Labor Agreement.

I.      <u>GENERAL</u>

The purpose of Performance Pay is to allow employees to share in profits and the financial impact of operating improvements while focusing employees in a Location on business goals that are critical to the long term success of the Location.  Working together and achieving Location goals will result in increased profitability for the business and monetary reward and security for employees.

Guiding Principles for Performance Pay

-       The design and goals will be consistent with the Location's business strategies and with Alcoa's Vision and Values.

-       The design and goals should support teamwork and employee involvement, be perceived as fair, and be easily understood by employees.

-       The award opportunity will be based on improvement against an objective and verifiable set of measurements for each factor(s) being measured.

-       Performance payouts will supplement the negotiated base level of wages.

II.     EFFECTIVE DATE

The Performance Pay Plan found in the 2010 Labor Agreement will be applicable for the remainder of **2019** under the provisions of that plan and will continue to be applicable to employees at those plants specified above. The provisions of this plan will be applicable to all other employees commencing January 1, **2020**.

III.    DESIGN

1.   General

A minimal number of financial improvement measures will be identified and established.

The payout to employees for Performance Pay will consist of 22% of the savings associated with improvement as measured against the base for each factor with all factors netted together.

The award opportunity will be based on Location measurements or on a smaller than location basis if agreed to by the parties.

The plan is intended to stimulate improved engagement and problem solving to achieve significant improvement over past performance in cost improvement and productivity.

Plan results will vary by location but will be designed to provide employees a realistic opportunity to earn approximately twice the percentage payout of historical (pre 2007) performance in aggregate if performance measurements are achieved.

At locations with more than one business unit, the Union shall have the right to pool the results of the units with the pool weighted in proportion to reflect the number of employees in each of the units.

In the event a plan provides excess or insufficient payout opportunity due to improper design or factors not anticipated during the design, the local parties will meet to discuss and agree to remedial actions

77

necessary to fulfill the intent of properly rewarding employees for their efforts to improve financial performance. In the event the parties are unable to agree, Management will implement the remedial actions necessary to fulfill the intent, consistent with the design criteria described above.

2. Location Design Process

At each location a joint Company/Union committee will, by November 30, 2014, review, discuss and provide input into the performance measures, weighting, etc. to be applicable for their location for 2015.  Performance measures and weightings will be reviewed and adjusted on an annual basis by November 30 of each subsequent year of the Agreement. Should agreement not be reached, Management will determine and implement the measures, provided however, that such measurements shall be consistent with the design criteria described in III above.

IV.    DEFINITIONS

For purposes of Performance Pay, the following definitions are established:

1. LOCATION….means a plant location.

2. ELIGIBLE EARNINGS….means the sum of straight-time hourly-base wages (for straight-time hours and overtime hours); straight-time shift and schedule premiums (for straight-time hours and overtime hours); vacation pay; unworked holiday pay; and jury, witness, and bereavement pay. Effective January 1, 2015, eligible earnings shall also include overtime hours credited at the halftime rate regardless if paid at the rate of time-and-one-half or double-time.

The definition of Eligible Earnings for an Eligible Employee who is on disability attributable in whole or in part

78

to his or her employment with the Company, shall include the time lost and the straight-time earnings associated with that time lost at a rate not to exceed 8 hours per day or 40 hours per week.

The definition of Eligible Earnings for an Eligible Employee who is a local union official who is on an excused absence for union business and who otherwise would be actively at work shall include the time lost and the straight-time earnings associated with that lost time at a rate not to exceed 8 hours per day or 40 hours per week.

The period used to determine Eligible Earnings for a Year shall encompass the same payroll weeks used in the determination of the Company's fiscal quarter.

3. ELIGIBLE EMPLOYEE….is an hourly employee covered by this Agreement who had actual hours worked during the payroll weeks disbursed in the quarter and who either had employee status on the last calendar day of the quarter or whose employee status terminated during the quarter due to death or retirement.

4. PERFORMANCE MEASURES…. are the set of financial and operating measures upon which any payout is based.

V.    <u>CALCULATION OF THE PERFORMANCE PAY PAYOUT</u>

At the end of each quarter, results will be used to calculate a Performance Pay payout, with attainment against financial Performance Measures as the basis for the payout.

The actual result for each Performance Measure will be compared to its base performance. Twenty-two percent (22%) of the savings will be distributed to eligible employees as follows:

An individual employee's Performance Pay payout will be calculated by dividing his/her Eligible Earnings by the eligible earnings of all employees participating in the plan and multiplying that result by the total amount of money available for distribution to employees.

VI.     ADMINISTRATION OF THE
        PERFORMANCE PAY PLAN

The information necessary to administer the provisions of Performance Pay will be prepared and maintained by the Company. The costs associated with its administration will be borne by the Company.

Communication

The parties agree that it is important for participants in the Performance Pay Plan to understand the relevant goals, Performance Measures and their potential impact on plant performance and their potential payout opportunities.

Administration

In the event an employee quits or is terminated during the quarter, no payout shall be paid. In the event of death, disability, retirement or layoff, an employee's award will be calculated on actual Eligible Earnings.

In the event an employee is transferred between Business Unit/Location and his new job is covered by a different plan, the payout shall be pro-rated for the number of whole weeks worked in each unit, based on the employee's job classification for each week.

Payouts will be paid as soon as practical after the close of the quarter.

80

The determination of accounting policies in regards to Performance Pay shall be at the sole discretion of the Company.  Such policies shall be applied in accordance with accounting practices of the Company.

Payments of Performance Pay shall not be considered earnings for any other purpose, except as subject to the applicable statutory taxes on income.

The Compensation Committee of Alcoa's Board of Directors has the authority to make adjustments to results because of unusual events. Business Unit/Location management and bargaining unit representatives will be provided the opportunity to give input for consideration for such adjustments. Such events might include the purchase or sale of business assets that was not planned when goals were set for that year, plant shutdowns, unanticipated reductions in business, etc. It is intended that, once a commitment has been made to goals, changes will not be entertained except in truly unusual situations.

The Performance Pay calculations for each business unit and corporate performance will be communicated to the Union prior to payment.

This Agreement has been reached on the basis that the Union will ensure that, until and only to the extent the information is made available by the Company to the public at large, the information will be disclosed only to those reviewing for the Union the computations related to Performance Pay and neither the Union nor anyone reviewing such information for the Union will make any other disclosure of the information.

Should payment of Performance Pay, or any part of such payment, be required to be included in the regular rate under the Fair Labor Standards Act of any eligible hourly employee, the Company will reduce applicable percentages and adjust individual payout amounts such that the total payout for the applicable Year for each Location for bargaining-unit employees will not be changed by such decision.  The parties shall make any and all adjustments to this document as may be necessary from time to time to ensure that the intent and understanding is upheld.

VII.    UNION RIGHT TO REVIEW

The International Union, through the Chair of its Negotiating Committee or his/her designee, shall have the right to review any information concerning the calculation of payouts under the Plan.

In the event that a discrepancy exists between the Company's calculation and the results obtained by the Union's review, the Chairman of the Employee Relations Council (ERC) and the President of the International Union, or his/her designee, shall attempt to reach an agreement to resolve the discrepancy. Should the parties be unable to resolve the dispute, they will select an independent Third Party with the appropriate expertise relative to the dispute, to review each party's position related to the issue being disputed and to render a written opinion concerning the issue.

The opinion rendered by the Third Party will be final and binding on both parties. However, the opinion will not be cited by either party with respect to any other issue except one relating to this Performance Pay Plan.

The costs associated with the Third Party shall be borne equally by the parties.

VIII.    TERM OF THE PLAN

This performance pay plan is applicable only for the duration of the **2019** Labor Agreement and will not be extended to succeeding Labor Agreements.


**APPENDIX IV.**

**NEUTRALITY**

**Section 1.  Intent**

Over the years, the Company and the United Steelworkers ("Union") have developed a constructive and harmonious relationship built on trust, integrity, and mutual respect.  The Company places high value on the continuation and improvement of its relationship with the Union as well as with all of its employees.

We also know from experience that when both parties are involved in an organizing campaign directed at unrepresented Company employees, there is a risk that election conduct and campaign activities may have a harmful effect on the parties' relationship. Therefore, it is incumbent on both parties to take appropriate steps to insure that all facets of an organizing campaign will be conducted in a constructive and positive manner which does not misrepresent to employees the facts and circumstances surrounding their employment and in a manner which neither demeans the Company or the Union as an organization nor their respective representatives as individuals.

To underscore the Company's commitment in this matter, the Company agrees to adopt a position of neutrality in the event the Union seeks to represent any unorganized production and maintenance employees at facilities of the Company engaged in types of businesses in which the Union currently represents production and maintenance employees under this Master Agreement. This Neutrality Agreement shall only apply to facilities where the Company has an ownership interest greater than fifty percent (50%) and operating responsibility.

Neutrality means that the Company shall neither help nor hinder the Union's conduct of an organizing campaign, nor shall it in providing information or expressing an opinion demean the Union as an organization or its representatives as individuals. Also, the Company shall not provide any support or assistance of any kind to any person or group opposed to Union organization. Should the Company hold meetings with employees covering an organizing campaign during the campaign period, a union organizer may attend such meetings for the purpose of observation only.

Consistent with the above, the Company reserves the right to communicate fairly and factually to employees in the unit sought concerning the terms and conditions of their employment with the Company and concerning legitimate issues in the campaign.

For its part, the Union agrees that all facets of its organizing campaign will be conducted in a constructive and positive manner which does not misrepresent to the employees

83

the facts and circumstances surrounding their employment and in a manner which neither demeans the Company as an organization nor its representatives as individuals.

**Section 2.  Notice of Intent to Organize**

The Union will give the Company's Director of Industrial Relations written notice of the Union's intent to organize a facility subject to this Neutrality Agreement.

Upon receipt of such notice, the Company shall meet with the Union to exchange information that might be pertinent to an organizing effort.  During this meeting, the parties will discuss the scope of the proposed collective bargaining unit, employees to be excluded from the unit, campaign issues, etc.  Union access to the plant may also be addressed at this notice of intent meeting.  The Company reserves the right to challenge any issues relating to the scope and makeup of the unit sought by the Union by invoking the Dispute Resolution procedure described below.  To minimize disputes about the scope of collective bargaining units, the Company and the Union agree that the National Labor Relations  Board's case law regarding the composition of collective bargaining units is incorporated into this Neutrality Agreement by reference.  Upon reaching an agreement on all outstanding issues, the Company will give the Union a list of the names and addresses of the production and maintenance employees in the agreed-upon proposed collective bargaining unit, as well as a description of their wages and benefits.

Upon receiving the Union's notice of intent to organize, the Company may send a letter to members of the proposed collective bargaining unit describing the neutrality process contained in this Agreement, as well as the results of signing a Union authorization card.

**Section 3.  Campaign Period and Union Access to**
**            Company Facilities**

The campaign period shall not exceed forty-five (45) days and shall commence upon the Union's receipt of the names, addresses, and wage and benefit information described above in Section 2.  The Company and the Union will agree upon reasonable times and reasonable places at the plant premises where the Union can campaign.  The Company and

the Union will review all Company and Union campaign literature prior to its distribution.

**Section 4.  Union Authorization Cards**

For purposes of this Neutrality Agreement, only cards signed after the notice of intent has been served may be counted as valid cards.  The Union's authorization cards will clearly state that the card may be used for the purpose of obtaining:

(a)  an NLRB-sponsored election where a simple majority of votes will create a duty to bargain;

(b)  a secret ballot election conducted in cooperation with the Company where a duty to bargain will arise if the Union receives votes from a majority of the eligible voters in the proposed collective bargaining unit; or

(c)  recognition on the basis of a card check where a duty to bargain will arise if the Union receives cards from at least sixty-five percent (65%) of the employees in the proposed collective bargaining unit.

**Section 5.  <u>Struksnes</u> Election**

If, at any time during the campaign period, the Union represents that it has obtained cards from a majority of the employees in the agreed-upon collective bargaining unit, the parties will schedule a secret ballot election to take place no later than seven days from such notice to the Company by the Union.  The Company will provide an opportunity for both the Union and the Company to make short presentations to groups of employees in the proposed collective bargaining unit.  Such presentations will be reviewed by the parties in advance.

After the presentations to the employees, the employees will be given an opportunity to participate in a secret ballot election for the purpose of determining whether the Union will represent employees in the proposed collective bargaining unit.  The election shall be conducted in accordance with <u>Struksnes Construction Company.</u>  This means: (1) the Union must formally demand recognition and

85

advise the Company that it has authorization cards from a majority of the employees in the agreed-upon proposed collective bargaining unit; (2) the employees must be told that the purpose of the election is to determine whether the Union has majority status; (3) the Company will give employees assurances that there will be no reprisals for engaging in protected activity; (4) the employees will be polled by secret ballot; and (5) there may be no unfair labor practices or other activity that creates a coercive atmosphere. The Company will recognize the Union as the representative of the proposed collective bargaining unit if a simple majority of the employees in the proposed collective bargaining unit cast votes to be represented by the Union.

If the Union does not obtain votes demonstrating that it represents a majority of the proposed collective bargaining unit, or if the Union does not claim that it represents a majority of the employees in the collective bargaining unit within the forty-five (45) day campaign period, the Union will be barred from filing another notice of intent to organize that facility and from filing an NLRB petition for an election at that facility for twelve (12) months from the date of the <u>Struksnes</u> election or the close of the campaign period.

**Section 6.  Card-Check Recognition**

Any time during the campaign period, the Union may demand recognition on the basis of authorization cards if the Union asserts that it has cards from at least sixty-five percent (65%) of the employees in the proposed collective bargaining unit. The authorization cards must be dated subsequent to the notice of intent and comply with the language requirements of Section 4 above. The Company and the Union shall choose one of the following methods to verify the authenticity of the cards:  (a) the Company and the Union may mutually agree upon a third party who will count the cards and compare the signatures on the cards to exemplars furnished by the Company; or (b) the Company and the Union shall ask the American Arbitration Association to select an individual to count the cards and compare the signatures on the cards to exemplars furnished by the Company. The individual who counts the cards will only inform the parties whether or not there are valid cards from at least sixty-five percent (65%) of the employees in the agreed-upon collective bargaining unit and shall not inform the Company of the precise number of

cards. If the Union obtains valid cards from at least sixty-five percent (65%) of the employees in the agreed-upon collective bargaining unit, the Company shall recognize the Union as the exclusive collective bargaining representative of such employees without a secret ballot election.

