# EXHIBIT 31



AGREEMENT

BETWEEN

ALUMINUM COMPANY OF AMERICA

AND

INTERNATIONAL UNION,
UNITED STEELWORKERS OF AMERICA

Plants located at

ALCOA, TENNESSEE

BADIN, NORTH CAROLINA

BAUXITE, ARKANSAS

MOBILE, ALABAMA

POINT COMFORT, TEXAS

ROCKDALE, TEXAS

MAY 31, 1993



7-26-22 EXHIBIT KS

R. PORTER 5

Planet Depos, LLC



AGREEMENT

BETWEEN

ALUMINUM COMPANY OF AMERICA

AND

INTERNATIONAL UNION,
UNITED STEELWORKERS OF AMERICA

*

Plants located at

ALCOA, TENNESSEE

BADIN, NORTH CAROLINA

BAUXITE, ARKANSAS

MOBILE, ALABAMA

POINT COMFORT, TEXAS

ROCKDALE, TEXAS

*

MAY 31, 1993

SPK00004220

CONTENTS

| | PAGE |
|---|---|
| ARTICLE I. Purpose and Scope...... | 10 |
| Section 1. Coverage......... | 10 |
| Section 2. Recognition and Successorship......... | 10 |
| Section 3. Direction of Working Forces......... | 11 |
| Section 4. Negotiation of Excluded Matters....... | 11 |
| Section 5. Other Agreements | 11 |
| ARTICLE II. Union Membership and Check-Off.............. | 12 |
| A. Union Membership......... | 12 |
| B. Check-Off................. | 13 |
| C. Service Charge......... | 15 |
| D. Indemnity Clause......... | 15 |
| ARTICLE III. Wage Manual, Standard Hourly Rates, Performance Pay and Lump Sum Payments........ | 16 |
| A. Wage Manual.............. | 16 |
| B. Standard Hourly Rates.... | 16 |
| C. Performance Pay.......... | 16 |
| D. Lump Sum Payments........ | 17 |
| ARTICLE IV. New or Changed Job Classifications.............. | 17 |
| Section 6. New Job Classifi- cations................ | 17 |

| | PAGE |
|---|---|
| Section 7. Changed Job Class- ifications............. | 18 |
| Section 8. Exclusions....... | 21 |
| ARTICLE V. Hours of Work, Overtime, and Premium Pay.............. | 21 |
| Section 9. Hours of Work.... | 21 |
| Section 10. Incidental Time | 22 |
| Section 11. Daily Overtime.. | 22 |
| Section 12. Sixth or Seventh Consecutive Day........ | 22 |
| Section 13. Sunday Work and Holidays.............. | 23 |
| Section 14. Weekly Overtime | 24 |
| Section 15. General Rules... | 24 |
| Section 16. Shift, Schedule and Weekend Premium.... | 28 |
| ARTICLE VI. Allowed Time.......... | 29 |
| Section 17. Call-In Pay..... | 29 |
| Section 18. Incomplete Day's Work................. | 30 |
| ARTICLE VII. Contracting Out...... | 30 |
| Article VIII. Seniority.......... | 33 |
| A. Company Seniority -- Definition.......... | 33 |
| B. Departmental Seniority -- Definition............ | 33 |

SPK00004221

- 4 -

    C.  Presently Qualified --
        Definition............  35

Section 19.  Termination of
    Seniority..............  35

Section 20.  Prior Seniority  37

Section 21.  Union Officials --
    Representation.........  38

Section 22.  Seniority and
    Classification Lists...  38

Section 23.  Reduction of
    Forces and Interplant
    Transfer...............  39

Section 24.  Notice of Reduc-
    tion of Forces.........  45

Section 25.  Restoration of
    Forces.................  45

Section 26.  Notice of Restor-
    ation of Forces........  46

Section 27.  Exceptions to
    the Application of
    Seniority..............  48

Section 28.  Transfers.......  48

Section 29.  Return to Bar-
    gaining Unit...........  49

Section 30.  Temporary Super-
    visors.................  52

Section 31.  Probationary
    Employees..............  53

Section 32.  Local Rules.....  53

ARTICLE IX.  Job Postings and Work
Assignments...................  54

- 5 -

Section 33.  New Job Classi-
    fication, Vacancy in
    Classification and
    Lines of Progression  54

Section 34.  Rates on Pro-
    motions or Demotions  56

Section 35.  Rates on Temp-
    orary Assignments....  56

Section 36.  Refusal of
    Assignment...........  57

ARTICLE X.  Leaves of Absence....  57

Section 37.  Employees.....  57

Section 38.  Union Officials  58

ARTICLE XI.  Rights Under This
    Agreement..................  59

Section 39.  Legal Rights..  59

Section 40.  Dismissals and
    Disciplinary Action..  59

ARTICLE XII.  Supervisors Working  61

ARTICLE XIII.  Grievances........  62

Section 41.  Scope.........  62

Section 42.  Procedure.....  62

Section 43.  Time Limita-
    tions.................  66

Section 44.  Pay for Lost
    Time.................  68

Section 45.  Access to
    Plants...............  69

SPK00004222

- 6 -

ARTICLE XIV.   Arbitration........   69

    Section 46.   Scope.........   69

    Section 47.   Board of Arbi-
       tration..............   69

    Section 48.   Duties of
       Board...............   69

    Section 49.   Finality of
       Awards..............   70

    Section 50.   Jurisdiction
       of Board............   70

    Section 51.   Costs.........   71

    Section 52.   Rules.........   72

    Section 53.   Agreement
       Against Strikes or
       Lockouts............   72

    Section 54.   Expedited
       Arbitration Procedures   73

ARTICLE XV.   Supplemental Unemploy-
    ment Benefits.........   75

    Section 55.   Weekly Benefits   76

    Section 56.   Short Week
       Benefits.............   84

    Section 57.   Finance........   86

ARTICLE XVI.   Bulletin Boards.....   89

ARTICLE XVII.   Vacations..........   89

    Section 58.   Eligibility....   90

    Section 59.   Length of
       Vacation............   91

- 7 -

    Section 60.   Return from
       Vacation.............   92

    Section 61.   Vacation
       Scheduling...........   92

    Section 62.   Vacation Pay...   94

    Section 63.   Legislative
       Impact...............   95

ARTICLE XVIII.   Apprenticeship....   96

    Section 64.   Posting and
       Selection............   96

    Section 65.   Entrance
       Requirements..........   96

    Section 66.   Credit.........   98

    Section 67.   Related Instruc-
       tion................   98

    Section 68.   Apprentice
       Program Standards and
       Work Experience.......   99

    Section 69.   Periodic Review
       of Progress...........   99

    Section 70.   Joint Apprentice-
       ship Advisory Committee   101

    Section 71.   Ratio..........   102

    Section 72.   Status of
       Apprentice Programs...   103

    Section 73.   Local Imple-
       mentation............   103

    Section 74.   Certificate of
       Completion...........   103

SPK00004223

- 8 -

Section 75.  Apprentice Program Lengths and Rates.................. 103

ARTICLE XIX.  Safety and Health... 104

Section 76.  General........ 104

Section 77.  Safety and Health Committee...... 105

Section 78.  Safety Equipment and Facilities........ 108

Section 79.  Employee Safety and Health Rights..... 109

Section 80.  Rate Retention 110

Section 81.  Advisory and Review Procedures..... 112

ARTICLE XX.  Job and Income Security.............. 112

ARTICLE XXI.  Income Maintenance Program............... 113

Section 82.  Purpose........ 113

Section 83.  Definitions.... 113

Section 84.  Benefit Calculation................ 115

Section 85.  General........ 116

ARTICLE XXII.  Group Insurance.... 117

ARTICLE XXIII.  Report of Physical Examination........... 122

ARTICLE XXIV.  Disabled or Handicapped Employees...... 122

ARTICLE XXV.  Civil Rights........ 122

- 9 -

ARTICLE XXVI.  Military Service... 124

ARTICLE XXVII.  Jury and Witness Pay.................. 124

ARTICLE XXVIII.  Bereavement Pay.. 124

ARTICLE XXIX.  Period of Agreement 125

APPENDIX I.  Standard Hourly Rates 127

APPENDIX II.  Shift Premium Hourly Rates................ 128

APPENDIX III.  Cost of Living..... 129

APPENDIX IV.  Grievance Appeal Form.................. 131

APPENDIX V.  Summary of Job and Income Security Program..... 134

APPENDIX VI.  Procedural Rules -- USWA-Alcoa Regular Arbitration................. 142

APPENDIX VII.  USW Hourly 401(k) Plan.................... 145

**APPENDIX VIII.  Performance Pay...** 146

**APPENDIX IX.  Neutrality..........** 156

Letters of Understanding.......... 157

SPK00004224

## AGREEMENT

This Agreement, dated May 31, 1993, amending and extending the Agreement of November 1, 1988, is between the Aluminum Company of America, hereinafter referred to as the Company, and the International Union, United Steelworkers of America, hereinafter referred to as the Union. The provisions of this Agreement shall become effective June 1, 1993, except as otherwise expressly provided herein.

### ARTICLE I.   PURPOSE AND SCOPE

**Section 1.   Coverage**

It is the intent and purpose of the parties to set forth certain agreements pertaining to wages, hours, and working conditions to be observed between the parties, and to provide procedures for the prompt and equitable adjustment of grievances.

**Section 2.   Recognition and Successorship**

A.   The Company recognizes the International Union, United Steelworkers of America, as the exclusive collective bargaining agency for those employees of the Company in its Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Mobile, Alabama; Point Comfort, Texas; and Rockdale, Texas plants for which the Union has heretofore been certified or determined by the National Labor Relations Board, or for whom the Company has recognized the Union as the exclusive bargaining agency.

B.   If the Company sells an entire plant or an organizationally distinct operation thereof, subject to this Labor Agreement, and the purchaser intends to operate the same business at the same location within one (1) year of the sale, the purchase and sale agreement will include a provision to require the purchaser to extend offers of employment to members of the Company's collective bargaining

unit such that a majority of the employees the purchaser needs to perform unit work will be members of the Company's collective bargaining unit. The Company will have no further obligation under this provision if (a) the purchase and sale agreement contains such terms or (b) the purchaser commits to the Company that it does not intend to operate the same business at the same location within one year of the sale. This provision does not apply to the sale of a plant which has been closed for at least six (6) months or to the separate sale of equipment and/or real estate, including buildings, not intended to be operated within one (1) year after sale as the business at the same location.

**Section 3.   Direction of Working Forces**

Except as may be limited by the provisions of this Agreement, the operation of the plants and the direction of the working forces, including the right to hire, lay off, suspend, dismiss, and discharge any employee for proper and just cause are vested exclusively with the Company.

A selection of an individual to fill any job of a supervisory nature not included in the bargaining unit is the exclusive determination of the Company.

**Section 4.   Negotiation of Excluded Matters**

Any matter pertaining to hours and working conditions not covered by this Agreement and not determined in negotiations of this Agreement is subject to negotiations between the Company and representatives of the Union at all times.

**Section 5.   Other Agreements**

A.   Local agreements in effect as of May 8, 1947, on matters covered by this Agreement and which are not in conflict with this Agreement and which apply or interpret the terms

SPK00004225

- 12 -

of this Agreement will remain in effect for the period of this Agreement unless modified or terminated by agreement of the local Union and the local Management.

B.  Local agreements in effect as of May 8, 1947, on matters not covered by this Agreement are not subject to or affected by this Agreement unless and until a written agreement, so stating, is executed by the local Union and a representative of the International Union and the local Management.

C.  Any local agreement negotiated subsequent to May 8, 1947, applying or interpreting the terms of this Agreement shall be in writing and signed by the local Union and a representative of the International Union and the plant or works manager in order to be valid in any future application of the terms of this Agreement.

## ARTICLE II.   UNION MEMBERSHIP AND CHECK-OFF

### A.  Union Membership

1.  Each employee who on the effective date of this Agreement is a member of the Union in good standing and each employee who becomes a member after that date, shall, as a condition of employment, maintain membership in the Union.

2.  Each employee hired on or after August 1, 1956, shall, as a condition of employment, beginning on the 30th day following the beginning of such employment or the effective date of this Agreement, whichever is the later, acquire and maintain membership in the Union.

3.  On or before the last day of each month, the Union shall submit to the Company a notarized list showing separately for each plant the name, department and clock number of each employee who shall have become a member of the Union in good standing other than through the procedures pursuant to Paragraph A-2 above since

- 13 -

the last previous list of such members was furnished to the Company.  The Company shall continue to rely upon the membership lists which have been certified to it by the Union in the past subject to revision by the addition of new members certified to it by the Union to the date of this Agreement and to the deletion of the names of employees who have withdrawn from membership prior to the date of this Agreement.

For the purpose of this Article, an employee shall not be deemed to have lost his membership in the Union in good standing until the International Treasurer of the Union shall have determined that the membership of such employee in the Union is not in good standing and shall have given the Company a notice in writing of that fact.

The foregoing provisions shall be effective in accordance and consistent with applicable provisions of federal and state law.

### B.  Check-Off

1.  The Company will check-off monthly dues, assessments and initiation fees each as designated by the International Treasurer of the Union, as membership dues in the Union, on the basis of individually signed voluntary check-off authorization cards in forms agreed to by the Company and the Union.

2.  At the time of employment, the Company will suggest that each new employee voluntarily execute an authorization for the check-off of union dues in the form agreed upon.  A copy of such authorization card for the check-off of union dues shall be forwarded to the financial secretary of the local Union along with the membership application of such employee.

3.  New check-off authorization cards, other than those provided for by Paragraph B-2 above will be submitted to the Company through the financial secretaries of the local Unions at

SPK00004226

- 14 -

intervals no more frequent than once each month. On or before the last day of each month, the Union shall submit to the Company a summary list of cards transmitted in each month.

**4.** Deductions on the basis of authorization cards submitted to the Company shall commence with respect to dues for the month in which the Company receives such authorization card or in which such card becomes effective, whichever is later. Dues for a given month shall be deducted from the first pay closed and calculated in the succeeding month.

**5.** In cases of earnings insufficient to cover deduction of dues, the dues shall be deducted from the next pay in which there are sufficient earnings, or a double deduction may be made from the first pay of the following month, provided, however, that the accumulation of dues shall be limited to two months. The International treasurer of the Union shall be provided with a list of those employees for whom a double deduction has been made.

**6.** The Union will be notified of the reason for nontransmission of dues in case of interplant transfer, layoff, discharge, resignation, leave of absence, sick leave, retirement, or insufficient earnings.

**7.** Unless the Company is otherwise notified the only union membership dues to be deducted for payment to the Union from the pay of the employee who has furnished an authorization shall be the monthly union dues. The Company will deduct the initiation fees when notified by notation on the lists referred to in Paragraph 3 of this subsection, and assessments as designated by the International treasurer. With respect to check-off authorization cards submitted directly to the Company, the Company will deduct initiation fees unless specifically requested not to do so by the International Treasurer of the Union after such check-off authorization cards have become effective. The

- 15 -

Internationa' Treasurer of the Union shall be provided with a list of those employees for whom initiation fees have been deducted under this Paragraph.

**8.** The provision of this subsection B shall be effective in accordance and consistent with applicable provisions of federal law.

**C. Service Charge**

The following provisions to the extent that they are lawful shall apply:

Each employee covered by this Agreement who fails to acquire or maintain membership in the Union shall be required as a condition of employment, beginning on the 31st day following the beginning of such employment, or the date of signing this amended Agreement, whichever is later, to pay to the Union each month a service charge as a contribution toward the administration of this Agreement and the representation of such employee. The service charge for the first month shall be in an amount equal to the Union's regular and usual initiation fee and monthly dues, and for each month thereafter in an amount equal to the regular and usual monthly dues.

**D. Indemnity Clause**

The Union shall indemnify and save the Company harmless against any and all claims, demands, suits, or other forms of liability that shall arise out of or by reason of action taken or not taken by the Company for the purpose of complying with any of the provisions of this Article, or in reliance on any list, notice or assignment furnished under any of such provisions.

SPK00004227

- 16 -

ARTICLE III.  WAGE MANUAL, STANDARD HOURLY
RATES, PERFORMANCE PAY AND LUMP SUM PAYMENTS

### A.  Wage Manual

The Wage Manual which became effective
April 2, 1956, by agreement between the parties,
as amended, is hereby incorporated by reference
as a part of this Agreement and shall continue
in effect for the same term and under the same
conditions as this Agreement.  The Standard
Hourly Rates and the wage rates for the job
classifications covered by this Agreement will
not be changed for the period of this Agreement
except by mutual agreement or except as changes
are made under Article IV (New or Changed Job
Classifications).

### B.  Standard Hourly Rates

A table of Standard Hourly Rates
reflecting a twenty-five (25) cent general
increase under said Manual to be effective June
7, 1993, through June 4, 1995, is attached
hereto as the first rate table listed under
Appendix I.  Effective June 5, 1995, locals will
exercise an option to receive either an increase
of twenty-five (25) cents in the standard hourly
rates or a company match to 401K contributions
of fifty (50) cents on a dollar up to 6% of
eligible earnings.  A table of standard hourly
rates reflecting the twenty-five (25) cents
general increase effective June 5, 1995, and
continuing for the balance of the term of the
1993 Labor Agreement is attached hereto as the
second rate table listed under Appendix I.

### C.  Performance Pay

A Performance Pay Plan for hourly
employees represented by the Union to be
effective for the Plan Years 1993, 1994, 1995 is
set forth in Appendix VIII of this Agreement.

- 17 -

### D.  Lump Sum Payments

1.  A lump sum payment of $1300 (less
required withholding amounts), in lieu of 1992
Performance Pay, shall be paid within thirty
(30) days of the date the Company is notified by
the International Union, United Steelworkers of
America, of the ratification of the Labor
Agreement to all employees who had active
employee status on December 31, 1992.  This lump
sum payment will also be paid to employees who
were inactive on that date but returned to
active employment by February 28, 1993.

2.  A lump sum payment of $650 (less
required withholding amounts) shall be paid
within sixty (60) days of the date the Company
is notified by the International Union, United
Steelworkers of America, of the ratification of
the Labor Agreement to all employees not
receiving a lump sum payment as defined above
but who either had employee status on December
31, 1992, or, whose employee status terminated
during 1992 due to death or retirement.

ARTICLE IV.  NEW OR CHANGED JOB CLASSIFICATIONS

Section 6.  New Job Classifications

When a new job classification is
established:

A.  The Company will develop a proposed
job description and wage rate for the new job
classification in accordance with provisions of
the Wage Manual.

B.  The proposed job description and wage
rate shall be submitted to and discussed with
the proper union representatives with the object
of obtaining agreement.

C.  If the Union and Company are unable to
agree upon the description and wage rate, the
Company may install the proposed rate.  The
Union may, at any time within 90 days after

SPK00004228

- 18 -

receipt of the proposed description and rate,
file a grievance alleging that the
classification is improperly described and/or
evaluated under the provisions of the Manual.
Grievances pertaining to the description and
evaluation shall be initiated in the Third Step
and processed under the grievance and
arbitration procedures of this Agreement.  The
decision shall be made effective as of the date
when the employee was assigned to the new job
classification.

Section 7.   Changed Job Classification

It is the intent of the parties to set
forth in this Section the maintenance and
stabilization of job classifications and to
provide for bona fide changes.

When the character and type of duties and
requirements of a job classification are so
changed, either all at once or as a result of an
accumulation of changes over a period of time,
as to alter the wage rate relationship of that
classification to other classifications in the
same plant:

A.  The Company shall develop a proposed
job description and wage rate for the changed
job classification in accordance with the
provisions of the Wage Manual.

B.  The proposed description and wage rate
shall be submitted to and discussed with the
proper union representatives with the object of
obtaining agreement.

C.  If the Union and Company are unable to
agree upon the description and wage rate, the
Company may install the proposed rate.  The
Union may, at any time within 90 days after
receipt of the proposed description and rate,
file a grievance alleging that the job
classification is improperly changed under the
terms of this Section 7 or improperly described
and/or evaluated under the provisions of the

- 19 -

Manual.  Grievances pertaining to the
descriptions and evaluations shall be initiated
in the Third Step and processed under the
grievance and arbitration procedures of this
Agreement.  The decision shall be made effective
as of the date the job classification was
changed.

D.  In the event that the Company does not
develop a job description and wage rate for the
changed job classification or in the event that
it does not report a change in job duties or
content to the Union and it is claimed that the
change constitutes a change in the job
classification, the Union may file a grievance
requesting that a changed job description and
wage rate be developed and installed in
accordance with the provisions of the Wage
Manual.  Such grievances shall be initiated in
the Third Step and processed under the grievance
and arbitration procedures of the Agreement.
The decision shall be made effective as of the
date the changed job classification was
established or ninety (90) days prior to the
filing of this grievance whichever is later.

E.  A change in methods, materials, or
functions, or addition or deletion of a job may,
among other things, constitute a change in
duties or requirements.  The Company will change
existing job classifications only for valid
operating reasons including but not limited to
improved utilization of employees and/or
equipment, improved product quality, or changed
technology, products or markets.

The Company shall promptly inform the
proper union representative of any significant
change in classification content which is
formally made by the Company of which the
Company becomes aware.  The Union may also bring
to the Company's attention for appropriate
recognition any change in classification content
the Union believes is significant but which the
Company has not reported.

SPK00004229

- 20 -

F.  Employees to be laid off from a department solely as a result of job changes initiated under this Section subsequent to July 1, 1986, will be afforded additional opportunities for placement within the plant in the application of Section 23.  Specifically such employees that have 10 years or more of company seniority may be transferred to such suitable department and classification within the Works as may be decided by the Company, provided there are employees with less company seniority working in a classification or classifications which requires limited training and/or experience and he has sufficient ability to qualify for the classification, in which case the employee will replace the employee with the least company seniority in such classification.

The local parties by mutual agreement will determine those classifications that require limited training.  If the local parties have not completed their initial list of limited training classifications within 90 days after July 1, 1986, then the matter may be referred to the district director or his representative, and the vice president of Industrial Relations or his representative, for resolution.  The local parties may add or delete classifications to the limited training classifications list by mutual agreement.  Any agreed-to limited training classification whose job grade is subsequently changed, shall remain a listed classification only by mutual agreement of the local parties.

G.  The changed job classification procedures of this Section will not be used for the sole purpose of circumventing whatever rights employees have under any provision of this Agreement.  Changes in job classifications under this Section shall not be made unless it is expected that they will continue in effect for a reasonable period of time.

- 21 -

## Section 8.  Exclusions

Production standards are not subject to modifications, termination, or establishment by arbitration although the Arbitration Board may consider evidence relative to production standards.  However, failure to meet production standards will not be cited as the determining reason for discipline.

## ARTICLE V.  HOURS OF WORK, OVERTIME, AND PREMIUM PAY

## Section 9.  Hours of Work

The work week for any employee shall be according to present or future local arrangements and commence with the employee's shift change cycle beginning nearest to Midnight Sunday and continue until that same time the following Sunday.

The work day for such employee shall be consecutive twenty-four hour periods commencing with the beginning of the employee's work week.

The normal work day shall be eight (8) hours, and the normal work week shall be forty (40) hours, being the normal time worked at straight time rates.  Nothing herein is a guarantee of work or any number of hours of work, or a limitation on scheduling the work.

If the distribution of available work would probably result in regular employees working less than four (4) days per week, averaged over a reasonable period of time, a reduction in forces shall be made in order that the remaining employees will have a reasonable expectancy of averaging at least four (4) days of work per week.

It is understood that no general restoration of forces in any such unit will be made unless there is reasonable expectancy that

SPK00004230

- 22 -

there will be five (5) days of work per week for all employees then working in such unit.

### Section 10.   Incidental Time

In the absence of written agreement to the contrary, incidental time such as make ready, clothes changes, wash-up, or travel time is not either straight time worked or overtime worked, provided that such incidental time will continue to be paid for where such payments were made prior to May 8, 1947, and shall be applicable to all employees regardless of date of hire.

### Section 11.   Daily Overtime

Time and one-half shall be paid for time worked in excess of eight (8) hours in any one day.

### Section 12.   Sixth or Seventh Consecutive Day

A.   Time and one-half shall be paid for time worked by any employee on the sixth consecutive day worked in his regularly scheduled work week.

B.   Double time shall be paid for time worked by an employee on the seventh consecutive day worked in his regularly scheduled work week.

C.   For the purpose of computing consecutive days worked, any holiday listed in Section 13A shall be considered a day worked whether or not work is actually performed. Further, any day for which an employee receives jury, witness, or bereavement pay as provided for in Articles XXVII and XXVIII shall be considered a day worked whether or not work is actually performed.

D.   For the purpose of computing consecutive days worked, a day on which an employee qualifies for Allowed Time under Article VI and does not leave the plant before the end of his shift, except for a

- 23 -

substantiated, justifiable reason, shall be considered a day worked.  Misrepresentation of the above reasons for leaving the plant will be the cause for disciplinary action.

### Section 13.   Sunday Work and Holidays

A.   The following days shall be recognized as holidays for the purpose of this Agreement: New Year's Day, Good Friday, Memorial Day (or such other day as may be locally agreed to), Independence Day, Labor Day, Thanksgiving Day, the day after Thanksgiving Day, the day before Christmas Day, Christmas, Washington's Birthday (or such other day as may be locally agreed to). When any of these holidays fall on a Sunday, the following day, Monday, will be recognized as the holiday.  If Christmas falls on Monday, the following Tuesday shall be recognized as the "day before Christmas" holiday.

B.   Employees shall be paid for the holidays providing they meet all of the following eligibility requirements:

1. a.   The employee works or is on a vacation scheduled under the Vacation Plan (Article XVII Vacations) or on layoff because he is not eligible for a vacation at the time of a shutdown during the payroll week during which the holiday is observed or is on layoff the payroll week in which the holiday is observed but did work in the immediately preceding payroll week, or receives bereavement pay pursuant to Article XXVIII for one or more days during that week or

b.   The employee is absent the entire week because of a short term absence due to authorized local union business, jury or witness service as defined in Article XXVII, or because of sickness or accident, and is not eligible for sickness and accident benefits for the day the holiday is observed because it is included in the seven-day waiting period required for entitlement for sickness and accident benefits.

SPK00004231

- 24 -

c.  The language in Paragraph B-1a involving the scheduling of vacation during a shutdown, shall not affect the rights of either party concerning this matter.

2.  The employee has thirty (30) days' seniority as of the date of the holiday.

3.  An employee who is scheduled to work on a holiday and is absent for any reason except sickness is not eligible for holiday pay.

C.  The holiday pay shall be at the employee's regular hourly rate for eight (8) hours.  Overtime and shift premiums are excluded.

D.  Double time and one-half only shall be paid for work performed on such named holidays.

E.  When a week day is substituted for a holiday (which falls within an employee's normal working schedule) and the plant or any part thereof is closed because of the holiday, the employee will be paid time and one-half for the time worked on the day which was substituted for the holiday.

F.  Time and one-half shall be paid for time worked on Sundays.  Such premium based on the standard hourly wage rate shall be included in any Allowed Time (Article VI) paid on Sundays when no work is available.

### Section 14.  Weekly Overtime

A.  Time and one-half shall be paid for time worked in excess of forty (40) hours in any payroll week (or established work week); however, time worked in excess of eight (8) hours in any week day and such time worked on Sundays, or on a day substituted for a holiday, or on the sixth or seventh consecutive day worked as may be subjected to overtime shall be excluded when determining weekly overtime in excess of forty (40) hours.

- 25 -

B.  When a holiday falls within an employee's normal working schedule, and the plant or any part thereof is closed because of the holiday, the hours that would have been worked on the holiday shall be included when determining weekly overtime in excess of forty (40) hours.

### Section 15.  General Rules

A.  1)  Schedules may be changed at any time provided, however, that any changes made subsequent to Thursday of the week preceding the week in which the change is to be effective shall be explained at the earliest practicable time to the appropriate union representative of the employee affected.  Provided further that changes in schedules shall not be made after Thursday of the week prior to the work week affected except for breakdowns or reasons beyond the control of the local Management.  Should changes be made in schedules contrary to the above so that an employee does not work on a day that he was previously scheduled to work, he shall be paid four (4) hours' pay at his standard hourly rate.