If the Union does not obtain cards from sixty-five percent (65%) of the employees in the proposed collective bargaining unit as a result of the card check, or if the Union does not claim that it has cards from sixty-five percent (65%) of the employees in the proposed collective bargaining unit within the forty-five (45) day campaign period, the Union will be barred from filing another notice of intent to organize that facility and from filing an NLRB petition for an election at that facility for twelve (12) months from the date of the card check or the close of the campaign period.

### Section 7. Dispute Resolution

This Neutrality Agreement shall not be subject to the grievance and arbitration provisions or the no strike/no lockout provision of the collective bargaining agreement. Instead, any disputes arising under this Neutrality Agreement shall be submitted to the Chief Executive Officer of his/her designee and the International President of the United Steelworkers or his/her designee.

If another union begins an organizational effort or claims representation rights, either party may cancel this Neutrality Agreement as it applies to that particular organization campaign.

## APPENDIX V.

## ALCOA COOPERATIVE
## PARTNERSHIP AGREEMENT

### Purpose and Intent

The Company and the Union recognize the value of and commit to work together through a joint decision making process to develop a labor-management partnership which serves the interests of employees, consumers and stockholders and promotes employment security, employee involvement in

the identification and solution of business problems, customer satisfaction, open communications, mutual trust and understanding. The parties are responsible for working together to reach joint decisions concerning issues regarding customer requirements, business objectives and stockholder and Union interests. This commitment to working together, on an ongoing basis, must extend from the Company and Union executive offices to the shop floor and be driven by a shared vision of the need for continuous improvement in joint decision-making processes, employee participation, the parties' relationship, and all aspects of the business. The commitment to this decision-making, as further detailed below, is mandatory for both parties for the life of the current labor agreement. All employees must have greater safety, security, influence, control, and accountability for their immediate work environment as well as the knowledge, resources, skills, and information required to effectively and cooperatively meet these challenges.

It is the intent of the parties that cooperative partnership will result in an improved quality of work life that recognizes the worth and dignity of all employees, facilitates their individual growth and development and recognizes the need for each employee to contribute fully toward the success of the business. Just as the Union is concerned with the competitive problems and continuous improvement needs of the Company, the Company is equally concerned with the employment security of the work force.

The parties acknowledge that this Agreement is a "living" document that will evolve throughout the life of the contract to best meet the requirements of changing circumstances. Its principles, however, are intended to carry through future contract periods.

## **Principles**

This Agreement reflects our mutual commitment and is based on the following principles:

- The viability of the business and the Union depends on becoming the safest highest quality supplier of competitively priced aluminum products delivered on time. To achieve such a reality, the experience, skill,

88

intelligence, and commitment of each employee will be needed and must be fully utilized to ensure continuing improvement for the best long-term interest of all.

- Employees are responsible and trustworthy. An environment must be fostered where all employees are treated in accord with this principle on a daily basis. The parties will take steps to build a truly participative joint decision-making and problem-solving style that recognizes that employees provide a competitive advantage.

- Employees and the Union should be provided with the necessary information in a timely fashion, and the training to use that information effectively, so they can make effective decisions regarding their sphere of responsibility.

- The parties recognize that a cooperative partnership, though necessary, is not by itself adequate to meet the competitive demands of the world market.

  - Both parties recognize that the implementation of cooperative partnership is an extremely difficult task which must be approached realistically and patiently. The parties agree that, if the business is to prosper and provide employee satisfaction and long-term security, cooperative partnerships must be pursued as quickly as possible to maximize opportunities to resolve problems and to produce products at lower costs, higher quality, and delivered on time.

**Partnership Structure**

The parties recognize that successful partnership requires the establishment of an appropriate organizational structure at both the top levels and the local levels of their

89

organizations. Such structure must include defined roles and responsibilities for the participants at both levels.

The parties recognize that the changes contemplated by this Agreement must evolve. Accordingly, the local parties must have the flexibility to design participative structures that best meet their needs and that can change as changed circumstances and experience warrant. Further, where participative structures are already in place, the local parties recognize that it may be in their best interest to retain such structure so long as they meet the objectives of the Agreement.

**Top-Level Structure**

A top-level committee will be established in order to further partnering at the top levels of the Company and the Union, and to properly guide local cooperative partnerships. The committee will be comprised of Company and Union(s) representatives. This committee will provide oversight, ensure that the local parties are assisted as needed, and discuss related topics of mutual concern. The representatives on this committee will be designated by the Co-chairmen of the respective Company and Unions' Negotiating Committees. The top-level committee will meet as needed, but no less than quarterly, in order to ensure that the full intent of this Agreement is consistently implemented and administered. The committee will address such subjects as safety and health measures; strategic plans; technological changes and plans; staffing levels; customer evaluation; major organizational issues; and facilities utilization.

**Top-Level Roles and Responsibilities**

It is recognized that in order for this committee to function effectively, timely information regarding the above subjects must be shared with the Union, subject to an agreed upon confidentiality agreement. Shared information will be timely and specific to the needs of the top-level parties about the business, plant performance, capital improvements, new technologies and products, future skills needs, customer satisfaction, and competitive issues.

The top-level committee will provide assistance and necessary resources to the local parties in order that the objectives of this Agreement are achieved and will develop

90

appropriate measures in order to evaluate objectively the top-level and local partnership efforts.  In addition, the top-level committee will provide guidance to the local parties concerning such matters as safety, leadership,  problem-solving, training, new and innovative organization designs, and the potential impacts on the organization of new technology.  The top-level committee will also review issues and concerns relative to this Agreement brought to it by the local parties.

The top-level committee shall encourage behaviors, attitudes, forums, and opportunities that enlist the know-how and ingenuity of employees in achieving the goals of this Agreement.

## Local Structure

The local parties are committed to enter into a cooperative partnership which promotes the goals of this Agreement. This commitment is mandatory on the local parties for the term of the current Labor Agreement.

Each location will establish a Plant Steering Committee that will include the local Plant Manager and top local Union official.  The size and composition of the local Plant Steering Committee will be decided jointly.  At multiple-union plants, the Committee will include representatives from other union bargaining units at that location.

## **Local Roles and Responsibilities**

The Plant Steering Committee shall investigate, consider, and test alternative approaches to safety, work redesign, work assignments, work scheduling, planning for technological change, training, development, problem solving, and process improvement to facilitate both individual and group contribution towards improved quality, efficiency, productivity, employee satisfaction, and employment security. It is recognized that in order for this committee to function effectively, timely information regarding these issues must be shared with the local union.

The Plant Steering Committee will guide partnership initiatives and ensure such initiatives are in compliance with

91

the Labor Agreement and other memoranda of agreement negotiated by the parties.

The Plant Steering Committee shall encourage behaviors, attitudes, forums, and opportunities that enlist the know-how and ingenuity of workers in achieving the goals of this Agreement.

The Plant Steering Committee will identify measures of improvement by which the parties can track the achievement of joint objectives set for meeting the needs of customers, employees, the Union and the business.

In addition, the Plant Steering Committee may study and evaluate new and innovative alternative work systems that support the parties' commitment to continuous improvement and employment security. It is agreed that such work systems may be desirable and the local parties shall commit to a prompt joint effort to study, design, and implement such work systems where appropriate.

The local parties are responsible and accountable for working together through joint decision-making and problem-solving processes to meet the parties' commitment to the following objectives:

a. Create and maintain a safe and healthy work environment through joint participation in setting safety and health goals, implementing improvement plans and auditing performance;

b. Sustain an open environment that shares knowledge and provides detailed information which is timely and specific to the needs of the local parties about the business, plant performance, capital improvements, new technology and products, future skills needs, customer satisfaction, and competitive issues;

c. Provide for employment security;

d. Improve the quality, service, productivity, and competitiveness of the business and its

92

products, seeking profitability on a sustained basis;

e.      Promote the objectives of the business and align with its Vision, Values, and Milestones;

f.       Increase employee responsibility for and influence in workplace decision-making;

g.      Support work environments built on fairness and commitment to improving the quality of employees' work life;

h.      Support rapid response to changes in the marketplace in products and customer requirements;

i.        Plan for technological change designed to serve the best interests of both parties affected by the change;

j.       Understand the current state of competitiveness and its relationship to "World Class" standards;

k.      Identify and implement cost reduction opportunities;

l.        Provide improved job opportunities, skills development, leadership training and education, and more productive utilization of a skilled workforce;

m.     Drive effective individual and group problem-solving; and;

n.      Acceptance by each party of the role of the other as an essential partner in attaining joint objectives.

**<u>Employment Security</u>**

The Company and the Union are committed to providing employment security for all employees covered by

this Agreement. Employment security is ultimately dependent upon efficient, competitive plants, and high quality products. To obtain efficient, competitive plants and high quality products, the Company needs both the Union's cooperation as a valued partner and employee participation in work processes. Union cooperation and employee participation are dependent upon an agreement that gives employees sufficient employment security so they will offer suggestions freely and give their full cooperation to make the business a success.

Employment Security shall apply only to layoffs that commence during the term of this Labor Agreement, and shall remain in effect at a location so long as the local parties are actively participating in the local structures created by this Cooperative Partnership Agreement.

### Guarantee

The parties agree that employment security is a priority objective of this cooperative partnership agreement. No employee shall be laid off as a result of the implementation of ideas, suggestions, or recommendations from individual bargaining unit employees or from teams that include bargaining unit employees. Exceptions may be made where there is a major capital deployment to affect a technology shift that results in significant crewing reductions, or when the parties recognize that the long term viability of the plant or a major segment thereof requires a reduction in employment. In such circumstances, the Company agrees to work with the Union through the process to avoid layoffs.

No employee shall be laid off during the term of this Agreement except as determined through the Joint Decision-Making and Responsibility Process defined below. In any event, no employee shall be laid off from the plant for an expected duration of less than four (4) weeks.

The above guarantees shall not apply in the event of a strike or work stoppage by employees covered by this Agreement.

### Joint Decision-Making and Responsibility

The Union and the Company share responsibility for the long-term viability of each covered location and, therefore,

94

must share in the decision making with respect to the employment security of its employees. This authority and responsibility shall be vested in the local parties. The parties are confident that the sharing of information and full discussion and exchange of ideas and consideration of all views about issues impacting employees long-term employment security will lead to decisions that are satisfactory to all. This continuous flow of information will ensure that the Union has the earliest possible notice of potential layoffs.

As a minimum, in cases where layoffs from the plant are contemplated or where the guarantee provided above is operative, the local parties shall consider alternatives designed to provide employment to affected employees including assignment to non-traditional tasks, the reduction of contracting out, attrition, early retirement, voluntary termination programs, overtime reduction, work schedules, and flexible use of the work force in non-traditional work assignments and other economically viable options. Should the local parties not be able to make a joint decision, either of the local parties may request a timely review by the appropriate Business Unit President or his designee and a representative of the International Union who shall ensure that reasonable alternatives have been explored.

**Rates of Pay**

An employee working in a new job assignment as a result of the application of this Employment Security provision shall receive:

The established rate of pay of the job to which he is assigned unless the parties otherwise agree.

If there is no rate of pay established for that job, the rate of pay will be determined by the local parties or; if they are unable to reach agreement, the rate of pay will be determined by the application of the Wage Manual.

95

## Training

The parties recognize that the goals of this Agreement can be attained only by a commitment to comprehensive and ongoing training and education. Accordingly, the Plant Steering Committee shall take steps to establish training programs necessary to the purposes of this Agreement. All training shall be focused on the following objectives: the long-range mutual goals of the parties; problem-solving techniques; communication activities; skills, attitudes, behaviors and techniques for increasing the effectiveness of participation and involvement activities; and methods for determining and achieving joint goals. Without limiting the comprehensiveness or continuity of the training and education required by this Agreement, such activities will, unless otherwise agreed to, include at least the following minimum standards and guidelines:

1. Both Company and Union representatives shall receive training by their respective organizations in how, consistent with their organization's goals, they can accomplish the objectives of this Agreement through participation and involvement activities.

2. The Plant Steering Committee shall sponsor a program for appropriate training of all members of joint committees created under this Agreement.

3. The Plant Steering Committee shall develop a joint training program designed to increase the skills of bargaining unit and non-bargaining unit employees concerning the subjects identified in this Section. Such program shall commence with instruction (a) how best to pursue organizational objectives through participation activities, (b) partnership structure of this agreement, and (c) the commitment of the parties to the process.

4. The Company shall fund all training programs referred to in this Section. This shall include employee time spent in such training as though it were time worked and employees shall suffer no loss of earnings as a result thereof.

5. Training referred to in this Section designed to achieve the objectives of this Agreement (other than Union training), shall be jointly developed and implemented.

## Work Redesign

The Plant Steering Committee may investigate and implement Work Redesign consistent with the principles of this Agreement. Work Redesign will include the establishment of operating work teams or self-directed work teams and/or the implementation of other new and improved ways of performing work. Additionally, any Work Redesign will be aimed at increasing employee responsibility, more effective utilization of people, materials and equipment along with a heightened level of job satisfaction resulting from increased employee contributions to the decisions and initiatives that impact the workplace.

## Technological Change

The parties recognize that technological change can have significant implications for employment security and the nature of the working environment. Accordingly, the Company shall provide the top-level committee and the appropriate Plant Steering Committee notice of any proposed significant technological change within such a time that the Plant Steering Committee will be able to evaluate the impact of, and be an active participant in the decision-making process regarding, such change. Such notice shall address such issues as the purpose for and timetable of the change; the effect on training needs and outline of other options considered; and the number and types of jobs that would be changed, added, or eliminated. Disclosure of this information is dependent upon a confidentiality agreement satisfactory to the parties. "Significant technological change" shall mean the introduction of new and/or significant changes in existing machinery, equipment, controls and materials, and software.

## Workforce Training and Skills Assessment

## Objective

1. To develop and maintain the highly skilled workforce needed to meet the demands of the ever changing competitive environment through providing

97

employees with the training necessary to meet those demands.