2)  Should changes be made in schedules contrary to the provision of the preceding paragraph so that an employee is required to work on a day or days that otherwise would have been the sixth or seventh day worked, the employee shall be paid for such day or days worked as though they were the sixth or seventh consecutive day worked.

3)  The schedule change procedures provided in the preceding Paragraph A-1) shall not be used for scheduling normal overtime work within any classification unit within an affected work week prior to first exhausting the voluntary overtime procedures customary to that classification and department, except where an entire classification unit or department must be utilized or where the deviation conditions of Paragraph B-1) of this Section are present.

SPK00004232

- 26 -

Employees scheduled for overtime work contrary to this provision shall, in addition to the regular compensation due for the work performed, receive four (4) hours' pay at their standard hourly rate.

B.  If work cannot be performed within a classification at straight time and overtime is thus required, the Company will distribute such overtime work as is necessary as fairly as possible between employees within the classification affected by this overtime work. In order to curb favoritism or the appearance of it in overtime distribution the following shall apply:

1)  Overtime shall be offered to the low available employee on the overtime list in the affected classification unit unless there is a valid basis for deviating from the order of standing.  Examples of a valid basis for deviation from the order of standing on the list are such things as maintaining continuity of a started task, need for special skills required for a particular overtime assignment, availability of an employee for overtime which becomes necessary on short notice or the like. Should such deviation be disputed in the grievance procedure the Company bears the burden of proving the validity of its overtime assignment under the circumstances that existed at the time.

2)  If the Company fails to offer the overtime opportunity to the low available employee in the classification unit, absent a valid basis for deviation as set forth in Paragraph 1) above and such employee at the time the overtime is offered, is 16 credited overtime hours or more below the employee who works the overtime, the bypassed employee shall be entitled to a monetary remedy for the missed opportunity.  If the low available employee not offered the overtime opportunity is less than 16 credited overtime hours below the employee who works the overtime, no violation of this Section

- 27 -

shall be deemed to have occurred.  The Company will not use this 16-hour provision for the sole purpose of circumventing the low-man concept. The local Union and the local Management may agree upon such applications or modifications of these Paragraphs 1) or 2) as are suitable to that location.

3)  To avoid the creation of overtime imbalances and to achieve and maintain a fair distribution of necessary overtime work, overtime hours will be charged as follows:

a.  All overtime hours worked in the employee's classification unit.

b.  All overtime hours offered and refused in the employee's classification unit.

c.  All overtime hours which would have been offered to an employee but were not for the following reasons:

I.  Vacation (Regular)

II.  Absence due to sickness or injury

III.  Absence for personal reason or union business, jury duty, bereavement, and a military leave of absence longer than two weeks in duration.

IV.  Inability to contact consistent with present local practices.

V.  Working as a temporary supervisor.

VI.  Inability to work overtime due to medically substantiated physical limitations agreed to by the Company and the employee's doctors.

C.  Overtime work may occur in any department from which employees are on layoff. However, employees laid off from that department will be recalled to minimize overtime to the

SPK00004233

- 28 -

extent that they can be reasonably scheduled and utilized for a reasonable period of time on work which otherwise would be performed at overtime.

Section 16.  Shift Schedule and Weekend Premium

A.  Shift Premium

Fixed shift premium rates appropriate to the job grade paid shall be paid for work performed on the second or afternoon shift and for work performed on the third or night shift. A table of shift premium rates by job grade is attached hereto as Appendix II.

For the purpose of this Section 16-A, any regular shift starting between 4:00 a.m. and 11:59 a.m. shall be designated as the day shift; any regular shift starting between 12:00 noon and 7:59 p.m. shall be designated as second or afternoon shift; and any regular shift starting between 8:00 p.m. and 3:59 a.m. shall be designated the third or night shift.

1.  The shift differential shall be included in computing overtime compensation.

2.  The shift differential shall be included in Allowed Time paid when no work is available.

3.  Time worked beyond an employee's regular first or day shift hours for four (4) hours or more will result in payment of the afternoon shift premium for all hours worked during the second or afternoon shift.

4.  Time worked beyond an employee's regular second or afternoon shift hours for four (4) hours or more will result in payment of the night shift premium for all hours worked during the third or night shift.

5.  Time worked beyond an employee's regular third or night shift hours shall result in continued payment of the night shift premium

- 29 -

for all hours worked during the first or day shift.

B.  Schedule and Weekend Premium

The schedule and weekend premium shall be thirty (30) cents per hour.  The schedule and weekend premium shall be paid as follows:

1.  When an employee's schedule cycle calls for him to work other than from Monday through Friday in any work week, the employee shall be paid the premium for all time worked while he is on such schedule cycle.  If the schedule cycle of such employee includes the work weeks of Monday through Friday in each of half or more of the work weeks of the schedule cycle, the schedule premium shall not be payable for the Monday through Friday work weeks but shall be payable for the other work weeks of the schedule cycle.

2.  With respect to employees not covered by the preceding paragraph, when an employee works on Saturday or Sunday and is not compensated pursuant to Section 12-A or 12-B for such work, he shall be paid the premium for all time worked in such work week.

An employee's schedule and weekend premium shall be included with the hourly rate only in the calculation of pay for hours worked (including overtime hours) and Allowed Time in accordance with Section 17 and 18.

For the purposes of this provision the work week shall in all cases commence on Monday.

ARTICLE VI.  ALLOWED TIME

Section 17.  Call-in Pay

An employee called to work on a nonscheduled day or shift shall receive not less than eight (8) hours' pay at his regular hourly rate, except that an employee called to work

four (4) hours or less before his regular shift and continuous therewith works his regular shift shall receive not less than four (4) hours' pay at his regular hourly rate.  Any premium pay applicable to the above hours or work will not be used as an offset against the foregoing guarantee.

### Section 18.   Incomplete Day's Work

A.  An employee permitted to come to work at the beginning of his scheduled shift without having been reasonably notified that there will be no work for him shall receive not less than eight (8) hours' pay at his regular hourly rate.

B.  An employee permitted to come to work at the beginning of his scheduled shift without having been reasonably notified that there will be no work for him shall receive not less than his regularly scheduled hours of work (not to exceed eight (8) hours) at his regular hourly rate if such employee is put to work, except in cases resulting from conditions beyond the control of the Company, in which cases Paragraph A will apply.

C.  The Company may assign such an employee work other than in his own classification and the employee may not refuse such work provided the assignment is within the reasonable capacity of the individual to perform.

D.  This Section does not apply in cases resulting from labor disputes, caused, aided, or participated in by the Union or employees in the bargaining unit represented by the Union.

### ARTICLE VII.   CONTRACTING OUT

A.  It is the Company's continuing intention to perform bargaining-unit work within the plant on facilities and equipment with employees from within the bargaining unit. However, when and if the efficient operation of

the plant, or efficient maintenance, or addition of facilities requires it, the Company may contract out work to be performed in or out of the plant.  Criteria for considering this requirement will include but are not limited to the availability of manpower with the necessary training, ability and skills, the availability of the necessary equipment and the time constraints involved in accomplishing the work.

B.  The Company is not restricted from contracting out such bargaining-unit work but, in cases involving small projects (those expected to be less than 300 man-hours) a reasonable effort will be made to reach a mutually acceptable determination regarding the possibility of accomplishing such work with bargaining-unit employees.  The Company will give good faith consideration to any suggestions from the Union to avoid or minimize contracting such projects.

C.  At each plant there shall be a regularly constituted contracting-out committee composed of two (2) representatives appointed by the Company and the local union president or his designated representative and not more than two (2) additional members appointed by the Union. Before contracting out work to be performed within the plant the Company will, not less than five (5) days before the work is commenced, notify the designated union representative of the contracting-out committee or his designee. Such notice shall include sufficient anticipated detail regarding location, type, scope, duration, and time requirements of the work to be performed so that the union committee members can adequately review the need for contracting out.

Should the union committee members believe that a discussion is necessary, they shall within five (5) days after notification request a meeting and the Company will meet promptly for this purpose.  The parties may by mutual agreement, include in the meeting a member of

- 32 -

the classification involved in the project. At such meeting the parties should review the plans for the work to be performed and the reasons for contracting out such work. The Company will give good faith consideration to any suggestions by the union members of the committee and to any alternate plan proposed by the work by bargaining-unit personnel. If there is no dispute following notification or discussion of any particular contracting-out matter, such matter shall be considered resolved, but without precedent with respect to any future contracting-out matter.

D.  If after such discussion or during the performance of such work, craft employees are to be laid off or subject to short work weeks, the Company will make every reasonable effort to reassign work to its craft employees rather than to contractors.

E.  Should a discussion be held and the contracting-out matter not resolved or in the event a discussion is not held after notification, the Union may file a grievance relating to the merits of the contracting out at the third step of the grievance procedure within five (5) days of such notice. If the Company fails to notify the Union as provided in Paragraph C, then not later than five (5) days from the commencement of the work a grievance relating to the merits of the contracting out may be filed at the third step of the grievance procedure.

The third step hearing will be held within five (5) days and the Company's answer will be given within (5) days after the hearing.

If the grievance is not withdrawn or settled as a result of the Company's third step answer, it may be appealed to the fourth step of the grievance procedure provided such appeal is within the ten (10) days of the third step answer. A fourth step meeting will be held

- 33 -

within twenty (20) days of the appeal to the fourth step and the Company's answer will be given within fifteen (15) days after the hearing.

F.  Should the Union believe the Company has failed to properly notify the Union as provided for in Paragraph C, the Union may file a grievance on compliance with the notification time period at the third step of the grievance procedure within five (5) days from the commencement of the work.

G.  The time limits set forth in this Section shall exclude Saturdays, Sundays, holidays, and by mutual consent of the parties may be extended.

H.  Disputes over contracting out other than those provided for in the Letter of Understanding on notification issues shall not be subject to arbitration but shall be subject to the Union's Right to Strike as provided in Section 53.

ARTICLE VIII.  SENIORITY

A.  Company Seniority - Definition

Company seniority of an employee is measured by years, months, and days from his last date of hire.

B.  Departmental Seniority - Definition

Departmental seniority of an employee is measured by years, months, and days from his first employment in his department, less time lost due to:

a.  Bona fide sickness or accident, arising from causes outside of company employment, in excess of ninety (90) days per calendar year.

SPK00004236

- 34 -

b.  Leave of absence in excess of twenty-one (21) days per calendar year, except that time lost during any leave of absence granted to an employee in order to permit him as a union representative to negotiate with the Company shall not be deducted.

c.  Layoffs from the employee's regular department in excess of ninety (90) days due to lack of work.

d.  A disciplinary suspension, when the suspension exceeds twenty-one (21) calendar days.

e.  Employment in other departments except as provided for in Section 28 (Transfers) and except that an employee who is temporarily transferred to a department other than his regular department due to an industrial injury sustained while employed by the Company shall continue to accumulate seniority in his regular department, and if laid off from such other department, will accumulate departmental seniority in his regular department as though he was laid off from his regular department.

Except that in the case of an employee with five (5) years or more departmental seniority in the department from which he is absent, the times specified in a, b, and c above shall be a maximum of one year for any continuous absence even though the absence extends beyond one year; and except that, in the cases of permanent shutdown of a department, employees of that department who, at the time of the shutdown, had five or more years of departmental seniority in that department and were transferred to some other department with no departmental seniority in the new department shall, in the case of layoff from the new department, accumulate departmental seniority as though they had five years of departmental seniority in that department.

- 35 -

Accumulated Departmental Seniority shall be the sum of an employee's departmental seniority in all departments of the Company, as determined in accordance with the provisions of this Article, and which has not been terminated as provided in this Article, provided, however, there shall be no pyramiding of departmental seniority in determination of Accumulated Departmental Seniority.

C.  Presently Qualified - Definition

"Presently qualified," where used in this Article, is understood by the parties to mean that the employee can perform the duties of the job classification without additional training or experience.  Training or experience as used above does not include orientation or break-in and the fact that an employee has not previously performed the job classification for the Company is not conclusive evidence that the employee is not presently qualified.

Criteria to be considered in determining if an employee is "presently qualified" shall be:

1.  The employee has worked in the job classification for the Company, or

2.  The employee has worked in related job classifications for the Company, or

3.  The employee has gained sufficient knowledge and experience with the Company or elsewhere.

Section 19.  Termination of Seniority

All seniority of an employee shall terminate when he:

A.  Quits for any reason, except that an employee who ceases work at a plant by exercising the option to do so provided him in

SPK00004237

- 36 -

Section 23.D.1(b) of this Article shall retain seniority as provided in that Section.

B. Is dismissed or discharged for sufficient and reasonable cause.

C. Is absent without leave for a period of six (6) days or longer, on which he is scheduled to work; however, a request for a leave of absence made before or after the six (6) days have elapsed will be granted under the terms of Section 37, provided that in the case of a request made after the six (6) days, the delay is for reasonable cause.

D. Fails to report for work as provided for in Section 26 (Notice of Restoration of Forces).

E. While unable to work because of a bona fide case of sickness or accident arising from causes outside employment, does not report the same to the Company as the reason for his absence before six (6) days have elapsed on which the employee is scheduled to work unless such notification proves to be impractical.

F. When laid off due to a reduction of forces, does not request, in person or by mail direct to the Company or through the Union to the Company by means of a notice signed by the laid off employee, that he be given the notice of restoration of forces as provided for in Section 26 (Notice of Restoration of Forces) if at the time of layoff the employee has less than five years' company seniority. Such request must be made during the month of March of each year. Each request must be sent to the employment office for the Works in which the employee last worked and provide in writing the employee's name and correct permanent address. Such employee at the time of his layoff will be given a written notice advising him of this clause and will, during each February while the employee is laid off, be mailed a reminder of the need for him to make such request during

- 37 -

March of that year. Such reminder will be mailed to the laid off employee's last address reported to the employment office. Nonreceipt of a reminder does not relieve the laid off employee of the requirement to make such request. A list of the employees, with addresses, to be sent the reminder shall be given to the local Union prior to mailing.

G. In addition, the departmental seniority of an employee may be terminated as provided herein in Article VIII, Section 25 (Restoration of Forces), Article VIII, Section 26 (Notice of Restoration of Forces), and Article VIII, Section 28 (Transfers).

H. Grievances concerning terminations as provided in Paragraphs A, C, D, E, and F of this Section may be initiated at Step 2 of the grievance procedure and if the Union is dissatisfied with the answer at that step, the grievance may be submitted to Step 3. If the Union is dissatisfied with the answer at that step, the grievance may be submitted to Step 4 or directly to arbitration pursuant to Article XIV at the option of the staff representative involved.

Termination grievances shall receive prompt attention by the Board of Arbitration. The Board of Arbitration shall render its decision within forty-five (45) days after receipt of the transcript of the hearing and any post-hearing submission, unless the Board of Arbitration determines that circumstances warrant a longer period of time.

Section 20. Prior Seniority

An employee's seniority, as accumulated prior to May 8, 1947, the date of this Agreement, shall not in any way be changed as a result of the seniority provisions of this Agreement, but commencing as of the date of this Agreement additions to seniority shall be determined by the application of the provisions

SPK00004238

- 38 -

of this Agreement as they have been amended since May 8, 1947.

## Section 21.   Union Officials - Representation

Top company seniority for the purpose of layoffs and restoration of forces shall be granted to local Union officials at each plant on the following basis:

A.   The president, vice-president, grievance chairman, and other union officials (the latter not to exceed six) regularly dealing directly with the grievance procedure or contract administration and one union representative involved in the administration of the grievance procedure for each one hundred (100) employees in the bargaining agency of the local Union.  Each local Union will provide works management with a certified list of such union officials.  The total number so certified shall not be changed more often than every six (6) months.

B.   The top company seniority provided in the foregoing shall be applied in the department in which the employee works.  No such seniority shall be exercised unless the union official is capable of doing a job which is available in his department.

## Section 22.   Seniority and Classification Lists

The Company will prepare and have available for inspection, and where practical will post in each department, a list showing the company, departmental, and accumulated departmental seniority of all employees in that department and will revise such lists at least once every three (3) months.  Copies of these seniority lists will be given to the local Union.  The Company will furnish the Union a weekly list of all changes and additions thereto.  The Company will also furnish the local Union with a master seniority list showing

- 39 -

the company seniority of each employee at the Works.  Such list will be furnished once every six (6) months unless mutually agreed otherwise by the local Union and local Management.

The Company will also supply the local Union with a list of employees on layoff status, upon request of the local Union, in accordance with procedures to be worked out between the local Union and local Management at each plant.

At each location the Management will provide the local Union with a list of "little or no" jobs and will update that list as may be appropriate.

## Section 23.   Reduction of Forces and Interplant Transfer

A.   If, due to a reduction in working forces, in any department (or agreed subdivision thereof), an employee is to be demoted, seniority shall, subject to the exception stated in Section 27, determine which employee shall be so demoted.  Whether this shall be company seniority or departmental seniority shall be in accordance with agreements between the local plant Management and the local Union, and after a period of ninety (90) days from the date of this Agreement, such local agreement shall not be changed during the life of this Agreement.

B.   When it is necessary to lay off in the course of reducing the working forces in any department (or agreed subdivision thereof), company seniority shall, subject to the exceptions stated in Section 27, govern the order of the layoffs and the employee in such department (or agreed subdivision thereof) with the lowest company seniority shall be laid off first.

C.   An employee laid off in any reduction of forces who has maintained his company seniority and is willing and able to do the job shall be given preference for available

SPK00004239

- 40 -

employment in other departments within the bargaining unit before new employees shall be hired in such other departments.

D. 1. (a) An employee laid off in any reduction of forces who has maintained his company seniority and for whom no suitable work is available within the bargaining unit within a reasonable period of time shall be given preference for employment, if available, in other plants of the Company covered by this Agreement, if he so requests, such preference to be in order of company seniority. Such an employee shall not be rejected for employment on the basis of medical and physical requirements more stringent than those in effect for comparable jobs at his previous plant location. An employee transferred under the provisions of this Paragraph shall retain departmental seniority accumulated as provided in Article VIII, Seniority, Paragraph B, in the plant from which he was laid off for the purposes of determining vacation entitlement under Article XVII; and group insurance benefits under Article XXII and SUB entitlement under Article XV. He shall also retain credited service as provided for in the Pension Agreement. Such employees so employed shall be eligible for a moving expense allowance under the provisions of Section 23-D-2.

(b) An employee so transferred shall have a trial period of thirty (30) days worked during which either the employee or the Company may decide that continued employment at that location is not in the best interests of the employee and/or the Company. If either party so decides, the employee will revert to the status previously held except that should such employment cease by the employee's initiative, he shall not thereby establish or re-establish eligibility for the Supplemental Unemployment Benefits provided by this Agreement.

Notwithstanding the above, the Company may discharge an employee transferred under this

- 41 -

provision for sufficient and reasonable cause, during or after the trial period herein provided, in which case all seniority and employee status shall terminate in accordance with Section 19-B of this Article. Such a discharge is subject to the provisions of Article XI, Section 40 (Dismissals and Disciplinary Action) of this Agreement.

2. An employee who is employed pursuant to Section 23-D-1 in a plant at least 50 miles from the plant from which he was laid off and who changes his permanent residence as a result thereof will receive a moving expense allowance promptly after commencement of his employment at the plant to which he is relocated, on the following terms:

(a) The employee must make written request for such allowance in accordance with the procedure established by the Company.

(b) The amount of moving expense allowance will be determined in accordance with the following:

| Miles Between Plant Locations | Allowance For: | |
|---|---|---|
| | Employees Without Dependents | Employees With Dependent(s) |
| 50 - 99 | $200 | $600 |
| 100 - 299 | 250 | 650 |
| 300 - 499 | 300 | 750 |
| 500 - 999 | 350 | 950 |
| 1,000 - 1,999 | 450 | 1200 |
| 2,000 or more | 550 | 1450 |

(c) (1) The amount of any such moving expense allowance will be reduced by the amount of any moving expense allowance or its equivalent to which the employee may be entitled under any present or future federal or state legislation; and the amount of such allowance

SPK00004240

- 42 -

shall be deducted from monies owed by the Company in the form of pay, vacation benefits, supplemental unemployment benefits, pensions, or other benefits if the employee quits, except as it shall be agreed locally that the employee had proper cause, or is discharged for cause any time during the 12 months following the start of such new job.

(2)  An employee who moves residence without also moving his dependent(s) will be provided the moving allowance for employees without dependents.  In the event such employee later moves his dependent(s), he shall be paid the difference between the moving allowance for employees without dependents and the moving allowance for employees with dependent(s).

(d)  Only one moving expense allowance will be paid to the members of a family living in the same residence.

(e)  Only one moving expense allowance, as covered by this Section, shall be allowed an employee in any twelve (12) month period.

(3)  An employee who is eligible or could become eligible for a Rule of 65 Retirement and who accepts an offer of SLTE at an employment location listed in Table IV of the Pension Agreement between the parties effective  June 1, 1993, at a Group B location shall be paid a relocation allowance.  Such allowances shall be $3,500 plus $4.50 per mile between his home location and such Group B location, in accordance with a standard table of mileages between locations agreed to by the parties.  The Relocation Allowance provided above will become payable as of the date the employee changes his permanent residence or three months after the start of work at the new location, whichever occurs sooner.

E.  An employee with one year or more company seniority who is scheduled to be laid off shall be offered transfer to such other

- 43 -

department of the Works as may be decided upon by the Company, provided that in the department to which the employee is to be transferred:

1.  There is work available which the employee is able to perform in a vacancy in a classification for which he is presently qualified or in a classification for which little or no training or little or no experience is required, or

2.  The employee's company seniority is greater than that of the employee working in a classification for which he is presently qualified or in a classification for which little or no training or little or no experience is required, and he can perform the work, in which case the employee will replace the employee with the least company seniority in such classification.  An employee so transferred shall earn departmental seniority as of the date he starts work in the new department.

F.  An employee who is displaced because of a major improvement, a major change in process, or the permanent elimination of an entire operating unit or department shall:

1.  Be transferred to such suitable department within the Works as may be decided by the Company, provided there are employees in such department with less company seniority and provided the employee is able to do the work. In such case, the employee in the department with the least company seniority shall be displaced.  Such employee when transferred shall assume the departmental seniority of the employee he replaces, without prejudice to his seniority for any other purpose.

2.  If the cause of his displacement involves only part of the department, the employee may use his company seniority to replace any employee with less company seniority from a particular job in such department, provided he is able to do the work.

SPK00004241

- 44 -

3.   The local Union anc the local plant Management may agree upon such applications or modifications of this Paragraph F as are suitable to any particular si*uation.  **Such situations may include instances deemed by the Company to represent permanent restructuring.**

G.   An employee who is otherwise eligible or could become eligible for a Rule of 65 Retirement and who accepts an offer of SLTE at an employment location in Group A or B will continue to accrue seniority at his home location in accordance with the applicable seniority rules.

H.   If such an employee is recalled to his home location such employee may elect to accept or refuse such recall.  The effect of such an election will be as follows:

1.   If an employee accepts a recall to his home location, the employee's seniority at the location where employed at the time of such recall will be terminated, together with the additional rights under the Income Maintenance Program pursuant to Section 85 of this Agreement, the additional SUB credit units pursuant to Section 55 of this Agreement, and the eligibility for a Rule of 65 Retirement.

2.   If an employee refuses a recall to his home location, the employee's seniority at such home location will be terminated.

I.   If an employee who has accepted an offer of SLTE is subsequently transferred at his request to any other employment location, such employee's rights to any protection or benefit under this Agreement will be cancelled.

J.   If such an employee accepts an offer of SLTE at an employment location in Group A or B, he will have employee status as provided by the applicable Labor Agreement, except that the probationary employee provisions of that Agreement will not apply ard, except that in any

- 45 -

event, for vacation entitlement, group insurance, Supplemental Unemployment Benefits and pension entitlement, such employee shall retain and continue to accrue seniority and pension service accumulated at his home location, and except that his company seniority shall be listed as commencing 60 days prior to his start of work at such Group A or B employment location.

Section 24.  Notice of Reduction of Forces

When a reduction of forces is necessary, the Company will post the names of the employees to be laid off three (3) days, excluding Sundays and holidays, prior to such reduction unless cancellations or orders, changes in customer's requirements, breakdown, accidents or other emergency makes such notice impossible.  A copy of the posted list of employees to be laid off will be given to the local Union at the time of posting.  Any question or grievance arising from such reduction of forces shall, if possible, be presented within the three (3) day period of any such notice.

Section 25.  Restoration of Forces

A.   In the restoration of forces in any department (or agreed subdivision thereof), the employee shall be recalled to such department (or agreed subdivision thereof), in the order of greatest company seniority, subject to the exceptions stated in Section 27.  Employees shall have recall rights to their regular department (or agreed subdivision thereof), or, if such employee is laid off from the Works, to other departments to a classification for which he is presently qualified or to a classification for which little or no training or little or no experience is required.  The employees being recalled to such classifications must be able to perform the work available.  In the course of successive recalls, employees previously recalled to other departments shall be recalled

SPK00004242

- 46 -

to their original departments as recalls to such departments are made.

B.   The employee working in the department who had been demoted because of the reduction of forces shall, upon restoration of forces in that department, be returned to the classification, when available, held prior to such reduction of forces as caused his demotion.

C.   If a vacancy is not filled by a restoration of forces in accordance with Paragraphs A and B of this Section, then such vacancy shall be filled from among the employees then working in accordance with Article IX, Section 33, New Job Classification, Vacancy in Classification and Lines of Progression.

D.   If an employee laid off from his department and transferred to another department refuses to return to the department from which he was either transferred or laid off, he shall lose his departmental seniority in that department.

E.   If an employee, after retiring on a disability retirement, can meet the medical requirements for the job from which he retired and if he is restored to active status in accordance with Section 5.1 of the Pension Agreement, he will have his seniority accumulated prior to retirement restored, except that the employee's last date of hire will be adjusted for company seniority purposes to reflect the period of his retirement status. Such employee shall be placed in accordance with his seniority and ability as though the employee had been absent because of sickness.

F.   The local Union and the local plant Management may agree upon such applications or modifications of this Section 25 as are suitable to that location.

- 47 -

## Section 26.  Notice of Restoration of Forces

A.   When restoring forces, the Company will give notice of such restoration of forces, either by registered mail or in person or by other adequate means, to the individuals to be recalled and will post in the department the names of the individuals to be recalled as long in advance of such restoration of forces as conditions permit.  A copy of the posted list will be given to the local Union at the time of posting.

If notice of restoration is given by other than registered or certified mail and an employee does not report for work in accordance with Paragraph B below, such notice of restoration will be confirmed by either registered or certified mail.

B.   If any employee laid off due to a reduction of forces and not then working in another department does not report for work within seventy-two (72) hours (excluding Saturdays, Sundays, and holidays) after such notice is given, unless the employee can show reasonable cause for not having reported within the seventy-two (72) hours after such notice was given in which case the seventy-two (72) hours shall be increased to ninety-six (96), the employee shall forfeit his place in that particular restoration of forces unless sufficient employees have not been hired to complete such restoration of forces, in which case the employee shall not forfeit such place until such restoration has been completed.

C.   If an employee fails to report for work as provided above, but does, within a period of ten (10) days after the first notice is given, request the notice of the next restoration of forces, such request shall be granted.  The second notice shall be final, and employees who fail to report for work, as provided above, upon the second notice, shall lose all seniority.

SPK00004243

- 48 -

D. The local Union and the local plant Management shall negotiate and establish a procedure whereby employees may, upon declining first recall, waive subsequent recalls other than to their regular department, provided however, that such waiver will result in no further accumulation of accumulated departmental seniority. Company seniority for the purpose of recall to their regular department shall continue to accumulate.