**Study of Workforce Training Needs**

Within six (6) months of the effective date of the Labor Agreement, each Plant Steering Committee shall complete a report (Report) of the expected training needs of the workforce over the term of this Labor Agreement, given the objective set forth above. The Report shall include each of the items listed below.

1. an age and service profile and the anticipated attrition rates of the workforce over the term of this Labor Agreement compared to the anticipated workforce needed over the term of this Labor Agreement.

2. an assessment of the current skill levels necessary for the plant workforce compared to the skill levels necessary for the workforce and any training practices or programs necessary to bring the skill level of the current workforce into alignment with the skill levels currently necessary.

3. an evaluation of the appropriateness of existing training programs and the necessity of developing additional training programs, giving due consideration to changing technology and anticipated future skill needs.

4. an examination of methods by which productivity can be improved through additional training of employees.

5. an examination of the plant's business plan, including projected capital spending, planned or potential new technology or technological change and other relevant factors.

Based on its findings the Plant Level Steering Committee will develop recommendations and a timetable for implementation of a training program in light of the findings in the Report and the objective outlined above. Such report may include separate statements by the parties with respect to any finding or recommendation as to which they disagree.

**Updates**

Annually, after the initial report, each Plant Steering Committee will submit a report to the Top Level Committee that:

1.  Updates the implementation status, including the implementation timetable, of each item contained in the original report.

2.  Identifies modifications necessary to the original findings and/or recommendations and/or new findings and/or recommendations necessitated by changed circumstances.

**Action by Business Unit Leader**

Within thirty (30) days of receipt of the report or update from the Plant Steering Committee, the appropriate business unit leader and the relevant District Director or his designee shall meet to resolve any issues on which the Plant Steering Committee has been unable to agree.

**Safeguards and Resources**

1.  The selection of any consultant to assist in the development of the employee involvement and empowerment process will be mutual.

2.  The parties agree to encourage individual employee participation in involvement and empowerment activities because both parties agree that active employee participation is essential to the realization of the objectives of this Agreement. All meeting time will be paid as hours worked.

3.  Cooperative partnership and the activities generated therefrom shall not conflict with the traditional roles of the local Union, such as the processing of grievances. Such activities will not be used as a device by either party to bypass or undermine the other parties' rights or internal structure. This Cooperative Partnership Agreement will function within the context of the basic Labor Agreement and does not diminish or alter either party's contractual rights.

4. Local Union officials and plant management will be active, constructive participants in the long-term development and evaluation of local cooperative partnership and will not permit team activities to be affected by day-to-day labor-management activities and relationships.

### Final Decision-Making and Dispute Resolution

The parties have entered into this agreement for the purpose of making the Union and the Company partners in joint decision-making to achieve the objectives of this Agreement. After sharing information and discussing and exchanging ideas and considering all views about issues of mutual interest and concern to the parties, decisions should be reached that are in the best interests of the business and the employees. It shall be the goal of the parties to strive for joint decision-making in rendering decisions, resolving issues, and implementing plans for the success and well being of the business and its employees. Finally, in the event joint decision-making is unable to produce an understanding over a matter as to which, absent this Agreement, management has the right to make a final decision concerning such matter, management shall make the final decision and such decision shall not be subject to the grievance procedure. With respect to any matter in this Agreement which deals, in part, with various matters as to which Management has not heretofore had the unilateral right to make decisions, this Agreement gives Management no greater right to make unilateral decisions regarding such matters than it would have in the absence of this Agreement.

Disputes between the local parties over whether a party is living up to its obligations under this Partnership Agreement are not subject to the grievance procedure. However, should such a dispute arise, either local party may refer the matter to the Corporate Director of Industrial Relations and the Union(s) Co-Chairman of the Negotiating Committee or their designee for resolution. Should the Corporate Director of Industrial Relations and the Co-Chairman of the Negotiating Committee be unable to resolve the matter, at the request of either party, it may be submitted to the top-level committee for review.

In conclusion, the Company and Union are strongly committed to this Cooperative Partnership Agreement as a means of promoting the strong labor/ management relations necessary to create a work place that expands the opportunities for each individual to both support and share in the success of the business.

### APPENDIX VI. Interplant Transfer

In addition to the interplant transfer rights to other plant locations as provided in Article IX of the Labor Agreement, an employee who meets the eligibility requirements set forth in this Section shall be given preference over new hires for employment, if available, to locations listed below, if she/he so requests. Such preference shall be in order of Company seniority; however, employees laid off from a plant within fifty (50) miles of where the vacancy exists shall be given first preference.

Point Comfort, Texas      Gum Springs, Arkansas
Wenatchee, Washington

An eligible employee is an employee laid off in any reduction in forces who has at least one (1) year of Company seniority, has maintained his Company seniority and for whom no suitable work is available within the bargaining unit within a reasonable period of time. Further, in order to be eligible, an employee must have no citable discipline (any discipline for which an employee has received disciplinary time off work); must have a safety record that is free of disciplinary actions for a violation of plant safety rules and policies (any discipline for which an employee has received disciplinary time off work); and must be able to pass the hiring requirements for that location (excluding supervisor interviews) and must successfully complete a medical and physical examination including drug screen.

Employees requesting an interplant transfer, under the provisions of this section, to a similar process location, as defined in the table below, will not be subject to the pre-employment skill and knowledge testing at the new location.

| **Current Location** | **Similar Process Location** |
|---|---|
| **Massena, New York (Alcoa)** | **Wenatchee, Washington** |
| **Warrick, Indiana** | **Wenatchee, Washington** |

An employee transferred under the provisions of this Section shall be considered a new hire commencing on his date of employment at the new location for all purposes except such employee shall retain his equivalent seniority for the purposes of determining vacation entitlement, group insurance, SUB and pension service. The new hire probationary period does not apply.

An employee so transferred shall have a trial period of thirty (30) days worked during which either the employee or the Company may decide that continued employment at that location is not in the best interest of the employee and/or the Company. If either party so decides, the employee will revert to the status previously held prior to accepting the transfer and will retain recall rights to his/her former location. Once the trial period of thirty (30) days worked has been completed, the employee shall no longer have recall rights to the plant from which he was laid off.

An employee transferred under the provisions of this paragraph to a new plant location more than fifty (50) miles from the plant from which he was laid off who has completed the trial period of thirty (30) days worked and who changes his permanent residence as a result thereof shall receive a moving allowance of ten thousand dollars ($10,000) payable upon the purchase of a home in the new location or after completing six (6) months of employment on the new job, whichever event first occurs.

The employee shall make written request for such moving allowance in accordance with the procedure established by the Company.

### APPENDIX VII. Team Leader & Team Roles

**1.** The parties recognize the benefit and importance of teams and team roles including the leader position. It is agreed that to further those objectives and principles, the Company may establish a leader position or other job title as locally determined appropriate.. It is the desire of the

102

Company and the Union that the local parties effectively work together as it relates to the team process to determine the number of roles within the team; the work group or team; and the accountabilities of each. The duties will be performed by employees selected from the bargaining unit and such individuals will remain in the bargaining unit. It is recognized that not all locations may establish the leader position and/or team roles. However, if the leader position and/or team roles are established, the following agreement will govern unless modified by agreement between the local union and local management.

2.      The leader position will perform duties as a working member of the team. The duties of the leader position may also include such other duties as coordinating operations; problem solving; coaching and or teaching; leading and developing standardized work; assisting in ABS efforts; restoring product flow; engaging the team; measuring and tracking performance; planning; procuring; scheduling the team; insuring the development of team members; assisting in EHS responsibilities; and performing administrative work . The leader position will not discipline nor have any responsibility or duties related to payroll.

3.      The  leader position shall receive a standard hourly wage rate equal to six (6) job grades higher than the highest evaluated job grade (plus, if receiving, applicable convention(s) but not including the three (3) job grades for team roles and not including the increased job grade(s) for Non-Traditional Assignments) of the job classifications in the leader classification's team. The duties of the leader position will not be considered as duties for wage evaluation purposes. Time worked and job grade paid in the leader position will count for pension job grade determination.  Upon leaving the leader position, pay will revert to the appropriate job grade of the classification held by the employee.

4.      The selection and/or the development process for the leader position will include the following unless modified by agreement between the local Union and local Management. Where the local union and local management have agreements in place for the development and/or selection of the leader position the terms of such agreements shall remain in effect unless modified by agreement between the local union and local management.

**a.** A vacancy will be posted for a leader position opening in the department where such opening exists. Applicants for transfer from other departments will not be considered.

**b.** Employees within the department who bid on such openings will be provided with information outlining the selection process and other source information.

**c.** Employees who bid on such openings must be knowledgeable in the defined area of responsibility.

**d.** The selection process will also include an interview. The interviewers will consist of a member of management from the department where the opening exists and a member appointed by the Union.

**e.** The senior qualified bidder who meets the above qualifications and who passes the interview will be selected.

**f.** Those employees not selected will be provided feedback to prepare them for future opportunities.

**g.** Training will be provided to the successful bidder, area supervision, and team members to identify their various roles. Successful completion of the training is a requirement of the leader position.

**h.** The management within the department (Coaches) will assist the employee in the leader position or in a team role to be successful in fulfilling the requirements of the leader position or a team role. If needed, a development plan will be developed . If the management of the department determines the performance of the employee has not improved after ninety (90) days, the employee will be removed from the leader position or team role.

**5.** Team roles may be developed and implemented in the team. Members of the team who are selected to perform a role within the team will continue to perform the duties of their regular job classification. Examples of a team role may include duties in EHS, quality, scheduling, or continuous

104

improvement. Employees performing team roles shall receive a standard hourly wage rate equal to three (3) job grades higher than the highest evaluated job grade (plus, if receiving, applicable convention(s) but not including the six (6) job grades for the leader position or three (3) job grades for team roles and not including the increased job grade(s) for Non-Traditional Assignments) of the job classifications in the team. The duties performed in a team role will not be considered as duties for wage evaluation purposes. Time worked and job grade paid in the team role assignment will count for pension job grade determination. Upon leaving the team role, pay will revert to the appropriate job grade of the classification held by the employee.

**6.**     It is understood that the work performed by the leader position, in team roles or as team members in no way establishes the exclusive jurisdiction of such work within a bargaining unit or between bargaining unit and non-bargaining unit employees.

**7.**     The negotiating Co-Chairs at the location shall each appoint one person to serve on a joint oversight committee in a joint oversight capacity and serve as the contact point for insuring a smooth and successful implementation. The joint oversight committee shall resolve any disputes. Any unresolved issues shall be submitted to the negotiating Co-Chairs or their designees for resolution. If the Co-Chairs are unable to resolve such issue, it may be appealed to the grievance/arbitration procedure pursuant to the provisions of the Labor Agreement.

**APPENDIX VIII.  Joint Efforts Agreement**

1.  The Company and Union hereby agree to establish a jointly administered public policy fund (Public Policy Fund) meeting the following guidelines.

    a.  Purpose and Mission:  The purpose of the Fund shall be to:

        (1)  support public policies promoting the specific interests of the Alcoa plants represented by the Union on such subjects as energy, health care, currency valuation, and other matters of importance to the parties that promote the long-term viability of these locations and security for the workforce; and

        (2)  to contribute to and promote greater cooperation between labor and management; and

        (3)  to assist the Company and Union in solving problems of mutual concern that are not susceptible to resolution through collective bargaining.

    b.  The Public Policy Fund will pursue its mission through labor-management cooperative endeavors such as public and political education, issue advocacy, research and the coordination of such activities with other likeminded groups.

    c.  The Public Policy Fund shall not make political contributions nor become involved in political campaigns.

    d.  The Public Policy Fund will conduct its work in a non-partisan manner.

106

e. The Fund will have a six-person Governing Committee, with three members of the Committee appointed by the Chief Executive Officer of the Company and three by the International President of the Union.

f. The Company will contribute, no later than September 30, **2019**, the amount required to bring the fund balance to **eight hundred seventy thousand** dollars (**$870,000**) on the date such contribution is made. The Company will have no further obligation to finance the Public Policy Fund during the term of the **2019** Master Labor Agreement.

g. All activities of the Public Policy Fund and expenditures from the Public Policy Fund shall be subject to approval by the Governing Committee.

h. The Governing Committee will develop a report form to track accrued obligations and expenditures on a regular basis.

2. Industry-Wide Committee

a. The Company agrees to join an Industry-Wide Labor/Management Committee (IWC) effective on the agreement of at least one other major aluminum Company's agreement to join such committee.

b. The parties agree that the IWC will serve as a focal point for industry-wide joint activities as agreed to by the parties. The parties will continue to pursue other activities separately as appropriate.

c. The IWC will have a Governing Board consisting of an equal number of Union and Company representatives. The Board will be co-chaired by the President of the USW and a CEO (or his designee) selected by the participating companies.

107

d. All activities conducted under the banner of the IWC shall be approved by the Governing Board.

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN  46402**

RE:      Joint Health Care Committee

Dear **Mr. Millsap**:

During 2010 negotiations, the Union raised concerns about the administration of the negotiated benefits plans and ability of local Union representatives to get responses to unresolved benefits problems.

The parties also discussed the need to meet periodically during the life of the labor agreement to discuss issues that arise concerning benefits.  The parties will establish a Joint Health Care Committee for this purpose and will meet at least twice a year or more frequently as agreed to by the parties.  One representative from the Union from each location will be designated and will participate in these meetings at Company expense.  The Committee will also include such International Union representation as designated by the Union.

The Committee will seek to resolve specific benefit and administrative plan issues, review the performance of the Company's insurance carriers and service providers, and discuss ways to improve the delivery of benefit programs.

The Company will provide web based awareness training for the location Union representatives on the Committee regarding compliance with the Health Insurance Portability and Accountability Act (HIPPA).  It is understood that the Union representatives will not be considered "behind the firewall" for plan administration purposes.

**Mr**. **Michael R. Millsap**
**September 19**, **2019**
Page 2

The Company will also review with the Committee the performance measures used in contracts with its benefits service providers.  Moreover, during the first meeting of each calendar year, the Company will review with the Committee each vendor's performance against the measures for the prior year.