## Section 27.   Exceptions to the Application of Seniority

A. The Company may hire, retain, or transfer an employee or recall a laid off employee regardless of his seniority when and if the services of such employee are essential to the efficient operation of the plant because of his special training or ability, provided he is used on a job making use of such special training or ability, and provided such job cannot be properly performed except by resort to this provision. When the Company desires to make use of this provision, the matter shall first be discussed with the Union.

B. In layoffs, or demotions in the course of a reduction of forces, an employee may be retained in or recalled to a job classification regardless of his seniority when there is no other available employee with greater seniority who is presently qualified to perform the job classification under the conditions existing after the reduction of forces. This exception does not apply as to job classifications for which no training or particular qualifications are required. Local practices or agreements for methods of qualifying employees in connection with reductions of forces are not in conflict with this Paragraph.

## Section 28. Transfers

Except as otherwise provided in this Agreement, an employee transferred to another

- 49 -

department shall lose his departmental seniority in his former regular department and begin to accumulate departmental seniority in his new department.

An employee temporarily transferred or loaned to any department other than his regular department at the request of such other department, shall, if mutually agreed between the local Management and the local Union, continue to accumulate seniority in his regular department. When such employee is requested to return to his former regular department, he may, if mutually agreed between the local Management and the local Union, refuse such request without any penalty other than the loss of departmental seniority in his former regular department.

While any employees are laid off from any department, no other employees shall be transferred to such other department (except as otherwise provided in this Agreement). However, this paragraph shall not prohibit daily assignments to other departments under circumstances in which laid off employees would not normally be recalled.

## Section 29.  Return to Bargaining Unit

Employees who have been promoted to supervisory positions from production and maintenance units whose employees are part of the bargaining unit and who are subsequently returned shall be deemed to have seniority and be placed as follows:

A. Seniority

1. All employees promoted to supervisory positions prior to December 19, 1959, and all employees promoted between December 19, 1959, and August 1, 1962, who at the time of their promotion had accumulated one year or more of company seniority shall be deemed to have company seniority from their date of hire and shall be deemed to have and accumulate

SPK00004244

- 50 -

departmental seniority in the department in which they are working as supervisors and to have lost or retained such departmental seniority in the case of transfer to another department in accordance with Section 28, except that such departmental seniority shall not be deemed to accumulate in relation to those employees in the department with more company seniority while such employees are laid off beyond thirty (30) days for lack of opportunity to work.

2.   All employees promoted to supervisory positions between December 19, 1959, and August 1, 1962, who at the time of their promotion had accumulated less than one year of company seniority, and all employees promoted between August 1, 1962, and June 1, 1977, shall be deemed to have departmental and company seniority in accordance with this Article VIII, as though they had been on layoff from the bargaining unit.

3.   All employees promoted to supervisory positions subsequent to June 1, 1977, shall be deemed to have and accumulate company and departmental seniority in the department in which they are working at the time of their promotion for a total of ninety (90) days provided they return to a bargaining-unit job before the end of such period, otherwise such seniority shall terminate at the end of such ninety-day period.

B.   Placement upon return to bargaining unit.

1.   Employees covered under Paragraph A-1 above who are demoted from supervisory positions shall be returned to the production and maintenance unit in which they are then working in such supervisory position and they shall be placed on the job classifications in such department to which their seniority entitles them and on which they have previously worked or if they have not worked on any such

- 51 -

classification then on the lowest classification.

2.   Employees covered under Paragraph A-2 above who are demoted from their supervisory positions shall be returned to the department from which they were promoted and placed on a job classification to which their seniority entitles them.  If such employees do not have sufficient seniority to remain in such department, they shall have rights under Section 23-E of this Article, to the extent that their seniority entitles them.

3.   Employees covered under Paragraph A-3 above who are demoted from their supervisory positions shall be returned to the department from which they were promoted and placed on the job classification to which their seniority entitles them.  If such employees do not have sufficient seniority to remain in such department, they shall have rights under Section 23-E of this Article, to the extent that their seniority entitles them.

C.   Persons who have not been employees in classifications included in the bargaining units shall not be deemed to have any company seniority or departmental seniority for the purposes of this Section 29.

D.   Except for persons laid off from the bargaining unit in a reduction of forces, and except as provided in Section 28 (Transfers) employees in nonsupervisory positions who are not in the bargaining unit shall have no seniority for the purpose of this Agreement.

E.   The local Union and the local plant Management may agree upon such applications or modifications of this Section 29 as are suitable to that location.

SPK00004245

- 52 -

Section 30.  Temporary Supervisors

A.  The Company may assign employees to
act as temporary supervisors when a need for
such assignment arises from short-term absences
of other supervisors due to illness, jury duty,
vacation or increases in operating requirements
above normal levels not expected to be long
term.  Commencing June 1, 1980, the accumulated
time per individual employee thus utilized shall
not exceed six (6) months per calendar year.
The local parties may agree to such
modifications or applications of this
sub-section as are suitable to that location.

B.  An employee will not be assigned as
temporary supervisor solely to avoid a layoff
called for by his seniority or to effectuate his
recall from layoff despite lack of sufficient
seniority.  An employee who works as a temporary
supervisor for a work week will not perform
bargaining unit work during that work week.

C.  An employee who works as a temporary
supervisor on any given day will not be
permitted to work overtime in the bargaining
unit within the twenty-four (24) hour period
following the completion of such assignment.
Any employee who works for three shifts or more
as a temporary supervisor will not subsequently
be permitted to work overtime in the Bargaining
Unit in that work week.  Deviation from this
restraint may occur when qualified employees are
not otherwise available to perform the necessary
work.

D.  The use of any bargaining-unit
employee as a temporary supervisor shall not
affect the vacation schedule of any other
bargaining-unit employee, nor shall an employee
assigned as a temporary supervisor be granted a
more favorable vacation schedule than such
employee would have been entitled to, except for
such assignment.

- 53 -

E.  An employee assigned as temporary
supervisor shall remain an employee covered by
this Agreement.  However, such assignment, and
the terms and conditions of employment during
such assignment will be decided by the
Management.

F.  An employee assigned as a temporary
supervisor will not issue discipline to
bargaining-unit employees, except that a
temporary supervisor will not be prohibited from
suspending an employee from work for the balance
of the shift for alleged misconduct.

Section 31.  Probationary Employees

There shall be a probationary period of
sixty (60) days of actual work during which time
any new employee shall be entitled to all rights
granted under this Agreement, except during such
time the Company shall have the sole discretion
of discharging or transferring such employee.

If an employee is discharged, laid off, or
terminated during his probationary period and is
recalled or rehired within one (1) year
thereafter, the days worked prior to such
discharge, layoff, or termination shall be added
to the days worked after rehire or recall in
determining the completion of his probationary
period.

Section 32.  Local Rules

Other rules dealing with seniority,
reduction of forces, restoration of forces, and
the other matters dealt with in Article VIII may
be negotiated by the local Management and the
local Union and when accepted by both parties
such local rules shall be in full force and
effect, provided all such rules must be
consistent with the terms of this Agreement.
Grievances growing out of such rules shall be
subject to the grievance and arbitration
provisions of this Agreement.

SPK00004246

- 54 -

## ARTICLE IX.   JOB POSTINGS AND WORK ASSIGNMENTS

**Section 33.  New Job Classification, Vacancy in Classification and Lines of Progression**

A.  When, as covered by this Agreement, a new job classification is created, or a vacancy occurs in an existing classification in any department, it shall be posted in that department so that employees in that department may apply for it.

Consideration shall be given to applicants on the basis of departmental seniority, provided the employees have sufficient ability to qualify.  Such consideration shall be in the following order:

First, to employees in a higher classification in the same line of progression, and in a classification horizontally connected within the same line of progression.

Second, to employees in the classification next below the one in which the vacancy exists, and so on down, in accordance with existing lines of progression.

Third, if the vacancy is not filled from employees in the line of progression, or if there is no existing line of progression covering the classification, then such consideration shall be given to other employees in the department.

B.  An applicant who qualifies on the basis of departmental seniority shall, if he so requests be given a trial unless it is obvious that such applicant does not have sufficient ability to fill such new classification or vacancy.

C.  No such new classification or vacancy shall be permanently filled until any employee with greater departmental seniority than the

- 55 -

employee to whom the trial is given (or his union representative) has had an opportunity to have his case fully considered, provided such case has been properly presented within five (5) days, (excluding Saturdays, Sundays, and holidays) of the time when such new classification or vacancy is temporarily filled.

D.  If a new job classification or vacancy in an existing classification is not filled as above from within a department, consideration shall then be given to employees from other departments who have on file requests for transfer to that department.  Such consideration shall be on the basis of company seniority and ability.

Notices will be posted at up to five locations in each plant informing employees of those departments from which no employees are laid off and that requests for transfer to those departments will be accepted.  An employee may have requests for transfer to as many as three departments on file at any one time, except that in the case of apprenticeship programs there shall be no limit to the number of applications which an employee may have pending at any time.  Requests for transfer will be retained on file until withdrawn by the employee or until he accepts transfer to another department.

Posting practices presently in effect at certain locations which exceed the above will be continued unless it is mutually agreed to change them.

E.  An employee's failure to fill the new classification or vacancy satisfactorily shall not penalize him with any loss of seniority, and he shall be placed back on his former job.

F.  Whenever the Company or the Union determines that a change is needed in an established line of progression, or that a new line of progression should be established, the appropriate company and local union

SPK00004247

- 56 -

representatives shall meet to discuss the proposed change or new line of progression with the objective of reaching agreement.  If no agreement is reached the Company may, or may not, institute the change or establish the new line of progression.

Thereafter, the Union may, within thirty (30) days, file a grievance at the Third Step of the grievance procedure.  If such grievance is not resolved in the grievance procedure, it may be appealed to arbitration.  In determining the appropriateness of a proposed change or new line of progression, consideration shall be given to: the relationship between the classifications, skills, training, job duties, seniority impact and promotional sequence.

Section 34.  Rates on Promotions or Demotions

A.  When an employee is promoted to a higher-rated job classification, such employee will receive not less than the base rate of such higher-rated classification.

B.  In a posted reduction of forces employees who are demoted shall receive the rate of the job to which they are demoted.  Should an employee be permanently demoted from a classification, such employee will receive the rate of the job to which he is demoted.  The rate paid any individual under this Paragraph will be subject to the provisions of Section G (Red Circle Differentials) of the Wage Manual.

C.  Payment of the rate of the classification immediately upon promotion shall not be evidence of qualification for the job.

Section 35.  Rates on Temporary Assignments

A.  While an employee is temporarily assigned to a higher-rated classification, such employee will receive not less than the base rate of such higher-rated classification.

- 57 -

B.  When an employee is temporarily assigned to a lower-rated classification, he will receive his regular hourly rate of pay for the first eight (8) working days or less of such assignment, and will receive the rate of the classification for the time beyond eight (8) working days.  The rate paid any individual under this Paragraph will be subject to the provisions of Section G (Red Circle Differentials) of the Wage Manual.

Section 36.  Refusal of Assignment

An employee may not refuse a temporary assignment outside his regular classification provided the employee is capable of performing such work.  The Company will not make such assignments for disciplinary reasons.

ARTICLE X.  LEAVES OF ABSENCE

Section 37.  Employees

A leave of absence without pay will be granted an employee upon request for reasonable cause when the requirements of the plant permit under the following conditions:

A.  An employee absent on leave shall be considered as having quit if he engages in other employment without the consent of the Company and the Union.

B.  A leave of absence shall be for a specified period of time.  The Union will be notified in writing of any leave of absence and the reason therefor granted for a period of thirty (30) days or more, and of any extension thereof.  Notwithstanding any provisions in Section 19, an employee who overstays his leave of absence without first notifying his plant management and securing permission for the extension, unless such notification proves to be impractical, may be subject to disciplinary action.

SPK00004248

- 58 -

C. An employee who is appointed to, or campaigns for and serves in full-time political office and employees serving in the U. S. Peace Corps and VISTA (Volunteers in Service to America) will be deemed to have met the "reasonable cause" requirement of this Section. Such leaves may initially be granted for a period not to exceed two (2) years, and are subject to renewal on a yearly basis on proper application by the employees and according to the same rules affecting the original issuance of the leave.

An employee on such leave, to be eligible for reemployment, should apply for reinstatement prior to expiration of the leave, or within fifteen (15) days of the termination of the political job or separation from the U. S. Peace Corps or VISTA, whichever comes first.

Employees granted leaves of absence in accordance with this Paragraph C shall be deemed to have the "consent" of both parties called for in Paragraph A of this Section.

D. During any such leave of absence, the employee's company seniority shall not be broken, but his departmental seniority shall not accumulate beyond the limitations prescribed in Article VIII (Seniority).

**Section 38.  Union Officials**

Employees duly elected or selected by the Union to an office of the Union shall be granted, upon request, a leave of absence without pay for the period of the term of office. Employees on such leave of absence on or after August 1, 1962, shall not have their company seniority broken and their departmental seniority shall accumulate for that period of their leave which is subsequent to August 1, 1962, in accordance with Article VIII, Paragraph B (Departmental Seniority) as though they were on layoff from the bargaining unit.

- 59 -

**ARTICLE XI.   RIGHTS UNDER THIS AGREEMENT**

**Section 39.  Legal Rights**

This Agreement shall be binding on both the Company and the Union and shall be faithfully performed by each and shall apply alike to male and female employees.

Nothing herein shall be considered as depriving either party or any employee of any rights or protection granted under any applicable federal or state law.

**Section 40.  Dismissals and Disciplinary Action**

A. If an employee is disciplined, written notice of such discipline shall be given to the employee. The written notice shall include a statement of his right to grieve the discipline and to have union representation.

B. No dismissal, discharge, or disciplinary layoff in excess of five (5) days shall be imposed until a suspension period of up to five (5) days shall have elapsed. However, during the suspension period the Company may advise the employee and/or the employee's union representative of the extent of any further action being considered. Written notices of such suspensions and subsequent actions and the reason therefor shall be given to the employee's grievance representative, when available, and a copy mailed to the president of the local Union at the time such action has been taken provided the employee does not object to such notices being given. The suspended employee may request a hearing at Step 2 of the grievance procedure. In the event a request for a hearing is made promptly, such hearing will be held within the suspension period.

If the suspension is revoked or converted into a disciplinary layoff, dismissal or discharge, the effective date will be the date of the suspension.

SPK00004249

**C.** If the Union is dissatisfied with the decision at Step 2, the case may be processed through the grievance procedure.

**D.** Where grievances concerning written reprimands or disciplinary layoffs of five (5) days or less are not resolved at Step 3 and are to be arbitrated, they shall be arbitrated in the Expedited Arbitration Procedure unless the appropriate representatives agree to refer such grievance to regular arbitration through regular procedures.

Subject to agreement of the local Union at each plant, disciplinary suspensions of five (5) days or less for absenteeism or tardiness shall be administrative in nature and shall not result in the affected employee being removed from active work without pay prior to a final determination of the merits of the suspension in accordance with the Labor Agreement. Disciplinary action of this nature will become part of the employee's personnel record and may be considered when determining future disciplinary action for the employee. The parties agree that the administrative nature of this discipline does not minimize the impact of the disciplinary action or the need for correction of employee conduct.

**E.** If a case of dismissal, discharge or termination is not resolved at Step 3 it may be submitted to Step 4 of the grievance procedure or directly to arbitration as provided in Article XIV, at the option of the international staff representative involved.

Dismissal, discharge and termination grievances shall receive prompt attention by the Board of Arbitration. The Board of Arbitration shall render a decision within 45 days after receipt of the transcript of the hearing and any post-hearing submission, unless the Board of Arbitration determines that circumstances warrant a longer period of time.

**F.** If it is determined that the dismissal, discharge, or disciplinary layoff was not for proper and just cause, the penalty may be modified or rescinded and restitution of pay may be made within the terms of the grievance procedure. The Board of Arbitration shall not have the authority to offset earnings in any such restitution.

**G.** In arbitration proceedings, the Company will not make use of any personnel records of previous disciplinary action against the employee involved where the disciplinary action occurred four (4) years prior to the date of the event which is the subject of such arbitration.

**H.** During each step of the grievance procedure the Union and the Company shall disclose the pertinent facts and information relied upon. Copies of such information and materials shall be made available.

### ARTICLE XII. SUPERVISORS WORKING

Any supervisor at a plant shall not perform work on a job normally performed by an employee in the Bargaining Unit at such plant; provided, however, this provision shall not be construed to prohibit supervisors from performing the following types of work:

**(a)** experimental, development and other research work;

**(b)** demonstration work performed for the purpose of instructing and training employees;

**(c)** work required by emergency conditions; and

**(d)** work which is negligible in amount and which also, under the circumstances then existing, it would be unreasonable to assign to a bargaining-unit employee.

SPK00004250

- 62 -

Work which is incidental to supervisory duties on a job normally performed by a supervisor, even though similar to duties found in jobs in the Bargaining Unit, shall not be affected by this provision.

If a supervisor performs work in violation of this Article XII and the employee who otherwise would have performed this work can reasonably be identified, the Company shall pay such employee the applicable standard hourly wage rate for the time involved or for four (4) hours, whichever is greater. In the event no such employee can be reasonably identified, the Company shall pay the grievant the applicable standard hourly wage rate for the time involved or four (4) hours, whichever is greater.

For the purpose of this Article, the term "supervisor" shall include other nonbargaining-unit employees of the Company.

### ARTICLE XIII.  GRIEVANCES

**Section 41.  Scope**

The grievance procedure may be applied to any differences, disputes, or complaints regarding the interpretation or application of this Agreement, or regarding matters of wages, hours, and working conditions excluded from or not covered by this Agreement.

**Section 42.  Procedure**

Grievances may be presented and discussed by an employee or an employee's Union representative, or for a group of employees by their Union representative or representatives, in the following steps:

**Step 1.** (Oral) With the immediate supervisor.

If an employee believes that he has a grievance, such employee may present and discuss

- 63 -

such grievance with his immediate supervisor with or without his union representative as the employee may elect, in an attempt to resolve the matter. The employee, may, if he so desires, report the matter directly to such union representative or representatives who shall in the presence of the employee, present the grievance to the employee's supervisor who shall be empowered to and shall attempt to resolve it.

The supervisor, after discussion, shall promptly give his oral answer. If the employee is not satisfied with the supervisor's answer, the union representative shall be empowered to resolve, withdraw, or appeal the grievance. If the supervisor's answer is not accepted, the grievance may be appealed by the union representative to Step 2 of the grievance procedure.

If the grievance is to be appealed to the second step, an appeal form as set forth in Appendix IV attached to this Agreement, shall be prepared by the union representative or the supervisor and given to the department head or his representative. The appeal form shall be signed by the affected employee or employees or the union representative. It shall be signed by the immediate supervisor to verify its processing at the first step. The appeal form will be given to the proper union representative who normally appeals cases to Step 2 in that area.

**Step 2.** (Oral) With the department head or the department head's representative.

On presentation of an appeal to the second step of the grievance procedure, the appeal form shall be signed and dated by the department head or his representative to acknowledge receipt of the appeal.

The grievance shall be discussed between the department head or the department head's representative and the union representative who

SPK00004251

- 64 -

shall be empowered to and shall attempt to resolve the grievance. Other participants to the discussion shall include the employee complainant, the immediate supervisor involved and such other witnesses as the parties may, by agreement, invite.

The department head after discussion of the grievance shall promptly give his oral answer. The union representative shall be empowered to resolve, withdraw or appeal the grievance.

If the grievance is not resolved in Step 2, a written grievance record shall be prepared by the department head, or his representative, after consultation with the union representative, within three (3) days of the delivery of the Step 2 answer. This time limit may be extended by agreement of the company and the union representative.

The grievance record shall contain the union representative's statement of the grievance, a statement of facts agreed to, a statement of the facts known to be in dispute, and the signatures of the proper representatives of each party. The respective parties shall cite such contractual provisions as may have been relied upon in the proceedings. The Union shall indicate the remedy sought. The Company shall record its answer to the grievance including reasons therefor.

**Step 3.** (Written) With the works manager or the works manager's representative.

On presentation of an appeal accompanied by the grievance record and appeal form, to the third step of the grievance procedure, the appeal form shall be signed and dated by the works manager or his representative to acknowledge receipt of the appeal.

If the parties mutually agree, a grievance may be referred back to the previous step with

- 65 -

appropriate recommendations and with appropriate extension of time limitations.

The grievance shall be discussed between the works manager or the works manager's representative or representatives and the union representative or representatives who shall be empowered to and shall attempt to resolve the grievance.

The company representative after discussion of the grievance shall promptly give his answer in writing. If the grievance is not resolved, the appropriate union representative shall be empowered to resolve, withdraw or appeal the grievance.

**Step 4.** With the manager of Industrial Relations of the Company.

On presentation of an appeal, accompanied by the grievance record, third step answer and the appeal form, the appeal form shall be signed and dated by the manager of Industrial Relations of the Company to acknowledge receipt of the appeal.

The grievance shall be discussed between the manager of Industrial Relations or his representative and the union representative who shall be empowered to and shall attempt to resolve the grievance.

The company representative after discussion of the grievance shall promptly give his answer in writing. The union representative shall be empowered to resolve, withdraw or appeal the grievance to arbitration, subject to the limitations of the arbitration provisions of this Agreement.

It is recognized that the nature of a grievance may be such that its initiation at a step above Step 1 is appropriate. In such case, the local parties may agree to their initiation at a higher step. Without limiting the

SPK00004252

- 66 -

foregoing it is specifically agreed that grievances concerning suspensions, disciplinary layoffs, dismissals, discharges, and terminations may be initiated at Step 2. Grievances concerning new or changed job classifications, as provided in Article IV, contracting out as provided in Article VII, and insurance issues, as provided in Article XXII, may be initiated at Step 3. When any grievance is initiated at Step 3, the grievance record for such a grievance shall be prepared at Step 3.

Grievances resolved at Step 1 or 2 shall be considered resolved without precedent and shall not be used in the discussion of other grievance or arbitration cases, provided however that disciplinary penalties resulting in such cases and the violation of which such disciplinary action resulted shall not be barred by this provision from use in other grievance or arbitration cases, unless the parties' representatives at such step shall agree in writing that a specific resolution of a disciplinary grievance shall be nonprecedent setting and noncitable.

Where one or more departments of a plant are directly involved, the grievance may be taken up first with the proper supervisor, a department head, or superintendent.

The local Union and the local plant Management may negotiate such modifications of or additions to Steps 1, 2 or 3 or preparation of the appeal form as may be suitable to the local situation.

### Section 43.   Time Limitations

Grievances shall be processed within the following time limitations, except that the appropriate parties' representatives may mutually agree to an extension of a time limitation in any particular instance. Neither party shall unreasonably withhold its agreement to such an extension requested by the other.

- 67 -

Except as provided in Article IV, Sections 6 and 7, a grievance shall be initiated within five (5) days of the time at which the grievant became aware of the facts on which the grievance is based, unless precluded from filing a grievance by some determining circumstance beyond his control. In such case the five (5) day limitation shall become effective when such determining circumstances cease. In any event, monetary liability shall not be assessed for any period prior to thirty (30) days before the initiation of the complaint.

A grievance initiated at Step 1 shall be answered within three (3) days.

Appeals of grievances to Step 2 shall be within seven (7) days of the answer at the previous step. Hearing at Step 2 shall be within seven (7) days of the appeal to that step. A grievance record shall be prepared within three (3) days of the delivery of the answer to Step 2 if the grievance remains unresolved at that point.

Appeals of grievances to Step 3 shall be within seven (7) days of the completion of the grievance record. A hearing at Step 3 shall be within seven (7) days of the appeal to that step. Grievances heard at Step 3 shall be answered within fourteen (14) days of the hearing.

Unless a time limit applicable to Step 1, 2, or 3 is extended by mutual agreement, no grievance may be processed outside of the stated time limit, except that if a hearing is not held or the answer is not given at Step 1, 2, or 3 within the applicable time limit, the Union may appeal the grievance to the subsequent step. The time limit for each respective appeal shall start as of the time the grievance answer is given or upon expiration of the time in which such answer is due, whichever occurred earlier.

SPK00004253

- 68 -

Appeals to Step 4 shall be within thirty (30) days of the Step 3 answer or of the expiration of the time in which that answer is due, whichever is earlier. The staff representative appealing the grievance will be offered a hearing date to be set within sixty (60) days from the date of receipt of the appeal. The company and staff representative may agree upon such a date or any other found to be mutually acceptable under the circumstances. A Step 4 answer, to be timely, shall be given within forty-five (45) days of the hearing.

If a hearing at the fourth step is not held within the applicable time limit, the grievance, if subject to arbitration, may be submitted to arbitration by the staff representative within thirty (30) days of the expiration of the time limit for fourth step hearing.

A grievance heard at the fourth step which is subject to arbitration pursuant to Article XIV may be submitted to arbitration within thirty (30) days of the fourth step answer or upon expiration of the time in which such answer is due, whichever is earlier.

However, if a grievance is not appealed to arbitration within fifteen (15) days from the start of the applicable appeal period, monetary liability will not accumulate for the time elapsing between the end of such fifteen (15) day period and the time the appeal is made.

Time limitations, as specified in this Section 43, shall be calendar days exclusive of Saturdays, Sundays and holidays specified in Article V, Section 13.

### Section 44.  Pay for Lost Time

When local plant conferences between any employees (including the union representative or representatives) and the local plant Management are held during their regular working hours,

such conferences shall not result in any loss of time to any such employees.

### Section 45.  Access to Plants

A staff representative of the Union shall be granted access to the plants of the Company for the purpose of investigating grievances which are being considered by the Union and the Company at the third or fourth step of the grievance procedure provided such investigations do not conflict with any government regulations and are in accordance with general rules agreed upon by the Company and the Union.

### ARTICLE XIV.  ARBITRATION

### Section 46.  Scope

Not all grievances are subject to arbitration. The scope of arbitration and the jurisdiction of the Board of Arbitration are defined in Section 50.

Grievances may be submitted to arbitration by either party after the grievance procedure has been exhausted subject to the following principles and procedure:

### Section 47.  Board of Arbitration

A Board of Arbitration is hereby created consisting of one representative of the International Union (to be appointed by the Chairman of the Alcoa Negotiating Committee), one representative of the Company and a third party, wholly disinterested, to be appointed by the respective parties for such period of time and upon such financial and other terms as may be agreed upon. Such third party shall be entitled the Umpire.

### Section 48.  Duties of Board

It shall be the duty of the Board to hear disputes on subjects within its jurisdiction

SPK00004254

- 70 -

certified to it by the Union or the Company after the grievance procedure of the Agreement has been exhausted.  Such hearings shall be held in the vicinity (as presently designated by the parties) of the plant which is arbitrating the grievance, unless another place be unanimously designated.

All decisions or awards of the Board shall be made by majority vote and shall be issued under the sole signature of the Umpire.

### Section 49.  Finality of Awards

The decisions and awards of the Board shall be final and binding upon the parties.

### Section 50.  Jurisdiction of the Board

**A.**  The Board shall regard the provisions of this Agreement as the basic principles and fundamental law governing the relationship of the parties.  The Board's function is to interpret the provisions of the Agreement and to decide cases of alleged violation of such provisions.  The Board shall not supplement, enlarge, diminish, or alter the scope or meaning of the Agreement as it exists from time to time, or any provisions therein nor entertain jurisdiction of any subject matter not covered thereby (except to the extent necessary to determine its jurisdiction).  Without limiting the foregoing, the subjects of wages, production standards, and contracting out except as specifically provided in the letter regarding the notification procedure are by this Section excluded from arbitration, except that wage rates are arbitrable for new or changed job classifications under Article IV of this Agreement, and except that questions of compliance with Article III are arbitrable.

**B.**  Whenever the Board may determine that the subject of a dispute is, or a decision or award thereon would be, beyond the Board's jurisdiction, or would contravene this Section

- 71 -

50, it shall dispose of the case by reducing such determination to writing and may then refer the dispute to the parties.