In the unlikely event that an issue cannot be resolved by the committee, it can be referred by either party to the Co-Chairpersons of the National Negotiating Committee for resolution.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Safety and Health Language

Dear **Mr. Millsap**:

In the negotiations for our 2001 Agreement and as revised
during the 2014 Agreement the Company and the Union have
agreed upon the following to clarify and implement the safety
and health language of the Labor Agreement:

1.  Any attempt by an employee, or employees, to
    utilize the procedures of the Article for
    harassment, coercion, retaliation, or to achieve
    objectives other than health and safety, however
    proper those objectives might be if pursued by
    other means, would be abuse of this Article and
    contrary to the Labor Agreement itself.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
               **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN  46402**

RE:      Plant-Level Committees on Health Care & Cost
         Containment

Dear **Mr. Millsap**:

During the course of our recent negotiations, the parties
discussed the problem of escalating health-care costs and the
serious impact which such inflation has had, both on the
ability of the Company to maintain our negotiated group
insurance plans, and on the capacity of active and retired
employees to afford their own out-of-pocket expenditures for
unreimbursed medical services.

This letter will confirm our commitment to develop and
implement cooperative efforts, particularly within the local
community, which will promote greater efficiency in the use
of health-care resources by Steelworkers and their families.
Furthermore, the parties agree to join together to combat those
instances where health-care providers engage in wasteful
practices or overcharge for their services.

In order to achieve our objectives in this area, the Company
and the International Union agree to encourage the
establishment of plant-level committees on health care and
cost containment.

The local committee shall study the operation of the group
insurance plan and particularly the influence which the plan
has on utilization and cost of area health-care services.

Mr. **Michael R. Millsap**
**September 19, 2019**
Page 2

As part of the study, the joint committee may recommend that the benefit provisions applicable to a given employment location be modified on an experimental or permanent basis to determine if a given modification will make more efficient utilization of health-care resources or to take into account particular circumstances at a given employment location.  Any recommendations made by such a joint committee shall become effective only upon written agreement between the Company and the International Union.  The Company and the International Union shall, wherever possible, assist the local committees in carrying out the intent of our understanding.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
         **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN  46402**

RE:     Dispute Regarding Return to Work from Sick
        Leave

Dear **Mr. Millsap**:

This is to confirm that the Company, during the 1996
negotiations, agreed to the following matter:

In the event of disagreement between the Company appointed
physician and the employee's personal physician regarding an
employee's ability or non-ability to return to work from sick
leave, the local Union may request that the matter be reviewed
by the Company's Office of Vice President, Sustainability and
Environment, Health and Safety.  A prompt review of the
findings and conclusions of both involved physicians will be
made and an opinion regarding the issue will be given to the
employee, the local Union, and local Company officials.

The parties agree that for a proper review and well-based
opinion, complete medical records regarding the employee's
condition are essential.  Therefore, such requests must be
accompanied by a written release signed by the employee
which permits the designated representative of the Company's
Office of Vice President, Sustainability and Environment,
Health and Safety, access to such records.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

During the review period set forth above, an employee's sickness and accident benefits will continue until the opinion is issued from the office of the Vice President, Sustainability and Environment, Health and Safety, if the employee would otherwise be eligible for sickness and accident benefits and has not exhausted such benefits.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
                           **Michael R. Millsap**

115

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Joint Training of the Joint Safety & Health
          Committee Members

Dear **Mr. Millsap**:

During the course of the negotiations of our 1996 Labor
Agreement and again in 2014, the parties discussed the
potential benefits that might be gained through joint training
of the joint Safety and Health Committee members.  As such,
the parties agreed the Company, in cooperation with the
International Union, will provide JSHC training at each
location, open to all committee members (union and
management) with the objective of improving the
effectiveness of the JSHC and the prevention of occupational
injuries/illness.  Such training shall be provided at least once
during the duration of this agreement or more times as may be
determined as a result of the following described joint
assessment.

It was also reaffirmed that at each location the local parties
should periodically assess the needs for conducting such
training.  If such assessment reveals a need for specific
training, the Co-Chairpersons of the committee will develop
an appropriate agenda for such training.  The training will be
held at a mutually agreeable date, time and location.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

116

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:      SOAR-PAC

Dear **Mr. Millsap**:

During our 1996 negotiations the Company agreed to make
deductions from earnings for each union member who signs
voluntary authorization cards in forms agreed to by the
Company and the Union and to remit the deductions to the
Union for inclusion in the Union SOAR-PAC.

The procedure to be followed will be as stated in check-off.
The Union agrees that the indemnity set forth shall apply to
the Company's actions taken or not taken pursuant to this
letter.

The provisions of this letter shall be effective in accordance
with and consistent with the applicable provisions of state or
federal law.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

117

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:        Managed Care Program

Dear **Mr. Millsap**:

During their 1993 negotiations the parties agreed to a
Managed Care Program designed to replace the current
Employee Group Benefit Plan.  Essential to that Managed
Care Program are a list of protocols as well as Managed Care
Program evaluation criteria and standards and the
establishment of a Joint Union-Management Managed Care
Committee and Area Review Committees.

The parties agree that the Managed Care Program will go into
effect January 1, 1994, at all locations and that the current
Employee Benefit Plan will remain in effect until that date.
The local parties will monitor the performance and quality of
the network against the protocol and criteria established.

The parties further agree that when the Managed Care
Program goes into effect it will be accompanied by a "Fresh
Start" for purposes of determining limitations for visits,
confinements, and any associated costs for services, treatments
or medical supplies, as well as for lifetime maximums.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

The protocols and criteria and standards for the Managed Care Program will be established in advance of the Union's ratification vote.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
**Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:  National Health Care Program

Dear **Mr. Millsap**:

During our discussions of the 1993 collective bargaining
agreement, the parties recognized that a National Health Care
Program was under active discussion in Washington, D.C. and
throughout the country.  While the parties do not know what
the details of such a Program might be and how it might
impact bargaining-unit employees and the Company, the
parties agree that should such a Program become effective,
they will meet to resolve any issues raised by the overlap of
that Program with the insurance program for bargaining-unit
employees by utilizing the following principles:

1.  Duplication will be eliminated at no loss to
    employees.

2.  Net savings, if any, realized by the Company from
    the implementation of the National Health Care
    Program shall be paid into a fund established for
    payment of retiree insurance costs in future years.
    "Net Savings realized" will be measured as the
    amount of reduction in the Company's cost from the
    amount of expense in the calendar year immediately
    prior to full implementation of a National Health

**Mr. Michael R. Millsap**
**September 19,2019**
Page 2

       Care Program and shall take into consideration any
premiums, taxes, or other contribution paid by the
Company associated with funding the National
Health Care Program.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
           **Michael R. Millsap**

121

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Contracting Out Site Visits by Joint
         Labor/Management Team

Dear **Mr. Millsap**:

During the 1996 labor negotiations, one issue of concern was
contracting out.  Based on these discussions, there are
apparent questions with respect to the interpretation and
implementation of the Contracting-Out Process Guiding
Principles by some of the local parties.

Therefore, it is mutually agreed that a Joint
Labor/Management Team will be appointed to visit each site
covered under the Agreement.  The Joint Team will meet with
the local Contracting-Out Representative of the Union and
Management to discuss and explain the principles, as well as
the process.  The Joint Team will make a report of their efforts
to the USW Negotiating Committee Chairman and the
Corporate Director of Industrial Relations.

It is further agreed that a copy of each contracting-out notice
provided to the Local Union Contracting-Out Committee will
be forwarded to the Chairman of the USW Negotiating
Committee.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
                     **Michael R. Millsap**

122

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Company/Union Meet Twice During Term of
           Labor Agreement

Dear **Mr. Millsap**:

The Company and the Union including local plant
Management and Union representatives shall meet twice
during the term of the Labor Agreement at a mutually
agreeable time and location.  Full and candid discussions shall
be encouraged in these meetings with the objective of
advancing the shared interests of the Company, the Union, and
the employees.  Subjects for discussion shall include Company
and industry operating conditions, domestic and foreign
investments, governmental affairs and other relevant topics as
may be agreed upon by the Company-Union Co-Chairman.


Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:     Alcoholism & Drug Abuse As Treatable Illness

Dear **Mr. Millsap**:

This is to confirm that the Company, during the course of
2001 negotiations, agreed to the following policy statement:

Alcoholism and drug abuse are recognized by the parties to be
a treatable illness.  Without detracting from the existing rights
and obligations of the parties recognized in the other
provisions of this Agreement, the Company and the Union
agree to cooperate at the plant level in encouraging employees
afflicted with alcoholism or drug addiction to undergo a
program directed to the objective of their rehabilitation.
Neither job security nor promotional opportunities should be
jeopardized by a request for treatment for either alcoholism or
drug use.  Such request and all records shall remain
confidential.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                          **Michael R. Millsap**

124

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:       Musculoskeletal Disorders (MSDs)

Dear **Mr. Millsap**:

During the negotiation of the 2001 Labor Agreement, the
parties discussed the importance of preventing
musculoskeletal disorders (MSDs) through implementation of
ergonomic principles and programs in the workplace.  The
parties agreed that MSD risks can be addressed effectively
through comprehensive joint labor-management health and
safety programs.  As such, the parties committed to jointly
promote and implement the principles of a comprehensive
ergonomic program.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN 46402**

RE:     Workers' Memorial Day

Dear **Mr. Millsap**:

The USW and Alcoa are recognized as having some of the
most effective health and safety programs in the world
because health and safety is a primary objective for both
organizations.  However, the parties recognize that our health
and safety processes and programs have not totally eliminated
fatalities from our workplaces.  As such, the parties have
agreed to honor the memory of those individuals who have
died in our workplaces as part of the Workers' Memorial Day
observed annually on April 28.  The locations' Joint Safety
and Health Committees will jointly determine the appropriate
activities in observance of this day.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Joint Health & Safety Committee Audits

Dear **Mr. Millsap**:

The parties discussed the importance of comprehensive audits
and self-assessments as important elements of a successful
health, safety, and environmental program during the 2001
negotiations.  The parties additionally discussed how the
appropriate involvement of representatives of the locations'
Joint Health and Safety Committees in these audits can
directly enhance the effectiveness of that location's joint
safety and health processes.  To that end, the locations where
it is not already occurring, the Company commits to work with
those locations' Joint Safety and Health Committees to
mutually establish how the Committee members will become
engaged in the process of auditing.



Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                          **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN  46402**

RE:      Adoption of Partnership Agreement & APS

Dear **Mr. Millsap**:

During the 2001 contract negotiations, the parties discussed
the competitiveness of Master Agreement locations.  Master
Agreement locations continue to face major competition from
both domestic and global operations.   Both parties recognize
that long-term survival and potential growth in these locations
will only result if we can find better ways to work together.
Future success will be determined by our ability to make
change at accelerated rates.

Leaders of both institutions believe that the Master Agreement
locations should drive toward or continue to be world-class
operations in terms of safety, productivity and workers job
satisfaction.  The leaders believe that the full adoption of the
Partnership Agreement and the Alcoa Production System
(APS) will be enablers in this process.  Furthermore, success
will lead to greater levels of compensation and the parties
believe that through the full adoption of Partnership/APS,
employees will gain greater long-term security and operations
will have the potential for added growth.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                        **Michael R. Millsap**

128

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      FMLA

Dear **Mr. Millsap**:

This letter will confirm our understanding reached during the 2001 negotiations concerning the Family Medical Leave Act (FMLA).

1.      The period an employee is receiving Sickness & Accident benefits will be counted toward the employee's FMLA leave.

2.      Vacation time will be counted toward the FMLA leave.  However, each employee will be allowed to retain one week of vacation exempt from application toward such leave.

3.      Where both spouses of a married couple are employees of the Company, each employee will be entitled to up to 12 weeks of FMLA leave.

4.      Health care benefits will continue for the full period of a FMLA leave.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**


129

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Contracting Out Process

Dear **Mr. Millsap**:

This letter will confirm our discussions during the 2001
Negotiations concerning the implementation of procedures for
joint contracting out processes.  The Company will establish
joint location-specific, business-based contracting out
processes consistent with the Guiding Principles at those
locations where such processes have not been established.

The Company reconfirms its commitment that the locations
will adhere to these processes.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                                    **Michael R. Millsap**

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Joint Health & Safety Conferences

Dear **Mr. Millsap**:

During the negotiations of the 2001 Labor Agreement and
again in 2014, the parties discussed how jointly-sponsored
conferences on safety and health can enhance the joint safety
and health efforts in the facilities covered by this Collective
Bargaining Agreement (CBA).  The purpose of these
conferences would be to seek out opportunities to reduce the
fatality and illness potential at our facilities, improve
communication between the parties, and establish a forum for
the sharing of best practices and lessons learned to improve
each location's joint safety, health and environmental
processes.  These meetings will occur annually and be held at
a mutually agreeable time and location.  The USW and Alcoa
HS&E conference leadership shall schedule the conference at
the same time as the USW's Health, Safety and Environment
Conference.  At a minimum, the participants will include two
(2) Joint Safety and Health Committee representatives (one
hourly and one salaried) from each location covered by this
CBA, representatives of the USW Health, Safety and
Environment Department, and appropriate representatives
from the business unit and corporate organizations.  The
company will pay the full lost time and expenses for the
number of union member(**s**) of the JSHC from each location
as provided in the table below.  Additional union
representatives may attend at union expense.

| Plant Bargaining Unit Population | Total Hourly JSHC Members |
|----------------------------------|---------------------------|
| 1-50                             | 1                         |
| 51-750                           | 2                         |
| 751 and above                    | 3                         |

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2


Additionally, the Company will pay the full lost time and expenses for the above identified JSHC members to attend the USW's Health, Safety and Environment Conference, when the conference is held the same week as the joint meeting held by the Company.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
      **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Retiree Health Care

Dear **Mr. Millsap**:

Effective January 1, **2020** and through December 31, **2023**, the
Company will maintain its program of medical and
prescription drug benefits, subject to the modifications and
required individual Participant premiums summarized on
Appendix A ("Program") for post May 31, 1993 retirees,
certified domestic partners (as defined by the Health Care
Benefits Agreement), spouses and surviving spouses of
retirees who were hired prior to June 1, 2006 and retire from
the "USW Locations" listed below ("Current Participants"),
and "Other USW Locations" listed below ("Other
Participants") (Current Participants and Other Participants are
herein referred to as "Existing Participants").  Employees
hired on or after June 1, 2006 and before July 1, 2010 and
retire from a current USW Location as of May 31, 2010
("New Participants") will also be eligible for the Program, **but
prior to October 1, 2019 are not eligible for the Retiree
Health Care Account. Effective October 1, 2019, New
Participants will also be considered Current Participants
and therefore eligible to participate in the Retiree Health
Care Account as of October 1, 2019.**  (Existing Participants
and New Participants are herein referred to as ("Participants").
Notwithstanding anything to the contrary, the Current
Participants and claims costs attributable to Frederick, MD
(Eastalco) shall be limited to post October 1, 2001 retirees,
certified domestic partners, spouses and surviving spouses of
retirees, and such Participants shall be covered by the
Program, effective January 1, 2007.  Non-spouse and non-
domestic partner eligible dependents will also continue to be
eligible for coverage under the Program, but will not be
treated as "Participants" for purposes of this Agreement.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

Employees hired on or after July 1, 2010 will not be eligible for the Program or the Retiree Health Care Account.