**C.**  The Board shall not take jurisdiction of any dispute or grievance arising under any prior agreements.

**D.**  The proposals made by each party with respect to changes in the basic labor agreements, and the discussions had with respect thereto, during the negotiations of the 1962 Agreement or subsequently shall not be used, or referred to, in any way during or in connection with the arbitration of any grievance arising under the provisions of the basic labor agreements.

### Section 51.  Costs

The compensation and expenses of the Board representative of each party shall be borne by such party.  The compensation and expenses of the Umpire shall be borne equally by the parties.

Interest shall be added to back pay awards granted by the Board of Arbitration which are not paid within thirty (30) working days from the date the Company receives the decision. Such interest at the then prime rate, will begin to accrue on the thirty-first (31st) day unless the Company is able to demonstrate the need for additional time to assemble the necessary data to compute the back pay award in which case such thirty (30) day period will commence with the date the data is available.  Where it is necessary to obtain a clarification of the Board's decision such thirty (30) day period will commence with the date the Company receives clarification of the award.

SPK00004255

- 72 -

**Section 52.   Rules**

The rules for the functioning of the Board of Arbitration are set forth in Appendix VI of this Agreement.  However, the Board may, by unanimous vote, make such other rules and regulations for the conduct of its business as do not conflict with these provisions.


**Section 53.   Agreement Against Strikes or Lockouts**

As to any disputes subject to arbitration, the Union agrees that it will not cause nor will its members take part in any strike or work stoppage, and the Company agrees that it will not cause any lockout.

As to any dispute not subject to arbitration, no strike, work stoppage,  or lockout will be caused or sanctioned until negotiations have continued for at least five (5) days at the final step of the bargaining procedure described in Article XIII.  Thereafter any strike which occurs under such circumstances shall not be deemed to be a violation of this Agreement, which shall continue to remain in full force notwithstanding such strike.

During the life of this Agreement, the Union will not cause nor will its members take part in any slow-down or similar interference with production, nor withhold services in recognition or support of issues between parties other than the parties to this Agreement.

The Union agrees that the Company has the right to discipline or discharge anyone guilty of violating the provisions of this Section.  In the event of an appeal to the Board of Arbitration of a grievance involving action taken under this paragraph, the Board shall have the right in its discretion to affirm, reverse, or modify the discharge or disciplinary penalty.

- 73 -

**Section 54.   Expedited Arbitration Procedure**

A panel of arbitrators shall be maintained for each plant area by the headquarters representatives of the parties.  The Rules of Procedure for Expedited Arbitration shall be maintained by the headquarters representatives of the parties and modified by them as deemed appropriate.  Their expenses and fees of the expedited arbitration proceedings shall be borne equally by the Company and the local Union.

As to any grievance appealed directly to expedited arbitration under Article XI, Section 40, Paragraph D, such appeal shall be made by the appropriate Union representative so notifying the Company's Step 3 representative within seven (7) days of the receipt of the Step 3 answer to the grievance.

As to any grievance appealed to Step 4 of the grievance procedure, the Step 4 representatives within fifteen (15) days after receipt of such appeal shall review the grievance and communicate with one another and jointly determine whether such grievance shall be referred back to Step 3 for final disposition.

As to any grievance referred back to Step 3, the Union's Step 3 representative may appeal it to the Expedited Arbitration Procedure by notifying the Step 3 representative of the Company within seven (7) days of the receipt of the referral from Step 4.

The Step 3 representatives shall then arrange for handling in Expedited Arbitration as follows:

1.   The list of members of the panel applicable to that plant shall be maintained alphabetically to be used by fixed rotation. The next panel member shall be contacted and requested to serve on the case or cases designated for Expedited Arbitration at a time

SPK00004256

and place agreed upon by the Step 3 representatives. The date for the hearing shall be within ten (10) days of the appeal unless an extension of time is mutually agreed by the Step 3 representatives. The rotation shall be followed until a panel member accepts the assignment. The next assignment shall be offered to the next panel member in the rotation.

2. The hearing shall be conducted in accordance with the following:

(a) The hearing shall be informal.

(b) No briefs shall be filed or transcripts made.

(c) There shall be no formal evidence rules.

(d) Each party's case shall be presented by a previously designated representative.

(e) The Arbitrator shall have the obligation of assuring that all necessary facts and considerations are brought before him by the representatives of the parties. In all respects, the Arbitrator shall assure that the hearing is a fair one.

(f) If the parties acting jointly or the Arbitrator conclude at the hearing that the issues involved are of such complexity or significance as to require further consideration by the parties, the case shall be referred to the Fourth Step and it shall be processed as though appealed on such date.

3. The Arbitrator shall render his decision within forty-eight (48) hours after conclusion of the hearing (excluding Saturdays, Sundays, and holidays). The Arbitrator's decision shall be based on the record developed by the parties before and at the hearing and shall include a brief written explanation of the

basis for such conclusion. These decisions will not be cited as a precedent in any discussion of grievances at any step of the grievance procedure or in subsequent arbitration, except that the disciplinary outcome of such cases and the violation for which such disciplinary action resulted shall not be barred by this provision from use in other grievances or arbitration cases at the same location. However, when previous disciplinary cases decided in Expedited Arbitration are cited in subsequent grievances or arbitration cases, the citation shall be limited to the result of that prior decision. The decision itself shall not be presented. The authority of the Arbitrators shall be the same as those provided in this Article XIV of the Labor Agreement between the parties.

4. The parties agree that the grievance appropriate for handling through the Expedited Arbitration Procedure should not involve novel problems or issues which have extensive contractual significance or which are unusually complex or which are beyond the jurisdiction of the permanent Arbitrator.

5. The decisions in Expedited Arbitration shall be consistent with the decisions of the permanent Arbitrator for the Company and the Union.

6. Duplicate originals of a decision shall be furnished to the representatives presenting the case, and copies shall be furnished to the union's Step 4 representative of the plant involved, the union's international office (Arbitration Department) and the company's manager of Industrial Relations.

## ARTICLE XV. SUPPLEMENTAL UNEMPLOYMENT BENEFITS

This Supplemental Unemployment Benefits Plan is designed to provide a covered employee who becomes wholly or partially unemployed (a) Weekly Benefits to provide income while he is on layoff, and (b) Short Week Benefits for any week

SPK00004257

- 76 -

in which he is partially unemployed, that is, he works some, but less than 32 hours for the Company.

A three-tiered program is established wherein employees are grouped depending upon their years of accumulated departmental seniority. The Tier I group comprises those employees who have 2 but less than 10 years of accumulated departmental seniority; the Tier II group comprises those employees who have 10 but less than 20 years of accumulated departmental seniority; and the Tier III group comprises those employees who have 20 or more years of accumulated departmental seniority.

### Section 55. Weekly Benefits

1. Weekly Supplemental Unemployment Benefits shall be payable to employees covered by this Agreement who have two or more years' accumulated departmental seniority at the beginning of the layoff. For purposes of this Article, an employee shall be considered as having been laid off in any week in which, because of lack of work, he is not scheduled or assigned to work for the Company.

2. A layoff shall not include one occasioned by (a) disciplinary reasons; or (b) a strike, slow down, work stoppage, picketing, or other labor dispute involving any employee or group of employees of the Company, at the company's plant, or involving the Union whether at the company's plant or elsewhere; or (c) a hostile act of any foreign government.

3. To qualify for a weekly supplemental benefit in any week, the laid off employee shall:

(a) be eligible for a state unemployment benefit (including any state requirement for application) except:

- 77 -

(i) as the length of layoff may exceed the duration of such state benefits to which he is entitled,

(ii) if he is compensated or receives a public or private pension payment (other than a pension payment wholly or partially financed by the Company) in an amount which disqualifies him for state benefits,

(iii) if he is on layoff on account of a shutdown of the plant or department for vacation purposes and is ineligible for vacation pay,

(iv) if he did not have a sufficient period of work in employment covered by the state system,

(v) if he fails to receive a state unemployment benefit because he is not physically able to work provided he became disabled while on layoff and after sickness and accident coverage ceased under Article XXII, and he supplies the same certification of disability as would be required for sickness and accident benefits if such coverage had not ceased. Any disability benefit paid under or pursuant to a state or federal law with respect to the period for which a Weekly Benefit is paid under this paragraph shall for the purposes of this Article be deemed to be a state unemployment benefit.

(vi) if he does not receive a state unemployment benefit solely because he is participating in a training program established under or pursuant to federal law. In such case any income received by him under that program shall be deemed to be a state unemployment benefit.

(b) have made application for benefits from the Company no later during the week following the week for which benefits are payable, at a time and place designated by the Company. The place at which reporting and applying are required will be at or near the

SPK00004258

- 78 -

location where the employee was last employed. If such place is an unreasonable distance from the employee's residence, or if he leaves the area to seek work, the Company shall, upon request of the employee in person, grant permission to report at another company location where an adequate office for such reporting is maintained. If no such office is within reasonable distance, the Company shall, upon request of the employee in person, grant permission to report and apply by mail. An employee applying for a Weekly Benefit pursuant to Paragraph 3(a)(v) may report and apply by mail. The necessary forms and instructions for making S. U. B. applications by mail shall be supplied by the Company to the employee at the time his request for mail reporting is granted. No employee shall receive a Weekly Benefit until he shows that he received a State unemployment benefit for the week or failed to receive such benefit for a reason which does not disqualify him from receiving a Weekly Benefit. This may be done by showing a State check or by some other method, which must reasonably provide for securing such proof.

(c)  not be receiving or claiming any sickness or accident or disability benefit, or any pension or retirement benefit wholly or partially financed by the Company, for which he is eligible.

(d)  not be receiving a week's vacation pay.

(e)  not be in military service (including training encampments).

4.  Weekly Benefits shall be payable, to employees meeting the qualifications of Paragraph 1, and who have not been on continuous layoff for more than two years for periods of layoff not to exceed their weeks of benefits eligibility. The maximum number of weeks of benefits eligibility shall be 52 weeks for Tier I employees, 78 weeks for Tier II employees and

- 79 -

104 weeks for Tier III employees; (except as provided in Paragraph 11 (a) and (b) except however, an employee shall not be eligible for benefits in excess of 52 weeks if such employee has refused to accept an assignment to any appropriate work at the work location where employed.

Employees who complete either 10 years of accumulated departmental seniority or 20 years of accumulated departmental seniority shall have their weeks of benefits eligibility increased by 26 at the time they complete each such seniority provided they are actively at work on that date. If not actively at work on that date, weeks of benefits eligibility shall be so increased at the time such employee returns to active work.

For purposes of this Article XV the phrase "actively at work" means an employee is present at work for the Company. "Actively at work" shall also include an employee who is on vacation scheduled under the Vacation Plan of the Company or is absent from work because of a paid holiday, a paid jury or witness day, a paid bereavement day, a short-term absence due to authorized local union business or an off day within the employee's working schedule provided in all cases such employee was present at work on the last scheduled working day immediately preceding such vacation or absence listed above.

If an employee is recalled to work, his remaining weeks of benefits eligibility in any subsequent layoffs shall be increased to his tier maximum at a rate of one-half week for each week thereafter in which he has any of the following hours:

(a)  Hours worked for the Company.

(b)  Hours not worked but for which he is paid, such as vacation hours or hours for which he received jury or witness pay or bereavement pay.

SPK00004259

- 80 -

(c)  Hours not worked and not paid for but which were lost because:

(i)  He was performing his duties as a member of the Grievance Committee, or president, vice-president, recording secretary, financial secretary and/or treasurer of a local of the Union which is his collective bargaining representative, or

(ii)  He was absent because of disability for which benefits are payable under a Workers' Compensation or Occupational Disease law or the Company Program of Insurance Benefits.

An employee who receives benefits which are reduced under Paragraph 6 shall be deemed to have used only three-quarters of a week of eligibility unless his benefit was so reduced by one-half or more, in which case he shall be deemed to have used only one-quarter of a week's eligibility.  Any employee having less than a full week's eligibility for any week shall be entitled to receive a proportionate benefit for such week.

5.  (a) The amount of an employee's Weekly Benefit (subject to the provisions of Paragraph 6 through 10 of this Section and Paragraph 3 of Section 57) shall be 28 hours of average straight time hourly earnings (computed for the last calendar quarter which ended one month or more prior to the beginning of the employee's layoff, excluding pay for vacations, extended vacations and holidays from such calculation of straight-time hourly earnings and adjusting for any intervening general wage change) minus the amount of the state unemployment benefit the employee receives or, if he is only partially unemployed, the amount he would have received for that week if totally unemployed.

(b)  In the application of (a) above, the following shall apply (subject to the provisions of Paragraph 6 through 10 of this Section and Paragraph 3 of Section 57) in cases where the

- 81 -

employee's state unemployment benefit is reduced or eliminated because of the receipt of a public or private pension.

(i)  Where the employee's state unemployment benefit is reduced solely because of the receipt of a public or private pension, the Weekly Benefit shall be 28 hours of average straight time hourly earnings minus the amount of state unemployment benefit received.

(ii)  Where the employee's state unemployment benefit is eliminated solely because of the receipt of a public or private pension and the employee is not in receipt of compensation, the Weekly Benefit shall be 28 hours of average straight-time hourly earnings.

(iii)  Where the employee's state unemployment benefit is eliminated because of the receipt of a public or private pension and compensation, the employee would not have otherwise been disqualified for a state unemployment benefit because of receipt of compensation, the Weekly Benefit shall be as computed in (a) above plus that portion of the public or private pension used in the reduction of the State unemployment benefit.

(iv)  Where the employee's state unemployment benefit is eliminated because of the receipt of a public or private pension but the employee would have otherwise been disqualified for a state unemployment benefit because of the receipt of compensation, the Weekly Benefit shall be as computed in Paragraph 6(a).

(c)  In the event that Trade Readjustment Act benefits are payable to an employee who is also receiving a state unemployment benefit, such T.R.A. benefits shall not be deducted from the employee's Weekly Benefit.  In those weeks for which no state unemployment benefits are payable, such T.R.A. benefits shall be deducted but limited to the amount of a full state unemployment benefit if it had been payable,

SPK00004260

assuming the employee in all respects is otherwise qualified for the State unemployment benefit.

6. (a) An employee who is or would be disqualified for state unemployment benefits solely because of the receipt of compensation shall have his benefit as computed in Paragraph 5(a) reduced by the amount by which his compensation exceeds the sum of:

(i) the state unemployment benefit he would have received for that week if totally unemployed and

(ii) the maximum amount, not in excess of $10.00, which is disregarded by the state in calculating unemployment benefits for partial unemployment.

(b) An employee who is or would be ineligible for state unemployment benefits, for a reason other than the receipt of compensation, shall receive a Weekly Benefit equal to the sum of the state unemployment benefit, if any, and the Weekly Benefit which he would have received under Paragraph 5, or subparagraph (a) of this Paragraph 6, except for his ineligibility for a state benefit.

7. The amount of benefits to which a part-time employee is entitled shall be computed as above, except the 28 hours shall be reduced in the proportion that the part-time employee's regularly scheduled hours per week bear to 40. A part-time employee is an employee who, for his own convenience, works less than the regularly scheduled hours.

8. Notwithstanding the above an employee who receives a state unemployment benefit, or is ineligible for such benefit solely because of the receipt of compensation or a public or private pension payment as set forth in Paragraph 3(a)(ii), shall have his Weekly Benefit calculated without a maximum benefit

limit. In other weeks, the maximum Weekly Benefit for employees in Tier I shall be $260.00 and for employees in Tier II and Tier III there shall be no maximum Weekly Benefit.

In the case of an employee who accumulates two years' departmental seniority after he has established a state benefit year, he shall be deemed to receive state unemployment benefits for the number of weeks subsequent to his exhaustion of state benefits equal to the number of weeks in that benefit year in which he received state benefits although not yet eligible under this Agreement.

9. To the amount set forth above shall be added $1.50 per week for each dependent for whom the personal exemption deduction is allowed the employee under federal income tax laws, but such additional amount shall not exceed $6.00 per week.

10. In such instances as the Company determines that state unemployment benefits are not payable to an eligible employee because of the receipt of such supplemental unemployment benefits from the Company, the Company and Union shall determine a suitable alternate method of payment. Such method of payment shall be effective as of the date of the Company's determination that supplementation is not permitted.

11. (a) If an employee who would be eligible for a Rule of 65 Retirement under the Pension Agreement effective June 1, 1993, except for the fact that the Company has not yet determined whether he will be offered "Suitable Long-Term Employment" (SLTE) as defined in Appendix A of such Pension Agreement exhausts his weeks of benefits eligibility, the Company shall grant the employee weeks of benefits eligibility to provide Weekly Benefits for which the employee may otherwise be eligible for whatever period of time that it may require to offer SLTE or to determine not to offer SLTE.

SPK00004261

- 84 -

(b) If an employee who is otherwise eligible or could become eligible for a Rule of 65 Retirement accepts an offer of SLTE at an employment location included in Group A or B of Table IV of the Pension Agreement effective June 1, 1993, and is subsequently laid off at any time during the two-year period following the date on which he starts work at the new employment location, the employee will be afforded the following additional protection. If the employee's weeks of benefits eligibility become exhausted, the Company will grant whatever additional weeks of benefits eligibility may be necessary to permit continuation of any Weekly Benefits for which the employee may be otherwise eligible during such layoff.

12. No weekly benefit of less than $2.00 will be paid, nor will any week of eligibility, or fraction thereof, be cancelled for any week in which the Weekly Benefit would have been less than $2.00.

13. An employee is not eligible to receive a Weekly or Short Week Benefit if he receives, or is eligible to receive, a similar benefit under an arrangement provided by an employer with whom he has more service than with the Company.

14. If pursuant to any federal law, or the law of any state or political subdivision, an employee receives or would be eligible to receive any benefit or payment because of layoff or employment displacement resultant from an energy crisis, such benefit or payment shall be considered and treated as State Unemployment Compensation for the purpose of this Article.

Section 56.   Short Week Benefits

1. An employee having two or more years of accumulated departmental seniority will receive a Short Week Benefit from the Company for any week in which some, but less than 32,

- 85 -

hours are worked for the Company, unless the sum of hours described in Paragraph 2 below equals or exceeds 32.

2. A Short Week Benefit for a particular week will be calculated by multiplying the employee's standard hourly wage rate by the difference between 32 and the sum of the hours:

(a) He worked in the week, and

(b) He did not work but for which he was paid by the Company, provided, however, that hours for which he was paid for one unworked holiday shall not be counted, and

(c) He did not work for reasons other than lack of work.

3. If the employee applies for state unemployment benefit for any portion of the week, he must notify the Company of such application and of the total amount of any such benefit received. One-seventh of the amount of such state unemployment benefit will be deducted from the amount calculated in accordance with Paragraph 2 above for each day of the State benefit week which falls within the payroll week for which the Short Week Benefit is paid.

4. Short Week Benefits shall be paid directly by the Company and shall not be charged against the contributions to or the finances of the SUB plan. Paragraphs 3(b) and (c) of Section 57 shall not apply to Short Week Benefits.

5. A Short Week Benefit will be paid to the employee, without application by him for any week for which he qualifies.

6. One-half week of eligibility will be cancelled for each Short Week Benefit.

7. If pursuant to any federal law, or the law of any state or political subdivision an

SPK00004262

- 86 -

employee receives or would be eligible to receive any benefit or payment because of layoff or employment displacement resultant from an energy crisis, such benefit or payment shall be considered and treated as State Unemployment Compensation for the purpose of the Article.

### Section 57.  Finance

1.  For each month the Company shall compute a Maximum Benefit Limit.  Such Maximum Benefit Limit shall be equal to thirty (30) cents per hour worked in the first twelve of the previous thirteen months.

2.  For each month the Company shall compute an Available Benefit Limit, which shall be the Available Benefit Limit for the preceding month adjusted by subtracting the Weekly Benefits paid during the second preceding month, and adding the amount required to bring the Available Benefit Limit up to 125 percent of the Maximum Benefit Limit; but such additional amount shall not exceed an amount computed by multiplying (i) nine and one-half (9.5) cents times the hours worked in the second preceding month until the Available Benefit Limit has been brought up to the Maximum Benefit Limit and (ii) an additional fifteen (15) cents times the hours worked in the second preceding month.  The addition of the fifteen (15) cents shall be subject to the provisions of Paragraph 3(d).

3.  (a)  For each month the Company shall compute the ratio of Available Benefit Limit to the Maximum Benefit Limit.  Until the first month after May 1983, in which the ratio of the Available Benefit Limit to the Maximum Benefit Limit calculated on the basis of thirty (30) cents equals at least one, the ratio shall continue to be calculated by reference to a Maximum Benefit Limit based on twenty-three (23) cents.

(b)  If the ratio of the Available Benefit Limit to the Maximum Benefit Limit, calculated

- 87 -

as in (a) above, shall be less than .35, the benefits otherwise payable during the month shall be reduced in accordance with the following table:

| When the ratio is: | The Portion of the Benefit Paid is |
|---|---|
| .25 or more but less than .35 | 60% |
| .15 or more but less than .25 | 30% |

(c)  In the event that such ratio shall be less than .15, no benefit shall be paid until such month as the ratio shall exceed .15; in no event however shall the total benefits paid during any month exceed the Available Benefit Limit calculated for such month.

(d)  Notwithstanding Paragraphs 3(b) and (c) above, the Company guarantees that all Weekly Benefits payable under the Plan shall be paid in full to employees who are in Tier II or Tier III.  To the extent that Weekly Benefits to such employees are reduced pursuant to Paragraphs 3(b) and (c), the Company shall advance to the trust fund the amount by which the Weekly Benefits paid to such employees pursuant to Paragraphs 3(b) and (c) need to be supplemented to provide full payment.  The Company shall maintain a separate record of such advances.  In any month in which there is an outstanding balance of such advances, and the Available Benefit Limit would otherwise exceed the Maximum Benefit Limit, the Company may reduce the additions which would otherwise be made to the Available Benefit Limit pursuant to Paragraph 2, but such reduction shall not reduce the Available Benefit Limit below the Maximum Benefit Limit.  Any such reduction in the additions which would otherwise be made to the Available Benefit Limit shall be recorded as a credit against the outstanding balance of advances made pursuant to this paragraph.

4.  The word "month" as used in this Article shall be construed to mean a four or

SPK00004263

- 88 -

five-week period, depending upon the number of weekly payroll ending dates falling within a calendar month.

**5.** The Company shall continue the trust fund established under the Agreement dated August 1, 1956, which is administered by a trustee selected by the Company. All payments of benefits shall be made from the trust fund and for each month, the Company shall contribute to the fund an amount to cover all benefits payable.

**6.** Federal Income Tax Ruling. Continued contributions to the Plan shall be conditioned upon the continuation in effect of the ruling of the Commissioner of Internal Revenue that such contributions constitute a currently deductible expense for income tax purposes under the Internal Revenue laws of the United States.

**7.** Fair Labor Standards Act Ruling. Continued contributions to the Plan shall be conditioned upon the continuation in effect of the ruling of the United States Department of Labor that no part of such contribution shall be included in the regular wage rate of any employee.

**8.** Withholding Provision. If the Company or trustee at any time shall be required to withhold any amount from any payment of benefits, by reason of any federal, state, county, or municipal law or regulation, the Company or trustee shall have the right to deduct such amount from such payment.

**9.** If an employee is disqualified from supplemental unemployment benefit payments for the reason that his eligibility for state unemployment insurance benefits is in dispute, and withheld pending a ruling from an Appeal to the State, company benefits shall not be paid but shall be set aside pending such state ruling.

- 89 -

**10.** Disputes arising from the application of supplemental unemployment benefits shall be initiated at the third step of the grievance procedure.

**11.** Upon the expiration of this Agreement, the Company shall have the right to suspend or terminate contributions, except as may be otherwise provided in any subsequent agreement between the Company and the Union. If contributions are terminated, any assets then remaining in the fund, plus that portion of the Available Benefit Limit made up of accrued liability, shall be subject to all the applicable provisions of this Article and shall be used until exhausted to pay similar benefits to applicants laid off or thereafter laid off in the order, each week, of the respective dates as of which they were laid off. In such case, the provision for reduction of benefits of Paragraph 3 of this Section shall not be effective.

**12.** The Union shall be furnished, on forms and at times to be agreed upon, such information as may be reasonably required to enable the Union to be properly informed concerning the operation of the Plan.

### ARTICLE XVI.   BULLETIN BOARDS

The Company will provide union bulletin boards in the principal departments of or at other suitable locations in each plant and will post thereon notices (not larger than legal caption paper) of union meetings and union activities as may be submitted by the Union for such posting.

### ARTICLE XVII.   VACATIONS

The following regulations shall govern the Vacation Plan for Hourly-Rated Employees.

SPK00004264

- 90 -

## Section 58.  Eligibility

1.  An employee shall be entitled to a vacation with pay during a calendar year if, at December 31 of the preceding year or at any time while such employee is working between January 1 and November 30, inclusive, of such calendar year, he has completed one or more years of accumulated departmental seniority and has either (a) worked 1000 or more hours in the immediately preceding 365 days or (b) worked in at least 60% of the preceding 52 weeks, provided during such period the scheduled work weeks have been reduced below five (5) days per week for more than twenty-six (26) weeks.

For the purpose of determining whether 1000 or more hours have been worked, time lost during such 365 days due to an injury arising out of company employment, or due to jury or witness duty (Article XXVII) or due to bereavement leave (Article XXVIII) or due to absence from work while on a previous year's vacation, or time lost while participating in national contract negotiations with the Company and in preparations contiguous therewith, or holiday hours not worked but paid for, shall be added to the actual hours the employee worked at the rate of eight (8) hours per day but no more than forty (40) hours per week.

An employee otherwise eligible, who on November 30 lacks 31 days or less of the required accumulated departmental seniority will be deemed to have satisfied the seniority requirements for eligibility and for length of vacation.

2.  An employee, who in any calendar year obtains a leave of absence for the purpose of entering the Armed Forces, and who provides proof of having entered the Armed Forces, in such year, will be credited with hours worked at the rate of eight (8) hours per day but no more than forty (40) hours per week during such leave up to the date of having entered the Armed

- 91 -

Forces, for the purpose of determining whether 1000 hours have been worked during the immediately preceding 365 days, and will be credited with accumulated departmental seniority for the balance of such year for the purpose of satisfying the seniority requirements for eligibility and length of vacation for that year.

An employee, who after being honorably discharged from the Armed Forces, is reinstated pursuant to the Company's Military Service Regulations, shall, in the year of his reinstatement without regard to the hours or weeks worked requirements, be entitled to a regular vacation.

3.  Any employee otherwise entitled to a regular vacation pursuant to this Agreement in the calendar year in which he retires under the terms of the Pension Agreement between the Company and the Union, which makes such employee eligible for a special retirement payment, but who has not taken such vacation prior to the date of such retirement, shall not be required to take a regular vacation in that calendar year and shall not be entitled to regular vacation pay for that calendar year or in any subsequent year.

## Section 59.  Length of Vacation

An eligible employee who has attained the years of accumulated departmental seniority indicated in the following table in any calendar year during the continuation of the Agreement shall receive a regular vacation (except as otherwise provided) corresponding to such years of accumulated departmental seniority as shown in the following table:



- 92 -

| Accumulated Departmental Seniority | Weeks of Regular Vacation |
|---|---|
| 1 year but less than 3 years | 1 week |
| 3 years but less than 10 years | 2 weeks |
| 10 years but less than 17 years | 3 weeks |
| 17 years but less than 25 years | 4 weeks |
| 25 years or more | 5 weeks |

The vacation taken shall consist of consecutive days and shall include Sundays and holidays; however, vacations of two, three, four, or five weeks may consist of separate periods of one week each.

### Section 60.  Return from Vacation

Notwithstanding any provisions of Section 19, an employee who overstays his vacation leave without first notifying his plant management and securing permission for the extension, unless such notification proves to be impractical, may be subject to disciplinary action.