<u>Guaranteed Company Contributions</u>
Notwithstanding the foregoing, and disregarding the Medicare Part B premium reimbursements provided for on Appendix A, the annual per capita cost of the Company under the Program will be limited to the following amounts: $7,767 for each pre-Medicare Current Participant, and $6,121 for each pre-Medicare Other Participant ("Pre-Medicare Caps"), $3,389 for each post-Medicare Current Participant, and $2,334 for each post-Medicare Other Participant ("Post-Medicare Caps") (the Pre-Medicare Caps and Post-Medicare Caps together are the "Cap"). Notwithstanding the above, the annual per capita cost of the Company under the Program for the Frederick MD (Eastalco) facility will be limited to the following amounts: $6,341 for each pre-Medicare Participant, and $2,962 for each post-Medicare Participant.

<u>Number of  Participants and Participant Categories:</u>
For the purposes of this agreement, Participants shall be divided into the following categories:

A.   Pre-Medicare Existing Participants USW Locations

B.   Medicare Eligible Existing Participants USW Locations

C.   Pre-Medicare Existing Participants Other Locations

D.   Medicare Eligible Existing Participants Other Locations

<u>Benefit Plans</u>
For all Participants, the Program shall be as follows:

Participants under age 65 who are not eligible for Medicare are covered under the same medical and prescription drug

134

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 3

coverage (excluding premiums) as outlined in the **July, 2019** Settlement Agreement between the parties covering USW Master Agreement Locations.

Participants age 65 and over or who are eligible for Medicare are covered under the same prescription drug coverage (excluding premiums) as outlined in the **July, 2019** Settlement Agreement between the parties covering USW Master Agreement Locations. The medical coverage for such participants shall remain unchanged.

Participant Premiums
Participant premiums, as summarized on Appendix A, and plan redesign will be used to reduce the overall cost of the Program for all Participants covered by this Program. The parties agree to discuss any increases to the premiums during the term of this agreement.

Company Contributions
**Per the Agreement effective January 1, 2015** the Company agrees to provide **a** contribution equal to **$2,212,500** as of December 31, **2019.**

Retiree Health Care Account
The Company agrees to continue the non-interest bearing account ("the Account") for Existing Participants which shall be the sum of: (i) the Balance in the Account as of **October 1, 2019** (as adjusted per the Per Capita Claims Cost Determination and Reconciliation methodologies, (ii) Company Contributions, and (iii) Participant Premiums. The balance of the Account will apply to offset costs for the Program until the account is exhausted.

Program Costs
In the event that prior to December 31, **2023**, in a given Measuring Period the average projected per capita claims cost of the Program (including administrative expenses) exceeds the amount of the Cap (plus, for Existing Participants only, the per capita share of the Account), the excess cost will be borne by the Participants. Their participant premiums will be increased for any excess costs of the Program.

135

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 4

<u>Per Capita Claims Cost Determination</u>
For purposes of determining the per capita claims cost of the Program, prior to June 1, 2007 and each July 1 thereafter, the Company will:

(i)      Collect medical and prescription drug claims with dates of service during the most recent consecutive twelve-month period from January 1 through December 31 ("Measurement Period") and paid through the end of February 28 of the following year. The medical claims will be adjusted to reflect changes in plan design, and claims incurred during the Measurement Period but not paid as of February 28 of the following year (prescription drug claims will be assumed fully incurred as of February 28). This adjustment will be based on a factor developed from medical claims incurred during the prior Measurement Period and paid through the end of the current measurement period, as compared to the amount paid through February 28 of the current Measurement Period.

(ii)     Determine annual costs on a per Participant basis by dividing the incurred claims by the weighted average number of Participants enrolled in the Program during the Measurement Period. While claims for other non-spouse and non-domestic partner eligible dependents will be used in the calculation, non-spouse and non-domestic partner eligible dependents will not be included in the denominator in the 'per Participant' cost calculation.

(iii)     Project the Measurement Period's incurred claims costs into the target calendar year (the year these costs will be used for contributions) using appropriate medical and prescription drug trend rates as defined by **AON** (or its successor) internal trend expectations and the appropriate number of months of trend.

136

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 5

(iv)      Add administrative costs to the incurred claims. These administrative costs will be those established by the claim and benefit outsourcing administrators and subject to review for reasonableness.

(v)      Develop the appropriate per capita claims cost per Participant. The claims data and enrollment counts should be based on all Participants enrolled in the plan during the Measurement Period. These calculations will be performed separately for pre-Medicare and post-Medicare eligible Participants.  The parties will evaluate whether it is appropriate to merge plan experience for Current Participants and Other Participants.

The foregoing information will be provided to the Union by May 1 of the prior year to which the per capita claims cost data will apply.  Within 30 days of delivering the foregoing information, the Union will inform the Company of any dispute it may have as to the data.

<u>Reconciliation</u>
In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is less than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be added to the Account.

In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is greater than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be deducted from the Account.

<u>Dispute Resolution</u>
The International Union, through the Chair of its Negotiating Committee or his/her designee, will have the right to review any information, calculation or other matters concerning this Agreement.  In the event of a dispute between the parties regarding this agreement, the **Company's Director of Industrial Relations** and the President of the International Union, or **their** designee, will attempt to reach an agreement

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 6

to resolve the discrepancy. Should the parties be unable to resolve the dispute, they will select an independent Third Party with the appropriate expertise relative to the dispute, to review each party's position related to the issue being disputed and to render a written opinion concerning the issue by July 1 of the year in question. In no event will a dispute delay the Company's annual enrollment process, but the dispute resolution will be applied through prospective adjustments to the Program. The opinion rendered by the Third Party will be final and binding on both parties. However, the opinion will not be cited by either party with respect to any other issue except ones relating to this Agreement. The costs associated with the Third Party will be borne equally by the parties.

<u>Deferral and Re-enrollment</u>
Participants may elect to defer participation in the Program based on the availability of other health care coverage. Participants who lose coverage from other sources will be allowed to enroll (or reenroll) in the Program immediately upon notice and payment of the applicable premium.

Participants who elect to defer participation will be given the opportunity to enroll (or reenroll) in the Program during the next annual enrollment period.

Participants who withdraw or whose coverage is terminated for failure to make the required premium contribution, will be allowed to enroll (or reenroll) in the Program after six months without coverage under the Program.

<u>Communication</u>
The parties will, in good faith, attempt to develop a joint communications strategy to notify Participants of the changes to the Program and applicable premiums by **November 1, of each Plan year**.

<u>Litigation</u>
To the extent a court ruling affecting the Program changes the Company's obligations under this agreement, the parties agree to negotiate over the impact of the ruling.

Mr. Michael R. Millsap
September 19, 2019
Page 7

<u>Collective Bargaining Obligation</u>
The parties agree that the subjects of Participant Premium,
plan design, and Company Contributions set forth in this
 letter will be mandatory subjects of bargaining in any
negotiations commencing prior to December 31, **2023**.

| USW Locations: | Other USW Locations: |
|---|---|
| Alcoa, TN **(GPP Portion)** | Listerhill, AL **(Reduction Plant)** |
| Badin, NC | Bellwood, VA Extrusions Plant |
| Baton Rouge, LA | Corpus Christi, TX **(Sherwin)** |
| Bauxite, AR | Fort Meade, FL |
| Gum Springs, AR | Longview, WA |
| Hot Springs, AR | Louisville, KY Plant 3 |
| Lake Charles, LA | Richmond, IN |
| Louisville, KY Plant 1 | Torrance, CA Extrusions Plant |
| Massena, NY East | |
| Massena, NY West **(GPP Portion)** | |
| Point Comfort, TX | |
| Richmond, VA | |
| Rockdale, TX | |
| Troutdale, OR | |
| Warrick, IN | |
| Wenatchee, WA | |
| Mobile, AL | |
| Frederick, MD (Eastalco) | |

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                                **Michael R. Millsap**

APPENDIX A

Pre-Medicare coverage will be the same medical and
prescription drug coverage as active employees. Post-
Medicare coverage will be the same medical coverage as of
May 31, 2010 and same prescription drug coverage as active
employees.

<u>MONTHLY PER PARTICIPANT PREMIUM
CONTRIBUTIONS FROM JANUARY 1, **2020** THROUGH
DECEMBER 31, **2023**</u>

USW Location Existing Participants (each retiree, spouse, or
surviving spouse).

| Year | **2020** | **2021** | **2022** | **2023** | |
|---|---|---|---|---|---|
| Pre-Medicare | $90 | $90 | $90 | $90 | |
| Post-Medicare | $50 | $50 | $50 | $50 | |

Other Location Existing Participants (each retiree, certified
domestic partner, spouse, or surviving spouse).

| Year | **2020** | **2021** | **2022** | **2023** | |
|---|---|---|---|---|---|
| Pre-Medicare | $150 | $150 | $150 | $150 | |
| Post-Medicare | $75 | $75 | $75 | $75 | |

APPENDIX A (continued)

<u>MEDICARE PART B PREMIUM REIMBURSEMENT</u>:

All Medicare Part B reimbursements are capped at current amounts:

Participants retired on or after June 1, 1993 but prior to January 1, 1994, $88.50
Participants retired on or after January 1, 1994 but prior to April 1, 2002, $46.10
Participants (excluding new hires after June 1, 2006) retired on or after April 1, 2002, $88.50
New hires on or after June 1, 2006, None
Participants retired from the Frederick MD (Eastalco) facility, $50

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Employment Security

Dear **Mr. Millsap**:

During the **2019** negotiations, the parties discussed the subject
of employment security and agreed as follows.

Alcoa will strive to provide employment security as set forth
herein, to employees of the Company who have two or more
years of Company seniority on June 1, **2019**, or attain two or
more years of Company seniority during the term of the **2019**
Labor Agreement.

In the event there is a need for a layoff at a particular location,
prior to implementing the layoff the Company will first offer
voluntary quit packages consisting of $400 for each full year
of Company seniority and $10,000.  Quit packages will be
offered to employees actively employed in the plant by
seniority, subject to skill sets needed to maintain efficient
operation of the plant, and may not all be granted at the same
time so that the Company can manage operation of the
affected plant.  The acceptance of the voluntary quit package
shall terminate the seniority of the employee, with no right of
re-employment.

The employment security commitment as set forth by the
above provisions is applicable for the duration of the **2019**
Labor Agreement.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

The commitments set forth above will not apply in the event of Acts of God, terrorism, strikes, war or other force majeure events. Nothing in this commitment shall impact the Company's right to declare a plant, department or substantial portion thereof as being shut down, in which case the above provisions will not apply.

Moreover, the parties agree that the provisions of this Letter of Understanding are subject to the grievance and arbitration procedure set forth in this Labor Agreement.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

143

September 19, 2019

Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:      Contracting Out/Employment Security

Dear **Mr. Millsap**:

This letter will confirm the agreement reached during **2019**
negotiations that consistent with the parties intent and the
Company's commitment to employment security, the
Company will not contract out work for performance within
the plant that is currently performed by bargaining unit
employees if such contracting out would directly result in the
layoff from the plant of an employee who has two (2) or more
years of Company seniority on May 16, **2019** or who attains
two (2) or more years of Company seniority during the term of
the **2019** Labor Agreement.

Disputes concerning this letter at the facilities located in Pt.
Comfort, TX; Massena, NY (West Plant); Warrick, IN; and
Wenatchee, WA, shall be subject to the grievance procedure
but shall not be subject to arbitration.  No strike, work
stoppage, or lockout will be caused or sanctioned until
negotiations have continued for at least five (5) days at the
final step of the bargaining procedure described in the
procedure for handling grievances.  Thereafter, any strike
which occurs under such circumstances shall not be deemed to
be a violation of the Agreement applicable to the location,
which shall continue to remain in full force notwithstanding
such strike.

Disputes concerning this letter at the facility located in Gum
Springs, AR, shall be subject to the grievance procedure but
shall not be subject to arbitration.  No strike or lockout will be
caused or sanctioned until negotiations have continued for at

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

least ten (10) days in accordance with the procedure set forth
in Article XVIII, Section 7 of the Agreement.  Thereafter, any
strike which occurs under such circumstances shall not be
deemed to be a violation of the Agreement applicable to the
location, which shall continue in effect during such strike.


Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
              **Michael R. Millsap**

145

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:        Unexpected Forced Overtime

Dear **Mr. Millsap**:

During the 2006 Negotiations the parties discussed the issues
that can result when employees work extended hours and are
unexpectedly "forced" to work hours beyond their regularly
scheduled shifts.  The parties agreed that extended work hours
and forcing employees to unexpectedly work overtime is
undesirable.  Over the years, the parties have diligently
pursued the elimination of all causes of accidents and injuries
in the workplace.  Toward this end, the parties have
committed to the identification of the causes of these upset
conditions and then working together in an effort to identify
ways to minimize both excessive work hours and unexpected
"forced" overtime.

Within ninety (90) days of ratification each location will
conduct a thorough review of the current overtime situation.
Both parties are committed to having open and honest
dialogue to identify the root causes of excessive work hours
and unexpected forced overtime.  The parties shall explore and
attempt to solve to the root cause, at a minimum, the following
potential causes of extended work hours and/or unexpected
forcing:

| Absenteeism/Employee Availability | Vacation Scheduling |
|---|---|
| Transfers/Job Bidding | Work Schedules |
| Business Seasonality/Cyclicality | Employment Levels |
| Equipment Reliability | Retirements |
| Upgrades | Customer Commitments |
| Training | Attrition |

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

The parties shall also develop 90 day plans for minimizing excessive work hours and unexpected "forced" overtime. The Location Manager and Local Union President at each plant covered by this Agreement shall conduct a quarterly review concerning the progress towards those plans.