### Section 61.  Vacation Scheduling

1.  The vacation period shall be from January 1 to December 31, inclusive.

2.  Time lost by an employee for a period of at least an entire payroll week during the vacation period due to the necessity of reducing the working forces or due to bona fide sickness or injury or due to leave of absence shall be applied to any regular vacation time to which such employee is entitled if the employee so requests.

3.  It is the intent and purpose of the Vacation Plan that all eligible employees shall receive benefit of a vacation from work. However, the employee who is required to work instead of taking time off for regular vacation shall be entitled to vacation pay in addition to

- 93 -

his regular pay providing he has not had time lost as described applied to all regular vacation time to which he is entitled.

4.  In light of the amount of regular vacation provided by this Article, the local Union and local plant Management shall meet as necessary to review the vacation scheduling practices in effect for the purpose of arriving at mutually satisfactory scheduling arrangements.  In such review, the parties shall endeavor to accommodate the wishes of the employees as to desired vacation periods in an equitable manner, giving consideration to operating requirements and the desire of employees to take their regular vacations at times most appropriate to their individual situations.

5.  If no local agreement exists at a plant concerning vacation scheduling practices, the following provision shall apply:

The employee shall take his vacation as scheduled by the Management provided he has not had time lost as described applied to all regular vacation time to which he is then entitled.  The employee's wishes as to the time his vacation is to be scheduled will necessarily be governed by the operating requirements of the plant.  To the extent that seniority is involved in such consideration, whether it shall be company seniority or departmental seniority shall be in accordance with agreements between the local plant Management and the local Union, and after a period of ninety (90) days from the date of this Agreement, such local agreements shall not be changed during the life of this Agreement.

Whenever an employee moves voluntarily or otherwise, from one department to another subsequent to the completion of the scheduling of regular vacations in the latter department for an oncoming year, he shall not be entitled to displace another employee of the second

SPK00004266

- 94 -

department from an established regular vacation schedule regardless of their relative seniorities.

The employee moving to a different department shall be scheduled for his vacation in accordance with his preference but subject to the orderly operation and production requirements of his new department.

### Section 62.   Vacation Pay

1.   The vacation pay for a vacation of one week shall be 44 hours multiplied by the employee's average earnings per hour (exclusive of overtime earnings, Cost-of-Living Allowance, and Schedule and Weekend Premium).   The vacation pay for 2, 3, etc., weeks shall be twice, three times, etc., that amount, respectively.   The employee's average earnings per hour are averaged over the period of the first four of the last six weeks (excluding any week in which a paid holiday is observed) in which the employee worked prior to the date on which (a) the vacation period begins (or fourteen days preceding that date if the employee requests advance vacation pay), or (b) the date the vacation is considered as starting.

Vacation pay computed on the basis of payroll weeks prior to a general wage increase for a vacation or portion thereof scheduled after such wage increase in such year shall be adjusted for such increase for the vacation time taken after the effective date of the increase. The adjustment will consist of the amount by which the hourly rate of the employee's payroll classification is increased as part of such General Wage Increase.   The adjustment so determined shall be added to those hours of vacation pay entitlement subject to adjustment. This is in accordance with the practices in effect under the August 1, 1954 Agreement.

2.   The vacation pay will be paid as follows:

- 95 -

(a) Vacation pay will be paid on the regular pay days for the period of the employee's vacation.   However, an employee may receive vacation pay in a lump sum for vacation time off provided such request is made in writing to the Company at least 14 days prior to the date the employee wishes such lump sum. However, such lump sum shall not be paid prior to the last day worked before his vacation is scheduled to start.

(b) For the employee who requests that regular vacation be applied because of the time lost or who works instead of taking time off, as described under Sections 61-2 and 61-3, the vacation pay shall be paid the employee on the first regular pay day occurring not less than ten (10) days following the date the employee makes such request.

(c) In the event of death of an employee who was eligible for a vacation, the amount of vacation pay to which the employee would have been entitled shall be paid to his proper legal representative.

### Section 63.   Legislative Impact

In the event of a war or other national emergency, or federal legislation designed to reduce the normal work week below 40 hours, either party may notify the other of a desire to negotiate with respect to an appropriate modification of this Plan or its termination. In the event of failure to agree within 120 days from notice, if given as a result of the above-described type notice, if given as a result of the above-described type of federal legislation, the Plan shall remain in effect subject to the termination provision of the Agreement, but the parties shall be free to strike or lockout in support of their positions with respect to such matters (and no other) notwithstanding the provisions of this or any other agreement between the parties.

SPK00004267

- 96 -

## ARTICLE XVIII.  APPRENTICESHIP

### Section 64.  Posting and Selection

The Company and the Union recognize the advantage to train and develop interested and qualified employees for predictable needs in skilled trade classifications through bona fide apprentice programs in accordance with Section 33.  In keeping with this recognition it is agreed that full and fair opportunity for advancement through properly organized and supervised apprenticeship programs shall be provided to all interested employees who meet the entrance requirements for filling vacancies in apprenticeships, and only when it is determined that there are not a sufficient number of interested employees who meet the entrance requirements to fill such jobs will the Company hire from outside the plant to fill apprenticeship vacancies.

Applicants who meet the entrance requirements as outlined below shall be selected to fill declared vacancies in the apprenticeship program in accordance with the Labor Agreement. Applicants selected for apprenticeship shall thereupon be considered to be included in the designated craft classification for purposes of Section 33.  Apprentices are nonetheless subject to the applicable rate progression herein provided and required to complete satisfactorily their apprenticeship training.

The Company will not hire new employees to fill vacancies for skilled trade classifications if there are interested and suitable qualified employees available in the plant.

### Section 65.  Entrance Requirements

The Company will select apprentices from applicants for apprenticeship who are qualified to enter such programs.  Among the criteria to be used in making the selection are whether the applicant has the ability to absorb the training

- 97 -

of the program specifically related to the occupation involved and the physical ability to perform the duties of the occupation involved. In addition, age and prior training are factors which may be considered without diminishing considerations of seniority.

In determining ability and physical fitness as used to fill apprenticeship vacancies in accordance with the applicable seniority provisions of the Labor Agreement, only such examinations and testing procedures which are job-related and fair in their administration will be used.

A job-related test is one which measures whether an applicant can satisfactorily meet the specific requirements of the given craft, including the ability to absorb the appropriate training.  For applicants determined not to be qualified, the testing procedures should include notification to such applicants of deficiencies and an offer of counsel as to how deficiencies may be overcome.

Applicants who have withdrawn or been disqualified from any apprenticeship program or who are currently enrolled in or have satisfactorily completed any apprenticeship program in the Company shall not be eligible for participation in another apprenticeship program, except in special cases such as:

(a) Applicant has been disqualified because of unsatisfactory ratings and thereafter remedied the cause of the unsatisfactory rating.

(b)  Applicant is requesting consideration for a different craft which has a rate at least three (3) job grades higher than his present craft, or the applicant has worked as a journeyman for the Company for at least six (6) years, to be measured by the actual time worked in his craft.  In such cases the applicant must meet the qualifying requirements for entering the applicable Apprenticeship.

SPK00004268

**(c)** Applicant has been removed in a reduction of forces from a craft to which there is little likelihood that he will be recalled.

### Section 66.  Credit

Individuals who have been selected to fill vacancies in an apprenticeship program shall promptly be furnished a form which contains a space for the individual's name, seniority, schooling and any other special training or experience which directly relates to the training involved and as such may qualify them for credit in the form of advanced standing in the apprenticeship program.  The form when completed by the employee shall be reviewed by the Joint Apprenticeship Advisory Committee before completion of the first period of training and a determination made by the Company as to whether or not advanced standing is warranted.  Individuals granted such credit shall be paid the wage rate commensurate with credit granted.  Such determination is subject to review in the grievance procedure.

### Section 67.  Related Instruction

Apprentices shall be required to satisfactorily complete a program of related instruction which, over the duration of his apprenticeship, will average at least 72 hours per 1000-hour period, but will not exceed 200 hours per 1000-hour period.

The Company shall arrange for and outline all courses of related instructions which may be given in plant classroom, vocational facilities, or approved correspondence course.  Such courses will be discussed with the Joint Apprenticeship Advisory Committee.  The cost of any designated related instruction including books shall be paid for by the Company upon satisfactory completion of the involved training period, provided such costs are neither covered nor reimbursable to the apprentice by some other agency.

Time spent by apprentices on designated related instruction during their regular working hours shall be paid for at the applicable hourly rate of the apprentice and shall count toward completing the training program hours.  Such time shall be counted as hours worked for overtime or premium pay purposes.  Related instruction shall pertain to the requirements of the specific job classification.

### Section 68.  Apprentice Program Standards and Work Experience

A work experience schedule for the major areas of the job classification to be learned for each apprenticeship covered by this Agreement will be prepared for guidance of on-the-job assignments.  Instructions of the apprentice need not follow the chronological order of the areas as they appear in the work experience schedule, but may be assigned in the sequence deemed best suited to the volume and type of work common to the classification, provided that all apprentices shall receive instruction in all major areas of the classification as listed in the work experience schedule except for those areas for which credit allowance has been made.

Both the on-the-job training and related instruction courses shall be reviewed and updated periodically to assure they are job related and reflect the current requirements of the classifications as they are being performed.  Such review and updating will be discussed with the Joint Apprenticeship Advisory Committee.

### Section 69.  Periodic Review of Progress

Progress of apprentices shall be subject to review at any time while in a course of apprenticeship training and will be discussed with the Joint Apprenticeship Advisory Committee.  Should such review reveal unsatisfactory progress on the part of the

SPK00004269

apprentice, corrective measures will be taken in an effort to remedy the situation.

The Company shall arrange appropriate methods to determine satisfactory progress in the program through job-related examinations and tests specifically job-related to the occupation involved. This will include progress in related instruction courses and field training.

If an unsatisfactory progress rating is given in a specific phase of field training or related instruction courses, or both, the apprentice must remove the unsatisfactory rating before advancing to the next training period. If the apprentice receives a second unsatisfactory rating the same field training phase or related instruction course, such may be considered cause for terminating the apprentice from the program.

Tests used in determining the satisfactory progress rating of an apprentice either in a specific phase of field training or related instruction course of the occupation involved shall be job related and limited to such specific field training or related instruction course on which the apprentice has received appropriate craft-related, and on-the-job training or classroom training. Such tests shall be fairly administered with regard to the time for completion of the test, normalcy of the job conditions for test purposes and evaluation of the results.

An apprentice terminated or laid off from the program during the first training period shall return to his former department without loss of seniority and be placed in his former classification. An apprentice terminated during subsequent training periods shall be placed as though he were laid off from the department except that if he entered the apprentice program from that department he shall be demoted in accordance with his applicable seniority.

The apprentice rate progression schedule shall not prevent more rapid advancement or time credit when exceptional progress or qualifications are shown.

**Section 70. Joint Apprenticeship Advisory Committee**

It is the desire of the parties that effective liaison exists between them as it relates to the operation of apprenticeship programs at the various works and operations locations. To further facilitate this objective a Joint Apprenticeship Advisory Committee shall be established. It shall consist of not more than three (3) representatives to be appointed by the local plant Management and not more than three (3) representatives to be appointed by the local Union at least two (2) of whom shall be journeymen. The offices of chairman and co-chairman shall be filled and held alternately by a company representative and a union representative.

In order to assure a supply of qualified apprenticeship candidates, the Company shall modify its present pre-apprenticeship training program to include a course of instruction of not less than eighty (80) hours in subject matters relevant to apprenticeship programs. It shall be the responsibility of the Joint Committee to advise regarding the development, content and operation of this course. The Joint Committee shall also be responsible for encouraging interested employees (regardless of race, sex, religion or national origin) to avail themselves of this opportunity. In addition, the Joint Committee shall monitor the progress of the participants in this program in order to assure that the program is achieving its goals. The Joint Committee shall make recommendations to the Company regarding changes to the program from time to time if the same appear to be necessary.

SPK00004270

It shall be a function of the Joint Committee to assure that apprentices receive training in those areas necessary to satisfy the requirements of apprenticeship. It shall be the Joint Committee's responsibility to assure that apprentices are not measured against work not performed or classroom instruction not received and that accurate records reflecting actual experience and exposure are maintained.

The rating results, including classroom, field and on-the-job training, shall be made available to the Joint Committee on a regular basis in order that apprentice progress may be monitored. It shall be incumbent upon the Joint Committee to discuss less than satisfactory performance with apprentices in order that risks of failure are minimized to the extent possible.

The Joint Committee shall be informed of decisions to add, or reduce the number of journeymen and apprentices and the reasons therefor and it shall be informed of any decision to remove any apprentice from the program for lack of adequate progress.

It is the continuing intent of the parties that related instruction and on-the-job training be kept current and relevant to the needs of the craft. The Joint Committee may review the related training course content to determine if these criteria are being met.

Any committee member may make recommendations as to any of these matters and their effect on individual apprentices or on the apprenticeship program generally. In the event that any of these matters is not satisfactorily resolved then such question may be initiated directly by the grievance committee at the final local step of the grievance procedure.

**Section 71.  Ratio**

There shall be no ratio of apprentices to journeymen.

**Section 72.  Status of Apprentice Program**

V. A. approval will be sought for all apprentice programs.

B. A. T. registration will be sought for all apprentice programs.

**Section 73.  Local Implementation**

Details necessary to implement this Agreement shall be worked out locally provided they do not contravene the provisions of this Agreement.

**Section 74.  Certificate of Completion**

Upon the satisfactory completion of his apprenticeship under these standards, the graduating apprentice will be issued a certificate signifying his accomplishment.

**Section 75.  Apprentice Program Lengths and Rates**

In recognition of the substantially accelerated apprentice training program, shift and job assignments, vacation scheduling, and related training scheduling must be arranged so as to assure full training of competent craftsmen. Such arrangement shall not, except as the Company demonstrates, the specific and direct necessity therefor, deprive any employee of rights to which such employee would otherwise be entitled.

The following six (6) period apprentice rate progression shall apply to each craft as noted in the rate schedule:

SPK00004271

- 104 -

## SIX PERIOD APPRENTICE
## RATE PROGRESSIONS

1,000 Hour Training Period

| 1 | 2 | 3 | 4 | 5 | 6 | Prob* | Job Grade |
|---|---|---|---|---|---|-------|-----------|
| 7 | 8 | 10 | 12 |    |    | 12 | 16 |
| 7 | 8 | 10 | 12 |    |    | 13 | 17 |
| 7 | 8 | 10 | 12 | 14 |    | 14 | 18 |
| 7 | 8 | 10 | 12 | 14 |    | 15 | 19 |
| 7 | 8 | 10 | 12 | 14 | 16 | 16 | 20 |
| 7 | 8 | 10 | 12 | 14 | 16 | 17 | 21 |
| 7 | 8 | 10 | 12 | 14 | 16 | 18 | 22 |
| 7 | 8 | 10 | 12 | 14 | 17 | 19 | 23 |
| 7 | 8 | 10 | 12 | 14 | 17 | 20 | 24 |
| 7 | 8 | 10 | 12 | 14 | 17 | 21 | 25 |
| 7 | 8 | 10 | 12 | 14 | 18 | 22 | 26 |
| 7 | 8 | 10 | 12 | 14 | 18 | 23 | 27 |
| 7 | 8 | 10 | 12 | 14 | 18 | 24 | 28** |

*Probationary rate applicable to newly hired journeymen for period not to exceed six months.

**Journeymen in other crafts who bid the toolmaker classification shall remain at their present rate for six months and thereafter advance two job grades each six months until reaching Job Grade 28.

## ARTICLE XIX.   SAFETY AND HEALTH

### Section 76.   General

The Company, in compliance with applicable federal law, shall furnish to each employee employment free from recognized hazards that are causing or are likely to cause death or serious physical harm. Further, the Company shall comply with occupational safety and health standards promulgated under such law. It is intended that, consistent with the following functions of the safety and health committees, the International Union, Local Unions, union safety committees and its officers, employees and agents shall not be liable for any work-connected injuries, disabilities or diseases which may be incurred by employees. In this Safety and Health Article, the Union, through its various representatives, committees, officers, employees and agents, has been accorded certain participatory rights relating to employee safety and health; however, it is not the intention of the parties that these provisions or the Union's exercise of its rights thereunder shall in any way diminish the Company's exclusive responsibility. The Company and the Union will continue to cooperate toward the objective of eliminating accident and health hazards and will encourage employees to use the procedures stated herein in reaching this objective.

### Section 77.   Safety and Health Committee

A representative Safety and Health Committee will function at each of the plants on a joint basis, the number of members to be agreed on locally and the union members to be selected by the Union. The committee shall assist, make recommendations to, and cooperate with the Safety Department of the plant. Departmental safety committees are encouraged to follow the principle of rotating members in order to achieve broad participation. The Union will appoint the union members. Where the union co-chairman requests that a specific union departmental committee member excluded from rotation because of special training or positive contribution to the committee, such request will be granted.

This committee will be guided by the principles of the eight-point program set forth below:

1. Conduct monthly meetings for the sole purpose of discussing accident prevention and the health conditions of the plant. The Company will keep minutes and provide copies for the

- 105 -

SPK00004272

- 106 -

committee members.  At every third monthly meeting, the committee shall review and evaluate the activities of the previous period at which time the international union staff representative may attend.

2.  Review published plant safety reports **such as**, relevant near-miss and accident **investigations** and develop other data which would be useful in identifying accident sources and injury trends.

3.  Recommend changes or additions to protective equipment or devices for the elimination of hazards.

4.  Participate in the promotion and advertising of safety.

5.  Review safety and health matters that have been raised by members of the bargaining unit as referred to in the third from the last paragraph of this Article.

6.  Coordinate with the Management Environmental Steering Committee.

7.  Encourage employees to use procedures established by the Company and the Union to process matters relating to safety and health.

8.  Review existing safety orientation and safety training activities for new employees as well as those existing safety training activities applicable to present employees who may change job classifications.

The Union shall certify its co-chairman from the local bargaining unit.  The union co-chairman or the co-chairman's designee from the Safety and Health Committee and the management co-chairman will jointly inspect work areas they deem appropriate on a day immediately prior to each monthly Committee meeting.  It is understood that the purpose of the plant inspection is to assist the Company in

- 107 -

satisfying its responsibility for work-connected injuries, disabilities, or diseases which may be incurred by employees.  The union co-chairman or the co-chairman's designee from the committee will be accorded timely access to the plant work areas in the conduct of committee responsibilities but a standard of reasonableness must be met in the obtaining of permission to leave that individual's regular job, in the amount of time involved if it is during regular working hours, in the amount of disruption involved if other employees are to be contacted, and in the arranging for advance clearance to be in work areas other than the chairman's own.  The company co-chairman may accompany the union co-chairman or the co-chairman's designees from the committee during such access.

The Safety Department and departmental management are responsible for effective and accurate accident and near-accident investigation.  Where lost-time injuries are involved, the Safety Department and/or departmental management will send notification to the co-chairman or designee as soon as possible and no later than 24 hours from the time the Safety Department received knowledge of the injury.  In the event of serious disabling accidents, the union co-chairman of the Safety and Health Committee or designee shall be included among those on the list of those to be promptly notified.  Such notification is made for the purpose of providing him an opportunity to review the circumstances of the accident, which may include a site visit, in preparation for participating in item two (2) of the eight point program.

When local plant conferences between any employees (including the union representative or representatives) and the local plant Management are held during his or their regular working hours, such conferences shall not result in any loss of time to any such employees.  This would

SPK00004273

- 108 -

include any special conferences that the co-chairman mutually agree to arrange.

### Section 78.  Safety Equipment and Facilities

A.  Protective devices, wearing apparel, and other equipment necessary to protect employees from injury shall be provided by the Company in accordance with practices now prevailing in each separate plant or as such practices may be improved from time to time by the Company.  Where protective wearing apparel is sold to employees, it is understood that prices of such apparel as is sold in the plants to employees will be at such levels as to not assure profit to the Company.  The Company will discuss significant intended improved practices with the Safety and Health Committee in advance of their implementation.  Such discussions do not necessarily have to precede discussions of the same matters in the grievance procedure.

B.  Effective December 1, 1993, each employee, other than a probationary employee, will be provided an allowance of $40.00 to purchase safety shoes for the employee's wear at the plant.  On June 1, 1995, each employee who on that date has one year of accumulated departmental seniority shall receive an allowance of $40.00 to purchase safety shoes for the employee's wear at the plant.  This benefit is in lieu of and supersedes any local practice or agreement to pay for shoes or metatarsals except where the employees have any superior conditions they may elect to retain the existing practice or agreement, and except where the Company is required by law to pay for such shoes and metatarsals.

This agreement is also applicable to employees in clerical and technical jobs who are required by the Company to wear safety shoes or metatarsals.

- 109 -

### Section 79.  Employee Safety and Health Rights

The Company will continue to provide adequate first-aid facilities and access to emergency medical treatment when necessary, as recommended by qualified medical personnel.

An employee hurt in an industrial accident will be paid for time lost during that shift, including any applicable overtime or shift premium, due to time required for medical treatment or due to being sent home for the balance of the shift by the Medical Department. If the employee is sent to the Plant Medical Department and is required to remain in the Medical Department for medical examination or treatment beyond the end of that shift, such time shall be paid as hours worked.

When an employee is temporarily reassigned to another department, or to another job classification in a different area in the same department, as a result of the Medical Department's determination that his exposure to a toxic substance calls for such temporary reassignment, he shall receive for hours worked his regular rate of pay or the pay of the job classification or job classifications to which such employee is assigned, whichever is higher, for a period of sixty (60) days following reassignment or upon such employee's return to his former department, whichever is sooner.  The local parties may mutually agree to extensions of the rate retention period.

If an employee shall believe that there exists an unsafe condition, changed from the normal hazards inherent in the operation, so that the employee is in danger of injury, he shall notify his foreman of such danger and of the facts relating thereto.  Thereafter, unless there shall be a dispute as to the existence of such unsafe condition, such employee shall have the right, subject to reasonable steps for protecting other employees and the equipment from injury, to be relieved from duty on the job

SPK00004274

- 110 -

about which he has complained and to return to such job when such unsafe condition shall be remedied. If the existence of such alleged unsafe condition shall be disputed, the chairman of the Grievance Committee and the works manager or his representative shall immediately investigate such alleged unsafe condition and determine whether it exists. If they shall not agree and if the chairman of the Grievance Committee is of the opinion that such alleged unsafe condition exists, the employee shall have the right to present a grievance in writing to the works manager or his representative and thereafter to be relieved from duty on the job as stated above. Such grievance shall be presented without delay directly to the Board of Arbitration under the provisions of Article XIV of this Agreement, which shall determine whether such employee was justified in leaving the job because of the existence of such an unsafe condition. If an employee is relieved from duty on the job as stated above, the Company will make a reasonable effort to advise any potential replacement of the grounds upon which the job was challenged as unsafe, until the outcome of such dispute is determined.

Other matters pertaining to unsafe conditions may be entered in the grievance procedure on a regular basis or, after notifying the supervisor in charge so that he can investigate and respond within a reasonable time, registering the matter with the Health and Safety Committee if the supervisor's response is unsatisfactory.

Section 80. Rate Retention

1. When, because of a disability attributable in whole or in part to his employment with the Company, it is medically indicated that an employee be removed from his job, the following shall apply:

a. The removed employee shall be entitled to exercise all rights under the Agreement as

- 111 -

though he had been affected by a reduction in forces. Such rights include, but are not limited to, the right to transfer to an available job in his own plant or to one in another plant if no job is available in his own plant.

b. For purposes of this Section "available job" means one to which the employee is entitled under the Agreement and which he can perform consistent with his physical ability and condition and health requirements.

c. In the event no available job exists in the plant, the chairman of the plant Grievance Committee and the representative of the plant manager may agree upon the alternative suitable job in the plant for a removed employee or provide assistance in arranging for a job in another plant of the Company to which the removed employee is willing to transfer. A job shall not be deemed suitable unless the removed employee can perform it consistent with his physical ability and condition and health requirements.

d. Should any dispute arise under this program as to disability, medical indication or health requirements, the company's medical representatives shall make the initial determination. If that determination is disputed by the Union, the matter shall be referred to a mutually-designated physician or medical center for a final and binding determination. The fees incurred in this determination shall be shared by the local parties. Any lost wages or expense involving the employee, shall be borne by the Company.

2. a. A removed employee, demoted or transferred pursuant to Paragraph 1.a. to a job of a lower job grade shall nevertheless be paid at the job grade not less than the job from which he was removed.

SPK00004275

- 112 -

    **b.** If the removed employee refuses two promotions to available jobs, as defined in Paragraph 1.b. above, he shall thereafter forfeit his right to receive the guaranteed job grade described in Paragraph 2.a.

## Section 81.   Advisory and Review Procedures

    The Health and Safety Committee may contact and use the Management Environmental Steering Committee as a technical and advisory resource in the area of ventilation, temperature control, fumes, smoke, toxic or corrosive substances, flammable materials, chemicals, solvents, and compounds. Specifically, the Management Environmental Steering Committee is available to indoctrinate the Health and Safety Committee in matters pertaining to acceptable health levels and techniques of monitoring environmental control. It is also expected that the Steering Committee will have occasion to communicate with individual employees and groups of employees concerning implementation of Occupational Safety and Health Act of 1970. Any unresolved issues may be entered at the third step of the grievance procedure.

    Representatives of the International Union's Safety and Health Department and corporate representatives of the Company's Health and Environmental Department may meet annually to review the effectiveness of safety and health activities.

    The international director or his designee may arrange to make a plant visitation by contacting the corporate office of the vice president of Environment and Health.

### ARTICLE XX.   JOB AND INCOME SECURITY

    The Job and Income Security Program was established by the parties to provide increased economic protection for long-service employees who are involuntarily displaced from their jobs. The parties agree that the method of achieving

- 113 -

this objective is to facilitate the placement of such employees in suitable long-term jobs and, when such jobs are not available, to reduce the adverse economic consequences to such employees by providing additional benefits.

    The program includes Supplemental Unemployment, Group Insurance and Income Maintenance Benefits and special benefits under the Pension Agreement.

    The provisions covering these benefits are incorporated in the appropriate Sections of this Agreement and the Pension Agreement. A summary of this Program appears in Appendix V of this Agreement.

### ARTICLE XXI.   INCOME MAINTENANCE PROGRAM

## Section 82.   Purpose

    The purpose of the Income Maintenance Program is to provide a guaranteed level of rate protection for eligible employees whose average job grade has been lowered solely through involuntary demotion resulting from a reduction of forces. This rate protection will be provided by the payment of an Income Maintenance Allowance which, when added to the employee's average job grade rate for hours worked in a quarter, will increase such average job grade rate to a specified percentage of the current rate applicable to the employee's average job grade established during a base period preceding such quarter.

## Section 83.   Definitions

    For the purposes of the Income Maintenance Program, the following terms are intended to have the meaning set forth below:

    **A.** "Base Year" -- The 52 pay periods prior to the first pay period commencing in December of the year preceding the end of any benefit quarter.

SPK00004276

- 114 -

B.  "Benefit Quarter" -- The 13 pay periods preceding the first pay period commencing in March, June, September and December.

C.  "Eligible Employees" -- Employees who have two or more years of accumulated departmental seniority as of the end of the last pay period in a Benefit Quarter and who have worked 160 or more hours during the Base Year.

D.  "Base Year Job Grade" -- The employee's average job grade during the Base Year as determined by weighting the job grade paid for each job in which the employee was payroll classified by the hours worked while so classified, except that:

should the employee, during the Base Year or any subsequent Benefit Quarter, through "voluntary means" become payroll classified in or retain any job grade lower than that determined above, such lower job grade shall immediately become his Base Year Job Grade for purposes of this program.  "Voluntary means" includes but is not limited to bidding down, refusal of a restoration, or refusal of a promotion which in accordance with local practices an employee would normally be expected to seek.

Temporary assignments to classifications paid a higher or lower job grade than that of an employee's regular job shall not be considered except in those situations where the local parties have agreed that normal plant operation and the purposes of this Program require that a special accommodation be made.