Beginning September 1, 2006, each location covered by this Agreement will implement guidelines restricting employees from being unexpectedly forced to work overtime more than five (5) shifts in a rolling four (4) week period. During any seven (7) day scheduling period, should the percentage of voluntary overtime for the involved distribution unit fall by 10% or more below the prior calendar year's average the forced overtime limits for that period will not apply. There may also be circumstances necessitating the suspension of the limitation described above. Examples of such situations include, but are not limited to such things as: significant environmental, health or safety incidents or significant customer impact, etc. Additionally, no employee shall be unexpectedly forced to work more than two (2) shifts in any seven (7) day scheduling period.

Finally, the parties agree that the Top Level Committee shall bi-annually review the information provided by the location to ensure compliance with the spirit of the commitment.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
                    **Michael R. Millsap**

147

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:      Retirement Notification Incentive

Dear **Mr. Millsap**:

During our 2006 negotiations, the parties agreed to establish an incentive program that will encourage employees to give advance notice of their intent to retire from the Company.

Accordingly, an employee who provides three (3) full months of advance notice of the employee's intent to retire under one of the following retirement options shall receive at the time of retirement a payment of $500, less applicable tax deductions: Normal; 62/10; 60/10; or 30-year. The $500 payment will not be applicable to an employee who receives a voluntary quit package and/or retirement incentive package.

**An employee wishing to qualify for this incentive payment must contact ALCOA4U and provide notice three (3) full months before the date of retirement. Confirmation of notice will be provided to the employee.**

In accordance with the existing retirement process, the employee also must **request** an **application form with ALCOA4U** anytime after he/she becomes eligible to retire under the retirement benefit provisions identified above (or is within ninety (90) days of becoming eligible to retire under such retirement benefit provisions) to begin the retirement process.

An employee who **provides notice to ALCOA4U** as described herein, and who later decides not to retire as stated.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

will be disqualified from future participation in this incentive program.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                                **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Total Productive Maintenance (TPM) Program

Dear **Mr. Millsap**:

During the 2006 negotiations, the parties discussed the Total
Productive Maintenance (TPM) program.  A critical
component of the TPM program includes the team-based
approach to clean and inspect equipment and the surrounding
work area and involves production and maintenance
employees as well as supervisors, engineers and other
members of management.  The parties agree that the
participation of supervisors, engineers and other members of
management in the cleaning and inspecting of equipment and
the surrounding work area as part of a scheduled TPM event is
not a violation of this Agreement.

Moreover, the parties agree that participation by non-
bargaining unit employees in scheduled TPM events as set
forth above is non-precedent setting and will not apply or be
cited by the Company relative to any other program or
process.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Training Resources Evaluation

Dear **Mr. Millsap**:

During the 2006 negotiations, the parties agreed to modify the Workforce Training and Skills Assessment provisions of the Cooperative Partnership Agreement.

The modification requires an assessment of skill levels, training programs, etc. be completed by the local parties within six (6) months of the effective date of the Labor Agreement and that based on the assessments, each Plant Steering Committee submit an initial report of their findings and recommendations to the Top Level Committee.

After reviewing the reports from each plant, the parties recognize that it may be necessary to provide additional resources to aid in the implementation of the recommendations of the local parties.  Therefore, as part of the process of reviewing the reports of the Plant Level Steering Committees, the parties will evaluate the need for an additional training resource.  If it is agreed that such a resource is necessary, they will mutually agree to the selection of the resource.  Should it be agreed that an additional training resource is necessary prior to the review of the Plant Level Steering Committee reports, the parties may mutually agree to the selection of the resource at that time.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
                           **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Interdepartment Transfers

Dear **Mr. Millsap**:

During 2006 Negotiations, the parties entered into a Letter of Understanding regarding restrictions on interdepartmental transfers.  The parties recognize there are existing local agreements addressing interdepartmental transfers and agree that the Letter of Understanding referenced above does not affect these existing local agreements except as the local parties may otherwise agree.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
              **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Transfer/Recall

Dear **Mr. Millsap**:

During the negotiation of the 2006 Labor Agreement, the
parties discussed situations where an employee whom the
Company would otherwise have transferred to a permanent
vacancy or recalled was required by the Company to
temporarily remain in another department.  The parties agreed
that in such situations, the following would apply:

1.   The employee's departmental seniority and bidding
     rights in the department to which he is transferring or
     being recalled would commence as of the date the
     Company would have physically transferred or
     recalled such employee absent the Company's
     decision to require the employee to temporarily
     remain elsewhere.

2.   An employee who is awarded a transfer to another
     department or recalled to his or her home department
     will be released from his or her current department no
     later than sixty (60) days from the date of the award
     or recall.  The parties agree that the "date of the
     award" for the purposes of this letter will be defined
     as the first Monday following the removal of the
     vacancy posting or recall.  An employee may be held
     for more than sixty (60) days from the date of the
     award in the event of an unforeseen or unusual
     circumstance, but in no event will an employee be
     held for more than ninety (90) days from the date of
     the award.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

3. If an employee is held for more than thirty (30) days from the date of the award, the employee will receive the rate of pay for the classification on which he is being held or the classification to which he will transfer, whichever is higher, for the period of time he is held after thirty (30) days from the date of the award, up to and including sixty (60) days, or if applicable, ninety (90) days.

4. An employee hired on or after June 1, 2006, will not be considered for an interdepartmental transfer to fill a vacancy in a new job classification in another department or a vacancy in an existing classification in another department unless that employee has been in his/her current department for at least twelve (12) months. This twelve (12) month requirement will not apply to vacancies for apprenticeships for skilled crafts.

5. The local Union President and the local Plant Manager may agree in writing upon such applications or modifications to these procedures that are suitable to their location. However, absent such agreement, the above procedures and applications will apply.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN  46402**

RE:        Burden Rates for Contracting Out

Dear **Mr. Millsap**:

During the 2006 negotiations, the parties discussed the Burden
Rates used in contracting out discussions when comparing the
cost of using outside contractors vs. bargaining unit employees
at each of the Master Agreement locations and that the Burden
Rates should provide a fair and reasonable basis for such
comparison. The Burden Rates include Retiree Medical or
OPEB (Other Post Employment Benefits) that is comprised of
two components. One is the accrual for the active employees
for the cost of their medical benefits upon retirement. The
other component is the cost associated with the retirees who
retired from the location. The Burden Rates in the comparison
of outside contractors vs. bargaining unit employees described
above will exclude the cost component for the retirees who
retired from the location.


Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      64/66 Hour Work Rule

Dear **Mr. Millsap:**

During the negotiation of the 2006 Labor Agreement the parties discussed the relationship between the risk of injury to our employees and working extended hours.

In recognition of the increased risk of injury for employees working extended hours, the parties have agreed that, as it relates to the overtime distribution procedures established under the Labor Agreement or through local agreement, limiting extended work hours under the 64/66 hour work rule is an acceptable reason for deviating from the low and/or junior person or equalization requirements of those procedures.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                           **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN 46402**

RE:     401(k) Company Contributions & Deferrals

Dear **Mr. Millsap**:

The Company shall offer employees the opportunity to participate in the Retirement Savings Plan for Hourly Employees of Alcoa USA Corp. (the "Plan").

The Company shall match employee pre-tax contributions up to 6% of eligible pay as follows:

- 75% matching contribution percentage at Massena, Warrick and Wenatchee; and

- 50% matching contribution percentage at Gum Springs and Point Comfort.

The Company does not match any portion of bonus, variable pay, Pay for Performance or other similar payments.

As agreed to under the 2001 Labor Agreement, employees at Massena, Wenatchee, and Warrick will have 53.6 cents per hour worked deposited in the Retirement Savings Plan. The 53.6 cents is diverted from the Cost-of-Living Adjustment that became effective March 3, 1986, and is otherwise not payable under the 2001 Labor Agreement.

As agreed to under the 2014 Labor Agreement, employees may elect to defer up to 50% of performance pay for awards earned starting with the 2015 Performance Pay Plan.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2


It is acknowledged and agreed that other than the increase or
decrease of the Company Match and the deferral of
Performance Pay, the Plan's administration and participants'
rights under the Plan shall be concurrent with the
administration and participants' rights under the Retirement
Savings Plan for Salaried Employees of Alcoa USA Corp.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN 46402**


RE:  Plant Closing Program

Dear **Mr. Millsap**:

The Company and the Union recognize their mutual interest in the continuing economically competitive performance of plant and major operating departments.

However, in light of the potential, far-reaching impact which a permanent shutdown of a plant or major operating department may have on affected employees, a Plant Closing Program shall be established, as follows:

(1)  The Company shall provide ninety (90) days' written notice, if circumstances permit, to the International Union of its intention to permanently close a plant or major department.  In the event of such notice, the parties shall immediately commence discussions regarding the impact which the closing will have on affected employees.  At the Union's request, the Company shall explain the basis for its decision to close a plant or major operating department.

Without being obligated to bargain over its decision to permanently close a plant or major operating department, the Company shall consider any proposals of the Union which may either postpone or avoid the necessity for the closing, or which may minimize the adverse consequence of the closing for affected employees.

159

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

(2)    If a plant or major operating department is to be permanently shut down, the Company and the Union will designate appropriate representatives at the location to coordinate such activities as:

- liaison with federal, state, and local governmental officials who have some relationship to the assistance of affected employees in an effort to focus governmental support for the affected employees;

- personal contact with affected employees to assess needs and personal preferences in terms of assistance.

(3)    The Company will make available informational services to affected employees concerning applicable benefit programs and job opportunities possibly available at other plants of the Company covered by the Labor Agreement. The Company shall also cooperate with the state unemployment service, area business organizations, and other appropriate private or public employment agencies in an effort to secure job placements with other employers.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                          **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Compensation Plan for Future New Hires and
              Rehires

Dear **Mr. Millsap**:

Employees hired or rehired after July 1, 2010 will not be eligible for retiree medical benefits. **Effective the first full payroll week following ratification on September 19, 2019, those employees will receive a Company contribution into his/her individual 401(k) savings plan account of fifty cents ($0.50) per hour worked u**pon successful completion of one (1) year of employment, and beginning on his/her first anniversary date.  A separate sub-account will be established within the employee's savings plan account for these contributions, and the funds in this sub-account will not be available to the employee for withdrawal or loans.  Contributions to the sub-account will be placed in a professionally managed investment fund, which is automatically adjusted based on the employee's projected retirement age.  The employee will have the right to change the investments of this fund if they so choose.  The employee's sub-account will be available for withdrawal upon retirement or termination of employment for any reason.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____

**Michael R. Millsap**

September 19, 2019

Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:      FMLA Absences Impact on Departmental
          Seniority

Dear **Mr. Millsap**:

During the negotiations of the 2010 Labor Agreement the
parties discussed the issue of seniority adjustments for
employees who are on properly authorized Family Medical
Leave (FMLA).  The Company agreed that it would not adjust
an employee's Departmental Seniority as a result of an
employee having taken such leave of absence from the
Company.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
               **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Plant Investment Commitment

Dear **Mr. Millsap**:

This letter will confirm that the parties discussed the competitiveness of the Master Agreement locations and the importance of maintaining and modernizing these facilities. The Master Agreement locations continue to face major competition from both domestic and foreign operations.  This letter will confirm that the Company agrees to maintain and invest in the plants covered under the master agreement so as to keep the facilities capable of meeting market needs, subject to overall changing economic and market conditions.  It is the intention of the company to develop new products during the term of this agreement that will benefit many of these locations.

The Top Level Committee will periodically review such investments, new product introductions and expenditures in light of economic and market conditions.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                              **Michael R. Millsap**


163

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2ⁿᵈ Floor – Room 200**
**Gary, IN  46402**

RE:     Health Care Coverage During Receipt of S&A
        Benefits

Dear **Mr. Millsap**:

During the **2019** Master Labor Agreement Negotiations, the
parties discussed the issue of employees' health care coverage
being terminated due to lack of employee premium payments
while an employee is receiving S&A benefits. As a result of
the discussions, the parties agreed to the following:

1.   Effective January 1, **2020**, the **2020** weekly benefit
     schedule for S&A payments will be reduced by an
     amount equal to the average weekly employee
     healthcare contribution for **2020**. Employees who are
     receiving an S&A benefit payment on January 1,
     **2020** as the result of a Sickness or Accident that
     began prior to January 1, **2020** or employees who
     begin receiving an S&A benefit payment as the result
     of a Sickness or Accident on or after January 1, **2020**
     will receive a payment according to the new schedule
     for **2020**.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

2. On January 1 of each subsequent year during the term of the successor Labor Agreement, the **2020** weekly benefit schedule will be reduced by an amount equal to the average weekly employee health care contribution for that year (e.g. for **2020**, the **2020** S&A weekly benefit schedule will be reduced by the average weekly employee health care contribution for **2020**). The new rate will be applied in the same manner as specified in Paragraph **1** above for employees who are receiving an S&A benefit that originated in the prior year or who begin receiving S&A benefit payments as the result of a Sickness or Accident that begins on or after January 1 of that year.

3. Effective January 1, 2015, an employee will not be required to make health care payment contributions for the period of time covered by S&A payments that he receives and coverage will not be terminated for such employee during that period of time.

4. On or promptly after December 1, **2019** and on or promptly after each December 1 thereafter during the term of the Labor Agreement, the Company will meet with the Union to review the amount the rates will be reduced for the following year (the average weekly employee health care contribution) and how such rates were calculated.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
**Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:       Polychlorinated Biphenyl (PCB) Control Program

Dear **Mr. Millsap:**

This is to confirm that the Company, during 1996
negotiations, agreed to the following matters:

> For the purpose of protecting worker health the
> Company shall continue its control program for
> handling and disposing of oils containing
> polychlorinated biphenyls (PCB's).  This program will
> include, but not be limited to, provisions for testing
> devices that may contain PCB's, air, and soil
> sampling, labeling, protective clothing and respirator
> program, proper training for handling PCB's.