E.  "Benefit Quarter Job Grade" -- The employee's average job grade during the Benefit Quarter as determined by weighting the job grade paid for each job in which the employee was payroll classified during the Benefit Quarter by the hours worked while so classified.  Temporary

- 115 -

assignment consideration shall follow the principles noted above under "Base Year Job Grade."

F.  "Base Year Rate" -- The standard hourly wage rate in effect during the Benefit Quarter for the Base Year Job Grade. Interpolation shall be used between values on the Standard Hourly Wage Rate schedule to determine the appropriate rate to the nearest tenth of a job grade.

G.  "Benefit Quarter Rate" -- The standard hourly wage rate in effect during the Benefit Quarter for the Benefit Quarter Job Grade. Interpolation shall be used between values on the Standard Hourly Rate schedule to determine the appropriate rate to the nearest tenth of a job grade.

H.  "Income Maintenance Allowance" -- An amount of money to be calculated each Benefit Quarter as noted below and paid to eligible employees at the same time normal payment is made at the location involved for the first pay period commencing in the months of March, June, September, and December.

Section 84.   Benefit Calculation

The Income Maintenance Allowance shall be calculated as follows:  The employee's Base Year Rate during the Benefit Quarter shall be multiplied by the appropriate percentage specified in the table below.  The resulting rate represents the income security guarantee provided by the program to eligible employees for the hours worked during the Benefit Quarter. If the employee's Benefit Quarter Rate equals or exceeds the guaranteed rate, no Income Maintenance Allowance is payable for the Benefit Quarter.  If the employee's Benefit Quarter Rate is less than the guaranteed rate, the Income Maintenance Allowance shall be determined by multiplying the difference between the

SPK00004277

- 116 -

guaranteed rate and the Benefit Quarter Rate by the hours worked during the Benefit Quarter.

### I.M.A. PERCENTAGE TABLE

| Accumulated Departmental Seniority At End Of Benefit Quarter | Base Year Job Grade Percentage |
|---|---|
| 2 years but less than 10 | 90 |
| 10 years or more | 95 |

**Section 85.   General**

A.   No Income Maintenance Allowance shall be payable to any individual for a Benefit Quarter during which his seniority is terminated under any of the provisions of Article VIII, Section 19 of the Labor Agreement.

B.   Money paid as an Income Maintenance Allowance shall not be used in the base for calculation of overtime (except where statutorily required), premium pay, benefits or other pay additive except in those cases where benefit levels are determined by reference to annual earnings.

C.   An employee who is otherwise eligible or could become eligible for a Rule of 65 Retirement and who accepts an offer of SLTE (as defined in Appendix A of the Pension Agreement effective June 1, 1993) at an employment location listed in Group A or B for the employee's location in Table IV of the Pension Agreement effective June 1, 1993, shall be covered by the Income Maintenance Program (IMP) in effect subject to the following:

1.   The employee immediately shall be deemed to be an eligible employee as defined by the IMP, irrespective of his most recent hours of work history.   The waiver of hours of work eligibility requirement shall continue throughout the periods of special Income

- 117 -

Maintenance Allowance benefits specified in 2. below unless employment status is terminated.

2.   The Base Year Job Grade to be used to calculate the special quarterly Income Maintenance Allowance for an employee accepting SLTE at other than his home location shall be the Base Year Grade in effect for that employee at his home location immediately prior to the employee's last layoff from that location.   Such Base Year Job Grade shall be in effect for the benefit quarter during which he starts work at the new location, plus the following applicable period:

Group A location:   The next four consecutive benefit quarters.

Group B locations:   The next eight consecutive benefit quarters.   Thereafter, the transferred employee's Base Year Job Grade shall be that calculated by regular procedures, based upon his work experience at the new location.

3.   The Income Maintenance Allowance Base Year Job Grade percentage for an employee accepting SLTE at a Group B location shall be 100% rather than 95% for the benefit quarter during which the employee starts work at the Group B location and for the next eight consecutive benefit quarters.

4.   The special Base Year Job Grades provided in 2. above will cease to be applicable should the employee, during the covered period, through "voluntary" means, become payroll classified in or retain any job grade lower than such special Base Year Job Grade.

### ARTICLE XXII — GROUP INSURANCE

The Company will provide the following coverages:   Life, Surviving Spouse, and Weekly Sickness and Accident for active employees and Hospital Expense, Surgical-Medical Expense, Extended Medical Expense, Dental Expense, and

SPK00004278

Vision Expense for active employees and eligible dependents. **Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program.** The Company will provide the following coverages for retired employees (and eligible dependents) and surviving spouses of active and retired employees (and eligible dependents) who are receiving a pension under the Pension Agreement:

(1)    For persons not eligible for Medicare-Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program. **Effective January 1, 1994 the Hospital Expense, Surgical-Medical Expense, and Extended Medical Expense program will be replaced with the Managed Care Medical Program, the Prescription Drug Program, and the Behavioral Health Care Program.**

(2)    For persons eligible for Medicare-Supplemental Hospital Expense, Supplemental Surgical-Medical Expense, and Supplemental Extended Medical Expense, and **Prescription Drug Program.**

The Company will also provide Life Coverage and Surviving Spouse Coverage for such retired employees.

All of the above benefits will be provided without cost to employees and retirees except as otherwise provided. Separate booklets describing these benefits are incorporated herein and made a part of this Agreement.

General Provisions Applicable to Article **XXII**

1.    It is agreed that if subsequent governmental legislation provides for the reduction or elimination of the premium for Medicare Part B for any person, the Company shall make a corresponding reduction or

elimination to the benefit payment for such Medicare premium for that person and such governmental action shall not require further modification or adjustment in this Article. **Medicare Part B premium reimbursement shall be the monthly government charged premium to a maximum of $46.10.**

2.    It is intended that the provisions for benefits in this Article shall comply with and be in substitution for provisions for similar benefits which are, or shall be, made by any law or laws. Amounts paid by the Company for such similar benefits either as contributions, taxes, or benefits under any law or laws providing non-occupational insurance benefits shall reduce to that extent the amounts the Company shall pay under this Article and appropriate readjustment shall likewise be made in the benefits.

3.    Benefits otherwise payable under the Hospital Expense Coverage **or the Managed Care Medical Benefit Program** shall be reduced to the extent of the hospital benefits the employee received or could upon application receive under or pursuant to the California Unemployment Insurance Code.

4.    Unless otherwise provided in this Article, the parties will meet and agree on a modification of this plan to eliminate duplication of benefits and the disposition of any savings to the Company if subsequent governmental legislation should provide any of the benefits described herein.

5.    Upon the request of either the Company or the International Union, the parties will jointly study the health-care program provided by a **Health Maintenance Organization Plan (HMO)** in any area. Furthermore, if desired by the International Union, the parties will also jointly study the health-care program provided by a qualified **Health Maintenance Organization** plan that presents to the Company an appropriate

SPK00004279

- 120 -

request for inclusion in this plan. A mutual agreement will be sought as to the desirability of providing at no additional cost to the Company an individual choice between an employee's coverage under this Article and similar coverages provided by the **Health Maintenance Organization** plan under study. The Company and the International Union will make a mutual determination of the costs in such area of the hospital-surgical-medical benefits provided for individuals by this Article and the costs for individuals of participation in such HMO plan. In the event the parties agree to provide such an individual choice, then with respect to employees who choose participation in such HMO plan, the Company will deduct from the pay of each such employee the amount, if any, by which the cost of such employee's participation in such plan exceeds the cost in such area of the **Managed Care Medical** benefits theretofore provided for such employee by this Article, as above determined, and the Company will pay to such plan the cost of such employee's participation in such plan. The parties agree that they will not unreasonably withhold agreement in reaching such mutual determination.

6.    Notwithstanding the provisions in 2 and 4 above, when and if, during the term of this Agreement, any employee covered by this Agreement becomes entitled to apply for or to obtain health care or other medical, dental, vision, or surgical benefits by reason of the enactment by the United States or any state of the United States of a Governmental System of health security or medical service program ("Governmental System") for active employees, the parties shall promptly meet and undertake to negotiate a modification of the benefits under this Article of the type and character provided or available under such Governmental System in order to achieve or to assure the following results:

(a)    No employee covered by this Article shall suffer any reduction in the level of any

- 121 -

of the several health-care benefits of this Article.

(b)    The Company shall, without cost to the employee, provide a plan of benefits supplementary to those available under such Governmental System to the extent necessary to make each benefit comparable to the corresponding benefit provided under this Article.

(c)    When an employee or dependent covered by this Article is required by law to make contributions, whether in the form of direct taxes, personal premiums, levies or otherwise, specifically designated by law toward the cost of benefits under such a Governmental System, the Company, in addition to any contributions required of it by law, shall pay to or on behalf of such employee or dependent any such required contributions to the extent such contributions are for benefits covered by this Article.

(d)    The Company will not be required to provide any benefits or make payment for any benefit to the extent that the employee or dependent covered hereby receives or would be able to receive such benefit as a matter of right and without means test of any kind if timely and proper steps had been taken to obtain the benefit or payment for the benefit under such Governmental System.

(e)    To preclude any duplicating of benefits to employees or their dependents and to preclude any duplication of costs to the Company including the costs arising from Taxes and contributions of employees paid by the Company.

(f)    To negotiate the disposition of any actual savings disregarding any increase or decrease in administrative cost which may accrue to the Company as a result of any such Governmental System.

SPK00004280

- 122 -

### ARTICLE XXIII.  REPORT OF PHYSICAL EXAMINATION

Upon written request of an employee, any report of his physical examination and laboratory tests made by physicians acting for the Company shall be given to the personal physician of such employee.

### ARTICLE XXIV.  DISABLED OR HANDICAPPED EMPLOYEES

The local Union and local Management may by mutual agreement provide rules whereby disabled or handicapped employees may be assigned to jobs which they are able to perform without regard to provisions of Article VIII, Seniority, or Article IX, Job Posting and Work Assignments.

### ARTICLE XXV.  CIVIL RIGHTS

A.  The provisions of the Memorandum of Understanding effective April 28, 1975, are hereby made a part of the Agreement.  In any case of conflict between the other provisions of the Agreement and the provisions of such Memorandum of Understanding, the Memorandum of Understanding shall control.

B.  There shall be no discrimination at the time of employment against any prospective employee, nor after employment, by supervisors, superintendents, or any other person in the employ of the Company against any employee because of membership or nonmembership in the Union.

It is the continuing policy of the Company and Union that the provisions of the Agreement shall be applied to all employees without regard to race, color, religious creed, national origin, handicap, Vietnam era service, sex or age, except where sex or age is a bona fide occupational qualification.  Wherever in this Agreement a masculine pronoun is used, such use

- 123 -

is intended to apply equally to males and females.

A Joint Committee on Civil Rights shall be established at each plant.  The Union shall have no more than three members of the local Union, in addition to the president and a designated representative of the Grievance Committee or Committees.  The union members shall be certified to the plant manager by the president of the local Union.

The company and union members of the Joint Committee shall meet as required.  The Joint Committee shall review complaints involving civil rights.  In the event a matter taken up by the Joint Committee is not satisfactorily resolved, it may then be dealt with as a grievance.  It is not intended by the parties that this Committee shall displace the normal operation of the grievance procedure.  The appropriate union representative may file a grievance in the third step of the grievance procedure.  The Joint Committee shall have no jurisdiction over the filing and processing of grievances.

When a matter is referred to the Joint Committee, the time limit for filing a grievance will commence with the day following the date of the initial meeting in which the matter was discussed unless mutually extended by the parties as long as the complaint is recorded with the Joint Committee within thirty (30) days of the incident giving rise to the complaint.

When local plant meetings are held between employees, including the union representative or representatives, and company representative of the Joint Committee during their regular working hours, such meetings, shall not result in any loss of time to any such employees.

SPK00004281

- 124 -

### ARTICLE XXVI.   MILITARY SERVICE

**A.** The Company agrees to comply with all applicable federal laws relating to the re-employment rights of veterans.

**B.** An employee entitled to reinstatement under the Article who applied for re-employment and who desires to pursue a course of study in accordance with the federal law granting him such opportunity before or after returning to employment with the Company shall be granted a leave of absence for such purpose.

**C.** Should an employee fail to meet the eligibility requirements for holiday pay solely because of being on active military encampment during the eligibility period, such employee will be considered as having met the eligibility requirements.

**D.** An employee will not be required to take vacation time during his period of active military encampment.

### ARTICLE XXVII.   JURY AND WITNESS PAY

An employee who is called for jury service or as a result of being subpoenaed as a witness in a court of law or duly constituted governmental agency shall be excused from work for the days on which he serves and such employee shall receive, for each such day of jury or witness service on which he otherwise would have worked, eight (8) times his average straight-time hourly earnings. The employee will present proof of such service.

### ARTICLE XXVIII.   BEREAVEMENT PAY

When death occurs in an employee's immediate family (i.e., employee's legal spouse, mother, stepmother, father, stepfather, mother-in-law, father-in-law, son, stepson, daughter, stepdaughter, brother, halfbrother, stepbrother, sister, halfsister, stepsister,

- 125 -

son-in-law, daughter-in-law, grandparents, or grandchildren), an employee, upon request, will be excused for up to three (3) days (or for such fewer days as the employee may be absent) on which such employee otherwise would have worked and which occur within six (6) days of the death, funeral, or service. The employee shall receive pay for any such excused scheduled shift provided such employee attends the funeral or service. Payment shall be eight (8) times an employee's average straight-time hourly earnings. An employee will not receive bereavement pay when it duplicates pay received for time not worked for any other reason.

### ARTICLE XXIX.   PERIOD OF AGREEMENT

Except as otherwise provided below, this Agreement shall terminate 60 days after either party shall give written notice of termination to the other party, but in any event shall not terminate earlier than 12:00 midnight, or the end of the shift starting before midnight, whichever is later, May 31, 1996.

If either party gives such notice it may include therein notice of its desire to negotiate with respect to pensions (existing provisions or agreements as to pensions to the contrary notwithstanding), and the parties shall meet within 30 days thereafter to negotiate with respect to such matters. If the parties shall not agree with respect to such matters by the end of 60 days after the giving of such notice, either party may thereafter resort to strike or lockout as the case may be in support of its position in respect to such matters as well as any other matter in dispute, but not earlier than midnight, May 31, 1996 (the existing agreements or provisions with respect to pensions to the contrary notwithstanding).

SPK00004282

- 126 -

FOR THE COMPANY:

G. E. Bergeron      A. C. Roemhild, Jr.
R. R. Hoffman       D. L. Root, Jr.
R. W. Porter        M. J. Schreier
J. Quaglia          E. T. Woloshyn
R. C. Rawe

FOR THE UNION:

Lynn R. Williams, President
Edgar L. Ball, Secretary-Treasurer
George Becker, Vice President - Administration
Leon Lynch, Vice President - Human Affairs
Joe L. Kiker, Director, District 35
Dick Davis, Director, District 36
Jack R. Golden, Director, District 37
David Cyrus, Jr., Representative
Jim G. Brumley, Representative
Fred Mabry, Representative
John Herron, Representative

INTERNATIONAL UNION HEADQUARTERS PERSONNEL:

Patti Seehafer      James English
Edward Ghearing     Melena Barkman

LOCAL UNION PRESIDENTS:

Tom Moore, Local Union 309
Randall Smith, Local Union 303
C. H. Satcher, Local Union 4895
Russell Pruitt, Local Union 4370
D. LeLand Turbyfill, Local Union 4880

- 127 -

## APPENDIX I
### STANDARD HOURLY RATES

| Job Grade | Rate Effective 6/7/93 | Rate* Effective 6/5/95 |
|---|---|---|
| 1 and 2 | $12.157 | $12.407 |
| 3 | 12.286 | 12.536 |
| 4 | 12.415 | 12.665 |
| 5 | 12.544 | 12.794 |
| 6 | 12.673 | 12.923 |
| 7 | 12.802 | 13.052 |
| 8 | 12.931 | 13.181 |
| 9 | 13.060 | 13.310 |
| 10 | 13.189 | 13.439 |
| 11 | 13.318 | 13.568 |
| 12 | 13.447 | 13.697 |
| 13 | 13.576 | 13.826 |
| 14 | 13.705 | 13.955 |
| 15 | 13.834 | 14.084 |
| 16 | 13.963 | 14.213 |
| 17 | 14.092 | 14.342 |
| 18 | 14.221 | 14.471 |
| 19 | 14.350 | 14.600 |
| 20 | 14.479 | 14.729 |
| 21 | 14.608 | 14.858 |
| 22 | 14.737 | 14.987 |
| 23 | 14.866 | 15.116 |
| 24 | 14.995 | 15.245 |
| 25 | 15.124 | 15.374 |
| 26 | 15.253 | 15.503 |
| 27 | 15.382 | 15.632 |
| 28 | 15.511 | 15.761 |

*Applicable to only those employees not taking the 401k match local option.

SPK00004283



- 128 -

APPENDIX II
SHIFT PREMIUM HOURLY RATES

| Job Grade Paid | Second Shift | Third Shift |
|---|---|---|
| 1-2 | .342 | .570 |
| 3 | .346 | .577 |
| 4 | .350 | .583 |
| 5 | .354 | .590 |
| 6 | .358 | .596 |
| 7 | .362 | .603 |
| 8 | .365 | .609 |
| 9 | .369 | .616 |
| 10 | .373 | .622 |
| 11 | .377 | .628 |
| 12 | .381 | .635 |
| 13 | .385 | .641 |
| 14 | .389 | .648 |
| 15 | .393 | .654 |
| 16 | .396 | .661 |
| 17 | .400 | .667 |
| 18 | .404 | .674 |
| 19 | .408 | .680 |
| 20 | .412 | .686 |
| 21 | .416 | .693 |
| 22 | .420 | .699 |
| 23 | .423 | .706 |
| 24 | .427 | .712 |
| 25 | .431 | .719 |
| 26 | .435 | .725 |
| 27 | .439 | .732 |
| 28 | .443 | .738 |

- 129 -

APPENDIX III
COST OF LIVING

1.  For purposes of this Agreement:

"Consumer Price Index" refers to the "Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) -- United States -- All Items (1967 = 100)" published by the Bureau of Labor Statistics, U.S. Department of Labor.

"Consumer Price Index Base" shall be determined as follows:

(i)  For the June 7, 1993, September 6, 1993, December 6, 1993, and March 7, 1994 Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January 1993 published by BLS in February 1993 as  417.8, multiplied by 103.0%.

(ii)  For the June 6, 1994, September 5, 1994, December 5, 1994, and March 6, 1995 Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January 1994, multiplied by 103.0%.

(iii)  For the June 5, 1995, September 4, 1995, December 4, 1995, and March 4, 1996 Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January 1995, multiplied by 103.0%.

"Adjustment Dates" are June 7, September 6, and December 6, 1993; March 7, June 6, September 5, and December 5, 1994; March 6, June 5, September 4, and December 4, 1995; and March 4, 1996.

"Change in the Consumer Price Index" is defined as the difference between (i) the Consumer Price Index Base and (ii) the Consumer Price Index for the second calendar month next preceding the month in which the applicable Adjustment Date falls.

SPK00004284

- 130 -

2. Cost-of-Living Adjustment: Effective on each Adjustment Date a Cost-of-Living Adjustment equal to 1¢ per hour for each full .3 of a point change in the Consumer Price Index shall be calculated. In calculating the adjustments, if any, for **June, September and December 1993 and March 1994,** there shall be added to the calculated amount a fixed carryover amount of **one hundred seventeen and six-tenths cents (117.6¢).** In calculating the adjustments, if any, for June, September, and December 1994, and March 1995, there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment, if any, which was payable on March 7, 1994. In calculating the adjustments, if any, for June, September, and December 1995, and March 1996, there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment, if any, which was payable on March 6, 1995.

Effective on each Adjustment Date, the Cost-of-Living Adjustment as determined above shall become payable for all hours worked by an hourly-rated employee until the next Adjustment Date. The Cost-of-Living Adjustments under this paragraph shall be considered an "add-on" and shall not be deemed part of the employee's standard hourly rate. Such adjustment shall be included with the hourly rate only in the calculation of pay for hours worked (including overtime hours) and allowed time in accordance with Sections 17 and 18.

3. Should the monthly Consumer Price Index in its present form and on the same basis as the Index published for January 1993 become unavailable, the parties shall attempt to adjust this Section or, if agreement is not reached, request the Bureau of Labor Statistics to provide an appropriate conversion of adjustment, which shall be applicable as of the appropriate Adjustment Date and thereafter.

- 131 -

APPENDIX IV
GRIEVANCE APPEAL FORM
(for grievances not resolved at first step)

Grievance No. .........

Employee Name ........................

Clock No. ............. Department ........................

Type of Complaint ........................

Date of Incident ........................

Date Initiated ................ Date Answered ............

Employee ............ Union Representative ............ Foreman ............

Agreed Time Extension (if applicable)

........... days beyond 5-day requirement
             for initiation of grievance

Foreman ............

........... days beyond 3-day requirement
             for answer at step one

Union Signature ............

- 132 -

STEP 2

Date Appeal received

by Company ................... Company Representative

Date Heard .................

Date Answered ................ Union Representative

Agreed Time Extension (if applicable)

......... days beyond 7-day requirement for appeal

Company Representative

......... days beyond requirement for hearing

Company Representative

Union Representative

......... days beyond 7-day requirement for answer

Union Representative

- 133 -

GRIEVANCE RECORD PREPARATION

Date of Completion of Agreed Grievance Record ................

Agreed Time Extension (if applicable)

....... days beyond 3-day subsequent to 2nd step answer

Union Representative

Company Representative

SPK00004286

- 134 -

**APPENDIX V**

**SUMMARY OF JOB AND INCOME SECURITY PROGRAM**

| Subject | Tier I (Employees with two years but less than ten years of accumulated departmental seniority) | Tier II (Employees with ten years but less than twenty years of accumulated departmental seniority) | Tier III (Employees with twenty or more years of accumulated departmental seniority) | Reference for further details |
|---|---|---|---|---|
| A. SUB | | | | |
| 1. Financing | (a) The Maximum Benefit Limit will be 30 cents times all hours worked in the base 12 months. | All SUB benefits are guaranteed. The Company will advance amounts required to pay benefits in full | Same as Tier II. | See Article XV, Section 57 of Labor Agreement. |
| | (b) The Company will accrue a liability of 9.5 cents per hour worked until the fund balance equals 100 percent of the Maximum Benefit Limit. | | | |
| | (c) The Company will also accrue a liability for an additional 15 cents per hour worked until the fund balance equals 125 percent of the Maximum Benefit Limit. | | | |

- 135 -

SPK00004287

- 136 -

APPENDIX V cont'd.

SUMMARY OF JOB AND INCOME SECURITY
PROGRAM

| Subject | Tier I (Employees with two years but less than ten years of accumulated departmental seniority) | Tier II (Employees with ten years but less than twenty years of accumulated departmental seniority) | Tier III (Employees with twenty or more years of accumulated departmental seniority) | Reference for further details |
|---|---|---|---|---|
| A. SUB (cont'd) | | | | |
| 2. Maximum Duration | Up to 52 weeks. | Up to 78 weeks. | Up to 104 weeks. | See Article XV, Section 55-4 of Labor Agreement |
| 3. Maximum Benefits | No benefit maximum for weeks in which unemployment compensation is received. $260 maximum for other weeks. | Both maximums are eliminated. | Same as Tier II. | See Article XV, Section 55-8 of Labor Agreement |
| B. Short Week Benefits | | | | |
| 1. Financing | All Short Week Benefits are guaranteed; no charge against SUB Fund. | Same as Tier I | Same as Tier I | See Article XV, Section 56-4 of Labor Agreement. |
| 2. Deduction of Holiday Pay | One holiday in a week will not be deducted. | Same as Tier I | Same as Tier I | See Article XV, Section 56-2 of Labor Agreement |
| C Income Maintenance | Employees will be guaranteed 90% income protection while working on a lower-rated job (in addition to existing protection). | Employees will be guaranteed 95% income protection. | Employees will be guaranteed 95% income protection. | See Article XXI, Section 84 of Labor Agreement. |

- 137 -

SPK00004288



- 138 -

APPENDIX V cont'd.

SUMMARY OF JOB AND INCOME SECURITY PROGRAM

| Subject | Tier I (Employees with two years but less than ten years of accumulated departmental seniority) | Tier II (Employees with ten years but less than twenty years of accumulated departmental seniority) |
| --- | --- | --- |
| D. Pensions | | |

- 139 -

Tier III (Employees with twenty or more years of accumulated departmental seniority)

Reference for further details

See Section II of Pension Agreement

Rule of 65 Pension

1. Rule of 65 Pension (age plus Pension Service equals 65) for employees who are affected by extended layoff or disability; also, such Pension applies to employees who are displaced as a result of a plant shutdown (including shutdown relating to energy problems) and the Company fails to provide suitable long-term employment.
2. Employee must have a minimum of 20 years of Pension Service as of the last day worked.
3. Benefit includes a special retirement payment, a full Pension, plus (until the employee becomes entitled to Social Security) a $400 supplement.
4. Supplement is suspended whenever the employee obtains suitable long-term employment.

SPK00004289

– 140 –

APPENDIX V cont'd.

SUMMARY OF JOB AND INCOME SECURITY
PROGRAM

| Subject | Tier I (Employees with two years but less than ten years of accumulated departmental seniority) | Tier II (Employees with ten years but less than twenty years of accumulated departmental seniority) |
|---|---|---|
| E. Sickness and Accident | 1. Effective June 7, 1993, benefits are increased to a range of from $265 to $333 per week.<br><br>2. Effective June 5, 1995, benefits are increased to a range of from $285 to $353 per week. | Same as Tier I. |
| F. Insurance Coverage in Event of Layoff | Medical Insurance and Life Insurance continued for up to one year. | Medical Insurance and Life Insurance continued for up to two years. |

– 141 –

| Tier III (Employees with twenty or more years of accumulated departmental seniority) | Reference for further details |
|---|---|
| Same as Tier I | See Sickness & Accident section of Insurance Booklet |
| Same as Tier II | See General Provisions of Insurance Booklet |

SPK00004290

- 142 -

### APPENDIX VI
### PROCEDURAL RULES
### USWA - ALCOA REGULAR ARBITRATION

1. Cases to the Arbitration Procedure, except cases pertaining to Safety and Health, may be certified to the Board of Arbitration by persons whom are authorized to represent the parties in the contractual Step 4 of the Grievance Procedure. A copy of such certification will be sent to the other party. The parties agree that continuing liability cases will be given priority in scheduling cases for arbitration.

2. Each party shall designate a spokesman (advocate) who shall make the party's presentation, calling upon other representatives of that party as witnesses as he deems appropriate. No representatives of either party shall be required to testify at the hearing except by designation of that party's advocate. Each person who testifies is subject to questioning by Board Members and cross-examination by the opposing advocate. Witnesses shall not be sworn.

3. Each party shall prepare a written opening statement in each case presented. Copies of those statements will be given to the other party and the Board at the start of hearing and read into the record of the hearing.

4. When a grievance is arbitrated on its merits, the party having the burden of proof will open and close first. In matters pertaining to Discipline, Discharge, Termination of Seniority, and Exceptions to the Application of Seniority (Section 27) the Company will go first.

5. The question of a case being subject to arbitration shall be raised by the party having the objection prior to a hearing on the merits of the case. Such objection should be communicated to the other party not later than

- 143 -

sixty (60) days after the date of certification. The hearing on arbitrability shall be held separate from and the decision rendered prior to any hearing if required, on the merits. The party raising the question of arbitrability shall open and close first.

6. Closing arguments shall be confined to summarization and conclusions; no new evidence or allegations shall then be presented.

7. Assertions of material fact made by either party and not disputed by the other party shall be accepted by the Board without specific proof.

8. Written transcripts will be utilized only in cases where the Umpire decides they are necessary. A record of all hearings will be made through the use of a tape recorder, or other mutually agreed-to method, during the hearing. The record of the hearing will not be typed for the Umpire unless the Umpire requests same. The Umpire is responsible for arranging to have the transcript typed, the cost of typing such transcript will be borne equally by the parties. The Umpire will retain in his possession the copy of all tapes.