> The Local Union Co-Chairman of the Safety and
> Health Committee or the International Union Safety
> and Health Department may request in writing from a
> single source designated by the Company current
> information as to the program for PCB control.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Industrial Hygiene Sampling

Dear **Mr. Millsap:**

This is to confirm that the Company, during 1996
negotiations, agreed to the following matters:

> The Company will continue its program of periodic in-
> plant air sampling and noise testing under the direction
> of qualified personnel.  Where the Union Co-
> Chairman of the Safety and Health Committee
> reasonably believes there is a significant on-the-job
> health hazard due to in-plant air pollution, or noise, the
> Company will make appropriate tests and
> investigations that are reasonable and necessary and
> will notify the Union Co-Chairman of the Safety and
> Health Committee when such a test is to take place.  A
> report based on such tests and investigations will be
> reviewed and discussed with the Union Co-Chairman.
> For such surveys conducted at the request of the Union
> Co-Chairman, a written summary of the sampling and
> testing results and the conclusions of the investigation
> will be provided to the Union Co-Chairman.

**Mr. Michael R. Millsap**
**September 19, 2019**
**Page 2**

The Company shall provide the Union Co-Chairman, or the Joint Safety and Health Committee, upon request, copies of specific environmental or employee exposure tests or survey reports.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
            **Michael R. Millsap**

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:       Toxic Materials

Dear **Mr. Millsap:**

This is to confirm that the Company, during 1996
negotiations, agreed to the following matters:

> Where the Company uses materials at levels
> considered to be toxic under normal conditions of use,
> or where employees might be exposed to unusual
> concentrations of toxic materials through accident, it
> shall inform the affected employees what hazards, if
> any, are involved and what precautions shall be taken
> to insure the safety and health of the employees.  Upon
> the written request of the Union Co-Chairman of
> Safety and Health Committee, the Company shall
> provide in writing requested information from material
> safety data sheets, if they are available to the
> Company, or their equivalent on toxic substances to
> which employees are exposed in the work place;
> provided that when the information is considered
> proprietary, the Company shall so advise the Union
> Co-Chairman, and provide sufficient information for
> the Union to make further inquiry.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

169

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      Safety & Health Training

Dear **Mr. Millsap:**

This is to confirm that the Company during 1996 negotiations
agreed to the following matters:

> The Company recognizes the special need to provide
> appropriate safety and health training to all employees.
> The Company presently has safety and health training
> that provides either the training described below or the
> basis for such training as it relates to the needs of the
> Company and its various plants.

> Training programs shall recognize that there are
> different needs for safety and health training for newly
> hired employees, employees who are transferred or
> assigned to a new job and employees who require
> periodic retraining.

> A.   <u>Training of Newly Hired Employees</u>

> Newly hired employees shall receive training in
> the general recognition of safety and health
> hazards, the applicable Labor Agreement
> provisions, and the purpose and function of the
> Company's Safety (Health) and Medical
> Departments, the local Safety Committee and **the**
> International Union Safety and Health
> Department.  In addition, upon initial assignment
> to their duties, they shall receive necessary
> training on the nature of the operation or process,
> the safety and health

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

hazards of their duties, safe working procedures, the purpose, use and
limitations of personal protective equipment required, and other controls or precautions associated with their duties.

B.  Training of Other Employees

The necessary training of employees, other than those newly hired by the Company shall be directed to the hazards of the duties to which they are assigned.  Such training shall include hazard recognition, safe working procedures, purpose, use and limitations of special personal protective equipment required and any other appropriate specialized instruction.

C.  Retraining

As required by an employee's duties and assignment area, periodic retraining as necessary shall be given on safe working procedures, hazard recognition, and other necessary procedures and precautions.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 3

       The Union Co-Chairman of the Safety (and
       Health) Committee and the International Union
       Safety and Health Department or a designee shall,
       upon request, be afforded the opportunity to
       review the training program for newly hired
       employees at the plant level.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
               **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      In-Plant Railroads

Dear **Mr. Millsap:**

During the 1996 negotiations, the parties discussed hazards
associated with operating in-plant railroads and the potential
for incurring serious injuries involving such fixed rail
equipment.  In light of the serious accidents that may result
from the operation of this equipment the parties believe it
would be beneficial for each joint Safety and Health
Committee to review their present railroad safety rules and
procedures.  Particular attention should be given to identifying
pinch points and the manner in which personnel may be
operating such equipment.


Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

173

**September 19, 2019**


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Notice of Technological Change

Dear **Mr. Millsap:**

The Union has requested, and the Company agrees to provide, notice of any technological change or any change in operations at the earliest possible time to the local Safety and Health Committee.  The Committee shall consider the safety and health implications of the proposed changes and make appropriate recommendations to the Company.


Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                          **Michael R. Millsap**

**September 19 2019**


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:        Revisions to **2019** Agreements

Dear **Mr. Millsap:**

This letter will confirm that as part of the process to
incorporate agreements reached during **2019** negotiations, the
**2014** Master Agreements will be reviewed and appropriate
revisions will be made to dates, **highlighting,** and other
provisions as necessary to incorporate the **2019** agreements.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**


175

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:     64/66 Hour Work Rule Modifications

Dear **Mr. Millsap:**

During the negotiations of the 2014 Labor Agreement the
parties again discussed issues that can result when employees
work extended hours and are forced to work hours beyond
their regularly scheduled shifts.

The parties further discussed the permit processes at each
location and the issues that are created when employees are
forced to work in their scheduling period.  There was
agreement that such situations are undesirable and that it
would be beneficial to provide a modification to each
location's overtime processes that would minimize those
instances where our employees are forced to work in their
scheduling period when volunteers exist.

The parties agreed that by August 01, 2014 each location will
implement modifications to their overtime processes that
would provide for volunteers prior to compulsory/involuntary
forces.  The revised process shall allow volunteers to work up
to 72 hours in the scheduling period prior to forcing
employees to work overtime. This change will not negate the
requirement for the permit for every incident where an
employee is allowed/required to work over 64/66 hours.  This
process revision shall include provisions that consider the
safety and wellbeing of the individual that is volunteering and
will be able to be modified should the parties develop
recommendations out of the task force considering the issues
of fatigue risk management.  The parties will conduct a regular
review of the data involving the employees that are being
permitted to exceed 64/66 hours and should incident trends or

176

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2


staffing needs be negatively influenced by this change it will
be discontinued.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                 **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:        Accelerated Apprentice Program

Dear **Mr. Millsap:**

The parties recognize the importance of the craft classifications of Electrician, Machinist and General Mechanic (GM) to maintaining equipment and assets in our facilities to ensure efficient operations, meet business goals and satisfy customer requirements. Due to the parties mutual concern regarding the shortage of available skilled trades talent, it is agreed that robust programs to accelerate the development of internal employees and experienced new hires is necessary to address current needs and projected attrition in the Electrician, Machinist and GM population.

This letter will confirm during the 2014 negotiations the parties agreed that locations shall develop and implement an accelerated apprenticeship/trainee program for Electricians, Machinists and GM's to meet talent demand and control costs associated with the lengthy, traditional program design. Internal employees and/or external hires shall meet technical qualification requirements established by the program for placement and acceleration through the program.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2


The Company maintains the right to determine apprentice/trainee levels and program implementation based on need and business conditions existing at each plant. In the event an accelerated program as per the guidelines above is implemented, management determines successful completion of the apprentice/trainee qualifying period and all area and shift assignments.

In the event the parties are unsuccessful in reaching a local agreement with specific program details for an accelerated apprenticeship/trainee program, management will implement a program that meets the interests of both parties and promotes the future success of the business.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
         **Michael R. Millsap**

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:      Wellness Programs

Dear **Mr. Millsap:**

During 2014 negotiations the parties discussed the Alcoa
Wellness programs.

The Company agrees to include at least one representative,
appointed by the local union president, on a location's
Wellness Committee.

Any health information or health condition of a specific
individual or individuals gathered as part of a Wellness
program or activity will remain confidential.   Any health
information collected as part of these initiatives shall in no
way be used to support any disciplinary action.   Any entity
collecting information on individuals will only share aggregate
data with Company representatives.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      Study and Adoption of Medicare Advantage Plan

Dear Mr. Millsap:

This is to confirm that during the 2019 negotiations, the Company agreed to solicit proposals from Highmark BCBS and up to four additional major insurance carriers to provide Medicare Advantage and Employer Group Waiver Plan Prescription drug plan (MA-EGWP) coverage to post May 31, 1993 retired hourly employees, dependents and surviving spouses covered by the USW-Alcoa Master Agreement, for coverage no earlier than January 1, 2021.

Highmark BCBS (if it responds)  and up to two additional responding carriers will be requested to make oral presentation to the Alcoa-USW Joint Health Care Committee for review and evaluation.  The adoption and transition to fully-insured Medicare Advantage program, including prescription plan, will be subject to the mutual agreement of the Company and the Union, which shall not be unreasonably withheld.  The parties retain their existing rights and protections regarding the administrators and vendors for the active and non-Medicare programs.  The parties will also review the adoption of a prescription drug formulary and the appropriateness of premium levels for non-Medicare eligible post May 31, 1993 retired hourly employees, dependents and surviving spouses covered by the USW-Alcoa Master Agreement, which will also be subject to mutual agreement, which shall not be unreasonably withheld.

**Mr. Michael R. Millsap**
**September 19, 2019**
**Page 2**

In evaluating responses from carriers, the parties will consider such factors as:

- The value of the benefit plans and services,
- Cost of the proposed benefits and / or services,
- Network access and network management (medical and pharmacy)
- Carrier's ability to minimize enrollee disruption, and
- Carrier's ability to educate and communicate with retirees.
- The impact to Alcoa's OPEB liability

The parties agree to work together to resolve any disputes over the adoption of a Medicare Advantage and Prescription Program, transition and plan provisions on or before June 1, 2020.

Very truly yours,


**Nicolaas G. Storm**
**Director, Industrial Relations**


Confirmed: _____
                    **Michael R. Millsap**

182

September 19, 2019

Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:      Joint Wage Evaluation Review Committee

Dear Mr. Millsap:

Within 90 days of ratification of the 2019 Labor
Agreement, the parties will establish a Joint Committee to
review the Wage Evaluation process.  The objective of the
Joint Committee is to develop a modified Wage Evaluation
Process that is relevant to today's job classifications and
business objectives.

The Committee will be chaired by the Central Wage
Committee with one (1) Union representative and one (1)
Management representative from each of the Master
Agreement locations.  The Company will bear the expenses
incurred by the Joint Committee.  The Joint Committee
will propose recommendations to the Co-Chairs of the
Union and Company's Negotiating Committees for final
discussion.

The Joint Committee's objective is to have a proposed
modified process completed within 1 year of the effective
date of the new labor agreement. Should the parties be
unable to agree on a modified process, the current Wage
Evaluation language in the Master Agreement and Wage
Manual will prevail.

Very truly yours,


Nicolaas G. Storm
Director, Industrial Relations


Confirmed: _____
                         Michael R. Millsap

183

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      Contact Information while on Layoff Status

Dear Mr. Millsap:

During the negotiation of the 2019 Labor Agreement, the parties agreed that when an employee is laid off due to a reduction in forces, the Company shall conduct an exit interview prior to the effective date of layoff.  As part of this discussion, employees will be informed of the process to maintain an updated record of personal contact information for future contact.

Very truly yours,



Nicolaas G. Storm
Director, Industrial Relations


Confirmed: _____
                        Michael R. Millsap

September 19, 2019

Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:     Delay in Return to Work from S&A or Workers
        Compensation

Dear Mr. Millsap:

This is to confirm that during the 2019 negotiations the
Company agreed that in the event an employee returning
to work from S&A or workers' compensation experiences
a delay in returning to work due to the unavailability of a
Company-designated physician for a return to work
physical, and who is subsequently approved to return to
work as a result of that physical, the employee will be paid
for each day of delay based on his/her applicable standard
hourly wage rate and number of hours per shift.

Very truly yours,

Nicolaas G. Storm
Director, Industrial Relations

Confirmed: _____
                    Michael R. Millsap

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      Compensation for Doubling Over from Last Shift

Dear **Mr. Millsap**:

As an accommodation to employees and without contractual obligation, it will be the Company's procedure when an employee doubles over from the last shift of a day terminating approximately at midnight to the first shift of the day immediately following, to compensate the employee at time and one-half for the double-over as an extension of the employee's shift terminating approximately at midnight.

This is to advise you that the Company will not change this procedure during the term of the Labor Agreement dated June 1, 1996.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                        **Michael R. Millsap**

**September 19, 2019**


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      SUB – Scheduling of Work Week

Dear **Mr. Millsap**:

This will reconfirm the Company's expression to you in the
course of the negotiation of the 1962 Agreement, Section 37,
Short Week Benefits, of the SUB provision that it has no
desire or intention to change its present policies or practices
with respect to the scheduling of the work week.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                           **Michael R. Millsap**


187

**September 19, 2019**


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:        Meeting New Employees

Dear **Mr. Millsap**:

During negotiation of our 1974 Agreement, the problem which
confronts the Union with regard to meeting new employees
was discussed.

This will reconfirm the Company's expressed willingness to
cooperate in establishing at the local level appropriate means
to alleviate this concern.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:        Wage Rates for Potroom Job Classifications

Dear **Mr. Millsap**:

During the 1974 negotiations, concern was expressed over the
possibility of wage rate reductions in Potroom job
classifications due to the "energy crisis."

This will reconfirm our statement to you that the
Company will not reduce wage rates for Potroom job
classifications when, due to temporary reductions of
power caused by reasons beyond the control of the
Company, such power reductions would reduce the
additional job grades applicable through Factor 11 of
the Wage Manual.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                      **Michael R. Millsap**

189

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:    Placement/Retention of Handicapped or Disabled
           Applicants

Dear **Mr. Millsap**:

During the 1980 negotiations of the Labor Agreement, the
parties discussed the placement and retention of handicapped
or disabled employees and placement of handicapped
applicants.  It was agreed that as far as possible Article XII-C
would be so used, and that such employees would be
considered before applicants.

In the event no agreement is reached through the use of Article
XII-C, the Company may place such employee or applicant in
a job that he or she is able to do.  Such placement of
individuals will only be to the extent necessary to comply with
federal or state laws concerning handicapped persons and is
subject to the grievance procedure of the Labor Agreement.