9. The record of the case will include the hearing transcript, if applicable, pertinent documents exchanged by the parties and provided to the Board prior to the hearing, and documents provided to the Board prior to the hearing, and documents provided by either party to the other and to the Board during the hearing.

10. Each party shall make a good faith effort to avoid surprising the other party at the hearing with new or changed issues or contended facts. If, however, either party feels unable to respond adequately to a specific contention presented by the other at the hearing with new or changed issues or contended facts. If, however, either party feels unable to respond adequately to a specific contention

SPK00004291

- 144 -

presented by the other at the hearing, the record of the case will, upon request made at the hearing, be held open for a stated reasonable period of time for submission of a post-hearing statement on that specific contention. A copy of that post-hearing statement will be sent to the other party, which shall have a similar period of time within which to send a response to the Board members and the originating party. Except by special request of the Board, post-hearing briefs will not be submitted.

11.   Either party may refer to prior regular USWA - Alcoa arbitration decisions believed to be relevant by case number. The Board will be provided with a complete set of such prior decisions so that it may appropriately review cases so cited. Arbitration decisions in matters not arising out of the USWA - Alcoa relationship shall not be cited by either party.

12.   Legal rules of evidence shall not be enforced, and each advocate shall be permitted wide latitude in presenting the case. However, in using a wide latitude in presenting his case, each advocate must avoid suggesting answers to the witness.

The Job Descriptions prepared jointly by the parties for wage evaluation are not admissible in cases other than wage evaluation issues argued in accordance with the joint Wage Manual. Also, an offer of settlement made by one party shall not be submitted or referred to by the other party. Restrictions on the use of bargaining history are provided in Section 50-D of the Labor Agreement.

13.   There shall be no bench decisions regarding the outcome of a case rendered at a hearing except as provided for in Item 14. In executive session of the Board, both parties' representatives may provide comment and/or suggestions to the Umpire. After due

- 145 -

consideration in executive session the final decision shall be issued by the Board.

14.   In cases involving disputes arising under Section 79 (Employee Safety and Health Rights) of the Labor Agreement, wherein an employee has been relieved from duty on the job, the Board, after completion of the hearing, will review the record, consult with the parties if it is deemed necessary and may issue a verbal decision at the time or communicate the decision by wire to the parties within 24 hours of the close of the hearing. In either event the initial decision will be followed by a complete written decision.

15.   If the Company intends to submit photographs of Company Premises or equipment in evidence in any case, the Union will be so advised and copies of such photographs will be given to the Union if requested, thirty (30) days in advance of the hearing, if possible. If the Union wishes to similarly use such photographs, they may request the Company provide them thirty (30) days in advance of the hearing if possible. After use of such evidence at the hearing, the Board shall retain possession of the photos during consideration of the case, after which they will be returned to the Company.

It is understood and agreed that these procedural rules are part of Article XIV (Arbitration) of the Labor Agreement.

### APPENDIX VII
### USW HOURLY 401(K) PLAN

During the 1993 negotiations it was agreed that there would be a company allocation of matching contributions to participants in the Alcoa Savings Plan for Bargaining Employees (the "Plan") during the term of the 1993 Labor Agreement.

SPK00004292

- 146 -

Provided a local union elects a company match in lieu of a 25¢ wage increase and in conjunction with the Plan's provision which permits the allocation of Participating Employer Contributions ("Company Match") to participants' accounts in such amounts as shall be agreed to by the Company and the Union, the parties agree that effective June 5, 1995, the Company shall allocate to the account of each participant a Company Match equal to 50¢ per $1.00 of the participant's eligible compensation contributed to the Plan as pre-tax savings up to 6% of the participant's eligible compensation. It is acknowledged and agreed that other than the increase or decrease of the Company Match, the Plan's administration and participants' rights under the Plan shall be concurrent with the administration and participants' rights under the Alcoa Savings Plan for Non-Bargaining Employees. In addition, it was agreed that the description of the United Steelworkers of America Hourly 401(k) plan, will be updated to reflect the changes to the plan effective January 1, 1993.

APPENDIX VIII
PERFORMANCE PAY

During 1993 negotiations it was agreed that the profit sharing arrangements previously negotiated should be revised as set forth herein. The following Performance Pay provides for participation by hourly employees represented by the Union in the plants located at Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Point Comfort, Texas; and Rockdale, Texas.

I.   PURPOSE AND PHILOSOPHY

The purpose of Performance Pay is to share profits and gains while focusing employees in a Business Unit/Location on overall Corporate Financial Performance and critical business goals. Working together and achieving Corporate

- 147 -

Financial and Business Unit/Location goals will result in increased profitability for the business and monetary reward to employees. The intent is that all employees in a Business Unit/Location will have the same goals for variable compensation to achieve a common focus on key performance goals and congruency of employee treatment.

Guiding Principles for Performance Pay

-    The design and goals will be consistent with the Business Unit/Location's business strategies and with Alcoa's vision and values.

-    The design and goals should support teamwork and employee involvement, be perceived as fair, and be easily understood by employees.

-    All employees in a Business Unit/Location will have their Performance Pay payout based on the same Performance Measures.

-    A specified award opportunity will be based on the performance of the Business Unit/Location. A separate award opportunity will be based on Corporate Financial Performance. Payouts for Business Unit/Location and Corporate Financial Performance are independent of each other.

-    Variable compensation payouts will supplement the negotiated base level of wages.

II.   ELIGIBLE EMPLOYEE

An Eligible Employee is an hourly employee covered by this Agreement who had actual hours worked during the payroll weeks disbursed in the Year and who either had employee status on December 31 of the Year or whose employee status terminated during the Year due to death or retirement.

SPK00004293

- 148 -

III.  EFFECTIVE DATE

Performance Pay will be applicable for the full year 1993 and for the duration of the Agreement.

IV.  DESIGN

1.  General

The design requires that a range of performance improvement be established for each Performance Measure (financial or non-financial) that in turn translates to a range of payout opportunity for employees.  Higher levels of performance results provide for higher levels of payout as a percentage of employee Eligible Earnings.

The normal payout range for Performance Pay is up to 10.0% of Eligible Earnings.

The design provides that the award opportunity of up to 5.0% of Eligible Earnings will be based on Alcoa Corporate Financial Performance as measured by Return on Equity of Alcoa and consolidated subsidiaries (ROE), with an additional payout opportunity for outstanding corporate results.  There is no cap on the payout opportunity for Corporate Financial Performance.  Another payout opportunity of up to 5.0% of Eligible Earnings will be based on Business Unit/Location measurements.

The payouts for the corporate opportunities and the Business Unit/Location opportunities are calculated independently of each other.

- 149 -

2.  Corporate Financial Performance

The Corporate Financial Performance has a threshold of 10.0% ROE, a 15.0% ROE target, and an uncapped performance range, except that for 1993 the threshold shall be 8.0% ROE and the target shall be 10.0% ROE.

3.  Business Unit/Location Performance

Each Year beginning in 1994, a joint Company/Union committee at each location will meet to review, discuss and provide input to the set of Performance Measures, together with a threshold, target, and maximum value for each measure, which will become the basis for the Business Unit/Location payout for that Year.  If more than one Performance Measure will be used, the committee will recommend a relative weight to each measure.  The weights of the Business Unit/Location Performance Measures must sum to 50%.

If the joint committee is unable to agree on performance measures, management will determine and implement the measurements, performance ranges, and weightings applicable to all employees at the location including bargaining unit employees for that Year, provided, however, that such measurements, performance ranges, and weightings shall be no more difficult to achieve than those last proposed by management in the joint committee.

4.  Payout Opportunities

The range of Performance Measures and the range of payout percents forms the basis for payout opportunities.

If neither Corporate Financial Performance nor Business Unit/Location Performance reaches its threshold, no Performance Pay payout will be made.

SPK00004294

- 150 -

2.5% of Eligible Earnings will be the payout should both Corporate Financial Performance and Business Unit/Location Performance be at the threshold of the range.

5.0% of Eligible Earnings will be the payout should both Corporate Financial Performance and Business Unit/Location Performance be at target.

10.0% of Eligible Earnings will be the payout should both Corporate Financial Performance and Business Unit/Location Performance be at the normal range maximum.

The normal maximum payout opportunity on the corporate portion is uncapped above a 22.5% ROE. Performance results above a 22.5% ROE will result in extending the payout opportunity on Eligible Earnings at two times the rate of increase of the corporate portion as compared to the normal range above 15.0% ROE.

For Corporate Financial Performance and/or Business Unit/Location Performance which falls between the threshold and maximum values, the payout percent will be calculated by interpolation.

V.   DEFINITIONS:

For purposes of Performance Pay, the following definitions are established:

1.   BUSINESS UNIT/LOCATION....means a business unit, plant location or organizational unit within a location.

2.   BUSINESS UNIT/LOCATION PERFORMANCE....are goals which will be determined locally and communicated to all participants normally at the beginning of the Year. Business Unit/Location Performance Measures may be financial, non-financial, or a mix.

- 151 -

3.   CORPORATE FINANCIAL PERFORMANCE....has a threshold of 10.0% ROE, a 15.0% ROE target, and an uncapped performance range. The Compensation Committee of the Board of Directors has the authority to make adjustments to results because of unusual events or extraordinary circumstances.

4.   ELIGIBLE EARNINGS....means the sum of straight-time hourly-base wages (for straight-time hours and overtime hours); straight-time cost-of-living allowance (for straight-time hours and overtime hours); straight-time shift and schedule premiums (for straight-time hours and overtime hours); vacation pay; unworked holiday pay; and jury, witness and bereavement pay.

The definition of Eligible Earnings for an Eligible Employee who is on disability attributable in whole or in part to his or her employment with the Company, shall include the time lost and the straight-time earnings associated with that time lost at a rate not to exceed 8 hours per day or 40 hours per week.

The period used to determine Eligible Earnings for a Year shall encompass the same payroll weeks used in the determination of the Year's W-2 earnings.

5.   ELIGIBLE EMPLOYEE.... is an hourly employee covered by this Agreement who had actual hours worked during the payroll weeks disbursed in the Year and who either had employee status on December 31 of the Year or whose employee status terminated during the Year due to death or retirement.

6.   FINANCIAL THRESHOLDS....payouts will only occur after meeting specified financial profit thresholds. For the Corporate Financial Performance, the Financial Threshold is 10.0% ROE. There is no financial threshold for Business Unit/Location non-financial performance measurements.

SPK00004295

- 152 -

7.   PERCENT OF TARGET ATTAINED....is the ratio of actual results to target value for corporate performance and Business Unit/Location Performance Measures, with values of 50% at threshold, 100% at target, and 200% at maximum or higher for outstanding Corporate Financial Performance above 22.5% ROE.

8.   PERFORMANCE MEASURES.....are the set of financial and/or non-financial measures upon which the Business Unit/Location portion of any Performance Pay payout is based.  If more than one Performance Measure will be used, each of the measures must be weighted in importance, the sum of the weights totaling 50%.

9.   YEAR....means the 12-month period beginning January 1 and ending on December 31 for the Year 1993 and each additional Year for the duration of the Agreement.

VI.   CALCULATION OF THE PERFORMANCE PAY PAYOUT

At the end of each Year, full-year results will be used to calculate a Performance Pay payout, with corporate results against a Target value of 15.0% Return on Equity determining the corporate portion of the payout and attainment against Performance Measures as the basis for the Business Unit/Location portion of the payout.

A worksheet has been prepared for the calculation of the Performance Pay payout.

The actual result for Corporate Financial Performance and each Performance Measure will be compared to its range of performance to determine a Percent of Target Attained, as follows:

-   If the Corporate Financial Performance is below the threshold value of 10.0% ROE, the corporate Percent of Target Attained will be zero (0%) for the corporate portion of the payout;

- 153 -

-   For each Performance Measure used to determine the Business Unit/Location portion of the payout, a result which is below the threshold will result in a Percent of Target Attained of zero (0%) for that Performance Measure;

-   For results which are between the threshold and maximum values for Corporate Financial Performance or a Business Unit/Location Performance Measure, interpolation will be used to determine the respective Percent of Target Attained.

-   For each Business Unit/Location Performance Measure, a result which exceeds the maximum will result in a Percent of Target Attained of 200% for that Performance Measure;

-   For Corporate Financial Performance which exceeds 22.5% ROE, a Percent of Target Attained will be calculated by doubling the rate of increase in payout opportunity as compared to the range above 15.0% ROE for that portion of the results which exceed 22.5% ROE;

The corporate Percent of Target Attained will be multiplied by 50% to determine a weighted corporate Percent of Target Attained;

-   The Percent of Target Attained for each Business Unit/Location Performance Measure will be multiplied by the weight assigned to it to determine a weighted Percent of Target Attained;

-   The weighted results will be summed to determine a total Business Unit/Location Percent of Target Attained;

-   The total Business Unit/Location Percent of Target Attained will be added to the weighted corporate Percent of Target Attained to determine a Total Percent of Target Attained.

SPK00004296

- 154 -

    -    The Total Percent of Target Attained will be multiplied by 5.0% to determine the payout percentage.

    -    An employee's Performance Pay payout will be calculated by multiplying his/her Eligible Earnings by the payout percentage.

## VII.  ADMINISTRATION OF THE PERFORMANCE PAY

The information necessary to administer the provisions of Performance Pay will be prepared and maintained by the Company. The costs associated with its administration will be borne by the Company.

### Communication
The parties believe that it is important for participants in Performance Pay to understand the relevant goals, thresholds and maximum performance levels to understand the Business Unit/Location focus and their potential payout opportunities.

### Administration
In the event an employee quits or is terminated during the Year, no payout shall be paid. In the event of death, disability, retirement or layoff, an employee's award will be calculated on actual Eligible Earnings.

In the event an employee is transferred between Business Unit/Location, the payout shall be pro-rated for the number of whole weeks worked in each unit, based on the employee's job classification for each week.

Payouts will be determined annually and shall be determined and paid as soon as practical after the close of the calendar Year.

The determination of accounting policies in regards to Performance Pay shall be at the sole discretion of the Company. Such policies

- 155 -

shall be applied in accordance with accounting practices of the Company.

The Compensation Committee of Alcoa's Board of Directors has the authority to make adjustments to results because of unusual events. Business Unit/Location management and bargaining unit representatives will be provided the opportunity to give input for consideration for such adjustments. Such events might include the purchase or sale of business assets that was not planned when goals were set for that Year, plant shutdowns, etc. It is intended that, once a commitment has been made to goals, changes will not be entertained except in truly unusual situations.

The Performance Pay calculations for each business unit and corporate performance for each Year will be communicated to the Union prior to payment.

A report of such calculations, when accompanied by a certification by the Controller of the Company that the Performance Pay calculations are in accordance with the provisions of Performance Pay, shall be final and binding on the Union, participants, beneficiaries, and the Company.

Payments of Performance Pay shall not be considered earnings for any other purpose, except as subject to the applicable statutory taxes on income.

The provisions governing Performance Pay shall not be subject to the grievance and arbitration procedures of the Labor Agreement.

This Agreement has been reached on the basis that the Union will ensure that, until and only to the extent the information is made available by the Company to the public at large, the information will be disclosed only to those reviewing for the Union the computations related to Performance Pay and neither the Union nor

SPK00004297

- 156 -

anyone reviewing such information for the Union will make any other disclosure of the information.

It is the intent and understanding of the parties that Performance Pay provide a vehicle for sharing profits, and should payment of Performance Pay, or any part of such payment, be required to be included in the regular rate under the Fair Labor Standards Act of any eligible hourly employee, the Company will reduce applicable percentages and adjust individual payout amounts such that the total payout for the applicable Year for each Business Unit/Location for bargaining-unit employees will not be changed by such decision.  The parties shall make any and all adjustments to this document as may be necessary from time to time to ensure that the intent and understanding is upheld.

APPENDIX IX
NEUTRALITY

The Company agrees to a position of neutrality in the event that the Union seeks to represent any nonrepresented employees of the Aluminum Company of America.  Neutrality means that the Company shall not comment negatively concerning the integrity or character of the Union or its officials.

The Company's commitment to remain neutral shall cease if the Union, its agents, or its supporters comment negatively on the integrity or character of the Aluminum Company of America or its representatives.

The Company shall not unduly delay an election by the National Labor Relations Board.

- 157 -

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During our 1993 negotiations, the parties agreed that it would be desirable for the local parties to adopt a provision guaranteeing forty (40) hours of work or pay to craftsmen laid off or on short work weeks while outside contractors perform work in the plant with craftsmen of the same craft.  The local parties shall address themselves to the desirability of such a local understanding.  In doing so, the local parties should consider circumstances under which it would not be practical to provide such protection, such as in relation to major new construction and reconstruction projects, or work not normally done by Bargaining Unit employees at the plant.  The following is provided as a guide for the local parties in developing a more detailed program of implementation at the plant level:

    Should outside contractors perform work in the plant with the use of craftsmen while employees in that craft are on layoff from the plant and not working at another company plant under Section 23-D of the Agreement, and who are qualified and available for work, or working on short work weeks shall be guaranteed forty (40) hours of work or pay each week to the extent of the number of craftsmen engaged in contracting out relative to that craft.

Local parties interested in such a provision are advised to consider such problems as the protection of recall rights; the impact of SUB and unemployment compensation, and the method of determining which of the laid off employees or employees on short work weeks will receive the guarantee.  Any such local agreement shall be subject to the procedures of Section 5-C of the Agreement.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbs

Confirmed: _____
                Joe L. Kiker

SPK00004298

– 158 –

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
990 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This will confirm that during our 1991 negotiations the Company stated that it will be its procedure when an employee doubles over from the last shift of any day terminating approximately at midnight to the first shift of the day immediately following, to compensate the employee at time and one-half for the double over as an extension of the employee's shift terminating at midnight.  Nothing in this procedure affects the existing 6th and 7th day premium pay handling for continuous operation (Dow Schedule) employees.

The Company agrees that this procedure will remain unchanged until May 31, 1996.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

---

– 159 –

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
990 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This will confirm that in applying Paragraph A-3 of Section 15, if after exhausting the voluntary overtime procedures customary to that classification and department it should be necessary to schedule an employee for a shift extension due to the conditions of Paragraph B-1, such employee shall be entitled to the additional four (4) hours' pay at his standard hourly rate provided for in Section 15, Paragraph A-1.  The commitment of this letter applies to shift extension situations only.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

SPK00004299

- 160 -

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This will confirm the position of the Company as stated during our 1993 negotiations that the schedule change procedures of Section 15 will not be used to call employees on their scheduled off day within the work week and schedule them to work on that day.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                  Joe L. Kiker

---

- 161 -

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 152-9

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During the course of our 1993 contract negotiations the Company agreed it would not utilize information provided to the Company by an employee in connection with the employment process, as a basis for discipline or discharge later than three (3) calendar years subsequent to such employee's date of hire.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                  Joe L. Kiker

SPK00004300

– 162 –

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Riker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1250
Atlanta, Georgia  30339

Dear Mr. Riker:

In the course of 1993 negotiations the Company agreed to incorporate the following letter between the parties with those other letters between the parties that are to be published in the 1993 Labor Agreement:

May 31, 1971

Mr. Ben Fischer
Director, Contract Administration Department
United Steelworkers of America

Dear Mr. Fischer:

In the negotiations for our 1971 Agreement the Company and the Union have agreed upon the following to clarify and implement Article XXIV of the Labor Agreement:

1. Article XXIV is directed solely towards the safety and health of the individual employees.  Any attempt by an employee, or employees, to utilize the procedures of the Article for harassment, coercion, retaliation, or to achieve objectives other than health and safety, however proper those objectives might be if pursued by other means, would be abuse of this Article and contrary to the Labor Agreement itself.

2. An employee who is relieved from duty on the job about which he has complained shall not be paid for work time lost as a result of his being so relieved unless the Board of Arbitration finds that he was justified in leaving the job because of the existence of an unsafe condition, changed from the normal hazards inherent in the operation.  The period of time to which such payment is applicable will end when the unsafe condition is remedied or when, through application of proper manpower assignment or adjustment procedures, the relieved employee is either reassigned, scheduled off, or laid off.

– 163 –

June 1, 1993
Page 2

Very truly yours,

P. W. Osborne
Manager
Industrial Relations

Confirmed: _____
                    Ben Fischer

You will recall that in 1971, Article XXIV was entitled Safety and Health and pertained to such matters as are now covered in the 1993 Labor Agreement under Article XIX, Safety and Health.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

Confirmed: _____
                    Joe L. Riker

SPK00004301

– 164 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During the course of the negotiations of our 1993 Labor Agreement, the question of when vacation pay would be paid to those employees requesting advance pay was discussed.

It was agreed that, without a change in Contract language, the Company would adopt a policy of paying such advance pay on the last regular payday before the employee's vacation is scheduled to begin. Should there be abuse of this procedure, the Company may revert to making such advance pay on the last day worked before the vacation is scheduled to start rather than the last regular payday before such vacation is scheduled to start.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:mbl

Confirmed: _____
                    Joe L. Kiker

– 165 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This is to confirm that the Company during 1993 negotiations, agreed to the following matters:

The Company recognizes the special need to provide appropriate safety and health training to all employees. The Company presently has safety and health training that provides either the training described below or the basis for such training as it relates to the needs of the Company and its various plants.

Training programs shall recognize that there are different needs for safety and health training for newly hired employees, employees who are transferred or assigned to a new job and employees who require periodic retraining.

A.   Training of Newly Hired Employees

Newly hired employees shall receive training in the general recognition of safety and health hazards, the applicable Labor Agreement provisions, and the purpose and function of the Company's Safety (Health) and Medical Departments, the local Safety Committee and the International Union Safety and Health Department. In addition, upon initial assignment to their duties, they shall receive necessary training on the nature of the operation or process, the safety and health hazards of their duties, safe working procedures, the purpose, use and limitations of personal protective equipment required, and other controls or precautions associated with their duties.

B.   Training of Other Employees

The necessary training of employees, other than those newly hired by the Company shall be directed to the hazards of the duties to which they are assigned. Such training shall include hazard recognition, safe working procedures, purpose, use and limitations of special personal protective equipment required and any other appropriate specialized instruction.

SPK00004302

– 166 –

June 1, 1993
Page 2

    C.   Retraining

        As required by an employee's duties and assignment area, periodic retraining as necessary shall be given on safe working procedures, hazard recognition, and other necessary procedures and precautions.

        The Union Co-Chairman of the Safety (and Health) Committee and the International Union Safety and Health Department or a designee shall, upon request, be afforded the opportunity to review the training program for newly hired employees at the plant level.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
        Joe L. Kiker

---

~ 167 ~

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

                                   ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

This is to confirm that the Company during the course of 1993 negotiations agreed to the following policy statement:

Alcoholism and drug abuse are recognized by the parties to be a treatable illness. Without detracting from the existing rights and obligations of the parties recognized in the other provisions of this Agreement, the Company and the Union agree to cooperate at the plant level in encouraging employees afflicted with alcoholism or drug addiction to undergo a program directed to the objective of their rehabilitation. Neither job security nor promotional opportunities should be jeopardized by a request for treatment for either alcoholism or drug use. Such request and all records shall remain confidential.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
        Joe L. Kiker

SPK00004303

– 168 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This is to confirm that the Company, during 1993 negotiations, agreed to the following matters:

### PCB CONTROL PROGRAM

For the purpose of protecting worker health the Company shall continue its control program for handling and disposing of oils containing polychlorinated biphenyls (PCB's). This program will include, but not be limited to, provisions for testing devices that may contain PCB's, air and soil sampling, labeling, protective clothing and respirator program, proper training for handling PCB's.

The Local Union Co-Chairman of the Safety and Health Committee or the International Union Safety and Health Department may request in writing from a single source designated by the Company current information as to the program for PCB control.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                Joe L. Kiker

---

– 169 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This is to confirm that the Company, during 1993 negotiations, agreed to the following matters:

### SAMPLING

The Company will continue its program of periodic in-plant air sampling and noise testing under the direction of qualified personnel. Where the Union Co-Chairman of the Safety and Health Committee reasonably believes there is a significant on-the-job health hazard due to in-plant air pollution, or noise, the Company will make appropriate tests and investigations that are reasonable and necessary and will notify the Union Co-Chairman of the Safety and Health Committee when such a test is to take place. A report based on such tests and investigations will be reviewed and discussed with the Union Co-Chairman. For such surveys conducted at the request of the Union Co-Chairman, a written summary of the sampling and testing results and the conclusions of the investigation will be provided to the Union Co-Chairman.

The Company shall provide the Union Co-Chairman, or the Joint Safety and Health Committee, upon request, copies of specific environmental or employee exposure tests or survey reports.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                Joe L. Kiker

SPK00004304

– 120 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This is to confirm that the Company during 1993 negotiations, agreed to the following matters:

MEDICAL RECORDS

Employee medical record files shall be maintained under the control of the Medical Department or a licensed physician, under conditions of confidentiality appropriate to ethical medical practice.  An employee's medical record file shall not be released to any individual without the informed written consent of the employee, except where legally required, or in grievance and arbitration proceedings, litigation, benefits proceedings, or medical studies.  The Medical Department may provide medical opinions, prognoses, or recommendations to the Company or to the Union, without the consent of the employee, where such information does not contain specific diagnoses or details, and where such information is necessary to the Company as the employer or the Union as the employee representative.  Whenever the company physician detects a medical condition which, in his judgement, requires further medical attention, the company physician shall advise the employee of such condition or to consult with his personal physician.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
            Joe L. Kiker

– 171 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35'
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This is to confirm that the Company, during 1993 negotiations, agreed to the following matters:

TOXIC MATERIALS

Where the Company uses materials at levels considered to be toxic under normal conditions of use, or where employees might be exposed to unusual concentrations of toxic materials through accidents, it shall inform the affected employees what hazards, if any, are involved, and what precautions shall be taken to insure the safety and health of the employees.  Upon the written request of the Union Co-Chairman of Safety and Health Committee, the Company shall provide in writing requested information from material safety data sheets, if they are available to the Company, or their equivalent on toxic substances to which employees are exposed in the work place; provided that when the information is considered proprietary, the Company shall so advise the Union Co-Chairman, and provide sufficient information for the Union to make further inquiry.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
            Joe L. Kiker

SPK00004305

– 172 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

⬡ ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This will confirm the parties' establishment during 1993 negotiations of a Joint Union/Management Committee on Mutual Growth, an essential new adjunct to our collective bargaining agreement.

This Committee is intended to serve as a useful and unique tool for progress, auxiliary to but not in contradiction with normal collective bargaining, grievance and arbitration procedures.  Through its creation, the parties have committed to the improvement of relationships, to systematic fact finding as a basis for cooperative problem solving, and to the timely discussion of certain impacting business developments that are relevant to the interests of the Union, the employees, and the Company.

The Committee is further intended by the parties to be a cooperative response to the long-term competitive economic challenge now confronting the health and growth of the Company and the future job security of employees.  Mutually responding to this challenge will develop both a business and a relationship environment in which constant changes must effectively be introduced.  Under the cognizance of the Committee, the parties, including those at the local level, will have available ongoing and more innovative options for anticipating and accommodating such changes.

The parties recognize that the progress we are committed to make is only possible when cooperative, constructive attitudes prevail between the Company, the Union, and all employees.  In this respect, our respective representatives in these negotiations have pledged to bring good faith, diligence, and mutual responsiveness to the future issues and concerns raised by the other.  Where the parties at certain locations have already made substantial mutual progress in this regard, nothing herein is intended to interrupt or modify those activities.

Within 90 days following the conclusion of 1988 negotiations, you and I have agreed to meet to appoint our own respective Committee members and to set forth certain basic goals and procedural guidelines in support of its commencing activities.