No assignment without agreement between the parties may be
made unless it is to comply with requirements of law.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                          **Michael R. Millsap**


190

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Working Third Shift WRT Jury/Witness Duty

Dear **Mr. Millsap**:

During the negotiations of our 1980 Labor Agreement, the
Union expressed a concern in regard to the ability of
employees working the third or night shift to fulfill their
obligations in regard to jury or witness duty.  Subject to
management approval and reasonable notification by the
employee, in application of Article XXVIII, Jury and Witness
Pay, the Company will allow an employee whose regularly
scheduled shift is the third or night shift to designate either the
day of or the day after such jury or witness service to be the
excused day.  This letter is not intended to provide any
additional days off or compensation other than that provided
under Article XXVIII.


Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                        **Michael R. Millsap**

191

**September 19, 2019**


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:       Visible Notification of Schedule Change While on
          Vacation

Dear **Mr. Millsap**:

During the negotiation of the 1977 Agreement, the Union
requested that some form of "visible" notification be given to
employees on regular vacation whose schedule had been
changed during their absence.  This will reconfirm that such
will be done when reasonable and practical depending upon
the circumstances present at the time.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
               **Michael R. Millsap**

192

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      Appendix II Job Changes/Combinations

Dear **Mr. Millsap:**

During the negotiation of our 1983 Labor Agreement, the
Company confirmed that when it changes jobs listed in
Appendix II and/or combines such jobs with each other, it
does not do so for the purpose of eliminating jobs from
Appendix II.  The Company will not remove such changed
and/or combined jobs from Appendix II unless they no longer
fit the traditional criteria for inclusion as Appendix II
classifications.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      Accumulated Seniority without Disciplinary
          Action

Dear **Mr. Millsap**:

During the negotiation of the 1988 Labor Agreement, the
parties agreed that if an employee completes three (3) years of
accumulated departmental seniority without incurring a
disciplinary action, no disciplinary action issued prior to such
accumulation period shall be considered by the Company or
cited in arbitration in any disciplinary action issued to that
employee subsequent to such accumulation period.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:      Employees in Other Employment While on
         Medical Leave/Absence

Dear **Mr. Millsap**:

During the negotiation of the 1993 Labor Agreement, the Union expressed concerns about the Company's handling of employees engaging in other employment while on medical leave of absence.  This letter confirms our mutual recognition that these concerns can be significantly reduced by improved communications.  To satisfy that objective, each location, within 60 days of ratification of the Labor Agreement, will develop a written summary of employee obligations and responsibilities in this regard.  The Company and local Union will jointly make that summary available to employees on medical leave.  Neither party will unreasonably withhold its permission for such employment, provided that such employment is consistent with medical restrictions.

It is further understood that such employee will, as required by the Company, undergo periodic medical reviews by the plant physician to determine whether other employment is consistent with medical restrictions and to determine the employee's capability to perform available in-plant work.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

195

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:       Supervisor Returning to Bargaining Unit Work

Dear **Mr. Millsap**:

During 1993 negotiations, concerns were expressed by the Union that returning a supervisory employee to the bargaining unit under the provisions of Section 35 may result in the displacement of a production and maintenance employee.

The Company commits that when and if any supervisor is returned to the bargaining unit, such return will not result in the layoff of a production or maintenance bargaining-unit employee.  Likewise, no supervisor will be returned to the bargaining unit if qualified employees are on layoff from the affected department or from the plant.


Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                            **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:     Skills Gained Through Team Process Training or
            Non-Traditional Assignments

Dear **Mr. Millsap**:

During the 1993 negotiations of the Labor Agreement, the
Union expressed concerns that skills gained through non-
traditional job assignments or team process training may be
used by the Company in determining an employee's retention,
restoration or recall.  This letter is to confirm that the
Company will not use the provisions of Article XII to retain,
recall or restore any employee to a bargaining-unit job based
solely on the skills or experience gained from team process
training or a non-traditional assignment.


Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                **Michael R. Millsap**

197

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:    One-Day-at-a-Time Vacation

Dear **Mr. Millsap**:

During the 1996 negotiations, the Union requested that one (1) week of regular vacation time be taken in increments of one day at a time.

If the local parties mutually agree to consider day-at-a-time vacation at their location, the local parties will meet within 90 days of ratification of the Labor Agreement with the goal of designing an efficient, cost-effective day-at-a-time vacation program.

If an agreement is reached in sufficient time, day-at-a-time vacation will be implemented for the 1997 vacation year.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Rules of the Alcoa/USW (ABG) Arbitration
            Procedure

Dear **Mr. Millsap**:

This will confirm the Company and Union have reached
agreement on the captioned as a result of our recent ongoing
discussions.

The rules are listed below:

RULES OF THE ALCOA/USW(ABG)
ARBITRATION PROCEDURE

1.      The party with the burden of proof opens and closes
        first.  The burden of proof lies with the Union in all
        cases except those involving discipline, including
        dismissal or discharge, and the party contending a given
        grievance is not arbitrable has the burden of proof in
        such matter.

2.      Each party presents a written Opening Statement to
        start its case.

3.      Must proceed with summation once the advocates
        indicate "summation is next".

4.      Closing arguments (summation) are oral.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 2

5.  Transcripts are produced for the Board of Arbitration members from a tape recording of the hearing. Upon request, the tape recording of the hearing will be made available to the Board members under the same principle of exclusivity as is the transcript.

6.  Only arbitration cases between Alcoa and ABGWIU or its successor union(s) may be cited and such cases are precedent setting.

7.  Summation is for arguing and conclusions on the basis of the facts in the record and no new facts or evidence may be introduced during summation.

8.  Witnesses are not sworn or sequestered.

9.  Each party's advocate may call only his/her own witnesses.

10. Legal rules of evidence are not enforced and the advocate is allowed wide latitude in presenting case.

11. Job descriptions are given weight only in accordance with Board of Arbitration case 204-104, supported by case 401-415.

12. The Arbitrator produces a draft decision for Board members only, with Executive Session review conducted by full Board before a final decision is issued.

13. No bench decisions (except in safety arbitration cases under Article XXVII) or declaratory judgments.

14. Non-employees not directly involved with the case are not allowed in the hearing. An employee's personal attorney or representative is not allowed in the hearing.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 3

15.     Assertions of material fact not disputed are accepted by the Board of Arbitration without specific proof.

16.     Recesses are allowed at the discretion of the Board of Arbitration, but during a recess occurring while a witness is undergoing cross-examination, no counsel or discussion of any kind may take place with such witness.

17.     Board members may ask questions for clarification.

18.     The advocates provide copies of the Opening Statement, documents, etc. for each Board member, plus two for the other side.

19.     Subpoenas are not used by either party.

20.     Each party will make every effort not to surprise the other with new evidence, contentions of fact or changed issues.

21.     The number of grievances heard at each session is agreed to by the Union and Company advocates.

22.     Board of Arbitration hearings will be held at the applicable site of the plant location unless otherwise agreed.

23.     No tape recorders are allowed in the hearing, other than the one for the Board of Arbitration.

24.     An offer of settlement through the grievance procedure would not be part of the arbitration case.

25.     Where the question of the arbitrability of a grievance is raised, the hearings on arbitrability and the merits shall be held together, however, the decision on the arbitrability shall be rendered prior to the decision, if required, on the merits.

**Mr. Michael R. Millsap**
**September 19, 2019**
Page 4

The Board of Arbitration case (Opening Statement, evidence, witnesses, summation, etc.) on the issue of arbitrability of a grievance is presented by the Company and Union Board of Arbitration members for decision by the Board of Arbitration with the draft decision reviewed in Executive Session before the final decision is issued.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
                                **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Gag Rule for Arbitration

Dear **Mr. Millsap**:

This letter will confirm that the proposals made by each party with respect to changes in the basic labor agreements, and the discussions had with respect thereto, during the negotiations of the 2014 Agreement or subsequently shall not be used, or referred to, in any way during or in connection with the arbitration of any grievance arising under the provisions of the basic labor agreements.

This agreement does not affect prior contract language on the same subject in effect at any Master Agreement location.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations



Confirmed: _____
                     **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:       Notice of Overtime

Dear **Mr. Millsap**:

This will reconfirm that during the negotiation of our 1977
Labor Agreement, the Company agreed it would give
employees as much advance notice as reasonably possible of
scheduled overtime.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:     State Article & Section of Labor Agreement in
        Grievances

Dear **Mr. Millsap**:

This will reconfirm that during the negotiation of our 1977
Labor Agreement, the parties agreed that, without contractual
obligation or giving the practice status in the grievance
procedure, it was desirable that grievances appealed beyond
the first step, state the particular Article and Section of the
Labor Agreement involved, if applicable, and the name of the
grievant(s).  It was further agreed that both parties would
make an effort to see that this objective be accomplished.


Very truly yours,



Nicolaas G. Storm
Director, Industrial Relations



Confirmed: _____
                **Michael R. Millsap**

September 19, 2019

**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:     Layoff as a Result of Plant Closing

Dear **Mr. Millsap**:

During the negotiations of our 1983 Labor Agreement, we
discussed the matter of employees laid off as a result of a
plant closing.  This will confirm our understanding that Article IX,
Paragraph G, subparagraphs 1, 2, and 3 also apply to such
employees subject to the results of bargaining between the
parties concerning the plant shutdown.

Very truly yours,

**Nicolaas G. Storm**
Director, Industrial Relations

Confirmed: _____
                    **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Supervisors Performing Work

Dear **Mr. Millsap**:

During the negotiation of the 1988 Labor Agreement, the Union expressed a concern with regard to supervisors performing work beyond the scope of the provisions of Article XXI. Supervisors.

In response, the Company reaffirmed its commitment that supervisors shall act in a supervisory capacity and shall not perform work so as to replace regular workers or operators on the job.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                         **Michael R. Millsap**

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:      Company Seniority

Dear  **Mr. Millsap**:

During the negotiation of the 1988 Labor Agreement, the parties discussed how "company seniority" is applied under Article IX, Paragraph G.

It was agreed that company seniority for an individual's participation in a plant's selection process for employment as a new employee is the sum of the employee's company seniority in all plants within the bargaining unit covered by this Agreement, and which has not been terminated as provided for in Article VIII, Section 17.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
               **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402


RE:     Eligible Earnings

Dear **Mr. Millsap**:

This will confirm our agreement during 1993 negotiations that
the definition of Eligible Earnings (Section V, item 4 of
Appendix IV) shall include the time lost and the straight-time
earnings associated with that lost time at a rate not to exceed 8
hours per day or 40 hours per week for local union officials
who are on an excused absence for union business and who
otherwise would be actively at work.

Very truly yours,



**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                   **Michael R. Millsap**

209

September 19, 2019


**Mr. Michael R. Millsap**
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**


RE:     Group Insurance Coverage & Elected Union
          Offices

Dear **Mr. Millsap**:

During the negotiations for the 1993 Labor Agreement, the parties discussed the employees of the Company who were and will be selected or elected to offices of the Union.  The Company's policy is to encourage employees to seek leaves of absence for Union offices because it is in the Company's interest to have Union representatives familiar with the Company facilities they represent.  Both parties recognized that the cost of Company group insurance benefits was a negative factor for employees seeking Union offices.

Therefore, the parties agreed that the Company will provide the group insurance coverages detailed in Article XXIII, subject to the provisions of that Article, to those employees who are on leave of absence pursuant to Article XIV because they have been selected or elected to offices of the Union. The costs of the insurance coverages will be provided by the Company to the same extent as provided for active employees.

Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                        **Michael R. Millsap**

September 19, 2019

Mr. Michael R. Millsap
**Director District 7 and**
**Chairman of the Alcoa Master Bargaining Committee**
**USW District 7**
**1307 Texas Street 2nd Floor – Room 200**
**Gary, IN  46402**

RE:        Reduction of Forces

Dear **Mr. Millsap**:

During the 2001 negotiations, the parties discussed the application or modification of Article IX (F) Reduction of Forces and Article XI (D) Recall and Restoration of Forces where applicable.  The Company is committed to avoid senior employees being laid off while junior employees are working.  Options to accomplish this may include straight seniority bumping exchange of senior employees for junior employees through an orderly transition process such as a roll-in and such other options as may be agreed to by the local parties.  The local parties agree that each will work diligently to reach agreement and to find a solution that meets the needs of employees and the business.  Neither party shall unreasonably withhold its approval of such application or modification.

Craft employees will not be displaced by other employees unless the employee displacing has been previously classified in the craft and/or meets all the prerequisite qualifications of the job and is presently qualified to perform the craft work involved.


Very truly yours,


**Nicolaas G. Storm**
Director, Industrial Relations


Confirmed: _____
                       **Michael R. Millsap**

September 19, 2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:     Contracting Out Failure to Properly Notify

Dear Mr. Millsap:

The Company will agree that if it fails to comply with the notification requirements explicit in the location-specific contracting-out process, unless there exist emergency conditions which make such notification impractical, sixteen (16) hours' pay at the appropriate standard hourly wage rate shall be paid to the low employee on the overtime list of the classification designated by the local Union.

Notwithstanding the Union's right to strike on the merits of contracting out, disputes regarding compliance with the notification procedure shall be subject to the regular grievance and Arbitration Procedure.  The issue shall be limited solely to the notification compliance question and the remedy awarded cannot exceed that provided for in this letter.

Very truly yours,



Nicolaas G. Storm
Director, Industrial Relations


Confirmed: _____
                     Michael R. Millsap

212

September 19,  2019


Mr. Michael R. Millsap
Director District 7 and
Chairman of the Alcoa Master Bargaining Committee
USW District 7
1307 Texas Street 2nd Floor – Room 200
Gary, IN  46402

RE:      Contracting Out Small Projects

Dear Mr. Millsap:

The Company is not restricted from contracting out
bargaining-unit work but, in cases involving small projects
(those expected to be less than 300 man-hours) a
reasonable effort will be made to reach a mutually
acceptable determination regarding the possibility of
accomplishing such work with bargaining-unit employees.
The Company will give good faith consideration to any
suggestions from the Union to avoid or minimize
contracting such projects.


Very truly yours,



Nicolaas G. Storm
Director, Industrial Relations



Confirmed: _____
                       Michael R. Millsap