---

– 173 –

June 1, 1993
Page 2

Our mutual discussions during 1993 negotiations were in some depth as to what those activities might be within Alcoa.  We specifically concurred that input from local Management and each local Union, prior to our meeting, would be both valuable and welcome as we chart a future course so dependent on the mutually cooperative support and involvement of the local parties and the employees at each location.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

– 174 –

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

**ALCOA**

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During the course of our recent negotiations, the parties discussed the problem of escalating health care costs and the serious impact which such inflation has had, both on the ability of the Company to maintain our negotiated group insurance plans, and on the capacity of active and retired employees to afford their own out-of-pocket expenditures for unreimbursed medical services.

This letter will confirm our commitment to develop and implement cooperative efforts, particularly within the local community, which will promote greater efficiency in the use of health care resources by Steelworkers and their families.  Furthermore, the parties agree to join together to combat those instances where health care providers engage in wasteful practices or overcharge for their services.

In order to achieve our objectives in this area, the Company and the International Union agree to encourage the establishment of plant-level committees on health care and cost containment.

The local committee shall study the operation of the group insurance plan and particularly the influence which the plan has on utilization and cost of area health care services.

As part of the study, the joint committee may recommend that the benefit provisions applicable to a given employment location be modified on an experimental or permanent basis to determine if a given modification will make more efficient utilization of health care resources or to take into account particular circumstances at a given employment location.  Any recommendations made by such a joint committee shall become effective only upon written agreement between the Company and the International Union.

– 175 –

June 1, 1993
Page 2

The Company and the International Union shall, wherever possible, assist the local committees in carrying out the intent of our understanding.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

SPK00004307

– 176 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

⊞ ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

The Company and the Union including local plant Management and Union
representatives shall meet twice during the term of the Labor Agreement at a
mutually agreeable time and location.  Full and candid discussions shall be
encouraged in these meetings with the objective of advancing the shared
interests of the Company, the Union and the employees.  Subjects for
discussion shall include Company and industry operating conditions, domestic
and foreign investments, governmental affairs and other relevant topics as
may be agreed upon by the Company-Union Co-Chairman.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                  Joe L. Kiker

---

– 177 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 152`9

⊞ ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This is to confirm that the Company, during the 1993 negotiations, agreed to
the following matter:

In the event of disagreement between the Company appointed physician and the
employee's personal physician regarding an employee's ability or non-ability
to return to work from sick leave, the local Union may request that the
matter be reviewed by the Company's Office of Vice President, Health and
Safety.  A prompt review of the findings and conclusions of both involved
physicians will be made and an opinion regarding the issue will be given to
the employee, the local Union, and local Company officials.

The parties agree that for a proper review and well-based opinion, complete
medical records regarding the employee's condition are essential.  Therefore,
such requests must be accompanied by a written release signed by the employee
which permits the designated representative of the Company's Office of Vice
President, Health and Safety, access to such records.

During the review period set forth above, an employee's sickness and accident
benefits will continue until the opinion is issued from the office of the
Vice President, Health and Safety.  If the employee would otherwise be
eligible for sickness and accident benefits and has not exhausted such
benefits.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                  Joe L. Kiker

SPK00004308

- 178 -

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This will confirm our understanding reached during our 1993 negotiations
concerning employees who are transferred to a new location under Section 23-D
of the Labor Agreement and who are subsequently laid off to the street due to
a reduction of forces.  The Company agrees in its application of 19-F
(Request for Restoration) to apply the company seniority of such employees as
of last date of hire at their original location providing the employee does
not have broken service.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                Joe L. Kiker

---

- 179 -

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During the 1993 negotiations, the parties agreed that each Company location
shall furnish to the International Union on or about January 1 and July 1 of
each year a list of all active 23D applications on file.  The list will
include the name, social security number and company seniority date of each
employee and the plant from which the employee is laid off.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                Joe L. Kiker

SPK00004309

– 180 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

Or as experimental and trial basis the Company will agree that where
grievances concerning supervisors working an improper distribution of
overtime within a classification are not resolved at Step 3 and are to be
arbitrated, they shall be arbitrated in the Expedited Arbitration Procedure
unless the appropriate representatives agree to refer such grievance to
regular arbitration through regular procedures.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

– 181 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This letter will confirm our understanding reached during the 1993
negotiations concerning the third step grievance record.

In writing the third step grievance answer, the Company representative will
include in his answer the date and place of the meeting as well as the names
of the attendees, the grievance number and a brief statement of the parties'
positions, and the decision reached. The Union may within ten (10) days of
the issuance of such answer submit to the Company representative a letter
detailing any specific comments by the Union. Such letter shall be
incorporated into and become a part of the grievance record.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

SPK00004310

- 182 -

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

During the course of our 1993 negotiations the Company agreed, without limiting its right to contract out work under the Labor Agreement, to continue its efforts at each location to utilize available equipment and bargaining unit employees on capital work that is to be performed in the plant within their capabilities when that can be accomplished on a timely and cost effective basis. In its considerations, the Company will review with the Union work practices and flexible work assignments for available manpower when action on these issues could reasonably lead to performance of work otherwise to be contracted out with bargaining unit personnel on a cost competitive basis.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed:

_____
Joe L. Kiker

---

- 183 -

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

During the course of the 1993 negotiations the parties discussed the concept of work design committees. The parties recognize that true employment security results from being efficient in a competitive business environment. The parties also recognize in achieving that efficiency the value of direct Union and employee involvement in the job change process. Accordingly, each location shall establish a Work Design Committee consisting of two members appointed by the local Union and two members appointed by the local management (or such other joint organizational design as shall be mutually agreed to by the local parties). Local Union representatives shall be paid by the Company for their attendance at such meetings at the compensation they would receive if they were working in the plant.

Each Committee may recommend improvements in the operation of the location through increased employee responsibility, more effective utilization of people, materials and equipment along with a heightened level of job satisfaction resulting from increased employee contributions to the decisions and activities that impact the work place.

As a part of the recommendations it formulates pursuant to the preceding paragraph, each Committee is authorized to develop and recommend flexible and innovative procedures and programs to address employment security concerns. Among the approaches each Committee may recommend are alternative work assignments, the performance by bargaining unit employees of work otherwise to be contracted out and other measures designed to enhance employment security compatible with maintaining a competitive plant operation or, should no other approach be reasonably possible to avoid layoff to the street as a result of its recommendations, early retirement offers under mutually satisfactory conditions in accordance with the provisions of Section 2.5(3) of the Pension Agreement.

SPK00004311

– 184 –

June 1, 1993
Page 2

Pursuit of the objectives set forth above at each location shall commence immediately with the appointment of the Committee members. Periodic progress reports to the District Director of the Union, or his representative, and the Vice President of Industrial Relations of the Company, or his representative, shall be made by the Committee at each location as appropriate but no less frequently than once every six months during the term of the Agreement.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                 Joe L. Riker

– 185 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

**ALCOA**

June 3, 1993

Mr. Joe L. Riker
Director, District 35
United Steelworkers of America
500 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Riker:

This will confirm our agreement during 1993 negotiations that the definition of Eligible Earnings (Section Y, Item 4 of Appendix VIII) shall include the time lost and the straight-time earnings associated with that lost time at a rate not to exceed 8 hours per day or 40 hours per week for local union officials who are on an excused absence for union business and who otherwise would be actively at work

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                 Joe L. Riker

SPK00004312

– 186 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

The parties recognize that, in view of the changes made with respect to Section 16 of the Labor Agreement as a result of our 1986 negotiations, there is some concern regarding fair and consistent application of its provisions. We also realize that the possibility exists for temporary assignments to be used for harassment or discipline purposes and this letter is intended to reaffirm our categorical condemnation of such activity as being counter to the interests and objectives of both the Company and the Union. The Company will take appropriate action to ensure local compliance with this position.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

– 187 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This will confirm the commitment of the Company during our 1988 negotiations that applicable from and after the day following the date of ratification of the 1988 Labor Agreement, without precedent or contractual obligation, there will be deemed to be no cessation in seniority accumulation for the period of the 1986 strike for individuals with employee status as of the day after ratification of the 1988 Labor Agreement.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                    Joe L. Kiker

SPK00004313

– 188 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

The Company will agree that if it fails to comply with the five-day minimum notification time period in Article VII, Paragraph C of the Labor Agreement or notification requirements explicit in the location-specific contracting-out process when they became operative unless there ex six conditions which make such notification impractical, sixteen (16) hours' pay at the appropriate standard hourly wage rate shall be paid to the low employee on the overtime list of the classification designated by the Local Union. Notwithstanding the Union's right to strike on the merits of contracting out, disputes regarding compliance with the notification procedure shall be subject to the regular grievance and Expedited Arbitration Procedure.

Where grievances concerning the notification procedures referred to above are not resolved at Step 3 and are to be arbitrated, they shall be arbitrated in the Expedited Arbitration Procedure unless the appropriate representatives agree to refer such grievance to regular arbitration through regular procedures. However, the issue shall be limited solely to the notification compliance question and the remedy awarded cannot exceed that provided for in this letter.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:DAH

Confirmed: _____
              Joe L. Kiker

– 189 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

This will confirm that during our 1993 negotiations we agreed that top company seniority for the purpose of layoffs and restoration of forces at Tennessee Operations in fulfillment of the provisions under Section 21 of the Labor Agreement would be applicable to the following Local 309 Union officials:

                    President
                    Vice-President
                    Plant Chairman

Sincerely,

R. W. Porter
Director
Industrial Relations & Human Resources
  Planning & Deployment

CONFIRMED: _____
              Joe L. Kiker

SPK00004314

– 190 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

This will confirm that the Company during the 1993 negotiations agreed to
provide each year the International Union Safety and Health Department with
copies of applicable OSHA Form 200, Summary of Occupational Injuries and
Illness reports.

Very truly yours,


R. W. Porter
Director
Industrial Relations & Human Resources
  Planning & Deployment

CONFIRMED: _____
                     Joe L. Kiker


– 191 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During the course of the negotiations of our 1993 Labor Agreement, the
parties discussed the potential benefits that might be gained through joint
training of the Joint Safety and Health Committee members.  It was agreed
that at each location the local parties should periodically assess the needs
for conducting such training.  If such assessment reveals a need for specific
training, the Co-Chairpersons of the committee will develop an appropriate
agenda for such training.  The training will be held at a mutually agreeable
date, time and location.

Very truly yours,


R. W. Porter
Director
Industrial Relations & Human Resources
  Planning & Deployment

CONFIRMED: _____
                     Joe L. Kiker

SPK00004315

– 192 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During the 1993 negotiations, the Company committed to the Union that it will provide the International Union Safety and Health Department with timely notification of any accident resulting in a fatality to a member of its bargaining unit. This notification shall include the date of the fatality, the plant location, and if known, the circumstances of the fatality.

When it becomes available, the Company will provide the International Union Safety and Health Department with a copy of the fatal accident report that is given to the local union.

Very truly yours,

R. W. Porter
Director
Industrial Relations & Human Resources
  Planning & Deployment

CONFIRMED:  _____
                  Joe L. Kiker

---

– 193 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia  30339

Dear Mr. Kiker:

During the 1993 negotiations, the parties discussed hazards associated with operating in-plant railroads and the potential for incurring serious injuries involving such fixed rail equipment.  In light of the serious accidents that may result from the operation of this equipment the parties believe it would be beneficial for each Joint Safety and Health Committee to review their present railroad safety rules and procedures.  Particular attention should be given to identifying pinch points and the manner in which personnel may be operating such equipment.

Very truly yours,

R. W. Porter
Director
Industrial Relations & Human Resources
  Planning & Deployment

CONFIRMED:  _____
                  Joe L. Kiker

SPK00004316

– 194 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

During our 1993 negotiations the Company agreed to make deductions from earnings for each union member who signs voluntary authorization cards in forms agreed to by the Company and the Union and to remit the deductions to the Union for inclusion in the Union SOAR-PAC.

The procedure to be followed will be as stated in Article II(B). The Union agrees that the indemnity set forth in Article II(D) shall apply to the Company's actions taken or not taken pursuant to this letter.

The provisions of this letter shall be effective in accordance with and consistent with the applicable provisions of state or federal law.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                Joe L. Kiker


– 195 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH PENNSYLVANIA 15219

ALCOA

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

During their 1993 negotiations the parties agreed to a Managed Care Program designed to replace the current Employee Group Benefit Plan. Essential to that Managed Care Program are a list of protocols as well as Managed Care Program evaluation criteria and standards and the establishment of a Joint Union-Management Managed Care Committee and Area Review Committees.

The parties agree that the Managed Care Program will go into effect January 1, 1994, at all locations and that the current Employee Benefit Plan will remain in effect until that date. The local parties will monitor the performance and quality of the network against the protocol and criteria established.

The parties further agree that when the Managed Care Program goes into effect it will be accompanied by a "Fresh Start" for purposes of determining limitations for visits, confinements, and any associated costs for services, treatments or medical supplies, as well as for lifetime maximums.

The protocols and criteria and standards for the Managed Care Program will be established in advance of the Union's ratification vote.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                Joe L. Kiker

– 196 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

Until ratification of the next Labor Agreement, the Company shall maintain
its program of medical benefits for future retirees and surviving spouses,
provided that the annual cost of benefits paid for by the Company under this
program shall be limited to an amount determined by multiplying the per
capita cost of such benefits during calendar year 1997 by the number of
retirees and surviving spouses ("covered persons") during a calendar year.

In the event that the average per capita company contribution exceeds the
amount established above in any calendar year, the excess shall be allotted
to and paid by each covered person on a pro rata basis. Notwithstanding the
foregoing, no covered person shall be required, solely by reason of this
limitation, to make any additional contribution toward the costs of the
program coverage until January 1, 1998. Furthermore, the parties agree that
the subject of the limitation set forth in this letter shall be a mandatory
subject of bargaining in any negotiations between the parties occurring
subsequent to May 31, 1993, and prior to December 31, 1996.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
              Joe L. Kiker

– 197 –

ALUMINUM COMPANY OF AMERICA
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

During our discussions of the 1993 collective bargaining agreement, the
parties recognized that a National Health Care Program was under active
discussion in Washington, D.C. and throughout the country. While the parties
do not know what the details of such a Program might be and how it might
impact bargaining-unit employees and the Company, the parties agree that
should such a Program become effective, they will meet to resolve any issues
raised by the overlap of that Program with the insurance program for
bargaining-unit employees by utilizing the following principles:

1.   Duplication will be eliminated at no loss to employees.

2.   Net savings, if any, realized by the Company from the
     implementation of the National Health Care Program shall be paid
     into a fund established for payment of retiree insurance costs in
     future years. "Net Savings realized" will be measured as the
     amount of reduction in the Company's cost from the amount of
     expense in the calendar year immediately prior to full
     implementation of a National Health Care Program and shall take
     into consideration any premiums, taxes, or other contribution paid
     by the Company associated with funding the National Health Care
     Program.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
              Joe L. Kiker

SPK00004318

— 198 —

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219



June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

During the 1993 negotiations the parties agreed to the appropriateness of the local parties having the ability to modify certain aspects of the Performance Pay Plan to meet business unit needs.

1.  The local parties may agree to have as much as 160% of their award opportunity based on their Business Unit/Location goals rather than the basic 50% Corporate and 50% Business Unit/Location plan design.

2.  Such modifications, whenever agreed so for a given year, will then apply for the remaining term of the Agreement.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
Joe L. Kiker

— 199 —

**ALUMINUM COMPANY OF AMERICA**
ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219
June 1, 1993



Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

WORKER PARTICIPATION

Alcoa and the United Steelworkers of America recognize that changing products, process technologies, markets and global competitive conditions are making greater worker participation necessary and an essential ingredient for successful business performance. Greater worker participation can lead to many benefits for the Company and the Union including increased employment, employment security, customer satisfaction, improved competitiveness, quality of work life, productivity, product quality, improvements in mutual trust, better training, increased skills, lower costs, increased compensation, health and safety improvements with increased opportunities for learning and advancement.

In order to achieve greater worker participation, a transition should be undertaken in such a way that it is beneficial to all stakeholders and meets their underlying needs and interests. The process should support an appropriate balance between manufacturing and human elements. Further, the methodology for change should extend from the shop floor to the executive office and be integrated into our corporate culture and the manufacturing processes to solve problems quickly and in a cooperative manner. All workers should have greater influence, control and accountability for their immediate work environment to enable ownership of the process.

This agreement reflects our mutual commitment and is based on the following principles:

1.  The viability of the Corporation and the Union depends on becoming the highest quality supplier of competitively priced aluminum products delivered on time. To achieve such a reality, the experience, skill, intelligence, and commitment of each employee will be needed and must be fully utilized to ensure continuous improvement for the best long-term interests of all.

2.  Employees are responsible and trustworthy and an environment must be developed in which employees on a daily basis interact with one another in accord with this belief.

SPK00004319

– 200 –

June 1, 1993
Page 2

    The parties will take steps to build a truly participative style that views the members of the organization as assets.

3.  Individuals and work crews are accountable for proper decisions related to their sphere of responsibility and given the necessary information and training. Where possible, employees should be encouraged to perform effectively with appropriate levels of supervision and guidance.

4.  Both parties recognize that bringing about change in an ongoing operation is an extremely difficult task which must be approached realistically and patiently because of deep rooted attitudes and practices. Nevertheless, the parties agree that if the Corporation is to prosper and provide employee satisfaction and long-term security, greater worker participation must be pursued to maximize opportunities to resolve problems and produce a lower cost and higher quality product delivered on time.

5.  Individual employee participation in involvement and empowerment activities is voluntary but both parties believe that active employee participation is essential to the realization of the objectives and will endeavor in good faith to encourage and support such participation.

Both the Company and the Union understand that employees cannot be expected to aspire to greater participation in the development of solutions to workplace problems if, by their participation, they risk the loss of their employment or that of their co-workers. On the other hand, both the Company and the Union understand that absolute employment security is not a condition that can be guaranteed. Further it is recognized that employment security is a condition that can only be provided by those businesses that are successful. It is also recognized that improvements in productivity, cost control, organizational effectiveness and customer satisfaction are examples of enablers which lead to employment security. Accordingly, the location management and local Union will work together to support employment security as a common objective and thus no employee shall experience loss of employment as a result of the implementation of joint team or committee recommendations. Expectations around this commitment will be determined and communicated by the parties as teams and committees are established. It is also recognized that conditions might exist which may make work-force reductions necessary. In that event, the Company and the Union agree to explore flexible and innovative approaches to minimize layoffs to the extent practical through the use of such tools as attrition, early retirement, voluntary quit programs, overtime reduction, shorter working hours, reduced contracting out and flexible use of the work force.

In recognition of the above, the parties agree to the following:

1  Programs to generate greater worker participation may be jointly established and supported at each location in order to achieve improved competitiveness, productivity, quality, customer satisfaction, lower costs, higher job skills, increased worker accountability, involvement

– 201 –

June 1, 1993
Page 3

and quality of worklife and a forum for input that increases the influence employees have over workplace issues.

2.  Within 90 days of the date of the Labor Agreement, each location will establish a top level Union/Management Steering Committee. The role of the Steering Committee will be to explore where it is appropriate for programs to be developed and implemented to bring about greater worker participation as well as how to guide and monitor the continuous improvement of those programs. The workplace participation process shall not be used to discipline employees.

Detailed information about the business, plant performance, new technology and products, customer satisfaction and competitive issues will be shared with the Steering Committee in order that they may be fully informed. The local union president and company location manager at each location shall be members of the Steering Committee unless it is mutually agreed otherwise. The selection of any consultant to assist in the development of the employee involvement and empowerment process will be mutual after June 1, 1993.

The size of the local Steering Committee will be decided jointly. Unless the local parties agree otherwise, all other union members will be selected by the union and all other management members will be selected by management. Either party may terminate this Worker Participation Agreement by giving sixty (60) days' written notice to the other party. No local Union-Management Worker Participation Agreement may be terminated until the matter has been referred and reviewed by the Senior Level Discussion Group.

The local Steering Committee should give consideration to at least the following topics in the pursuit of its mission and shall include any agreements reached on these topics in a writing setting forth their understandings.

  o  Employment Security.

  o  The values, beliefs, principles of their respective organizations.

  o  The information requirements of the stakeholders.

  o  Technical and social training needs assessment and the delivery of training interventions.

  o  New and innovative organizational designs.

  o  The selection and pay of consultants.

  o  The impact and implementation of new technology.

  o  The impact of traditional issues on the participation process.

SPK00004320

- 202 -

June 1, 1993
Page 4

    o   The interplay of worker participation and traditional local Union and local Management roles.

    o   Expectations of each party for strengthening their relationship.

    o   Selection procedures, roles and responsibilities, pay for meetings, etc.

3.   The parties shall establish a Senior Level Discussion Group that shall meet, as appropriate, during the term of the Agreement. The Group will review business results, trends and plans, as well as ways of improving this agreement and other items of interest or concern to the locations covered by this Agreement. The Company's representatives to the Group shall consist of four business-unit presidents and the director of Industrial Relations. The Union members shall include the chairperson of the Alcoa Negotiating Committee and such other members as he or she appoints. Local union presidents and location management will be invited to attend group sessions as appropriate.

The United Steelworkers of America and Alcoa are committed to the belief that our interests are best served by greater worker participation and commitment to the requirements that will make the various businesses successful. The United Steelworkers of America and Alcoa are also committed to the belief that greater worker participation will lead to mutual gain outcomes. The parties also recognize that bringing about change in an ongoing operation is extremely difficult and can best be accomplished through a combination of both bottom-up and top-down activities. The parties agree to explore the combination of those activities that will best serve their interests and to implement and arrange for the continuous improvement of those which are beneficial.

This Worker Participation Agreement does not in any way diminish either party's inherent contractual rights as established under the Labor Agreement nor does it alter any agreement that the local parties may already have in effect.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
              Joe L. Kiker

---

- 203 -

ALUMINUM COMPANY OF AMERICA

ALCOA BUILDING
PITTSBURGH, PENNSYLVANIA 15219

June 1, 1993

Mr. Joe L. Kiker
Director, District 35
United Steelworkers of America
900 Circle 75 Parkway
Suite 1750
Atlanta, Georgia 30339

Dear Mr. Kiker:

RE: IMPLEMENTATION PROCEDURE FOR JOINT CONTRACTING OUT PROCESS GUIDING PRINCIPLES

I.   RESPONSIBILITY AND REVIEW

    The appropriate business-unit president and district director will be responsible to insure that joint, location-specific, business-based contracting-out processes are established consistent with the attached guiding principles. They will establish an Oversight Committee functioning at the corporate/business unit-international union level, for the locations under their jurisdiction which will review the progress of the process development 60 days, 135 days and 180 days following the effective date of the Labor Agreement.

II.  PROCESS DEVELOPMENT

    A.   Immediately following the effective date of the Labor Agreement a Joint Committee at each location sponsored by the operations manager and local union president shall meet to consider and determine those items set forth in Item #6 of the Guiding Principles.

    B.   The Joint Committee will thereafter proceed to develop and implement a contracting-out process for its location in accordance with the Guiding Principles within 180 days of the effective date of the Labor Agreement. Such process shall be reduced to writing and will set forth the procedure under which the information described in Item #6 of the Guiding Principles will be obtained by the committee. The Joint Committee shall include in its process provisions for (1) initial, on-going and annual review of work which is or is being proposed to be contracted out and (2) advance notice to the Joint Committee of any work proposed to be contracted out.

    C.   The process established at each location shall be documented and reviewed by the sponsors and the Oversight Committee. This Oversight Committee will be responsible for monitoring the functioning of the Joint Committee and for assisting the Joint Committee and its sponsors as may be appropriate.

SPK00004321

— 204 —

June 1, 1993
Page 2

III.  PROCESS OPERATION

Throughout the term of the Agreement the Joint Committee shall review work projects being considered for contracting out in accordance with its process and the Guiding Principles for its location.

Changes in the location process and its operation shall be documented as they are developed so that they may be reviewed by the sponsors and the Oversight Committee.

Following installation of the process at each location, the Oversight Committee will review the development and implementation of the contracting-out process and determine which functions assigned to the contracting-out committee, under Article VII, Paragraphs B, C and D of the Labor Agreement shall be recognized as having been fulfilled through operation of the new process.  All other elements of Article VII remain in effect.

IV.  The Oversight Committee will identify facilitation resources.  The facilitation resources will be available for use by the locations during the process development phase and initial process operations and as requested thereafter.  Facilitators will have access to all necessary information, and the fees and expenses of such resources shall be borne by the Company.  Facilitation services will be provided at the request of the Joint Committee and/or the request of the Union or Company representatives on the Committee.

Very truly yours,

R. W. Porter
Director, Industrial Relations
& Human Resources Planning & Deployment

RWP:rbt

Confirmed: _____
                Joe L. Riker

---

— 205 —

June 1, 1993
Page 3

JOINT CONTRACTING OUT PROCESS
GUIDING PRINCIPLES

A profitable and productive business is the foundation for employment security and growth opportunity.  Effective participation in performance of work issues by knowledgeable representatives of management and the union is essential to the achievement of a location's performance potential and thus its profitability.  In recognition of these important benefits to the employees and the business, the following guiding principles for the establishment of a joint, location specific, business based contracting out process have been developed.

GUIDING PRINCIPLES

1.  DATA AND INFORMATION:

The joint contracting out process must function with as timely, accurate and complete data and information as is possible.

   a.  Time schedules
   b.  Man/hours by craft and/or job classification
   c.  Overtime levels
   d.  Human resources allocation
      (1)  Job security
      (2)  Layoff
      (3)  Hiring
      (4)  Adequate manpower
      (5)  Support services
   e.  Cost information including proposed contractor
      contract language
   f.  Social project criteria
   g.  Priority & sequence including emergency situations
   h.  Time schedule changes
   i.  Location operating plan information

2.  FACTORS:

The following specific factors must be considered for proper analysis:

   a.  Optimum utilization of in-plant forces should be a priority with the committee
   b.  Job security
   c.  Need to hire
   d.  People on layoff
   e.  Equipment - availability - leasing? - purchase?
   f.  Technology and/or unique skill requirements
   g.  Warranty work
   h.  Legal and/or regulatory requirements
   i.  Repair and maintenance and/or capital work is to be considered under this process.

SPK00004322

– 206 –

June 1, 1993
Page 4

    j.  Shelf items; i.e., items available from a supplier's
        inventory/catalogue as a stock item and not made for
        sole source sale or from blueprints supplied by the
        Company.
    k.  Bargaining unit/contractor decision criteria

3.  SAFETY:

    Safety must be given priority consideration by the committee.

    a.  Contractor and in-house employees must be held to the
        same safety standards and requirements for the same work.

4.  REVIEW/EVALUATION:

    The following elements should be considered in the joint
    review/evaluation process:

    a.  Data analysis
        (1)  Computer services
        (2)  Programs
        (3)  Data bases
    b.  Quality measurements
    c.  Accuracy of information
    d.  Ongoing review process
    e.  Performance measurements
        (1)  In-house
        (2)  Contractor
    f.  Control procedures

5.  FINANCIAL PLANNING:

    Location financial planning and budgeting information must be considered
    for long-term working forecasting.

    a.  Investment criteria (Return on Investment - ROI)
    b.  Capital budget
    c.  Maintenance budget
    d.  Business forecasts

6.  COMMITTEE PROCESS:

    The joint committee must consider and determine the specifics of its own
    process.

    a.  Procedures
    b.  Function
    c.  Joint structure
    d.  Communication
    e.  Internal/external resources

– 207 –

June 1, 1993
Page 5

7.  LOCATION:

    In all cases the contracting out process must address the specific needs
    of the location it serves.

8.  HUMAN RESOURCES:

    The joint process should insure that the following human resource
    activities are adequate to support the work forecast:

    a.  Apprenticeship programs/training
    b.  Support staff
    c.  Adequate manpower/hiring
    d.  Overtime levels

9.  DISPUTES:

    The joint committee should establish appropriate problem-solving
    procedures for handling disagreements or disputes arising under the process
    prior to activation of the parties' contractual remedies; i.e., grievance
    procedure, 5-day notice, etc.

    a.  Individual work performance decisions
    b.  Process review and adjustment

SPK00004323