# EXHIBIT 34

# SETTLEMENT AGREEMENT

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Union"), on behalf of its locals identified herein, and Alcoa Inc. ("Company") agree that the current labor agreements and working rules for the Company's facilities at Alcoa, TN (Local 309); Badin, NC (Local 303); Bauxite, AR (Local 4880); Davenport, IA (Local 105); Gum Springs, AR (Local 5073); Hot Springs, AR (Local 7972) Lafayette, IN (Local 115); Louisville, KY (Locals 155 and 155-01); Massena, NY (Locals 420 and 450A); Point Comfort, TX (Local 4370-01); Richmond, VA (Local 400A-01); Rockdale, TX (Local 4895-01); Warrick, IN (Local 104); and Wenatchee, WA (Aluminum Trades Council) shall remain unchanged except as modified below to provide new labor agreements dated June 1, 2006.

The effective date of changes shall be June 1, 2006 unless otherwise specified in this Settlement Agreement or the applicable Attachments. This Settlement Agreement is also subject to ratification by the Union's members.



USW060405

**Badin**
**Bauxite**
**Pt. Comfort**
**Rockdale**
**Tennessee**

|        | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
|--------|----------|----------|----------|----------|
| JG 1&2 | 14.829   | 15.125   | 15.225   | 15.325   |
| 3      | 15.013   | 15.313   | 15.433   | 15.553   |
| 4      | 15.199   | 15.503   | 15.643   | 15.783   |
| 5      | 15.383   | 15.691   | 15.851   | 16.011   |
| 6      | 15.568   | 15.879   | 16.059   | 16.239   |
| 7      | 15.753   | 16.068   | 16.268   | 16.468   |
| 8      | 15.938   | 16.256   | 16.476   | 16.696   |
| 9      | 16.123   | 16.446   | 16.686   | 16.926   |
| 10     | 16.308   | 16.634   | 16.894   | 17.154   |
| 11     | 16.492   | 16.822   | 17.102   | 17.382   |
| 12     | 16.678   | 17.011   | 17.311   | 17.611   |
| 13     | 16.862   | 17.200   | 17.520   | 17.840   |
| 14     | 17.048   | 17.389   | 17.729   | 18.069   |
| 15     | 17.232   | 17.577   | 17.937   | 18.297   |
| 16     | 17.417   | 17.765   | 18.145   | 18.525   |
| 17     | 17.602   | 17.954   | 18.354   | 18.754   |
| 18     | 17.787   | 18.143   | 18.563   | 18.983   |
| 19     | 17.972   | 18.332   | 18.772   | 19.212   |
| 20     | 18.157   | 18.520   | 18.980   | 19.440   |
| 21     | 18.341   | 18.708   | 19.188   | 19.668   |
| 22     | 18.527   | 18.897   | 19.397   | 19.897   |
| 23     | 18.711   | 19.086   | 19.606   | 20.126   |
| 24     | 18.897   | 19.275   | 19.815   | 20.355   |
| 25     | 19.081   | 19.463   | 20.023   | 20.583   |
| 26     | 19.266   | 19.651   | 20.231   | 20.811   |
| 27     | 19.451   | 19.840   | 20.440   | 21.040   |
| 28     | 19.636   | 20.029   | 20.649   | 21.269   |
| 29     | 19.821   | 20.218   | 20.858   | 21.498   |
| 30     | 20.006   | 20.406   | 21.066   | 21.726   |
| 31     | 20.190   | 20.594   | 21.274   | 21.954   |
| 32     | 20.376   | 20.783   | 21.483   | 22.183   |

Attachment A

Wages

JQ
12/06/06

Wage Table.xls

USW060406

**Davenport**
**Wentachee**

| | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
|---|---|---|---|---|
| JG 1&2 | 14.710 | 15.004 | 15.104 | 15.204 |
| 3 | 14.891 | 15.189 | 15.309 | 15.429 |
| 4 | 15.075 | 15.376 | 15.516 | 15.656 |
| 5 | 15.257 | 15.562 | 15.722 | 15.882 |
| 6 | 15.440 | 15.748 | 15.928 | 16.108 |
| 7 | 15.623 | 15.936 | 16.136 | 16.336 |
| 8 | 15.806 | 16.122 | 16.342 | 16.562 |
| 9 | 15.988 | 16.308 | 16.548 | 16.788 |
| 10 | 16.171 | 16.495 | 16.755 | 17.015 |
| 11 | 16.354 | 16.681 | 16.961 | 17.241 |
| 12 | 16.535 | 16.866 | 17.166 | 17.466 |
| 13 | 16.719 | 17.053 | 17.373 | 17.693 |
| 14 | 16.901 | 17.239 | 17.579 | 17.919 |
| 15 | 17.085 | 17.426 | 17.786 | 18.146 |
| 16 | 17.267 | 17.612 | 17.992 | 18.372 |
| 17 | 17.450 | 17.799 | 18.199 | 18.599 |
| 18 | 17.633 | 17.986 | 18.406 | 18.826 |
| 19 | 17.816 | 18.172 | 18.612 | 19.052 |
| 20 | 17.998 | 18.358 | 18.818 | 19.278 |
| 21 | 18.180 | 18.544 | 19.024 | 19.504 |
| 22 | 18.363 | 18.730 | 19.230 | 19.730 |
| 23 | 18.545 | 18.916 | 19.436 | 19.956 |
| 24 | 18.729 | 19.103 | 19.643 | 20.183 |
| 25 | 18.911 | 19.289 | 19.849 | 20.409 |
| 26 | 19.094 | 19.476 | 20.056 | 20.636 |
| 27 | 19.277 | 19.663 | 20.263 | 20.863 |
| 28 | 19.460 | 19.849 | 20.469 | 21.089 |
| 29 | 19.641 | 20.034 | 20.674 | 21.314 |
| 30 | 19.825 | 20.221 | 20.881 | 21.541 |
| 31 | 20.007 | 20.407 | 21.087 | 21.767 |
| 32 | 20.189 | 20.593 | 21.293 | 21.993 |
| 33 | 20.373 | 20.780 | 21.500 | 22.220 |

Wage Table.xls

USW060407

**Lafayette**
**Massena**
**Warrick**

|  | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
|---|---|---|---|---|
| JG 1&2 | 14.665 | 14.958 | 15.058 | 15.158 |
| 3 | 14.847 | 15.144 | 15.264 | 15.384 |
| 4 | 15.030 | 15.330 | 15.470 | 15.610 |
| 5 | 15.212 | 15.516 | 15.676 | 15.836 |
| 6 | 15.394 | 15.702 | 15.882 | 16.062 |
| 7 | 15.578 | 15.890 | 16.090 | 16.290 |
| 8 | 15.760 | 16.076 | 16.296 | 16.516 |
| 9 | 15.943 | 16.262 | 16.502 | 16.742 |
| 10 | 16.126 | 16.449 | 16.709 | 16.969 |
| 11 | 16.309 | 16.635 | 16.915 | 17.195 |
| 12 | 16.491 | 16.821 | 17.121 | 17.421 |
| 13 | 16.674 | 17.007 | 17.327 | 17.647 |
| 14 | 16.856 | 17.193 | 17.533 | 17.873 |
| 15 | 17.039 | 17.379 | 17.739 | 18.099 |
| 16 | 17.222 | 17.566 | 17.946 | 18.326 |
| 17 | 17.405 | 17.753 | 18.153 | 18.553 |
| 18 | 17.588 | 17.940 | 18.360 | 18.780 |
| 19 | 17.770 | 18.126 | 18.566 | 19.006 |
| 20 | 17.953 | 18.312 | 18.772 | 19.232 |
| 21 | 18.136 | 18.499 | 18.979 | 19.459 |
| 22 | 18.318 | 18.684 | 19.184 | 19.684 |
| 23 | 18.500 | 18.870 | 19.390 | 19.910 |
| 24 | 18.684 | 19.057 | 19.597 | 20.137 |
| 25 | 18.866 | 19.243 | 19.803 | 20.363 |
| 26 | 19.049 | 19.430 | 20.010 | 20.590 |
| 27 | 19.232 | 19.617 | 20.217 | 20.817 |
| 28 | 19.415 | 19.803 | 20.423 | 21.043 |
| 29 | 19.597 | 19.989 | 20.629 | 21.269 |
| 30 | 19.780 | 20.176 | 20.836 | 21.496 |
| 31 | 19.962 | 20.361 | 21.041 | 21.721 |
| 32 | 20.144 | 20.547 | 21.247 | 21.947 |
| 33 | 20.328 | 20.734 | 21.454 | 22.174 |

Wage Table.xls

USW060408

**Louisville Foil (#1)**

|         | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
|---------|----------|----------|----------|----------|
| JG 1&2  | 14.470   | 14.759   | 14.859   | 14.959   |
| 3       | 14.718   | 15.012   | 15.132   | 15.252   |
| 4       | 14.933   | 15.232   | 15.372   | 15.512   |
| 5       | 15.151   | 15.454   | 15.614   | 15.774   |
| 6       | 15.398   | 15.706   | 15.886   | 16.066   |
| 7       | 15.581   | 15.893   | 16.093   | 16.293   |
| 8       | 15.796   | 16.112   | 16.332   | 16.552   |
| 9       | 15.991   | 16.311   | 16.551   | 16.791   |
| 10      | 16.400   | 16.728   | 16.988   | 17.248   |
| 11      | 16.583   | 16.915   | 17.195   | 17.475   |
| 12      | 16.766   | 17.101   | 17.401   | 17.701   |
| 13      | 16.948   | 17.287   | 17.607   | 17.927   |
| 14      | 17.132   | 17.474   | 17.814   | 18.154   |
| 15      | 17.314   | 17.661   | 18.021   | 18.381   |
| 16      | 17.496   | 17.846   | 18.226   | 18.606   |
| 17      | 17.679   | 18.033   | 18.433   | 18.833   |
| 18      | 17.862   | 18.219   | 18.639   | 19.059   |
| 19      | 18.044   | 18.405   | 18.845   | 19.285   |
| 20      | 18.228   | 18.592   | 19.052   | 19.512   |
| 21      | 18.410   | 18.778   | 19.258   | 19.738   |
| 22      | 18.592   | 18.964   | 19.464   | 19.964   |
| 23      | 18.776   | 19.151   | 19.671   | 20.191   |
| 24      | 18.958   | 19.338   | 19.878   | 20.418   |
| 25      | 19.141   | 19.524   | 20.084   | 20.644   |
| 26      | 19.325   | 19.712   | 20.292   | 20.872   |
| 27      | 19.508   | 19.898   | 20.498   | 21.098   |

Wage Table.xls

USW060409

**Louisville Eng (#15)**

|        | 6/4/2005 | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
|--------|----------|----------|----------|----------|----------|
| JG 1&2 | 13.392   | 13.727   | 14.001   | 14.101   | 14.201   |
| 3      | 13.548   | 13.887   | 14.164   | 14.284   | 14.404   |
| 4      | 13.705   | 14.048   | 14.329   | 14.469   | 14.609   |
| 5      | 13.862   | 14.209   | 14.493   | 14.653   | 14.813   |
| 6      | 14.019   | 14.369   | 14.657   | 14.837   | 15.017   |
| 7      | 14.176   | 14.530   | 14.821   | 15.021   | 15.221   |
| 8      | 14.333   | 14.691   | 14.985   | 15.205   | 15.425   |
| 9      | 14.489   | 14.851   | 15.148   | 15.388   | 15.628   |
| 10     | 14.646   | 15.012   | 15.312   | 15.572   | 15.832   |
| 11     | 14.803   | 15.173   | 15.477   | 15.757   | 16.037   |
| 12     | 14.960   | 15.334   | 15.641   | 15.941   | 16.241   |
| 13     | 15.117   | 15.495   | 15.805   | 16.125   | 16.445   |
| 14     | 15.274   | 15.656   | 15.969   | 16.309   | 16.649   |
| 15     | 15.430   | 15.816   | 16.132   | 16.492   | 16.852   |
| 16     | 15.586   | 15.976   | 16.295   | 16.675   | 17.055   |
| 17     | 15.743   | 16.137   | 16.459   | 16.859   | 17.259   |
| 18     | 15.900   | 16.298   | 16.623   | 17.043   | 17.463   |
| 19     | 16.057   | 16.458   | 16.788   | 17.228   | 17.668   |
| 20     | 16.350   | 16.759   | 17.094   | 17.554   | 18.014   |
| 21     | 16.382   | 16.792   | 17.127   | 17.607   | 18.087   |

Wage Table.xls

USW060410

| | Richmond | | | | |
|---|---|---|---|---|---|
| | 6/4/2005 | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
| JG 1&2 | 13.849 | 14.195 | 14.479 | 14.579 | 14.679 |
| 3 | 14.091 | 14.443 | 14.732 | 14.852 | 14.972 |
| 4 | 14.302 | 14.660 | 14.953 | 15.093 | 15.233 |
| 5 | 14.512 | 14.875 | 15.172 | 15.332 | 15.492 |
| 6 | 14.755 | 15.124 | 15.426 | 15.606 | 15.786 |
| 7 | 14.933 | 15.306 | 15.612 | 15.812 | 16.012 |
| 8 | 15.144 | 15.523 | 15.833 | 16.053 | 16.273 |
| 9 | 15.332 | 15.715 | 16.030 | 16.270 | 16.510 |
| 10 | 15.732 | 16.125 | 16.448 | 16.708 | 16.968 |
| 11 | 15.911 | 16.309 | 16.635 | 16.915 | 17.195 |
| 12 | 16.089 | 16.491 | 16.821 | 17.121 | 17.421 |
| 13 | 16.267 | 16.674 | 17.007 | 17.327 | 17.647 |
| 14 | 16.445 | 16.856 | 17.193 | 17.533 | 17.873 |
| 15 | 16.624 | 17.040 | 17.380 | 17.740 | 18.100 |
| 16 | 16.802 | 17.222 | 17.566 | 17.946 | 18.326 |
| 17 | 16.980 | 17.405 | 17.753 | 18.153 | 18.553 |
| 18 | 17.159 | 17.588 | 17.940 | 18.360 | 18.780 |
| 19 | 17.336 | 17.769 | 18.125 | 18.565 | 19.005 |
| 20 | 17.515 | 17.953 | 18.312 | 18.772 | 19.232 |
| 21 | 17.694 | 18.136 | 18.499 | 18.979 | 19.459 |
| 22 | 17.872 | 18.319 | 18.685 | 19.185 | 19.685 |
| 23 | 18.050 | 18.501 | 18.871 | 19.391 | 19.911 |
| 24 | 18.229 | 18.685 | 19.058 | 19.598 | 20.138 |
| 25 | 18.408 | 18.868 | 19.246 | 19.806 | 20.366 |
| 26 | 18.586 | 19.051 | 19.432 | 20.012 | 20.592 |
| 27 | 18.765 | 19.234 | 19.619 | 20.219 | 20.819 |
| 28 | 18.923 | 19.396 | 19.784 | 20.404 | 21.024 |
| 29 | 19.091 | 19.568 | 19.960 | 20.600 | 21.240 |

Wage Table.xls

USW060411

**Hot Springs**

|        | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
|--------|----------|----------|----------|----------|
| JG 1&2 | 14.829   | 15.125   | 15.225   | 15.325   |
| 3      | 15.013   | 15.313   | 15.433   | 15.553   |
| 4      | 15.199   | 15.503   | 15.643   | 15.783   |
| 5      | 15.383   | 15.691   | 15.851   | 16.011   |
| 6      | 15.568   | 15.879   | 16.059   | 16.239   |
| 7      | 15.753   | 16.068   | 16.268   | 16.468   |
| 8      | 15.938   | 16.256   | 16.476   | 16.696   |
| 9      | 16.123   | 16.446   | 16.686   | 16.926   |
| 10     | 16.308   | 16.634   | 16.894   | 17.154   |
| 11     | 16.492   | 16.822   | 17.102   | 17.382   |
| 12     | 16.678   | 17.011   | 17.311   | 17.611   |
| 13     | 16.862   | 17.200   | 17.520   | 17.840   |
| 14     | 17.048   | 17.389   | 17.729   | 18.069   |
| 15     | 17.232   | 17.577   | 17.937   | 18.297   |
| 16     | 17.417   | 17.765   | 18.145   | 18.525   |
| 17     | 17.602   | 17.954   | 18.354   | 18.754   |
| 18     | 17.787   | 18.143   | 18.563   | 18.983   |
| 19     | 17.972   | 18.332   | 18.772   | 19.212   |
| 20     | 18.157   | 18.520   | 18.980   | 19.440   |
| 21     | 18.341   | 18.708   | 19.188   | 19.668   |
| 22     | 18.527   | 18.897   | 19.397   | 19.897   |
| 23     | 18.711   | 19.086   | 19.606   | 20.126   |
| 24     | 18.897   | 19.275   | 19.815   | 20.355   |
| 25     | 19.081   | 19.463   | 20.023   | 20.583   |
| 26     | 19.266   | 19.651   | 20.231   | 20.811   |
| 27     | 19.451   | 19.840   | 20.440   | 21.040   |
| 28     | 19.636   | 20.029   | 20.649   | 21.269   |
| 29     | 19.821   | 20.218   | 20.858   | 21.498   |
| 30     | 20.006   | 20.406   | 21.066   | 21.726   |
| 31     | 20.190   | 20.594   | 21.274   | 21.954   |
| 32     | 20.376   | 20.783   | 21.483   | 22.183   |

Wage_Table06_09_FINAL.xls

USW060412

|  | **Gum Springs** | | | |
|---|---|---|---|---|
|  | **6/5/2006** | **6/4/2007** | **6/2/2008** | **6/1/2009** |
| JG 1&2 | 14.829 | 15.125 | 15.225 | 15.325 |
| 3 | 15.013 | 15.313 | 15.433 | 15.553 |
| 4 | 15.199 | 15.503 | 15.643 | 15.783 |
| 5 | 15.383 | 15.691 | 15.851 | 16.011 |
| 6 | 15.568 | 15.879 | 16.059 | 16.239 |
| 7 | 15.753 | 16.068 | 16.268 | 16.468 |
| 8 | 15.938 | 16.256 | 16.476 | 16.696 |
| 9 | 16.123 | 16.446 | 16.686 | 16.926 |
| 10 | 16.308 | 16.634 | 16.894 | 17.154 |
| 11 | 16.492 | 16.822 | 17.102 | 17.382 |
| 12 | 16.678 | 17.011 | 17.311 | 17.611 |
| 13 | 16.862 | 17.200 | 17.520 | 17.840 |
| 14 | 17.048 | 17.389 | 17.729 | 18.069 |
| 15 | 17.232 | 17.577 | 17.937 | 18.297 |
| 16 | 17.417 | 17.765 | 18.145 | 18.525 |
| 17 | 17.602 | 17.954 | 18.354 | 18.754 |
| 18 | 17.787 | 18.143 | 18.563 | 18.983 |
| 19 | 17.972 | 18.332 | 18.772 | 19.212 |
| 20 | 18.157 | 18.520 | 18.980 | 19.440 |
| 21 | 18.341 | 18.708 | 19.188 | 19.668 |
| 22 | 18.527 | 18.897 | 19.397 | 19.897 |
| 23 | 18.711 | 19.086 | 19.606 | 20.126 |
| 24 | 18.897 | 19.275 | 19.815 | 20.355 |
| 25 | 19.081 | 19.463 | 20.023 | 20.583 |
| 26 | 19.266 | 19.651 | 20.231 | 20.811 |
| 27 | 19.451 | 19.840 | 20.440 | 21.040 |
| 28 | 19.636 | 20.029 | 20.649 | 21.269 |
| 29 | 19.821 | 20.218 | 20.858 | 21.498 |
| 30 | 20.006 | 20.406 | 21.066 | 21.726 |
| 31 | 20.190 | 20.594 | 21.274 | 21.954 |
| 32 | 20.376 | 20.783 | 21.483 | 22.183 |

Wage_Table06_09_FINAL.xls

USW060413

### Massena East (St. Lawrence)

|        | 6/5/2006 | 6/4/2007 | 6/2/2008 | 6/1/2009 |
|--------|----------|----------|----------|----------|
| JG 1&2 | 14.665   | 14.958   | 15.058   | 15.158   |
| 3      | 14.847   | 15.144   | 15.264   | 15.384   |
| 4      | 15.030   | 15.330   | 15.470   | 15.610   |
| 5      | 15.212   | 15.516   | 15.676   | 15.836   |
| 6      | 15.394   | 15.702   | 15.882   | 16.062   |
| 7      | 15.578   | 15.890   | 16.090   | 16.290   |
| 8      | 15.760   | 16.076   | 16.296   | 16.516   |
| 9      | 15.943   | 16.262   | 16.502   | 16.742   |
| 10     | 16.126   | 16.449   | 16.709   | 16.969   |
| 11     | 16.309   | 16.635   | 16.915   | 17.195   |
| 12     | 16.491   | 16.821   | 17.121   | 17.421   |
| 13     | 16.674   | 17.007   | 17.327   | 17.647   |
| 14     | 16.856   | 17.193   | 17.533   | 17.873   |
| 15     | 17.039   | 17.379   | 17.739   | 18.099   |
| 16     | 17.222   | 17.566   | 17.946   | 18.326   |
| 17     | 17.405   | 17.753   | 18.153   | 18.553   |
| 18     | 17.588   | 17.940   | 18.360   | 18.780   |
| 19     | 17.770   | 18.126   | 18.566   | 19.006   |
| 20     | 17.953   | 18.312   | 18.772   | 19.232   |
| 21     | 18.136   | 18.499   | 18.979   | 19.459   |
| 22     | 18.318   | 18.684   | 19.184   | 19.684   |
| 23     | 18.500   | 18.870   | 19.390   | 19.910   |
| 24     | 18.684   | 19.057   | 19.597   | 20.137   |
| 25     | 18.866   | 19.243   | 19.803   | 20.363   |
| 26     | 19.049   | 19.430   | 20.010   | 20.590   |
| 27     | 19.232   | 19.617   | 20.217   | 20.817   |
| 28     | 19.415   | 19.803   | 20.423   | 21.043   |
| 29     | 19.597   | 19.989   | 20.629   | 21.269   |
| 30     | 19.780   | 20.176   | 20.836   | 21.496   |
| 31     | 19.962   | 20.361   | 21.041   | 21.721   |
| 32     | 20.144   | 20.547   | 21.247   | 21.947   |
| 33     | 20.328   | 20.734   | 21.454   | 22.174   |

Wage_Table06_09_FINAL.xls

USW060414

**2006 Company Proposal**

*Page 1 of 3*

May 31, 2006 --                    4:30 PM

***Period of Agreement:***     4 year agreement; effective June 1, 2006 to May 31, 2010

***Current Employee***

Wages

| | | |
|---|---|---|
| *June 5, 2006* | 2.5% across the board |
| *June 4, 2007* | 2.0% across the board |
| *June 2, 2008* | $ 0.10 per hour across the board<br>plus .02 per hour increment per job grade starting with job grade 3 |
| *June 1, 2009* | $ 0.10 per hour across the board<br>plus .02 per hour increment per job grade starting with job grade 3 |

Active H&W Benefits     ***Attachment I*** *-- Detail of medical and Rx plan design & coverage*

**ALL DRUG UTILIZATION PROGRAMS except Step Therapy**

Weekly contribution per employee:     $ 20 per week over term of agreement

Active Life insurance improvement: $4,000
Sickness & Accident improvements
***Attachment II*** *-- S&A schedule*

Retiree Medical     ***Attachment I*** *-- Detail of medical & Rx plan design & coverage*
**ALL DRUG UTILIZATION PROGRAMS**

***Attachment III*** *-- Retiree Medical Revised CAP side letter*
CAP (company contribution) per enrolled participant engages in January 2007

| | | |
|---|---|---|
| Pre-Medicare: | $7,767 | *per participant (each retiree, spouse, surviving spouse)* |
| Post-Medicare: | $3,389 | *per participant (each retiree, spouse, surviving spouse)* |

Monthly Contribution over term of agreement:

| | | |
|---|---|---|
| Pre-Medicare: | $ 75 per month | *per participant (each retiree, spouse, surviving spouse)* |
| Post-Medicare: | $ 40 per month | *per participant (each retiree, spouse, surviving spouse)* |

Variable Company Contributions
*I. Medicare Part D Subsidy Contribution of 50%*

*II. LME based Performance Contribution*
Initial contribution of $ 30 million
LME calculation as per Attachment III

If medical & Rx costs exceed the amounts contributed above, the retirees will be
assessed additional charge.

Medicare Part B reimbursement capped as per Attachment II

*5/31/06*

USW060415

BF 8/25/06

**2006 Company Proposal  -- Continued**

*Page 2 of 3*

May 31, 2006 --                    4:30 PM

Pension                Three Level Factor Plan based upon Years of Service

Pension Factor by Years of Service

|          | Years of Service | 0 to 15 YOS | Over 15 to 30 YOS | Over 30 YOS |
|----------|------------------|-------------|-------------------|-------------|
| Job Grade | 1-4             | 38.25       | 40.25             | 51.00       |
|          | 5-8              | 40.05       | 42.05             | 53.00       |
|          | 9-12             | 41.90       | 43.90             | 55.00       |
|          | 13-16            | 43.75       | 45.75             | 57.50       |
|          | 17-20            | 45.55       | 47.55             | 60.00       |
|          | 21-24            | 47.90       | 49.90             | 63.00       |
|          | 25-27            | 50.25       | 52.25             | 66.00       |
|          | 28+              | 51.25       | 53.25             | 68.25       |

Plan provisions remain unchanged

Lump Sum                $ 1,500  at ratification
                        Paid to active employees at work or returns to active work within 30 days of ratification

Surviving spouse Lump Sum    November 2006: $1,500 to surviving spouses of Post June 1,1993 retirees
                             November 2008: $1,500 to surviving spouses of Post June 1,1993 retirees

New Pay for Performance Plan

USW060416

**2005 Company Proposal - Continued**

*Page 3 of 3*

May 31, 2006 --                    4:30 PM

*Employee hired __after__ ratification date of new labor agreement*

Wages                    Same hourly rate structure by location as current employee

Retiree Medical          ***Attachment  I*** *--  Detail of medical & drug plan design & coverage*

                         CAP per enrolled participant
                         Pre-Medicare:          $7,767  *per participant (each retiree, spouse, surviving spouse)*
                         Post-Medicare:         $3,389  *per participant (each retiree, spouse, surviving spouse)*

                         No eligibility for Medicare Part B premium reimbursement
                         No Participation in Variable company contributions
                             *(specifically,  Medicare Part D Subsidy and  LME Performance contributions)*

Pension                  ***Attachment  IV*** *--  New Hire Pension Plan Provisions*

                         Two Level Factor Plan based upon Years of Service

|  | | Pension Factor by Years of Service (YOS) | |
| --- | --- | --- | --- |
|  | Years of Service | 0 to 20 YOS | over 20 YOS |
| Job Grade | 1-4 | 33.00 | 38.25 |
|  | 5-8 | 34.55 | 40.05 |
|  | 9-12 | 36.15 | 41.90 |
|  | 13-16 | 37.50 | 43.75 |
|  | 17-20 | 39.05 | 45.55 |
|  | 21-24 | 41.15 | 47.90 |
|  | 25-27 | 43.25 | 50.25 |
|  | 28+ | 44.00 | 51.25 |

All other items as per current company proposals

USW060417

**ATTACHMENT IV**

**New Hire Pension Plan**
**General Summary of Provisions**

Accrued Benefit
Pension Factor times years of pension service

| Jobgrade | Years of Service up to 20 | Years of Service over 20 |
|---|---|---|
| 1 – 4 | $33.00 | $38.25 |
| 5 – 8 | $34.55 | $40.05 |
| 9 – 12 | $36.15 | $41.90 |
| 13 – 16 | $37.50 | $43.75 |
| 17 – 20 | $39.05 | $45.55 |
| 21 – 24 | $41.15 | $47.90 |
| 25 – 27 | $43.25 | $50.25 |
| 28 and above | $44.00 | $51.25 |

Job grade means the highest job grade or classification in which the Participant worked 1,000 or more hours (including hours for which he or she received vacation pay) in a twelve consecutive month period within the 120 month period prior to his or her Pension Eligibility Date.

Normal Retirement
Age 65 with 5 years of service. Pension equals Accrued Benefit.

Early Retirement
35 years of service with minimum age of 57. Pension equals Accrued Benefit.

Disability Retirement
10 years of service and permanently incapacitated. Pension equals Accrued Benefit. Additional $400 supplemental monthly pension paid until the earlier of attainment of age 65 or eligibility for social security disability benefits.

Vested Termination
5 years of service. Pension equals Accrued Benefit. Payable at age 65.

Forms of Payment
50% Joint and Survivor (reduced using Current Appendix C). Single Life Annuity. Deferred Vested participants not in receipt have reduction for spouse coverage prior to commencement of payments, if elected, in accordance with Current Appendix E.

Death in Active Service
Spouse receives 50% of participant's benefit as of the date of death, reduced for Joint and Survivor option and payable at the date at which the participant could have commenced payment.

Note: No shutdown benefits; No SRP – Pension begins immediately at retirement; Surviving spouse benefit based on actuarial reductions applicable to current plan deferred vested terminations. (Disability supplement to age 65 if person not eligible for social security disability).

USW060418

# PERFORMANCE PAY

During 2006 negotiations, the parties agreed to modify the Performance Pay Plan. The modified plan will provide for participation by hourly employees represented by the Union in the plants located at Davenport, Lafayette, Massena, Warrick, Wenatchee, Arkansas, Point Comfort, Rockdale, Tennessee, Richmond Foil, Louisville 1, and Hot Springs. Hourly employees represented by the Union in plants located at Gum Springs, Badin, Louisville 15 and Massena Global Cold Finishing will participate in the Performance Pay Plan set forth in the 2001 Labor Agreement under the terms of that Plan for the term of the 2006 Labor Agreement.

## I.    GENERAL

The purpose of Performance Pay is to allow employees to share in profits and the financial impact of operating improvements while focusing employees in a Location on business goals that are critical to the long term success of the Location.  Working together and achieving Location goals will result in increased profitability for the business and monetary reward and security for employees.

Guiding Principles for Performance Pay

-    The design and goals will be consistent with the Location's business strategies and with Alcoa's Vision and Values.

-    The design and goals should support teamwork and employee involvement, be perceived as fair, and be easily understood by employees.

-    The award opportunity will be based on improvement against an objective and verifiable set of measurements for each factor(s) being measured.

-    Performance payouts will supplement the negotiated base level of wages.

## II.    EFFECTIVE DATE

The Performance Pay Plan found in the 2001 Labor Agreement will be applicable for the remainder of 2006 under the provisions of that plan and will continue to be applicable to employees at those plants specified above. The provisions of this plan will be applicable to all other employees commencing January 1, 2007.

## III.    DESIGN

### 1.    General

A minimal number of financial improvement measures will be identified and established.

Attachment C
Performance Pay

JQ JR
12/06/06

1.

The payout to employees for Performance Pay will consist of 20% of the savings associated with improvement as measured against the base for each factor with all factors netted together.

The award opportunity will be based on Location measurements or on a smaller than location basis if agreed to by the parties.

The plan is intended to stimulate improved engagement and problem solving to achieve significant improvement over past performance in cost improvement and productivity.

Plan results will vary by location but will be designed to provide employees a realistic opportunity to earn approximately twice the percentage payout of historical performance in aggregate if performance measurements are achieved.

At locations with more than one business unit, the Union shall have the right to pool the results of the units with the pool weighted in proportion to reflect the number of employees in each of the units.

In the event a plan provides excess or insufficient payout opportunity due to improper design or factors not anticipated during the design, the local parties will meet to discuss and agree to remedial actions necessary to fulfill the intent of properly rewarding employees for their efforts to improve financial performance. In the event the parties are unable to agree, Management will implement the remedial actions necessary to fulfill the intent, consistent with the design criteria described above.

2. <u>Location Design Process</u>

At each location a joint Company/Union committee will, by November 1, 2006, review, discuss and provide input into the performance measures, weighting, etc. to be applicable for their location. Once these measures are established they will apply during the term of this Agreement, except as set forth below. Should agreement not be reached, Management will determine and implement the measures, provided however, that such measurements shall be consistent with the design criteria described in III above.

Excluding profit based components, modifications to the baselines for Performance Measures will be adjusted to account for inflation in the relevant area and will not be adjusted based on the plan's previous year's performance. The labor components of the Performance Measures will be adjusted based on the change in the overall unit labor cost (total hourly employment cost) for each quarter plus any COLA increases that occur after June 1, 2006. All other values included in the Performance Measures may be adjusted each quarter and/or annually for the upcoming year by the actual cost inflation experienced by the location or actual margin improvement experienced by the location or, if the actual cost cannot be realistically measured, based on the relevant PPI index.

USW060420

IV.   <u>DEFINITIONS</u>

For purposes of Performance Pay, the following definitions are established:

> 1. LOCATION....means a plant location.
>
> 2. ELIGIBLE EARNINGS....means the sum of straight-time hourly-base wages (for straight-time hours and overtime hours); straight-time cost-of-living allowance (for straight-time hours and overtime hours); straight-time shift and schedule premiums (for straight-time hours and overtime hours); vacation pay; unworked holiday pay; and jury, witness, and bereavement pay.
>
> The definition of Eligible Earnings for an Eligible Employee who is on disability attributable in whole or in part to his or her employment with the Company, shall include the time lost and the straight-time earnings associated with that time lost at a rate not to exceed 8 hours per day or 40 hours per week.
>
> The definition of Eligible Earnings for an Eligible Employee who is a local union official who is on an excused absence for union business and who otherwise would be actively at work shall include the time lost and the straight-time earnings associated with that lost time at a rate not to exceed 8 hours per day or 40 hours per week.
>
> The period used to determine Eligible Earnings for a Year shall encompass the same payroll weeks used in the determination of the Company's fiscal quarter.

3.  ELIGIBLE EMPLOYEE....is an hourly employee covered by this Agreement who had actual hours worked during the payroll weeks disbursed in the quarter and who either had employee status on the last calendar day of the quarter or whose employee status terminated during the quarter due to death or retirement.

4.  PERFORMANCE MEASURES.... are the set of financial and operating measures upon which any payout is based.

V.   <u>CALCULATION OF THE PERFORMANCE PAY PAYOUT</u>

At the end of each quarter, results will be used to calculate a Performance Pay payout, with attainment against financial Performance Measures as the basis for the payout.

The actual result for each Performance Measure will be compared to its base performance. Twenty percent (20%) of the savings will be distributed to eligible employees as follows:

USW060421

An individual employee's Performance Pay payout will be calculated by dividing his/her Eligible Earnings by the eligible earnings of all employees participating in the plan and multiplying that result by the total amount of money available for distribution to employees.

In addition to the payout yielded by the above calculation an additional payout can result by the use of additional measures for the transition years of 2007, 2008 and 2009. The additional measures are those set forth in the Performance Pay Plan in the 2001 Labor Agreement (prior plan). Any measures utilized will be set on a target of 5% with thresholds and maximum payouts as set forth in the prior plan, provided, however, that the percentages are not to exceed 30%, 20% and 10% for the years 2007, 2008 and 2009 respectively, i.e. if application of the transitional payment would result in a 5% payout, the additional payout as a result of this provision would be 1.5%, 1% and 0.5% for the years 2007, 2008 and 2009, respectively. This transitional payout provision will not be applicable for 2007 to plans designed to pay a target greater than the payout under the existing plan in 2006.

## VI.    ADMINISTRATION OF THE PERFORMANCE PAY PLAN

The information necessary to administer the provisions of Performance Pay will be prepared and maintained by the Company.  The costs associated with its administration will be borne by the Company.

### Communication

The parties agree that it is important for participants in the Performance Pay Plan to understand the relevant goals, Performance Measures and their potential impact on plant performance and their potential payout opportunities.

### Administration

In the event an employee quits or is terminated during the quarter, no payout shall be paid. In the event of death, disability, retirement or layoff, an employee's award will be calculated on actual Eligible Earnings.

In the event an employee is transferred between Business Unit/Location and his new job is covered by a different plan, the payout shall be pro-rated for the number of whole weeks worked in each unit, based on the employee's job classification for each week.

Payouts will be paid as soon as practical after the close of the quarter.

The determination of accounting policies in regards to Performance Pay shall be at the sole discretion of the Company.  Such policies shall be applied in accordance with accounting practices of the Company.

4.

Payments of Performance Pay shall not be considered earnings for any other purpose, except as subject to the applicable statutory taxes on income.

The Compensation Committee of Alcoa's Board of Directors has the authority to make adjustments to results because of unusual events. Business Unit/Location management and bargaining unit representatives will be provided the opportunity to give input for consideration for such adjustments. Such events might include the purchase or sale of business assets that was not planned when goals were set for that year, plant shutdowns, unanticipated reductions in business, etc. It is intended that, once a commitment has been made to goals, changes will not be entertained except in truly unusual situations.

The Performance Pay calculations for each business unit and corporate performance will be communicated to the Union prior to payment.

This Agreement has been reached on the basis that the Union will ensure that, until and only to the extent the information is made available by the Company to the public at large, the information will be disclosed only to those reviewing for the Union the computations related to Performance Pay and neither the Union nor anyone reviewing such information for the Union will make any other disclosure of the information.

Should payment of Performance Pay, or any part of such payment, be required to be included in the regular rate under the Fair Labor Standards Act of any eligible hourly employee, the Company will reduce applicable percentages and adjust individual payout amounts such that the total payout for the applicable Year for each Location for bargaining-unit employees will not be changed by such decision. The parties shall make any and all adjustments to this document as may be necessary from time to time to ensure that the intent and understanding is upheld.

VII.  UNION RIGHT TO REVIEW

The International Union, through the Chair of its Negotiating Committee or his/her designee, shall have the right to review any information concerning the calculation of payouts under the Plan.

In the event that a discrepancy exists between the Company's calculation and the results obtained by the Union's review, the Chairman of the Employee Relations Council (ERC) and the President of the International Union, or his/her designee, shall attempt to reach an agreement to resolve the discrepancy. Should the parties be unable to resolve the dispute, they will select an independent Third Party with the appropriate expertise relative to the dispute, to review each party's position related to the issue being disputed and to render a written opinion concerning the issue.

The opinion rendered by the Third Party will be final and binding on both parties. However, the opinion will not be cited by either party with respect to any other issue except one relating to this Performance Pay Plan.

The costs associated with the Third Party shall be borne equally by the parties.

USW060423

VIII.   <u>TERM OF THE PLAN</u>

This performance pay plan is applicable only for the duration of the 2006 Labor Agreement and will not be extended to succeeding Labor Agreements.

6.

USW060424

**5/31/2006**

All USW Master Agreement benefits agreements, Summary Plan Descriptions, letters of understanding and side letters between the Company and the Union, will be renewed and continue in full force and effect unless the parties have specifically agreed to change, alter or eliminate such agreements in these negotiations.

### Health Insurance

1.    Modify the medical plan as follows, effective January 1, 2007:

| | In-Network | Out-of-Network | Network-Not-Available |
|---|---|---|---|
| **Annual Deductible:** [1] | | | |
| Per Individual: | $250 | $500 | $500 |
| Per Family: | $500 | $1,000 | $1,000 |
| **Coinsurance:** [2],[3] | 90% | 70% | 80% |
| **Preventive Care:** | 100% | Not Covered | 100% |
| **Mental Health :** | 90% | 50%/70% Out/In Patient | 50%/80% Out/In Patient |
| **Annual Out-of-Pocket Maximum:** [4] | | | |
| Per Individual: | $1,000 | $2,000 | $1,500 |
| Per Family: | $2,000 | $4,000 | $3,000 |

Notes:    [1] Deductibles do not apply to Preventive Care and Organ Transplants at designated Centers of Excellence.
[2] Coinsurance amounts replace any copays that exist under the current plan.
[3] In-network reimbursement and coinsurance are calculated according to the negotiated amount; the employee is not responsible for any amount in excess of the negotiated rate. Reimbursement for out-of-network services is 70% after any applicable deductible. Out-of-network and Network-not-available coinsurance is calculated according to the R&C rate; the employee is responsible for any amount in excess of the R&C rate.
[4] Annual out-of-pocket maximum includes deductible and coinsurance amounts for covered medical expenses each calendar year, excluding prescription drugs and amounts above reasonable and customary (R&C) amount.

Attachment D
Health & Welfare,
$ A Schedule

USW060425

2.    Modify the prescription drug plan as follows:

| | Effective January 1, 2007 | |
|---|---|---|
| | Retail Pharmacy Network | Mail Order |
| **Annual Deductible** [1] | | |
| Per Individual: | $50 | None |
| Per Family: | $100 | None |
| **Maximum Supply:** | 30 days | 90 days |
| **Coinsurance:** | 80% | 80% |
| **Minimum Generic Copay** | $7.50 | $15.00 |
| **Minimum Name Brand Copay** | $15.00 | $30.00 |
| **Maximum Coinsurance per prescription** | $40.00 | $80.00 |

Notes:  Covered individuals who obtain prescription drugs from an out-of-network pharmacy must pay the full cost of the covered prescription at the time of purchase, then submit a claim form and receipt to the prescription drug claims administrator. The covered individual will then be reimbursed at in-network retail level less the applicable deductible and coinsurance. The covered individual must also pay the difference between the network negotiated rate and the Pharmacy's actual charge.

Covered individuals who use an out-of-network pharmacy in an emergency will be paid at the in-network level, with approval from your claims administrator.

3.    Where a covered individual elects to purchase a name brand drug for which there is a generic equivalent, such individual shall be responsible to pay the coinsurance for the generic equivalent and the amount equal to the difference in the cost to the Company of the generic and the name brand drug. That is, the cost to the Company will be no greater than if the covered individual had utilized the generic drug. Notwithstanding the above, if a covered individual's physician submits satisfactory written clinical evidence to the claims administrator, that there is a pharmacological or medical reason why a name brand drug must be dispensed, the name brand drug will be authorized. The covered individual's coinsurance responsibility for the name brand drug in such circumstance will be the same as for name brand drugs for which there is no generic equivalent.

4.    The Company will communicate, through its claims administrator, with all participants that are currently receiving a generic drug for which there is a name brand equivalent.  In this communication, the Company will explain the Mandatory Generics program and the process for applying for an exception.  This communication will take place during the Fall of 2006 and prior to the start up of the Mandatory Generics program on January 1, 2007.

USW060426

5.      Covered individuals will be required to purchase drugs through the mail service pharmacy where:

      a. the drug has been coded a "maintenance drug" by the claims administrator, and
      b. the prescription has been filled by a retail pharmacy on two prior occasions within the preceding 365 days, and
      c. the prescription is identical in dosage as the prescriptions filled on the two prior occasions as provided in b above

6.      Renew and restate all benefits letters of understanding, including the 1993-1994 Managed Care Protocols.

7.      Any change in health insurance carriers or networks or pharmacy benefit managers will be subject to the principals contained in the Managed Care Protocols.

8.      SPD Development Letter – Will update and restate the SPD letters dated 9/27/2001 and May 14, 2002

9.      Incorporate the relevant portions of Appendix VII USW HOURLY 401K PLAN into each Labor Agreement for each Master Agreement location. It is understood that the current level of Company matching contribution is not changing and that for all items other than the Company Match, the Plan's administration and the participant's rights under the Plan, shall be concurrent with the administration and the participant's rights under the Alcoa Savings Plan for Non-Bargaining Employees.

10.     Increase life insurance to $44,000 for active and pre-62 retirees.

*Final*
*5/31/06*

# Prescription Drug
## Utilization Management Programs

1. Drug Utilization Management programs shall be implemented in accordance with the parties' understandings reached during the 2006 negotiations and in accordance with the criteria and process as represented by the Company to the Union.

2. **Prior Authorization**

   The current Prior Authorization program is modified to include the following prescription drug classes. As new drugs are added to each class, they will be added to the Prior Authorization program. This list comprises the drugs in these classes as of June 1, 2006.

| Class | Prescription Drug |
|---|---|
| ADD/Narcolepsy | Adderall, Adderall XR, Dexedrine, Dextrostat, Desoxyn, Ritalin, Provigil, Concerta, Metadate, Focalin, Methylin, Strattera |
| Alzheimer's Agents | Aricept, Cognex, Exelon, Namenda, Reminyl, (Razadyne) |
| Anabolic Steroids | Anadrol-50, Oxandrin, Winstrol |
| Anemia Agents | Aranesp, Epogen, Procrit |
| Antifungals | Diflucan, Lamisil, Sporanox |
| Arthritis Agents | Arava, Enbrel, Humira, Kineret, Remicade |
| Asthma | Xolair |
| Botulinum Toxins | Botox, Myobloc |
| Gaucher's Disease | Ceredase, Cerezyme, Zavesca |
| Growth Hormones | Genotropin, Humatrope, Norditropin, Nutropin AQ, Nutropin, Nutropin Depot, Protropin, Saizen, Tev-Tropin, Serostim, Zorbtive |
| Interferons | Intron A, Roferon A, PEG-Intron, Infergen, Pegasys, Rebetol, Copegus, Ribasphere, Rebetron |
| Multiple Sclerosis | Avonex, Betaseron, Copaxone, Novantrone, Rebif, Tysabri |
| Osteoporosis | Forteo |
| Pain Agents | OxyContin and Stadol |
| Pigmenting Agents | Oxsoralen, Oxsoralen-Ultra, 8-MOP |
| Pulonary Arterial Hypertension | Revatio |
| Psoriasis | Raptiva, Soriatane |
| Testosterone | Androgel, Testosterone |
| Tretonin Topical (after age 35) | Avita, Retin-A |

USW060428

3. **Managed Drug Limitations (MDLs)**

   a.    A Managed Drug Limitation program will be established and described in the Health Care Benefits Agreement as follows:

> Under this program, the quantity and dosing level are limited to encourage pharmacists and doctors to adhere to the quantity recommended by the National Prescribing Guidelines and the Federal Drug Administration (FDA). Your retail pharmacist will receive a message on their system if you attempt to fill a prescription for a quantity above the established limit. Either you or your pharmacist must contact your doctor who must then contact the claims administrator's Prior Authorization Department to obtain approval for a quantity above the established limit. If your doctor determines that you need a greater quantity of drugs than what is approved by the claims administrator, you can obtain those amounts, but at your own expense. They will not be covered by the plan.

   b.    The following covered prescription drug classes are subject to the Managed Drug Limitation program. As new drugs are added to each class, they will be added to the Managed Drug Limitation program. This list comprises the drugs in these classes as of June 1, 2006. With the lone exception of the Erectile Dysfunction drug class, the retail and mail limits listed below are based on clinical evidence and guidelines as of June 1, 2006. As new clinical evidence is obtained these limits will be updated.

| Class | Drug | Retail Limits | Mail Order Limits |
|---|---|---|---|
| **Erectile Dysfunction** | | | |
| | Viagra | 6 tablets | 18 tablets |
| | Levitra | 6 tablets | 18 tablets |
| | Cialis | 6 tablets | 18 tablets |
| **Migraine Agents** | | | |
| | Amerge | 9 tablets | 27 tablets |
| | Axert | 6 tablets | 18 tablets |
| | Frova | 9 tablets | 27 tablets |
| | Imitrex Injection Kit | 2 kits (4 injections) | 6 kits (12 injections) |
| | Imitrex Injection Vials | 4 vials | 12 vials |
| | Imitrex NS 5mg | 12 units (2 packages) | 36 units (6 packages) |
| | Imitrex NS 20mg | 6 units (1 packages) | 18 units (3 packages) |
| | Imitrex Tablets | 9 tablets | 27 tablets |
| | Maxalt & Maxalt MLT | 6 tablets | 18 tablets |

| Class | Drug | Retail Limits | Mail Order Limits |
|---|---|---|---|
| | Migranal NS | 4 ml (1 package) | 12 ml (3 package) |
| | Relpax | 6 tablets | 18 tablets |
| | Zomig & Zomig ZMT 2.5mg | 6 tablets | 18 tablets |
| | Zomig & Zomig ZMT 5mg | 3 tablets | 9 tablets |
| | Zomig NS | 6 units (1 packages) | 18 units (3 packages) |
| Pain Agents | | | |
| | Stadol NS | 1 bottle (3 ml) | 1 bottle (3 ml) |
| | Oxycontin | 120 tablets | 360 tablets |
| Sedatives and Hypnotics | | | |
| | Need to complete | | |

Medical Necessity

All of the medical necessity criteria contained in the current Health Care Agreement apply to the Prescription Drug benefit and these Utilization Management programs. These Medical Necessity criteria shall serve as guidelines for reviewing the administration and appropriateness of all criteria utilized for Prescription Drug Utilization Management programs.  The administration of the Prescription Drug Benefit, and these Utilization Management programs, are subject to the grievance and arbitration procedure.

USW060430

## MANAGED DRUG LIMITATION PROGRAM

Add the following to the list of prescription drugs subject to the Managed Drug
Limitation program:

| Class | Drug | Retail Limits | Mail Order Limits |
|---|---|---|---|
| **Sedatives and Hypnotics** | | | |
| | Ambien | 14 tablets | 42 tablets |
| | Ambien CR | 14 tablets | 42 tablets |
| | Dalmane | 14 tablets | 42 tablets |
| | Doral | 14 tablets | 42 tablets |
| | Halcion | 10 tablets | 30 tablets |
| | Lunesta | 14 tablets | 42 tablets |
| | ProSom | 14 tablets | 42 tablets |
| | Restoril | 14 tablets | 42 tablets |
| | Sonata | 14 tablets | 42 tablets |

USW060431



# PRIOR AUTHORIZATION CRITERIA

| DRUG CLASS | Sedative/Hypnotics |
|---|---|
| **BRAND NAME (Generic)** | **Ambien (zolpidem)** |
| | **Ambien CR (zolpidem)** |
| | **Dalmane (flurazepam)** |
| | **Doral (quazepam)** |
| | **Halcion (triazolam)** |
| | **Lunesta (eszopiclone)** |
| | **ProSom (estazolam)** |
| | **Restoril (temazepam)** |
| | **Sonata (zaleplon)** |

*Status: Caremark Criteria*
*Type: Post-Limit Prior Authorization*

### FDA-APPROVED INDICATIONS

**Ambien:**
Ambien is indicated for the short-term treatment of insomnia. Hypnotics should generally be limited to 7 to 10 days of use, and re-evaluation of the patient is recommended if they are to be taken for more than two to three weeks. Ambien has been shown to decrease sleep latency and increase the duration of sleep for up to 35 days in controlled clinical studies. Ambien should not be prescribed in quantities exceeding a one-month supply.

**Ambien CR:**
Ambien CR is indicated for the treatment of insomnia, characterized by difficulties with sleep onset and/or sleep maintenance (as measured by wake time after sleep onset). The clinical trials performed in support of efficacy were both

Copyright© 2005 Caremark. All Rights Reserved
Confidential and Proprietary
This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.
1

USW060432

three weeks in duration, although the final formal assessments of sleep latency and maintenance were performed after two weeks of treatment.

**Dalmane:**
Dalmane is a hypnotic agent useful for the treatment of insomnia characterized by difficulty in falling asleep, frequent nocturnal awakenings, and/or early morning awakening. Dalmane can be used effectively in patients with recurring insomnia or poor sleeping habits, and in acute or chronic medical situations requiring restful sleep. Sleep laboratory studies have objectively determined that Dalmane is effective for at least 28 consecutive nights of drug administration. Since insomnia is often transient and intermittent, short-term use is usually sufficient. Prolonged use of hypnotics is usually not indicated and should only be undertaken concomitantly with appropriate evaluation of the patient.

**Doral:**
Doral is indicated for the treatment of insomnia characterized by difficulty in falling asleep, frequent nocturnal awakenings, and/or early morning awakenings. Because insomnia is often transient and intermittent, the prolonged administration of Doral tablets is generally not necessary or recommended. Since insomnia may be a symptom of several other disorders, the possibility that the complaint may be related to a condition for which there is a more specific treatment should be considered.

**Halcion:**
Halcion is indicated for the short-term treatment of insomnia, generally 7 to 10 days. Use for more than two to three weeks requires complete re-evaluation of the patient. Prescriptions for Halcion should be written for short-term use (7 to 10 days) and it should not be prescribed in quantities exceeding a one-month supply.

**Lunesta:**
Lunesta is indicated for the treatment of insomnia. In controlled outpatient and sleep laboratory studies, Lunesta administered at bedtime decreased sleep latency and improved sleep maintenance.

**ProSom:**
ProSom is indicated for the short-term management of insomnia characterized by difficulty in falling asleep, frequent nocturnal awakenings, and/or early morning awakenings. Because insomnia is often transient and intermittent, the prolonged administration of ProSom is generally neither necessary nor recommended. Since insomnia may be a symptom of several other disorders, the possibility that the complaint may be related to a condition for which there is a more specific treatment should be considered. There is evidence to support the ability of ProSom to enhance the duration and quality of sleep for intervals up to 12 weeks.

**Restoril:**
Restoril is indicated for the short-term treatment of insomnia, generally 7 to 10 days. For patients in whom the drug is used for more than two to three weeks, periodic evaluation is recommended to determine whether there is a continuing need. For patients with short-term insomnia, instructions in the prescription should indicate that temazepam should be used for short periods of time (7 to 10 days). Restoril should not be prescribed in quantities exceeding a one-month supply.

**Sonata:**
Sonata is indicated for the short-term treatment of insomnia. Hypnotics should generally be limited to 7 to 10 days of use, and re-evaluation of the patient is recommended if they are to be taken for more than two to three weeks. Sonata has been shown to decrease the time to sleep onset for up to 30 days in controlled clinical studies. Sonata should not be prescribed in quantities exceeding a one-month supply.

---

**CRITERIA FOR APPROVAL**

1. Is the prescription for Halcion?                                                                                   Yes    No
   [Tech Only: If the answer to this question is no, then may skip to question 3.]

2. Does the patient require more than 10 tablets per month?                                      Yes    No
   [Tech Only: Skip to question 4. **Note:** No authorization is required for 10 tablets or less per 25 days.]

3. Does the patient require more than 14 tablets/capsules per month?                   Yes    No

G:\PA - SQP Tracking\Rebranding Documents\Current Criteria\Sedative-Hypnotic Post Limit 12-2005.doc
Copyright© 2005 Caremark. All Rights Reserved

Confidential and Proprietary

This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.

USW060433

| [Tech Only: **Note:** No authorization is required for up to 14 tablets/capsules or less every 25 days.] | | |
|---|---|---|
| 4.   Does the patient have the diagnosis of chronic insomnia? | Yes | No |
| 5.   Have other causes of sleep disturbance been addressed? | Yes | No |
| 6.   Are the physician and patient aware that sedative-hypnotic agents should not be used on a daily basis long-term? | Yes | No |
| 7.   Is the physician willing to taper the sedative-hypnotic dose of the patient? | Yes | No |
| 8.   Does the patient require more than one tablet/capsule per day? | Yes | No |

### Guidelines for Approval

| Duration of Approval | ONE TIME per 365 days to allow for weaning |
|---|---|
| The approval for more than the limit of 14 tablets/capsules (10 tablets for Halcion) per 25 days is on a one time per year basis to allow patient to wean from the drug. | |

| Set 1 | | Set 2 | |
|---|---|---|---|
| **Approval Quantity** | 20 tablets/capsules | **Approval Quantity** | 42 tablets/capsules |
| **Yes to question(s)** | No to question(s) | **Yes to question(s)** | No to question(s) |
| 1 | 8 | 1 | None |
| 2 | | 2 | |
| 4 | | 4 | |
| 5 | | 5 | |
| 6 | | 6 | |
| 7 | | 7 | |
| | | 8 | |

| Set 3 | | Set 4 | |
|---|---|---|---|
| **Approval Quantity** | 20 tablets/capsules | **Approval Quantity** | 42 tablets/capsules |
| **Yes to question(s)** | No to question(s) | **Yes to question(s)** | No to question(s) |
| 3 | 1 | 3 | 1 |
| 4 | 8 | 4 | |
| 5 | | 5 | |
| 6 | | 6 | |
| 7 | | 7 | |
| | | 8 | |

### BLACK BOX WARNINGS
None

## RATIONALE[8-14]

Insomnia is characterized by difficulty in initiating or maintaining sleep and nonrestorative sleep. Insomnia can be primary or secondary to a variety of medical illnesses, psychiatric disorders, or drug use. Identifying and treating potential underlying conditions are priorities in the treatment of insomnia. In order to treat insomnia, various treatment modalities should be considered, such as, sleep hygiene, sleep restriction, stimulus control, and behavioral therapy, prior to the addition of pharmacotherapy, and continued throughout pharmacotherapy treatment.

The treatment of insomnia should be individualized and is dependent on the differential diagnosis. Although short-term therapy is appropriate for most patients, some patients may benefit from long-term use. Patients with insomnia that occurs several days per week and lasts for more than a month may have chronic insomnia. There are indications that long-term management of chronic insomnia may be beneficial. Long-term management of chronic insomnia is achievable

G:\PA - SOP Tracking\Rebranding Documents\Current Criteria\Sedative-Hypnotic Post Limit 12-2005.doc
Copyright© 2005 Caremark. All Rights Reserved
Confidential and Proprietary
This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.

USW060434

when pharmacotherapy is considered for use only in response to the occurrence of the symptoms, thus permitting long-term therapy without the use of nightly medication.

Five basic principles characterize rational pharmacotherapy for insomnia, especially chronic insomnia.[8-14]
- Use the lowest effective dose
- Use intermittent dosing (two to four times per week)
- Prescribe medication for short-term use (i.e., regular use for no more than three to four weeks)
- Discontinue the medication gradually
- Be alert for rebound insomnia following discontinuation

In addition, the patient should be monitored and evaluated frequently.

Therefore, a limit of 14 tablets per month will be allowed for all the sedative/hypnotic agents with the exception of Halcion. Halcion will have a limit of 10 tablets per month because the drug is prepackaged in bottles of 10. These limits will allow a sufficient quantity of drug for the treatment of chronic insomnia on an intermittent basis as suggested in the current literature and guidelines. The drug limitations will also allow a sufficient quantity of drug to treat insomnia for the recommended short-term therapy of 7 to 10 days. Additionally, these limits will also decrease the risk of habituation, tolerance, adverse events, and misuse.

When hypnotic agents have been used regularly for more than two weeks, a slow taper from the medication is recommended. Because there are patients who have used hypnotics on a daily basis, a post-limit criteria is available to allow a sufficient quantity of drug to taper to the recommended dose of no more than one tablet two to four times per week utilizing the following weaning protocols.

**Protocols:**[15-18]

**Method 1:**
- For patients taking low doses of hypnotics regularly, the initial dose is decreased by 20 percent per week for four weeks. To use this method divide the total daily dose of drug by five and round to a number attainable with available dosage forms. Then, reduce the dose by this number each week:

| Week | Number of Tablets |
|------|-------------------|
| 1    | 6                 |
| 2    | 5                 |
| 3    | 4                 |
| 4    | 3                 |
| 5    | 2                 |

The taper is completed by the end of the fourth week. This schedule can be done with either short half-life or long half-life drugs. Alternatively, short half-life drugs can be switched to a long-half life drug, and then weaning as per protocol can be done. Switching may be considered if the drug is to be completely withdrawn.

- For patients taking high dose hypnotics regularly, the taper begins with a 60 percent reduction in the initial total daily dose and rounding to a number attainable with available dosage forms. Then, the dose is decreased by 10 percent per day throughout the remainder of the schedule.

| Day | Dose |
|-----|------|
| 1   | Reduce total dose by 60% |
| 2   | Reduce day 1 dose by 10% |
| 3   | Reduce day 2 dose by 10% |
| 4   | Reduce day 3 dose by 10% |
| Continue until weaning has been completed | Continue reduction by 10% per day |

G:\PA - SOP Tracking\Rebranding Documents\Current Criteria\Sedative-Hypnotic Post Limit 12-2005.doc
Copyright© 2005 Caremark. All Rights Reserved

Confidential and Proprietary

This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.

USW060435

**Method 2:**

- This method works for both short and long-acting hypnotics. Begin with an initial 25 percent dose reduction for the first week. Reduce the dose by an additional 25 percent for the second week. After this first 50 percent reduction the taper is slowed. The dose should then be decreased by 12.5 percent every four to seven days according to patient tolerance. For patients with high initial doses, the taper may be further slowed during the final 25 percent reduction to 6.25 percent decreases every four to seven days. Depending on the initial dose, in order to wean the patient completely from the drug this taper will take four to eight weeks to complete.

| Week | Dose |
|------|------|
| 1 | Reduce total dose by 25% |
| 2 | Reduce dose by an additional 25% |
| 3- for low dose | Reduce dose by 12.5% every 4 to 7 days until complete |
| 3- for high dose | Reduce dose by 6.25% every 4 to 7 days until complete |

These criteria do not apply to Rozerem. In the clinical trials that evaluated potential rebound insomnia and withdrawal effects, Rozerem was not found to be different from placebo. At this time, Rozerem is not a controlled substance.

<u>ADDITIONAL INFORMATION</u>

**Dosage and Administration:**

**Ambien**
The dose of Ambien should be individualized. The recommended dose for adults is 10 mg immediately before bedtime. Downward dosage adjustment may be necessary when Ambien is administered with agents having known CNS-depressant effects because of the potentially additive effects.

Elderly or debilitated patients may be especially sensitive to the effects of Ambien. Patients with hepatic insufficiency do not clear the drug as rapidly as normals. An initial 5-mg dose is recommended in these patients. The total Ambien dose should not exceed 10 mg.

**Ambien CR**
The dose of Ambien CR should be individualized. The recommended dose of Ambien CR for adults is 12.5 mg immediately before bedtime. Elderly or debilitated patients may be especially sensitive to the effects of Ambien. Patients with hepatic insufficiency do not clear the drug as rapidly as normals. The recommended dose of Ambien CR in these patients is 6.25 mg immediately before bedtime. Ambien CR extended-release tablets should be swallowed whole, and not be divided, crushed, or chewed.

**Dalmane**
Dosage should be individualized for maximal beneficial effects. The usual adult dosage is 30 mg before retiring. In some patients, 15 mg may suffice. In elderly and/or debilitated patients, 15 mg is usually sufficient for a therapeutic response and it is therefore recommended that therapy be initiated with this dosage.

**Doral**
Adults: Initiate therapy at 15 mg until individual responses are determined. In some patients, the dose may then be reduced to 7.5 mg.

Elderly and Debilitated Patients: Because the elderly and debilitated may be more sensitive to benzodiazepines, attempts to reduce the nightly dosage after the first one or two nights of therapy are suggested. Initiate therapy in geriatric patients (> 60 years old) at 7.5 mg; if not effective after one to two nights dosage may be increased to 15 mg.

**Halcion**
It is important to individualize the dosage of Halcion tablets for maximum beneficial effect and to help avoid significant adverse effects. The recommended dose for most adults is 0.25 mg before retiring. A dose of 0.125 mg may be found to be sufficient for some patients (e.g., low body weight). A dose of 0.5 mg should be used only for exceptional patients who

Copyright© 2005 Caremark. All Rights Reserved

Confidential and Proprietary

This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.

USW060436

do not respond adequately to a trial of a lower dose since the risk of several adverse reactions increases with the size of the dose administered. A dose of 0.5 mg should not be exceeded.

In geriatric and/or debilitated patients the recommended dosage range is 0.125 mg to 0.25 mg. Therapy should be initiated at 0.125 mg in this group and the 0.25 mg dose should be used only for exceptional patients who do not respond to a trial of the lower dose. A dose of 0.25 mg should not be exceeded in these patients. As with all medications, the lowest effective dose should be used.

## Lunesta

The dose of Lunesta should be individualized. The recommended starting dose for Lunesta for most non-elderly adults is 2 mg immediately before bedtime. Dosing can be initiated at or raised to 3 mg if clinically indicated, since 3 mg is more effective for sleep maintenance.

The recommended starting dose of Lunesta for elderly patients whose primary complaint is difficult falling asleep is 1 mg immediately before bedtime. In these patients, the dose may be increased to 2 mg if clinically indicated. For elderly patients whose primary complaint is difficulty staying asleep, the recommended dose is 2 mg immediately before bedtime.

Taking Lunesta with or immediately after a heavy, high-fat meal results in slower absorption and would be expected to reduce the effect of Lunesta on sleep latency.

Hepatic:
The starting dose of Lunesta should be 1 mg in patients with severe hepatic impairment. Lunesta should be used with caution in these patients.

Coadministration with CYP3A4 Inhibitors:
The starting dose of Lunesta should not exceed 1 mg in patients coadministered Lunesta with potent CYP3A4 inhibitors. If needed, the dose can be raised to 2 mg.

## ProSom

The recommended initial dose for adults is 1 mg at bedtime; however, some patients may need a 2 mg dose. In healthy elderly patients, 1 mg is also the appropriate starting dose, but increases should be initiated with particular care. In small or debilitated older patients, a starting dose of 0.5 mg, while only marginally effective in the overall elderly population, should be considered.

## Restoril

While the recommended usual adult dose is 15 mg before retiring, 7.5 mg may be sufficient for some patients, and other may need 30 mg. In transient insomnia, a 7.5 mg dose may be sufficient to improve sleep latency. In elderly or debilitated patients, it is recommended that therapy be initiated with 7.5 mg until individual responses are determined.

## Sonata

The dose of Sonata should be individualized. The recommended dose of Sonata for most nonelderly adults is 10 mg. For certain low weight individuals 5 mg may be a sufficient dose. Although the risk of certain adverse events associated with the use of Sonata appears to be dose dependent, the 20 mg dose has been shown to be adequately tolerated and may be considered for the occasional patient who does not benefit from a trial of a lower dose. Doses above 20 mg have not been adequately evaluated and are not recommended.

Sonata should be taken immediately before bedtime or after the patient has gone to bed and has experienced difficulty falling asleep. Taking Sonata with or immediately after a heavy high-fat meal results in slower absorption and would be expected to reduce the effect of Sonata on sleep latency.

Elderly patients and debilitated patients appear to be more sensitive to the effects of hypnotics, and respond to 5 mg of Sonata. The recommended dose for these patients is therefore 5 mg. Doses over 10 mg are not recommended.

Hepatic insufficiency:
Patients with mild to moderate hepatic impairment should be treated with Sonata 5 mg because clearance is reduced in this population. Sonata is not recommended for use in patients with severe hepatic impairment.

G:\PA - SOP Tracking\Rebranding Documents\Current Criteria\Sedative-Hypnotic Post Limit 12-2005.doc
Copyright© 2005 Caremark. All Rights Reserved
Confidential and Proprietary
This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.

USW060437

_Renal Insufficiency:_
No dose adjustment is necessary in patients with mild to moderate renal impairment. Sonata has not been adequately studied in patients with severe renal impairment.

An initial dose of 5 mg should be given to patients concomitantly taking cimetidine because Sonata clearance is reduced in this population.

## CONTRAINDICATIONS/WARNINGS/PRECAUTIONS
**Contraindications:**
Benzodiazepine sedative-hypnotic drugs (e.g., Dalmane, Doral, Halcion, ProSom, Restoril) are Pregnancy Category X and should not be used during pregnancy.

**Warnings:**
Since sleep disturbances may be the presenting manifestation of a physical and /or psychiatric disorder, symptomatic treatment of insomnia should be initiated only after a careful evaluation of the patient. The failure of insomnia to remit after 7 to 10 days of treatment may indicate the presence of a primary psychiatric and/or mental illness, which should be evaluated. Worsening of insomnia or the emergence of new thinking or behavior abnormalities may be the consequence of an unrecognized psychiatric or physical disorder.

A variety of abnormal thinking and behavior changes have been reported to occur in association with the use of sedative-hypnotics. Some of these changes may be characterized by decreased inhibition, similar to effects produced by alcohol and other CNS depressants. Other reported behavior changes have included bizarre behavior, agitation, hallucinations, and depersonalization.

Amnesia, anxiety, and other neuropsychiatric symptoms may occur unpredictably.

In primarily depressed patients, worsening of depression, including suicidal thinking, has been reported in association with the use of sedative-hypnotics. Intentional overdose is more common in this group of patients; therefore, the least amount of drug that is feasible should be prescribed for the patient at any one time.

Following the rapid dose decrease or abrupt discontinuation of any of the sedative-hypnotics, there have been reports of signs and symptoms similar to those associated with withdrawal from other CNS-depressant drugs.

Sedative-hypnotics have CNS depressant effects. Patients should be cautioned against engaging in hazardous occupations requiring complete mental alertness or motor coordination such as operating machinery or driving a motor vehicle after ingestion of the drug, including potential impairment of the performance of such activities that may occur the day following ingestion.

Lunesta, like other hypnotics, has CNS-depressant effects. Because of the rapid onset of action, Lunesta should only be ingested immediately prior to going to bed or after the patient has gone to bed and has experienced difficulty falling asleep.

**Precautions:**
Lunesta should be taken immediately before bedtime. Taking a sedative-hypnotic while still up and about may result in short-term memory impairment, hallucinations, impaired coordination, dizziness, and lightheadedness.

Impaired motor and/or cognitive performance after repeated exposure or unusual sensitivity to sedative/hypnotic drugs is a concern in the treatment of elderly and/or debilitated patients.

Lunesta should be used with caution in patients with diseases or conditions that could affect metabolism or hemodynamic responses.

Sedative/hypnotic drugs should be administered with caution to patients exhibiting signs and symptoms of depression. Suicidal tendencies may be present in such patients, and protective measures may be required. Intentional overdose is more common in this group of patients, therefore, the least amount of drug that is feasible should be prescribed for the patient at any one time.

Drug Interactions

G:\PA - SOP Tracking\Rebranding Documents\Current Criteria\Sedative-Hypnotic Post Limit 12-2005.doc
Copyright© 2005 Caremark. All Rights Reserved
This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.
Confidential and Proprietary

USW060438

- <u>Ethanol</u>
  Sedative-hypnotics show additive effects when combined with alcohol and should not be taken with alcohol.
- <u>CYP3A4 Inhibitors</u>
  CYP3A4 is a major metabolic pathway for the elimination of Lunesta. AUC and half-life are increased with the coadministration of CYP3A4 inhibitors and Lunesta.
- <u>CYP3A4 Inducers</u>
  Racemic zopiclone exposure was decreased by concomitant use of rifampin. A similar effect would be expected with Lunesta (eszopiclone).

<u>Pregnancy</u>
Ambien - Category B
Ambien CR - Category C
Benzodiazepines (e.g., Dalmane, Doral, Halcion, ProSom, Restoril) – Category X
Lunesta - Category C
Sonata - Category C

<u>Pediatric Use</u>
Ambien - has not been established in patients under the age of 18 years
Ambien CR - has not been established in patients below the age of 18 years
Dalmane - the drug is not currently recommended for use in persons under 15 years of age
Doral - has not been established in patients under the age of 18 years
Halcion - has not been established in patients under the age of 18 years
Lunesta - has not been established in patients under the age of 18 years
ProSom - has not been established in patients under the age of 18 years
Restoril - has not been established in pediatric patients
Sonata - has not been established in pediatric patients

## REFERENCES
1. Ambien product information. Sanofi-Synthelabo, Inc. March 2004.
2. Dalmane product information. ICN Pharmaceuticals. September 2001.
3. Doral product information. Wallace Pharmaceuticalss. October 2001.
4. Halcion product information. Pharmacia and Upjohn Company. January 2003.
5. ProSom product information. Abbott Laboratories. December 2004.
6. Restoril product information. Mallinckrodt, Inc. January 2002.
7. Sonata product information. Wyeth Laboratories, Inc. December 2004.
8. Roth T, Hajak G, Ustun TB. Consensus for the pharmacological management of insomnia in the new millennium. IJCP, January/February 2001. 55(1): 42-52.
9. Richardson GS, Roth T. Future direction in the management of insomnia. J Clin Psychiatry. 2001; 62(S10): 39-45.
10. Lippman S, Mazour I, Shahab H. Insomnia: Therapeutic Approach. Southern Medical Journal. 2001; 94(9): 866-873.
11. Chesson A, Harse K, Anderson, WM, et al. Practice parameters for the evaluation of chronic insomnia. Sleep; 2000. 23(2): 1-5.
12. Kupper DJ, Reynolds III CF. Management of insomnia. NEJM. 1997; 36(5): 341-346.
13. Morin CM, Colecchi C, Stone J, et al. Behavioral and pharmacological therapies for late-life insomnia. JAMA. 1999; 281(11): 991-999.
14. McCall, WV. A psychiatric perspective on insomnia. J Clin Psychiatry 2001;62 (S10): 27-32.
15. U.S. Department of Health and Human Services, Public Health Service, Substance Abuse and Mental Health Services Administration, Center for Substance Abuse Treatment; 1998.173 (26).
16. Perry, P, Alexander, B, Lund, BC. Virtual Hospital: Clinical Psychopharmacology Seminar. Detoxification from benzodiazepines: Schedules and strategies. 1996. Revised: April 2004. www.vh.org. Accessed: November 2004.
17. MICROMEDEX. MICROMEDEX Healthcare Series, Drug Consults Volume 113. Benzodiazepine-withdrawal schedule. June 2000. www.micromedex.com. 2005.
18. Rickels, K, DeMartinis, N, Moira, R, Mandos, L. Pharmacologic strategies for discontinuing benzodiazepine treatment. Journal of Clinical Psychopharmacology. 1999; 19(6S2): 12S-16S.
19. Lunesta product information. Sepracor Inc. February 2005.
20. Rozerem product information. Takeda Pharmaceutical Company, Limited. August 2005.

G:\PA - SOP Tracking\Rebranding Documents\Current Criteria\Sedative-Hypnotic Post Limit 12-2005.doc
Copyright© 2005 Caremark. All Rights Reserved

Confidential and Proprietary
This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.

USW060439

21. Ambien CR product information. Sanofi-Synthelablo. September 2005.

Written by:      Georgette Patrin, R.Ph
Date Written:    1/1998
Last Revised:    Leslie Schroeder, R.Ph. 09/1999; Jacque Griffith Pharm.D. 08/2002; 07/2003; Nikki Berry, R.Ph. 11/2004; Jacque Griffith, Pharm.D.
                 01/2005; 07/2005; 09/2005; Andrew Kirklys, Pharm.D. 12/2005
Reviewed:        CRC: 7/1998, 09/1999; 09/2002; CDPR 11/2004, 01/2005, 09/2005, 12/2005
                 External Review: 08/2002; 08/2003; 01/2005; 05/2005; 11/2005

---

*The Participating Group signed below hereby accepts and adopts as its own the criteria for use with Prior Authorization,*
*as administered by Caremark.*

_____          _____

Signature                                          Date

_____

Client Name

G:\PA - SOP Tracking\Rebranding Documents\Current Criteria\Sedative-Hypnotic Post Limit 12-2005.doc
Copyright© 2005 Caremark. All Rights Reserved
                                                    Confidential and Proprietary
This page contains prescription brand name drugs that are registered or trademarks of pharmaceutical manufacturers that are not affiliated with Caremark Inc.

9



**Alcoa**

NEW UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This is to confirm our understanding that new drug classes shall not be added to Prescription Drug Utilization Management programs without the mutual agreement of both parties; such agreement shall not be unreasonably withheld.

The parties will annually review pharmacy claims and utilization experience in an effort to determine whether new drug classes should be added. In the conduct of such an evaluation, the parties shall consider safety, effectiveness, potential for abuse or misuse, cost savings and the disruption to Participants.

If the Company believes new drug classes should be added to such programs, it will meet with the Union, and provide the Union with supporting materials, applicable plan claims and utilization data, and copies of the proposed criteria to be used by the Claims Administrator. In the event that the parties are unable to agree, the matter will be referred to the respective Chairs of the Company and Union Negotiating Committees.

In addition, upon request, the Company will provide the International Union with copies of the criteria used by the Claims Administrator in administering the Prescription Drug Utilization Management Programs. It is understood that this criteria is the confidential and proprietary property of the Claims Administrator and is not to be used for any purpose other than an International Union periodic review of program administration.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

NEW UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
*Chairman of the Alcoa Master Bargaining Committee*
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This letter sets forth the policy that the Claims Administrator will apply in cases where a pharmacy claim is submitted by, or on behalf of an employee, retiree or dependent who is confined to a skilled nursing facility, or resides in a long term care residence, that maintains a policy limiting the use of prescription medications to "blister packs" or a similar limitation that either prevents the member from using medications dispensed through the Claims Administrator's mandatory mail-order program, or prevent the Claims Administrator from dispensing medications in a quantity or form that meets the facility's specifications.

For these specific cases, a mandatory mail order over ride will be applied after the skilled nursing facility or long term care residence provides the Claims Administrator with a satisfactory reason as to why mail service cannot be utilized for a specific participant.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060442

**ATTACHMENT II:    Sickness & Accident & Life Insurance**

The following increases would be effective on:

| Grades | 5-Jun-06 Increase | 4-Jun-07 Increase | 2-Jun-08 Increase | 1-Jun-09 Increase |
|---|---|---|---|---|
| 1-4 | $1 | $10 | $1 | $10 |
| 5-8 | $2 | $10 | $2 | $10 |
| 9-12 | $3 | $10 | $3 | $10 |
| 13-16 | $6 | $10 | $6 | $10 |
| 17–20 | $9 | $10 | $9 | $10 |
| 21–24 | $12 | $10 | $12 | $10 |
| ≥ 25 | $15 | $10 | $15 | $10 |

**LIFE INSURANCE IMPROVEMENT**

Life Insurance for active and pre age 62 retirees will be increased from $40,000 to $44,000.

USW060443



**Alcoa**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

### RETIREE HEALTH CARE

Effective January 1, 2007 and through December 31, 2010, the Company will maintain its program of medical and prescription drug benefits ("Program") for post May 31, 1993 retirees, spouses and surviving spouses of retirees from the "USW Locations" listed below ("Current Participants"), and "Other USW Locations" listed below ("Other Participants") (Current Participants and Other Participants are herein referred to as "Participants") subject to the modifications to the Program and required individual Participant premiums summarized on Appendix A. Notwithstanding anything to the contrary, the Current Participants and claims costs attributable to Frederick, MD (Eastalco) shall be limited to post October 1, 2001 retirees, spouses and surviving spouses of retirees, and such Participants shall be covered by the Program, effective January 1, 2007. Non-spouse eligible dependents will also continue to be eligible for coverage under the Program, but will not be treated as "Participants" for purposes of this Agreement.

**<u>Guaranteed Company Contributions</u>**
Notwithstanding the foregoing, and disregarding the Medicare Part B premium reimbursements provided for on Appendix A, the annual per capita cost of the Company under the Program will be limited to the following amounts: $7,767 for each pre-Medicare Current Participant, and $6,121 for each pre-Medicare Other Participant ("Pre-Medicare Caps"), $3,389 for each post-Medicare Current Participant, and $2,334 for each post-Medicare Other Participant ("Post-Medicare Caps") (the Pre-Medicare Caps and Post-Medicare Caps together are the "Cap").
Notwithstanding the above, the annual per capita cost of the Company under the Program for the Frederick MD (Eastalco) facility will be limited to the following amounts: $6,341 for each pre-Medicare Participant, and $2,962 for each post-Medicare Participant.

**<u>Number of Participants and Participant Categories:</u>**
For the purposes of this agreement, Participants shall be divided into the following categories:

A.    Pre-Medicare USW Locations

B.    Medicare Eligible USW Locations

C.    Pre-Medicare Other Locations

D.    Medicare Eligible Other Locations

*ATTAchment E*
*Retiree Health*
*Care*

*JQ SR*
*12/06/06*

USW060444

Mr. Jim Robinson
June 1, 2006
Page 2

## Benefit Plans
For all Participants, the Program shall be as follows:

Participants under age 65 who are not eligible for Medicare are covered under the same medical and prescription drug coverage (excluding premiums) as outlined in the June 1, 2006 Settlement Agreement between the parties covering USW Master Agreement Locations.

Participants age 65 and over or who are eligible for Medicare are covered under the same prescription drug coverage (excluding premiums) as outlined in the June 1, 2006 Settlement Agreement between the parties covering USW Master Agreement Locations. The medical coverage for such participants shall remain unchanged.

## Participant Premiums
Participant premiums, as summarized on Appendix A, and plan redesign will be used to reduce the overall cost of the Program for all Participants covered by this Program. The parties agree to discuss any increases to the premiums during the term of this agreement.

## Variable Company Contributions
### Medicare Subsidy Contribution
The Company agrees to provide an annual contribution equal to 50% of the Medicare Part D Subsidy projected to be received by the Company for the Participants covered by this agreement for the period June 1, 2006 through May 31, 2010, subject to adjustment for the actual amount received ("Medicare Subsidy Contribution"). The Medicare Part D Subsidy will be based on the Company's actual reimbursement reduced by external administrative expenses relating to the collection of the subsidy. For the term of this agreement, the Medicare Subsidy Contribution will be contributed to the Account, as described below and used to reduce the cost of this Program.

### Performance Contribution
Finally, in addition to Participant premiums, the Cap, and the Medicare Subsidy Contribution, the Company will provide a Performance Contribution ("Performance Contribution"), which shall consist of a Fixed Performance Contribution and a Variable Performance Contribution.

The Company agrees to make a fixed contribution of $30 million ("Fixed Performance Contribution").

The "Variable Performance Contribution" shall be equal to $2,375 per 3 month period ($9,500 annual equivalent) for each dollar the average 3 month price of aluminum is greater than $1,900 per metric tonne, but less than or equal to $2,500 per metric tonne, and $3,000 over 3 month period ($12,000 annual equivalent) for each dollar the average price of aluminum is greater than $2,500 per metric tonne. The average price will be determined by taking the 3 month average of the London Metal Exchange daily cash settlement prices (i.e. daily cash offered price) for high grade aluminum for each market day during the applicable 3 month period beginning on June 1, 2006 through May 31, 2010 as published by The Wall Street Journal.

USW060445

Mr. Jim Robinson
June 1, 2006
Page 3

The Performance Contribution will be credited to a non-interest bearing record keeping account. The Company agrees to a minimum Variable Performance Contribution of $20 million with a maximum Variable Performance Contribution of $50 million.

Notwithstanding the foregoing, employees hired on or after June 1, 2006 will not be eligible for the Medicare Subsidy Contribution or the Performance Contribution or any Medicare Part B reimbursement.

<u>Retiree Health Care Account</u>
The Company agrees to create a non-interest bearing account ("the Account") which shall be the sum of: (i) Participant Premiums, (ii) Medicare Subsidy Contributions, and (iii) Performance Contributions. The balance of the Account will apply beyond 2010, to offset costs for the Program until the account is exhausted.

<u>Program Costs</u>
In the event that prior to December 31, 2010, in a given Measuring Period the average projected per capita claims cost of the Program (including administrative expenses) exceeds the sum of: (i) the amount of the Cap, and (ii) the per capita share of the Account, the excess cost will be borne by the Participants. Their participant premiums will be increased for any excess costs of the Program.

<u>Per Capita Claims Cost Determination</u>
For purposes of determining the per capita claims cost of the Program, prior to June 1, 2007 and each July 1 thereafter, the Company will:

(i)      Collect medical and prescription drug claims with dates of service during the most recent consecutive twelve-month period from January 1 through December 31 ("Measurement Period") and paid through the end of February 28 of the following year. The medical claims will be adjusted to reflect changes in plan design, and claims incurred during the Measurement Period but not paid as of February 28 of the following year (prescription drug claims will be assumed fully incurred as of February 28). This adjustment will be based on a factor developed from medical claims incurred during the prior Measurement Period and paid through the end of the current measurement period, as compared to the amount paid through February 28 of the current Measurement Period.

(ii)      Determine annual costs on a per Participant basis by dividing the incurred claims by the weighted average number of Participants enrolled in the Program during the Measurement Period. While claims for other non-spouse eligible dependents will be used in the calculation, non-spouse eligible dependents will not be included in the denominator in the 'per Participant' cost calculation.

(iii)      Project the Measurement Period's incurred claims costs into the target calendar year (the year these costs will be used for contributions) using appropriate medical and prescription drug trend rates as defined by Hewitt Associate's (or its successor's) internal trend expectations and the appropriate number of months of trend.

3

USW060446

Mr. Jim Robinson
June 1, 2006
Page 4

(iv)    Add administrative costs to the incurred claims. These administrative costs will be those established by the claim and benefit outsourcing administrators and subject to review for reasonableness.

(v)    Develop the appropriate per capita claims cost per Participant. The claims data and enrollment counts should be based on all Participants enrolled in the plan during the Measurement Period. These calculations will be performed separately for pre-Medicare and post-Medicare eligible Participants. The parties will evaluate whether it is appropriate to merge plan experience for Current Participants and Other Participants.

The foregoing information will be provided to the Union by May 1 of the prior year to which the per capita claims cost data will apply. Within 30 days of delivering the foregoing information, the Union will inform the Company of any dispute it may have as to the data.

## Reconciliation
In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is less than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be added to the Account.

In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is greater than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be deducted from the Account.

## Dispute Resolution
The International Union, through the Chair of its Negotiating Committee or his/her designee, will have the right to review any information, calculation or other matters concerning this Agreement. In the event of a dispute between the parties regarding this agreement, the Chairman of the Employee Relations Council (ERC) and the President of the International Union, or his/her designee, will attempt to reach an agreement to resolve the discrepancy. Should the parties be unable to resolve the dispute, they will select an independent Third Party with the appropriate expertise relative to the dispute, to review each party's position related to the issue being disputed and to render a written opinion concerning the issue by July 1 of the year in question. In no event will a dispute delay the Company's annual enrollment process, but the dispute resolution will be applied through prospective adjustments to the Program. The opinion rendered by the Third Party will be final and binding on both parties. However, the opinion will not be cited by either party with respect to any other issue except ones relating to this Agreement. The costs associated with the Third Party will be borne equally by the parties.

## Deferral and Re-enrollment
Participants may elect to defer participation in the Program based on the availability of other health care coverage. Participants who lose coverage from other sources will be allowed to enroll (or reenroll) in the Program immediately upon notice and payment of the applicable premium. Participants who elect to defer participation will be given the opportunity to enroll (or reenroll) in the Program during the next annual enrollment period.

4

Mr. Jim Robinson
June 1, 2006
Page 5

Participants who withdraw or whose coverage is terminated for failure to make the required premium contribution, will be allowed to enroll (or reenroll) in the Program after six months without coverage under the Program.

**Communication**
The parties will, in good faith, attempt to develop a joint communications strategy to notify Participants of the changes to the Program and applicable premiums by September 1, 2006.

**Litigation**
Agreement pertaining to closed and sold locations is contingent upon withdrawal and settlement of pending lawsuit.

**Collective Bargaining Obligation**
The parties agree that the subjects of Participant Premium, plan design, Medicare Subsidy Contribution and Performance Contributions set forth in this letter will be mandatory subjects of bargaining in any negotiations commencing prior to December 31, 2010.

| USW Locations: | Other USW locations: |
|---|---|
| Alcoa, TN | Listerhill, AL |
| Badin, NC | Bellwood, VA Extrusions Plant |
| Baton Rouge, LA | Bristol, VA End Plant |
| Bauxite, AR | Corpus Christi, TX |
| Davenport, IA | Fort Meade, FL |
| Gum Springs, AR | Houston, TX Can Plant |
| Hot Springs, AR | Kansas City, MO Can Plant |
| Lake Charles, LA | Longview, WA |
| Lafayette, IN | Louisville, KY Plant 3 |
| Lebanon, PA | Chicago, IL |
| Louisville, KY Plants 1 & 15 | Richmond, IN |
| Massena, NY East and West Plants | Salisbury, NC Can Plant |
| Point Comfort, TX | Seattle, WA Can Plant |
| Richmond, VA | Tampa, FL Can Plant |
| Rockdale, TX | Torrance, CA Extrusions Plant |
| Troutdale, OR | |
| Warrick, IN | |
| Wenatchee, WA | |
| Mobile, AL | |
| Frederick, MD (Eastalco) | |

Very truly yours,


Joseph Quaglia, Jr.                 Confirmed:_____
Director, Industrial Relations                  Jim Robinson


5

USW060448

Mr. Jim Robinson
June 1, 2006
Page 6

## APPENDIX A

**MONTHLY PREMIUM CONTRIBUTIONS THROUGH DECEMBER 31, 2010**
**CURRENT PARTICIPANTS.**
Pre Medicare - $75 per participant (each retiree, spouse, or surviving spouse)
Post Medicare - $40 per participant (each retiree, spouse, or surviving spouse)
**OTHER PARTICIPANTS.**
Pre Medicare - $150 per participant (each retiree, spouse, or surviving spouse)
Post Medicare - $75 per participant (each retiree, spouse, or surviving spouse)


**MEDICARE PART B PREMIUM REIMBURSEMENT:**

All Medicare Part B reimbursements are capped at current amounts:

| | |
|---|---|
| Participants enrolled on or after June 1, 1993 but prior to January 1, 1994 | $88.50 |
| Participants enrolled on or after January 1, 1994 but prior to April 1, 2002 | $46.10 |
| Participants (excluding new hires after June 1, 2006) enrolled on or after April 1, 2002 | $88.50 |
| New hires on or after June 1, 2006 | None |
| Participants enrolled from the Frederick MD (Eastalco) facility | $50 |

6

USW060449

# COST OF LIVING ADJUSTMENT (COLA)

- USW Master Contract Plants (Tennessee, Rockdale, Point Comfort, Badin)
- Hot Springs
- Gum Springs

1. For purposes of this Agreement:

"Consumer Price Index" refers to the "Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) -- United States -- All Items (1967 = 100)" published by the Bureau of Labor Statistics, U.S. Department of Labor.

"Consumer Price Index Base" shall be determined as follows:

(i) For the **June 5, 2006, September 4, 2006, December 4, 2006, and March 5, 2007** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January 2006 published by BLS in February 2006 as 577.7, multiplied by 103.0%.

(ii) For the **June 4, 2007, September 3, 2007, December 3, 2007, and March 3, 2008** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January 2007, multiplied by 103.0%.

(iii) For the **June 2, 2008, September 1, 2008, December 1, 2008, and March 2, 2009** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January 2008, multiplied by 103.0%.

(iv) For the **June 1, 2009, September 7, 2009,  December 7, 2009 , and March 1, 2010** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January 2009, multiplied by 103.0%.

"Adjustment Dates" are **June 5, September 4, and December 4, 2006; March 5, June 4, September 3, and December 3, 2007; March 3, June 2, September 1, and December 1, 2008; March 2, June 1, September 7, and December 7, 2009; and March 1, 2010.**

"Change in the Consumer Price Index" is defined as the difference between (i) the Consumer Price Index Base and (ii) the Consumer Price Index for the second calendar month next preceding the month in which the applicable Adjustment Date falls.

ATTACHment F
COLA

12/06/6

1.

USW060450

2. Cost-of-Living Adjustment: Effective on each Adjustment Date a Cost-of-Living Adjustment equal to 1¢ per hour for each full .3 of a point change in the Consumer Price Index shall be calculated. In calculating the adjustments, if any, for **June, September and December 2006 and March 2007,** there shall be added to the calculated amount a fixed carryover amount of **$1.496.** In calculating the adjustments, if any, for **June, September, and December 2007,** and **March 2008,** there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment, if any, which was payable on **March 5, 2007.** In calculating the adjustments, if any, for **June, September, and December 2008,** and **March 2009,** there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment , if any, which was payable on **March 3, 2008.** In calculating the adjustments, if any, for **June, September, and December 2009,** and **March 2010,** there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment, if any, which was payable on **March 2, 2009.**

Effective on each Adjustment Date, the Cost-of-Living Adjustment as determined above shall become payable for all hours worked by an hourly-rated employee until the next Adjustment Date. The Cost-of-Living Adjustments under this paragraph shall be considered an "add-on" and shall not be deemed part of the employee's standard hourly rate. Such adjustment shall be included with the hourly rate only in the calculation of pay for hours worked (including overtime hours) and allowed time in accordance with the applicable articles of the Collective Bargaining Agreement.

3. Should the monthly Consumer Price Index in its present form and on the same basis as the Index published for **January 2006** become unavailable, the parties shall attempt to adjust this Section or, if agreement is not reached, request the Bureau of Labor Statistics to provide an appropriate conversion of adjustment, which shall be applicable as of the appropriate Adjustment Date and thereafter.

USW060451

# COST OF LIVING ADJUSTMENT (COLA)

- Former ABG Master (Massena West, Davenport, Warrick, Lafayette)
- Massena East
- Wenatchee

1. For purposes of this Agreement:

"Consumer Price Index" refers to the "Consumer Price Index for Urban Wage Earners and Clerical Workers (CPI-W) -- United States -- All Items (1967 = 100)" published by the Bureau of Labor Statistics, U.S. Department of Labor.

"Consumer Price Index Base" shall be determined as follows:

(i)  For the **June 5, 2006, September 4, 2006, December 4, 2006, and March 5, 2007** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January **2006** published by BLS in February **2006** as **577.7**, multiplied by **103.0%**.

(ii)  For the **June 4, 2007, September 3, 2007, December 3, 2007, and March 3, 2008** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January **2007**, multiplied by **103.0%**.

(iii)  For the **June 2, 2008, September 1, 2008, December 1, 2008, and March 2, 2009** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January **2008**, multiplied by **103.0%**.

(iv)  For the **June 1, 2009, September 7, 2009,  December 7, 2009 , and March 1, 2010** Adjustment Dates, the Consumer Price Index Base refers to the Consumer Price Index for the month of January **2009**, multiplied by **103.0%**.

"Adjustment Dates" are **June 5, September 4, and December 4, 2006; March 5, June 4, September 3, and December 3, 2007; March 3, June 2, September 1, and December 1, 2008; March 2, June 1, September 7, and December 7, 2009; and March 1, 2010.**

"Change in the Consumer Price Index" is defined as the difference between (i) the Consumer Price Index Base and (ii) the Consumer Price Index for the second calendar month next preceding the month in which the applicable Adjustment Date falls.

JS
JP
12/06/06

1.

USW060452

2. Cost-of-Living Adjustment: Effective on each Adjustment Date a Cost-of-Living Adjustment equal to 1¢ per hour for each full .3 of a point change in the Consumer Price Index shall be calculated. In calculating the adjustments, if any, for **June, September and December 2006 and March 2007,** there shall be added to the calculated amount a fixed carryover amount of **$1.17.** In calculating the adjustments, if any, for **June, September, and December 2007,** and **March 2008,** there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment, if any, which was payable on **March 5, 2007.** In calculating the adjustments, if any, for **June, September, and December 2008,** and **March 2009,** there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment , if any, which was payable on **March 3, 2008.** In calculating the adjustments, if any, for **June, September, and December 2009,** and **March 2010,** there shall be added to the calculated amount an amount equal to the Cost-of-Living Adjustment, if any, which was payable on **March  2, 2009.**

Effective on each Adjustment Date, the Cost-of-Living Adjustment as determined above shall become payable for all hours worked by an hourly-rated employee until the next Adjustment Date. The Cost-of-Living Adjustments under this paragraph shall be considered an "add-on" and shall not be deemed part of the employee's standard hourly rate. Such adjustment shall be included with the hourly rate only in the calculation of pay for hours worked (including overtime hours) and allowed time in accordance with the applicable articles of the Collective Bargaining Agreement.

3. Should the monthly Consumer Price Index in its present form and on the same basis as the Index published for **January 2006** become unavailable, the parties shall attempt to adjust this Section or, if agreement is not reached, request the Bureau of Labor Statistics to provide an appropriate conversion of adjustment, which shall be applicable as of the appropriate Adjustment Date and thereafter.

USW060453


**ALCOA**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212 5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 2006 negotiations, the parties discussed the subject of employment security and agreed as follows.

Alcoa will strive to provide employment security as set forth herein, to employees of the Company who have two or more years of Company seniority on June 1, 2006, or attain two or more years of Company seniority during the term of the 2006 Labor Agreement.

There will be no layoff in any plant for employees defined above unless the proposed layoff exceeds ten percent (10%) of the work force or 35 bargaining unit employees, whichever is less. In the event application of the preceding sentence provides for a layoff at a particular location, prior to implementing the layoff the Company will first offer voluntary quit packages consisting of $400 for each full year of Company seniority and $10,000. Quit packages will be offered to employees actively employed in the plant by seniority, subject to skill sets needed to maintain efficient operation of the plant, and may not all be granted at the same time so that the Company can manage operation of the affected plant. If at least 75 percent of the reduction needs are met through this voluntary quit provision, there will be no layoff from the plant. However, if this level of reduction is not met through the voluntary quit package, the Company retains the right to reduce the work force to the necessary levels. The acceptance of the voluntary quit package shall terminate the seniority of the employee, with no right of re-employment.

The employment security commitment as set forth by the above provisions is applicable for the duration of the 2006 Labor Agreement.

The commitments set forth above will not apply in the event of Acts of God, terrorism, strikes, war or other force majeure events. Nothing in this commitment shall impact the Company's right to declare a plant, department or substantial portion thereof as being shut down, in which case the above provisions will not apply.

Moreover, the parties agree that the provisions of this Letter of Understanding are subject to the grievance and arbitration procedure set forth in this Labor Agreement.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

ATTachment G
Employment
Security

Confirmed: _____
Jim Robinson



**Alcoa**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter will confirm the agreement reached during 2006 negotiations that consistent with the parties intent and the Company's commitment to employment security, the Company will not contract out work for performance within the plant that is currently performed by bargaining unit employees if such contracting out would directly result in the layoff from the plant of an employee who has two (2) or more years of Company seniority on June 1, 2006 or who attains two (2) or more years of Company seniority during the term of the 2006 Labor Agreement.

Disputes concerning this letter at the facilities located in Alcoa, TN; Badin, NC; Bauxite, AR; Pt. Comfort, TX; Rockdale, TX; Davenport, IA; Lafayette, IN; Massena, NY (West Plant); Warrick, IN; and Wenatchee, WA, shall be subject to the grievance procedure but shall not be subject to arbitration. No strike, work stoppage, or lockout will be caused or sanctioned until negotiations have continued for at least five (5) days at the final step of the bargaining procedure described in the procedure for handling grievances. Thereafter, any strike which occurs under such circumstances shall not be deemed to be a violation of the Agreement applicable to the location, which shall continue to remain in full force notwithstanding such strike.

Disputes concerning this letter at the facilities located in Hot Springs, AR; and Gum Springs, AR, shall be subject to the grievance procedure but shall not be subject to arbitration. No strike or lockout will be caused or sanctioned until negotiations have continued for at least ten (10) days in accordance with the procedure set forth in Article XVIII, Section 7 of the Agreement applicable to each location. Thereafter, any strike which occurs under such circumstances shall not be deemed to be a violation of the Agreement applicable to the location, which shall continue in effect during such strike.

Disputes concerning this letter at Louisville Plant #1 and Louisville Plant #15, Louisville, KY; and the facility located in Richmond, VA, shall be subject to the procedure set forth in Article XXIX, Section 2 of the Agreement applicable to each location.

Disputes concerning this letter at the East Plant facility, Massena, NY, shall be subject to the procedure set forth in Article VI, Section 3 of the Agreement applicable to the East Plant facility, Massena, NY.

Very truly yours,

*Joe Q.*

Joseph Quagha, Jr.
Director, Industrial Relations

Confirmed: *Jim Robinson*
                    Jim Robinson

*ATTAchment #
Contracting Out/
Employment Security*

USW060455



**ALCOA**

NEW UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The Company shall offer employees the opportunity to participate in the Alcoa Savings Plan for
Bargaining Employees (the "Plan").

The Company shall match employee pre-tax contributions up to 6% of eligible pay as follows:

- 75% matching contribution percentage at Davenport, Lafayette, Massena East, Massena
  West, Richmond, Warrick and Wenatchee;

- 50% matching contribution percentage at Alcoa, Badin, Bauxite, Gum Springs, Hot
  Springs, Louisville #15, Point Comfort and Rockdale; and

- 25% matching contribution percentage at Louisville #1.

The Company does not match any portion of bonus, variable pay, Pay for Performance or other
similar payments.

It is acknowledged and agreed that other than the increase or decrease of the Company Match,
the Plan's administration and participants' rights under the Plan shall be concurrent with the
administration and participants' rights under the Alcoa Savings Plan for Non Bargaining
Employees.  In addition, it was agreed that the description of the United Steelworkers Hourly
401(k) plan will be updated to reflect the changes to the plan on or before March 31, 2007 as
administratively feasible.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
              Jim Robinson

ATTAchment I

401(k) match
Allocation

JQ
12/06

### JOINT EFFORTS AGREEMENT

1. The Company and Union hereby agree to establish a jointly administered public policy fund (Public Policy Fund) meeting the following guidelines.

   a. Purpose and Mission: The purpose of the Fund shall be to:

      (1) support public policies promoting the specific interests of the Alcoa plants represented by the Union on such subjects as energy, health care, currency valuation, and other matters of importance to the parties that promote the long-term viability of these locations and security for the workforce; and

      (2) to contribute to and promote greater cooperation between labor and management; and

      (3) to assist the Company and Union in solving problems of mutual concern that are not susceptible to resolution through collective bargaining.

   b. The Public Policy Fund will pursue its mission through labor-management cooperative endeavors such as public and political education, issue advocacy, research and the coordination of such activities with other likeminded groups.

   c. The Public Policy Fund shall not make political contributions nor become involved in political campaigns.

   d. The Public Policy Fund will conduct its work in a non-partisan manner.

   e. The Fund will have a six-person Governing Committee, with three members of the Committee appointed by the Chief Executive Officer of the Company and three by the International President of the Union.

   f. The Public Policy Fund will be financed through an accrual account based on $0.54 for each ton of product shipped from locations covered by this agreement to third parties.

   g. All activities of the Public Policy Fund and expenditures from the Public Policy Fund shall be subject to approval by the Governing Committee.

   h. The Governing Committee will develop a report form to track accrued obligations and expenditures on a regular basis.

2. Industry-Wide Committee

   a. The Company agrees to join an Industry-Wide Labor/Management Committee (IWC) effective on the agreement of at least one other major aluminum Company's agreement to join such committee.

USW060457

b. The parties agree that the IWC will serve as a focal point for industry-wide joint activities as agreed to by the parties. The parties will continue to pursue other activities separately as appropriate.

c. The IWC will have a Governing Board consisting of an equal number of Union and Company representatives. The Board will be co-chaired by the President of the USW and a CEO (or his designee) selected by the participating companies.

d. All activities conducted under the banner of the IWC shall be approved by the Governing Board.

**Language to replace current Skills Assessment language in the Cooperative Partnership Agreement.**

## WORKFORCE TRAINING AND SKILLS ASSESSMENT

**Objective**
1. To develop and maintain the highly skilled workforce needed to meet the demands of the ever changing competitive environment through providing employees with the training necessary to meet those demands.

**Study of Workforce Training Needs**
Within six (6) months of the effective date of the Labor Agreement, each Plant Steering Committee shall complete a report (Report) of the expected training needs of the workforce over the term of this Labor Agreement, given the objective set forth above. The Report shall include each of the items listed below.

1. an age and service profile and the anticipated attrition rates of the workforce over the term of this Labor Agreement compared to the anticipated workforce needed over the term of this Labor Agreement.

2. an assessment of the current skill levels necessary for the plant workforce compared to the skill levels necessary for the workforce and any training practices or programs necessary to bring the skill level of the current workforce into alignment with the skill levels currently necessary.

3. an evaluation of the appropriateness of existing training programs and the necessity of developing additional training programs, giving due consideration to changing technology and anticipated future skill needs.

4. an examination of methods by which productivity can be improved through additional training of employees.

5. an examination of the plant's business plan, including projected capital spending, planned or potential new technology or technological change and other relevant factors.

Based on its findings the Plant Level Steering Committee will develop recommendations and a timetable for implementation of a training program in light of the findings in the Report and the objective outlined above. Such report may include separate statements by the parties with respect to any finding or recommendation as to which they disagree.

**Updates**
Annually, after the initial report, each Plant Steering Committee will submit a report to the Top Level Committee that:

ATTAchment K
work Force Training
&
1.    Skills Assessment

JQ
12/06/10

USW060459

1. Updates the implementation status, including the implementation timetable, of each item contained in the original report.

2. Identifies modifications necessary to the original findings and/or recommendations and/or new findings and/or recommendations necessitated by changed circumstances.

**<u>Action by Business Unit Leader</u>**
Within thirty (30) days of receipt of the report or update from the Plant Steering Committee, the appropriate business unit leader and the relevant District Director or his designee shall meet to resolve any issues on which the Plant Steering Committee has been unable to agree.

2.

USW060460



**Alcoa**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

*ATTachment L*
*Unexpected Forced*
*Overtime*

Dear Mr. Robinson:

During the 2006 Negotiations the parties discussed the issues that can result when employees work extended hours and are unexpectedly "forced" to work hours beyond their regularly scheduled shifts. The parties agreed that extended work hours and forcing employees to unexpectedly work overtime is undesirable. Over the years, the parties have diligently pursued the elimination of all causes of accidents and injuries in the workplace. Toward this end, the parties have committed to the identification of the causes of these upset conditions and then working together in an effort to identify ways to minimize both excessive work hours and unexpected "forced" overtime.

Within ninety (90) days of ratification each location will conduct a thorough review of the current overtime situation. Both parties are committed to having open and honest dialogue to identify the root causes of excessive work hours and unexpected forced overtime. The parties shall explore and attempt to solve to the root cause, at a minimum, the following potential causes of extended work hours and/or unexpected forcing:

| | |
|---|---|
| Absenteeism/Employee Availability | Vacation Scheduling |
| Transfers/Job Bidding | Work Schedules |
| Business Seasonality/Cyclicality | Employment Levels |
| Equipment Reliability | Retirements |
| Upgrades | Customer Commitments |
| Training | Attrition |

The parties shall also develop 90 day plans for minimizing excessive work hours and unexpected "forced" overtime. The Location Manager and Local Union President at each plant covered by this Agreement shall conduct a quarterly review concerning the progress towards those plans.

Beginning September 1, 2006, each location covered by this Agreement will implement guidelines restricting employees from being unexpectedly forced to work overtime more than five (5) shifts in a rolling four (4) week period. During any seven (7) day scheduling period, should the percentage of voluntary overtime for the involved distribution unit fall by 10% or more below the prior calendar year's average the forced overtime limits for that period will not apply. There may also be circumstances necessitating the suspension of the limitation described above. Examples of such situations include, but are not limited to such things as: significant

USW060461

Mr. Jim Robinson
June 1, 2006
Page 2

environmental, health or safety incidents or significant customer impact, etc. Additionally, no employee shall be unexpectedly forced to work more than two (2) shifts in any seven (7) day scheduling period.

Finally, the parties agree that the Top Level Committee shall bi-annually review the information provided by the location to ensure compliance with the spirit of the commitment.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060462



**ALCOA**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During our 2006 negotiations, the parties agreed to establish an incentive program that will encourage employees to give advance notice of their intent to retire from the Company.

Accordingly, an employee who provides three (3) full months of advance written notice of the employee's intent to retire under one of the following retirement options shall receive at the time of retirement a payment of $500, less applicable tax deductions: Normal; 62/10; 60/10; or 30-year. The $500 payment will not be applicable to an employee who receives a voluntary quit package and/or retirement incentive package.

An employee wishing to qualify for this incentive payment must complete and return a retirement notice (form to be provided by the Company) to his/her local Human Resources Department three (3) full months before the date of retirement.

In accordance with the existing retirement process, the employee also must file an application form with the Alcoa Retirement Service Center anytime after he/she becomes eligible to retire under the retirement benefit provisions identified above (or is within ninety (90) days of becoming eligible to retire under such retirement benefit provisions) to begin the retirement process.

An employee who submits a retirement notice to the local Human Resources Department as described herein, and who later decides not to retire as stated on the submitted notice, will be disqualified from future participation in this incentive program.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

ATTAchment M
Retirement
Notification
Incentive



NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 2006 negotiations, the parties discussed the Total Productive Maintenance (TPM) program. A critical component of the TPM program includes the team-based approach to clean and inspect equipment and the surrounding work area and involves production and maintenance employees as well as supervisors, engineers and other members of management. The parties agree that the participation of supervisors, engineers and other members of management in the cleaning and inspecting of equipment and the surrounding work area as part of a scheduled TPM event is not a violation of this Agreement.

Moreover, the parties agree that participation by non-bargaining unit employees in scheduled TPM events as set forth above is non-precedent setting and will not apply or be cited by the Company relative to any other program or process.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

ATTACHMENT N
TPM EVENTS



NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 2006 negotiations, the parties agreed to modify the Workforce Training and Skills Assessment provisions of the Cooperative Partnership Agreement.

The modification requires an assessment of skill levels, training programs, etc. be completed by the local parties within six (6) months of the effective date of the Labor Agreement and that based on the assessments, each Plant Steering Committee submit an initial report of their findings and recommendations to the Top Level Committee.

After reviewing the reports from each plant, the parties recognize that it may be necessary to provide additional resources to aid in the implementation of the recommendations of the local parties.  Therefore, as part of the process of reviewing the reports of the Plant Level Steering Committees, the parties will evaluate the need for an additional training resource.  If it is agreed that such a resource is necessary, they will mutually agree to the selection of the resource. Should it be agreed that an additional training resource is necessary prior to the review of the Plant Level Steering Committee reports, the parties may mutually agree to the selection of the resource at that time.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

*Attachment O*
*Training Resource*
*Evaluation*

USW060465





NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During 2006 Negotiations, the parties entered into a Letter of Understanding regarding restrictions on interdepartmental transfers.   The parties recognize there are existing local agreements addressing interdepartmental transfers and agree that the Letter of Understanding referenced above does not affect these existing local agreements except as the local parties may otherwise agree.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

ATTAchment P
Transfer/Recall
Letters

USW060466



**ALCOA**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the negotiation of the 2006 Labor Agreement, the parties discussed situations
where an employee whom the Company would otherwise have transferred to a permanent
vacancy or recalled was required by the Company to temporarily remain in another
department. The parties agreed that in such situations, the following would apply:

1.  The employee's departmental seniority and bidding rights in the department to
    which he is transferring or being recalled would commence as of the date the
    Company would have physically transferred or recalled such employee absent the
    Company's decision to require the employee to temporarily remain elsewhere.

2.  An employee who is awarded a transfer to another department or recalled to his or
    her home department will be released from his or her current department no later
    than sixty (60) days from the date of the award or recall.  The parties agree that
    the "date of the award" for the purposes of this letter will be defined as the first
    Monday following the removal of the vacancy posting or recall.  An employee
    may be held for more than sixty (60) days from the date of the award in the event
    of an unforeseen or unusual circumstance, but in no event will an employee be
    held for more than ninety (90) days from the date of the award.

3.  If an employee is held for more than thirty (30) days from the date of the award,
    the employee will receive the rate of pay for the classification on which he is
    being held or the classification to which he will transfer, whichever is higher, for
    the period of time he is held after thirty (30) days from the date of the award, up
    to and including sixty (60) days, or if applicable, ninety (90) days.

4.  An employee hired on or after June 1, 2006, will not be considered for an
    interdepartmental transfer to fill a vacancy in a new job classification in another
    department or a vacancy in an existing classification in another department unless
    that employee has been in his/her current department for at least twelve (12)
    months.  This twelve (12) month requirement will not apply to vacancies for
    apprenticeships for skilled crafts.

*ATTAchment P*
*Transfer / Recall*
*Letters*

USW060467

Mr. Jim Robinson
June 1, 2006
Page 2

5. The local Union President and the local Plant Manager may agree in writing upon
   such applications or modifications to these procedures that are suitable to their
   location.  However, absent such agreement, the above procedures and applications
   will apply.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                      Jim Robinson

USW060468



**ALCOA**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 2006 negotiations, the parties discussed the Burden Rates used in contracting out discussions when comparing the cost of using outside contractors vs. bargaining unit employees at each of the Master Agreement locations and that the Burden Rates should provide a fair and reasonable basis for such comparison. The Burden Rates include Retiree Medical or OPEB (Other Post Employment Benefits) that is comprised of two components. One is the accrual for the active employees for the cost of their medical benefits upon retirement. The other component is the cost associated with the retirees who retired from the location. The Burden Rates in the comparison of outside contractors vs. bargaining unit employees described above will exclude the cost component for the retirees who retired from the location.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                          Jim Robinson

ATTAchment Q
BURDEN RATES
for Contracting out

USW060469



**ALCOA**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm our understanding reached during the 2006 contract negotiations regarding the use of trust funds to disburse Supplemental Unemployment Benefits at master contract plants.

The use of an actual trust fund to disburse benefits is no longer necessary given numerous IRS rulings over such matters. Thus, over time, the uses of the trust funds have become simply a conduit for payment of these benefits.

Therefore, it is agreed that all master contract language and any controlling documents governing the establishment and use of these trusts will be revised to eliminate any such reference to the trust funds and their use. This does not, in any way impact any benefits that an employee may be entitled to.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

ATTAchment R
SuB Trust

USW060470

**Section 57. Finance**

1.  For each month the Company shall compute a Maximum Benefit Limit.  Such Maximum Benefit Limit shall be equal to thirty (30) cents per hour worked in the first twelve of the previous thirteen months.

2.  For each month the Company shall compute an Available Benefit Limit, which shall be the Available Benefit Limit for the preceding month adjusted by subtracting the Weekly Benefits paid during the second preceding month, and adding the amount required to bring the Available Benefit Limit up to 125 percent of the Maximum Benefit Limit; but such additional amount shall not exceed an amount computed by multiplying (i) nine and one-half (9.5) cents times the hours worked in the second preceding month until the Available Benefit Limit has been brought up to the Maximum Benefit Limit and (ii) an additional fifteen (15) cents times the hours worked in the second preceding month.  The addition of the fifteen (15) cents shall be subject to the provisions of Paragraph 3(d).

3. (a)  For each month the Company shall compute the ratio of Available Benefit Limit to the Maximum Benefit Limit.  Until the first month after May 1983, in which the ratio of the Available Benefit Limit to the Maximum Benefit Limit calculated on the basis of thirty (30) cents equals at least one, the ratio shall continue to be calculated by reference to a Maximum Benefit Limit based on twenty-three (23) cents.

(b)  If the ratio of the Available Benefit Limit to the Maximum Benefit Limit, calculated as in (a) above, shall be less than .35, the benefits otherwise payable during the month shall be reduced in accordance with the following table:

| When the ratio is: | The portion of the benefit paid is: |
|---|---|
| .25 or more but less than .35 | 60% |
| .15 or more but less than .25 | 30% |

(c)  In the event that such ratio shall be less than .15, no benefit shall be paid until such month as the ratio shall exceed .15; in no event however shall the total benefits paid during any month exceed the Available Benefit Limit calculated for such month.

(d)  Notwithstanding Paragraphs 3(b) and (c) above, the Company guarantees that all Weekly Benefits payable under the Plan shall be paid in full to employees who are in Tier II or Tier III.  To the extent that Weekly Benefits to such employees are reduced pursuant to Paragraphs 3(b) and (c), the Company shall advance the amount by which the Weekly Benefits paid to such employees pursuant to Paragraphs 3(b) and (c) need to be supplemented to provide full payment.  The Company shall maintain a separate record of such advances.  In any month in which there is an outstanding balance of such advances, and the Available Benefit Limit would otherwise exceed the Maximum Benefit Limit, the Company may reduce the additions which would otherwise be made to the Available Benefit Limit pursuant to Paragraph 2, but such reduction shall not reduce the Available Benefit Limit below the Maximum Benefit Limit.  Any

1.

USW060471

such reduction in the additions which would otherwise be made to the Available Benefit Limit shall be recorded as a credit against the outstanding balance of advances made pursuant to this paragraph.

**4.** The word "month" as used in this Article shall be construed to mean a four or five-week period, depending upon the number of weekly payroll ending dates falling within a calendar month.

**5.** All payments shall be made from the general assets of the Company.

**6.** Withholding Provision. If the Company at any time shall be required to withhold any amount from any payment of benefits, by reason of any federal, state, county, or municipal law or regulation, the Company shall have the right to deduct such amount from such payment.

**7.** If an employee is disqualified from supplemental unemployment benefit payments for the reason that his eligibility for state unemployment insurance benefits is in dispute, and withheld pending a ruling from an Appeal to the State, Company benefits shall not be paid but shall be set aside pending such state ruling.

**8.** Disputes arising from the application of supplemental unemployment benefits shall be initiated at the **second** step of the grievance procedure.

**9.** Upon the expiration of this Agreement, that portion of the Available Benefit Limit made up of accrued liability, shall be subject to all the applicable provisions of this Article and shall be used until exhausted to pay similar benefits to applicants laid off or thereafter laid off in the order, each week, of the respective dates as of which they were laid off. In such case, the provision for reduction of benefits of Paragraph 3 of this Section shall not be effective.

**10.** The Union shall be furnished, on forms and at times to be agreed upon, such information as may be reasonably required to enable the Union to be properly informed concerning the operation of the Plan.

2.

USW060472

**Section 38.  Finances**

1.    For each month the Company shall compute a Maximum Benefit Limit.  Such Maximum Benefit Limit shall be equal to twenty-three (23) cents per hour worked in the first twelve of the previous thirteen months.

2.    For each month the Company shall compute an Available Benefit Limit, which shall be the Available Benefit Limit for the preceding month adjusted by subtracting the Weekly Benefits paid during the second preceding month and adding the amount required to bring the Available Benefit Limit up to 125 percent of the Maximum Benefit Limit, but such additional amount shall not exceed an amount computed by multiplying (i) nine and one-half (9.5) cents times the hours worked in the second preceding month until the Available Benefit Limit has been brought up to the Maximum Benefit Limit and (ii) an additional five (5) cents times the hours worked in the second preceding month.  The addition of the five (5) cents shall be subject to the provisions of Paragraph 3(d).

3. (a)    For each month the Company shall compute the ratio of the Available Benefit Limit to the Maximum Benefit Limit.

(b)    If the ratio of the Available Benefit Limit to the Maximum Benefit Limit, calculated as in (a) above, shall be less than .35, the benefits otherwise payable during the month shall be reduced in accordance with the following table:

| When the ratio is: | The portion of the benefit paid is: |
|---|---|
| .25 or more but less than .35 | 60% |
| .15 or more but less than .25 | 30% |

(c)    In the event such ratio shall be less than .15, no benefit shall be paid until such month as the ratio shall exceed .15; in no event, however, shall the total benefits paid during any month exceed the Available Benefit Limit calculated for such month.

(d)    Notwithstanding Paragraphs 3(b) and (c) above, the Company guarantees that all Weekly Benefits payable under the Plan shall be paid in full to employees who are in Tier II or Tier III.  To the extent that Weekly Benefits to such employees are reduced pursuant to Paragraphs 3(b) and (c), the Company shall advance the amount by which the Weekly Benefits paid to such employees pursuant to Paragraphs 3(b) and (c) need to be supplemented to provide full payment.  The Company shall maintain a separate record of such advances.  In any month in which there is an outstanding balance of such advances, and the Available Benefit Limit would otherwise exceed the Maximum Benefit Limit, the Company may reduce the additions which would otherwise be made to the Available Benefit Limit pursuant to Paragraph 2, but such reduction shall not reduce the Available Benefit Limit below the Maximum Benefit Limit.  Any such reduction in the additions which would otherwise be made to the Available Benefit Limit shall be recorded as a credit against the outstanding balance of advances made pursuant to this paragraph.

1.

USW060473

4.      The word "month" as used in this Article shall be construed to mean a four or five-week period, depending upon the number of weekly payroll ending dates falling within a calendar month.

5.      All payments shall be made from the general assets of the Company.

6.      Withholding Provision.  If the Company at any time shall be required to withhold any amount from any payment of benefits, by reason of any federal, state, county, or municipal law or regulation, the Company shall have the right to deduct such amount from such payment.

7.      If an employee is disqualified from supplemental unemployment benefit payments for the reason that his eligibility for state unemployment insurance benefits is in dispute and withheld pending a ruling from an appeal to the state, Company benefits shall not be paid but shall be set aside pending such state ruling.

8.      Disputes arising from the application of supplemental unemployment benefits shall be initiated at the second step of the grievance procedure.

9.      Upon the expiration of this Agreement that portion of the Available Benefit Limit made up of accrued liability, shall be subject to all the applicable provisions of this Article and shall be used until exhausted to pay similar benefits to applicants laid off or thereafter laid off in the order, each week, of the respective dates as of which they were laid off.  In such case, the provisions for reduction of benefits of Paragraph 3 of this Section shall not be effective.

10.     The Union shall be furnished, on forms and at times to be agreed upon, such information as may be reasonably required to enable the Union to be properly informed concerning the operation of the Plan.

2.

USW060474



NEW UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This letter will confirm that as part of the process to incorporate agreements reached during 2006 negotiations, the 2001 Master Agreements will be reviewed and appropriate revisions will be made to dates and other provisions as necessary to incorporate the 2006 agreements.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                          Jim Robinson

ATTachment 5
Administrative
Clean Up

**For the Master Agreement Plants located at Alcoa, TN, Badin, NC, Bauxite, AR, Point Comfort, TX, and Rockdale, TX**

Article V. Hours of Work, Overtime, and Premium Pay
Section 15. General Rules, B.1.

B. If work cannot be performed within a classification at straight-time and overtime is thus required, the Company will distribute such overtime work as is necessary as fairly as possible between employees within the classification affected by this overtime work. In order to curb favoritism or the appearance of it in overtime distribution the following shall apply:

1. Overtime shall be offered to the low available employee on the overtime list in the affected classification unit unless there is a valid basis for deviating from the order of standing. Examples of a valid basis for deviation from the order of standing on the list are such things as **safety and/or health concerns applicable to the workforce,** maintaining continuity of task, need for special skills required for a particular overtime assignment, availability of an employee for overtime which becomes necessary on short notice or the like. Should such deviation be disputed in the grievance procedure the Company bears the burden of proving the validity of its overtime assignment under the circumstances that existed at the time.

ATTAchment T

Section 15 B.1

JQ 12/06/16


**ALCOA**

NEW UNPUBLISHED
USW ALCOA LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh. PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter will confirm that during 2006 negotiations the parties reviewed the manpower needs at the Rockdale Operations. This letter will confirm that the Rockdale Operations will hire fifteen (15) employees immediately following ratification of the 2006 Labor Agreement.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: Jim Robinson

*ATTAchment U*
*Rockdale Hiring*
*Commitment*



**Alcoa**

NEW UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the negotiation of the 2006 Master Agreement the parties discussed the extended work hour rules that were implemented at the various locations during the fall of 2005 and how the recent arbitration decisions impacted those locations.

To that end the parties agreed that for the USW Master Agreement locations at Alcoa, TN, Badin, NC, Bauxite, AR, Point Comfort, TX and Rockdale, TX that the remedy, in accordance with Arbitration No. 3302 dated May 15, 2006 under the terms of the Labor Agreement, would be applicable to each of those locations and that remedy would be provided as soon as practicable after the successful conclusions of the 2006 negotiations.

The parties further agreed that for the USW Master Agreement locations (former Reynolds Locations) in Louisville, KY, Richmond, VA, Massena, NY, Hot Springs, AR, and Gum Springs, AR the parties would settle each of the timely filed grievances, or mutually agreed to instances, for 50% of the value established by the by-pass related to the application of the 64/66 hour rule at those locations. That remedy would be provided as soon as practicable after the successful conclusions of the 2006 negotiations.

This agreement resolves all grievances and any other issue related to the extended work hour rule implementation from September, 2005 through May, 31, 2006 at the above locations and USW Master Agreement locations (Former Alcoa/ABG Locations) in Davenport, IA, Lafayette, IN, Massena, NY, Warrick, IN and Wenatchee, WA.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

ATTAchment V
64/66 Grievance
Resolution



**ALCOA**

NEW PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the negotiation of the 2006 Labor Agreement the parties discussed the relationship between the risk of injury to our employees and working extended hours.

In recognition of the increased risk of injury for employees working extended hours, the parties have agreed that, as it relates to the overtime distribution procedures established under the Labor Agreement or through local agreement, limiting extended work hours under the 64/66 hour work rule is an acceptable reason for deviating from the low and/or junior person or equalization requirements of those procedures.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

ATTAchment W
64/66 Hour
Work Rule

USW060479

**Unpublished Letter of Understanding Regarding Successorship**

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

**ALCOA**

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

RE: SUCCESSORSHIP – Cressona, PA

Dear Mr. Robinson:

If the Company sells the entire plant, or an organizationally distinct operation thereof at Cressona, PA, and the purchaser intends to operate the same business at the same location within one (1) year of the sale, the purchase and sale agreement will, as a non-waivable closing condition, require the purchaser to:

1.  Extend offers of employment only to members of the Company's collective bargaining unit until the purchaser has a full complement of such employees that it needs to perform work covered by the Company's collective bargaining unit, or until the purchaser has extended offers of employment to all members of the Company's collective bargaining unit;
2.  Recognize the Union as the collective bargaining representative of the unit that performed bargaining unit work for the Company upon the purchaser hiring a substantial and representative complement of the employees it needs to perform such unit work; and
3.  Agrees to become the successor employer under the collective bargaining agreement between the Company and the Union.

The Company will have completely fulfilled its obligations under this successorship provision if the purchase and sale agreement contains, as a non-waivable closing condition, the terms described above in Items 1-3, and the purchaser makes the offers specified in Item 1 with such offers contingent upon the closing of the transaction contemplated in the purchase and sale agreement. In lieu of Item 3, the purchaser and the Union may agree to a new collective bargaining agreement prior to the closing date. The Company will have no obligation under this successorship provision if the purchaser commits to the Company that it does not intend to operate the same business at the same location for at least one year from the sale. Moreover, this successorship provision will not apply if the plant has been closed for at least six (6) months, or to the separate sale of equipment and/or real estate, including buildings, not intended to be operated for at least (1) year after the sale as the same business at the same location.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

ATTAchment X
Successorship
Letters



**Unpublished Letter of Understanding Regarding Successorship**

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

RE:  SUCCESSORSHIP – Tifton, GA

Dear Mr. Robinson:

If the Company sells the entire plant, or an organizationally distinct operation thereof at Tifton, GA, and the purchaser intends to operate the same business at the same location within one (1) year of the sale, the purchase and sale agreement will, as a non-waivable closing condition, require the purchaser to:

1.   Extend offers of employment only to members of the Company's collective bargaining unit until the purchaser has a full complement of such employees that it needs to perform work covered by the Company's collective bargaining unit, or until the purchaser has extended offers of employment to all members of the Company's collective bargaining unit;

2.   Recognize the Union as the collective bargaining representative of the unit that performed bargaining unit work for the Company upon the purchaser hiring a substantial and representative complement of the employees it needs to perform such unit work; and

3.   Agrees to become the successor employer under the collective bargaining agreement between the Company and the Union.

The Company will have completely fulfilled its obligations under this successorship provision if the purchase and sale agreement contains, as a non-waivable closing condition, the terms described above in Items 1-3, and the purchaser makes the offers specified in Item 1 with such offers contingent upon the closing of the transaction contemplated in the purchase and sale agreement.  In lieu of Item 3, the purchaser and the Union may agree to a new collective bargaining agreement prior to the closing date.  The Company will have no obligation under this successorship provision if the purchaser commits to the Company that it does not intend to operate the same business at the same location for at least one year from the sale.  Moreover, this successorship provision will not apply if the plant has been closed for at least six (6) months, or to the separate sale of equipment and/or real estate, including buildings, not intended to be operated for at least (1) year after the sale as the same business at the same location.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                       Jim Robinson



**Unpublished Letter of Understanding Regarding Successorship**

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

RE: SUCCESSORSHIP – Plant City, FL

Dear Mr. Robinson:

If the Company sells the entire plant, or an organizationally distinct operation thereof at Plant City, FL, and the purchaser intends to operate the same business at the same location within one (1) year of the sale, the purchase and sale agreement will, as a non-waivable closing condition, require the purchaser to:

1.  Extend offers of employment only to members of the Company's collective bargaining unit until the purchaser has a full complement of such employees that it needs to perform work covered by the Company's collective bargaining unit, or until the purchaser has extended offers of employment to all members of the Company's collective bargaining unit;

2.  Recognize the Union as the collective bargaining representative of the unit that performed bargaining unit work for the Company upon the purchaser hiring a substantial and representative complement of the employees it needs to perform such unit work; and

3.  Agrees to become the successor employer under the collective bargaining agreement between the Company and the Union.

The Company will have completely fulfilled its obligations under this successorship provision if the purchase and sale agreement contains, as a non-waivable closing condition, the terms described above in Items 1-3, and the purchaser makes the offers specified in Item 1 with such offers contingent upon the closing of the transaction contemplated in the purchase and sale agreement. In lieu of Item 3, the purchaser and the Union may agree to a new collective bargaining agreement prior to the closing date. The Company will have no obligation under this successorship provision if the purchaser commits to the Company that it does not intend to operate the same business at the same location for at least one year from the sale. Moreover, this successorship provision will not apply if the plant has been closed for at least six (6) months, or to the separate sale of equipment and/or real estate, including buildings, not intended to be operated for at least (1) year after the sale as the same business at the same location.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

NEW UNPUBLISHED
USW ALCOA LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

RE:    Alcoa Eastalco Works

Dear Mr. Robinson:

The successor agreement to the current collective bargaining agreement between the United Steelworkers and Alcoa covering the Alcoa Eastalco Works shall continue to have an expiration date 75 days after the Master Agreement Contract Expiration, with continued future participation of USW Local 7886 or it successor in Master Agreement negotiations.

It is further understood that the Eastalco collective bargaining agreement is a stand alone agreement concerning all economic and non-economic matters, except that the parties have agreed that they would apply the 2006 Master Agreement retiree health care provisions, including participation in the Retiree Healthcare Non Interest Bearing Account, to Eastalco. Medicare Part B reimbursement will remain capped at $50/month.

Very truly yours,

Joseph Quagha, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

ATTAchment Y

Other "New"

Letters

USW060483



**ALCOA**

NEW UNPUBLISHED
USW ALCOA LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Re:     Pass Through For 2006 Negotiations
        Alcoa Lake Charles, LA

Dear Mr. Robinson:

The items of the economic package negotiated in the 2006 Master negotiations listed below will be passed through to the successor agreement to the current collective bargaining agreement between the United Steelworkers and Alcoa covering the plant at Lake Charles, LA.

1. New hire pension plan and pension factors.
2. Active health care plan
3. Retire health care plan
4. Wages
5. Performance pay
6. Lump sum payments
7. COLA – same as ABG

The successor contract shall continue to have an expiration date 75 days after Master Agreement Contract Expiration, with continued future participation of USW Local 211 or its successor in Master Negotiations.

It is further understood that the Lake Charles collective bargaining agreement is a stand alone agreement concerning all economic and non-economic matters.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060484



**ALCOA**

NEW UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During our discussions of the 2006 Settlement Agreements, we agreed to specifically list the Local Unions on the agreements. No local union designations are given for the Lebanon, Pennsylvania; Mobile, Alabama; Baton Rouge, Louisiana; or Troutdale, Oregon plants, which are shutdown or sold.

This will confirm our agreement that the failure to list those facilities on the Settlement Agreements shall not adversely affect the rights, if any, of individuals who worked at those facilities. In the event a dispute arises as to the rights, if any, of such individuals, it shall be resolved as though those local union numbers had been included on the Settlement Agreements.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During 1996 negotiations, as the result of the implementation of a customer service center and a reduction of on-site benefits representatives, the Union raised concerns about the ability of local union representatives to get responses to unresolved benefits problems in the future. The Company will ensure that the service center provides prompt and courteous service to benefits inquiries. In addition, at each location the human resources department will be designated to coordinate responses to the local union for any potential issues that have not been resolved through the service center or the insurance carriers. During a transition period existing benefits administrators will remain at locations to assist with issues that may arise. In most instances, benefits administrators will remain available at the location through the end of calendar year 1996.

The parties also discussed the need to meet periodically during the life of the labor agreement to discuss issues that arise concerning benefits. The parties will establish a joint committee for this purpose and will meet at least twice a year or more frequently as agreed to by the parties. One representative from the union from each location will be designated and will participate in these meetings at Company expense. The committee will also include such International Union representation as designated by the Union.

The committee will seek to resolve specific benefit and administrative plan issues, review the performance of the customer service center and the Company's insurance carriers, and discuss ways to improve the delivery of benefit programs. In the unlikely event that an issue cannot be resolved by the committee, it can be referred by either party to the Co-Chairpersons of the National Negotiating Committee for resolution.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                  Jim Robinson



**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

In the negotiations for our 2001 Agreement the Company and the Union have agreed upon the following to clarify and implement the safety language of the Labor Agreement:

1. Any attempt by an employee, or employees, to utilize the procedures of the Article for harassment, coercion, retaliation, or to achieve objectives other than health and safety, however proper those objectives might be if pursued by other means, would be abuse of this Article and contrary to the Labor Agreement itself.

2. An employee who is relieved from duty on the job about which he has complained shall not be paid for work time lost as a result of his being so relieved unless an arbitrator finds that he was justified in leaving the job because of the existence of an unsafe condition, changed from the normal hazards inherent in the operation. The period of time to which such payment is applicable will end when the unsafe condition is remedied or when, through application of proper manpower assignment or adjustment procedures, the relieved employee is either reassigned, scheduled off, or laid off.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**PUBLISHED
ALL MASTER AGREEMENT LOCATIONS**

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the course of our recent negotiations, the parties discussed the problem of escalating health-care costs and the serious impact which such inflation has had, both on the ability of the Company to maintain our negotiated group insurance plans, and on the capacity of active and retired employees to afford their own out-of-pocket expenditures for unreimbursed medical services.

This letter will confirm our commitment to develop and implement cooperative efforts, particularly within the local community, which will promote greater efficiency in the use of health-care resources by Steelworkers and their families.  Furthermore, the parties agree to join together to combat those instances where health-care providers engage in wasteful practices or overcharge for their services.

In order to achieve our objectives in this area, the Company and the International Union agree to encourage the establishment of plant-level committees on health care and cost containment.

The local committee shall study the operation of the group insurance plan and particularly the influence which the plan has on utilization and cost of area health-care services.

As part of the study, the joint committee may recommend that the benefit provisions applicable to a given employment location be modified on an experimental or permanent basis to determine if a given modification will make more efficient utilization of health-care resources or to take into account particular circumstances at a given employment location.  Any recommendations made by such a joint committee shall become effective only upon written agreement between the Company and the International Union.  The Company and the International Union shall, wherever possible, assist the local committees in carrying out the intent of our understanding.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060488


**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This is to confirm that the Company, during the 1996 negotiations, agreed to the following matter:

In the event of disagreement between the Company appointed physician and the employee's personal physician regarding an employee's ability or non-ability to return to work from sick leave, the local Union may request that the matter be reviewed by the Company's Office of Vice President, Health and Safety.  A prompt review of the findings and conclusions of both involved physicians will be made and an opinion regarding the issue will be given to the employee, the local Union, and local Company officials.

The parties agree that for a proper review and well-based opinion, complete medical records regarding the employee's condition are essential.  Therefore, such requests must be accompanied by a written release signed by the employee which permits the designated representative of the Company's Office of Vice President, Health and Safety, access to such records.

During the review period set forth above, an employee's sickness and accident benefits will continue until the opinion is issued from the office of the Vice President, Health and Safety, if the employee would otherwise be eligible for sickness and accident benefits and has not exhausted such benefits.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the course of the negotiations of our 1996 Labor Agreement, the parties discussed the potential benefits that might be gained through joint training of the joint Safety and Health Committee members.  It was agreed that at each location the local parties should periodically assess the needs for conducting such training.  If such assessment reveals a need for specific training, the Co-Chairpersons of the committee will develop an appropriate agenda for such training.  The training will be held at a mutually agreeable date, time and location.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During our 1996 negotiations the Company agreed to make deductions from earnings for each union member who signs voluntary authorization cards in forms agreed to by the Company and the Union and to remit the deductions to the Union for inclusion in the Union SOAR-PAC.

The procedure to be followed will be as stated in check-off.  The Union agrees that the indemnity set forth shall apply to the Company's actions taken or not taken pursuant to this letter.

The provisions of this letter shall be effective in accordance with and consistent with the applicable provisions of state or federal law.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson


**ALCOA**

**PUBLISHED**
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During their 1993 negotiations the parties agreed to a Managed Care Program designed to replace the current Employee Group Benefit Plan.  Essential to that Managed Care Program are a list of protocols as well as Managed Care Program evaluation criteria and standards and the establishment of a Joint Union-Management Managed Care Committee and Area Review Committees.

The parties agree that the Managed Care Program will go into effect January 1, 1994, at all locations and that the current Employee Benefit Plan will remain in effect until that date.  The local parties will monitor the performance and quality of the network against the protocol and criteria established.

The parties further agree that when the Managed Care Program goes into effect it will be accompanied by a "Fresh Start" for purposes of determining limitations for visits, confinements, and any associated costs for services, treatments or medical supplies, as well as for lifetime maximums.

The protocols and criteria and standards for the Managed Care Program will be established in advance of the Union's ratification vote.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson


**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During our discussions of the 1993 collective bargaining agreement, the parties recognized that a
National Health Care Program was under active discussion in Washington, D.C. and throughout
the country.  While the parties do not know what the details of such a Program might be and how
it might impact bargaining-unit employees and the Company, the parties agree that should such a
Program become effective, they will meet to resolve any issues raised by the overlap of that
Program with the insurance program for bargaining-unit employees by utilizing the following
principles:

1.  Duplication will be eliminated at no loss to employees.

2.  Net savings, if any, realized by the Company from the implementation of the National
    Health Care Program shall be paid into a fund established for payment of retiree
    insurance costs in future years.  "Net Savings realized" will be measured as the amount of
    reduction in the Company's cost from the amount of expense in the calendar year
    immediately prior to full implementation of a National Health Care Program and shall
    take into consideration any premiums, taxes, or other contribution paid by the Company
    associated with funding the National Health Care Program.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson

USW060493



PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 1996 labor negotiations, one issue of concern was contracting out.  Based on these discussions, there are apparent questions with respect to the interpretation and implementation of the Contracting-Out Process Guiding Principles by some of the local parties.

Therefore, it is mutually agreed that a Joint Labor/Management Team will be appointed to visit each site covered under the Agreement.  The Joint Team will meet with the local Contracting-Out Representative of the Union and Management to discuss and explain the principles, as well as the process.  The Joint Team will make a report of their efforts to the USWA Negotiating Committee Chairman and the Corporate Director of Industrial Relations.

It is further agreed that a copy of each contracting-out notice provided to the Local Union Contracting-Out Committee will be forwarded to the Chairman of the USWA Negotiating Committee.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson

USW060494



PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

RE: SUCCESSORSHIP

Dear Mr. Robinson:

If the Company sells an entire plant, or an organizationally distinct operation thereof, subject to this Labor Agreement, and the purchaser intends to operate the same business at the same location within one (1) year of the sale, the purchase and sale agreement will require the purchaser to:

1. Extend offers of employment only to members of the Company's collective bargaining unit until the purchaser has a full complement of such employees it needs to perform work covered by the Company's collective bargaining unit, or until the purchaser has extended offers of employment to all members of the Company's collective bargaining unit;

2. Maintain a preferential applicant pool of members of the Company's collective bargaining unit who are not initially employed by the purchaser pursuant to Item 1 above, and to extend offers of employment only to members of that pool for the purchaser's bargaining unit work, as the purchaser's needs arise, for a period of three (3) months from the commencement of the purchaser's production operations, or until the purchaser has extended offers of employment to all members of the Company's collective bargaining unit, whichever occurs, first; and

3. Recognize the Union as the collective bargaining representative of the unit that performed bargaining unit work for the Company upon the purchaser hiring a substantial and representative complement of the employees it needs to perform such unit work.

The Company will have completely fulfilled its obligations under this successorship provision if the purchase and sale agreement contains the terms described above in Items 1-3, the purchaser makes the offers specified in Item 1 contingent upon the closing of the transaction contemplated in the purchase and sale agreement, and the Company offers its services as a facilitator during negotiations for a labor agreement between the purchaser and the Union. The Company will have no obligation under this successorship provision if the purchaser commits to the Company that it does not intend to operate the same business at the same location within one year of the sale. Moreover, this successorship provision does not apply to the sale of a plant which has been closed for at least six (6) months or to the separate sale of equipment and/or real estate, including buildings, not intended to be operated within one (1) year after sale as the same business at the same location.

Very truly yours,

*Joe Ql*

Joseph Quaglia Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The Company and the Union including local plant Management and Union representatives shall meet twice during the term of the Labor Agreement at a mutually agreeable time and location. Full and candid discussions shall be encouraged in these meetings with the objective of advancing the shared interests of the Company, the Union, and the employees.  Subjects for discussion shall include Company and industry operating conditions, domestic and foreign investments, governmental affairs and other relevant topics as may be agreed upon by the Company-Union Co-Chairman.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060496



ALCOA

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

<u>For the Plants and Locals</u>:

| | |
|---|---|
| Davenport, IA | Local 105 |
| Lafayette, IN | Local 115 |
| Lebanon, PA | Local 3269 |
| Massena, NY | Local 420 |
| Warrick, IN | Local 104 |
| Baton Route, LA | Local 275 |
| Massena, NY (St. Lawrence) | Local 450 |
| Louisville, KY (#1 & #15) | Local 155 |
| Richmond, VA | Local 400 |

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This is to confirm that the Company, during the course of 2001 negotiations, agreed to the following policy statement:

Alcoholism and drug abuse are recognized by the parties to be a treatable illness. Without detracting from the existing rights and obligations of the parties recognized in the other provisions of this Agreement, the Company and the Union agree to cooperate at the plant level in encouraging employees afflicted with alcoholism or drug addiction to undergo a program directed to the objective of their rehabilitation. Neither job security nor promotional opportunities should be jeopardized by a request for treatment for either alcoholism or drug use. Such request and all records shall remain confidential.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the negotiation of the 2001 Labor Agreement, the parties discussed the importance of
preventing musculoskeletal disorders (MSDs) through implementation of ergonomic principles
and programs in the workplace. The parties agreed that MSD risks can be addressed effectively
through comprehensive joint labor-management health and safety programs. As such, the parties
committed to jointly promote and implement the principles of a comprehensive ergonomic
program.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson

USW060498



**ALCOA**

**PUBLISHED**
**ALL MASTER AGREEMENT LOCATIONS**

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The USWA and Alcoa are recognized as having some of the most effective health and safety programs in the world because health and safety is a primary objective for both organizations. However, the parties recognize that our health and safety processes and programs have not totally eliminated fatalities from our workplaces.  As such, the parties have agreed to honor the memory of those individuals who have died in our workplaces as part of the Workers' Memorial Day observed annually on April 28.  The locations' Joint Safety and Health Committees will jointly determine the appropriate activities in observance of this day.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson

USW060499



**PUBLISHED**
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The parties discussed the importance of comprehensive audits and self-assessments as important elements of a successful health, safety, and environmental program during the 2001 negotiations. The parties additionally discussed how the appropriate involvement of representatives of the locations' Joint Health and Safety Committees in these audits can directly enhance the effectiveness of that location's joint safety and health processes.  To that end, the locations where it is not already occurring, the Company commits to work with those locations' Joint Safety and Health Committees to mutually establish how the Committee members will become engaged in the process of auditing.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                          Jim Robinson



**PUBLISHED**
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 2001 contract negotiations, the parties discussed the competitiveness of Master Agreement locations.  Master Agreement locations continue to face major competition from both domestic and global operations.   Both parties recognize that long-term survival and potential growth in these locations will only result if we can find better ways to work together.  Future success will be determined by our ability to make change at accelerated rates.

Leaders of both institutions believe that the Master Agreement locations should drive toward or continue to be world-class operations in terms of safety, productivity and workers job satisfaction.  The leaders believe that the full adoption of the Partnership Agreement and the Alcoa Production System (APS) will be enablers in this process.  Furthermore, success will lead to greater levels of compensation and the parties believe that through the full adoption of Partnership/APS, employees will gain greater long-term security and operations will have the potential for added growth.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                      Jim Robinson

USW060501



PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter will confirm our understanding reached during the 2001 negotiations concerning the Family Medical Leave Act (FMLA).

1.  The period an employee is receiving Sickness & Accident benefits will be counted toward the employee's FMLA leave.

2.  Vacation time will be counted toward the FMLA leave.  However, each employee will be allowed to retain one week of vacation exempt from application toward such leave.

3.  Where both spouses of a married couple are employees of the Company, each employee will be entitled to up to 12 weeks of FMLA leave.

4.  Health care benefits will continue for the full period of a FMLA leave.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                           Jim Robinson

USW060502



**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This letter will confirm our discussions during the 2001 Negotiations concerning the implementation of procedures for joint contracting out processes. The Company will establish joint location-specific, business-based contracting out processes consistent with the Guiding Principles at those locations where such processes have not been established.

The Company reconfirms its commitment that the locations will adhere to these processes.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the negotiations of the 2001 Labor Agreement, the parties discussed how jointly-sponsored conferences on safety and health can enhance the joint safety and health efforts in the facilities covered by this Collective Bargaining Agreement (CBA). The initial purpose of these conferences would be to seek out opportunities to reduce the fatality potential at our facilities, improve communication between the parties, and establish a forum for the sharing of best practices to improve each location's joint safety, health and environmental processes. These meetings will occur annually starting in 2002 and be held at a mutually agreeable time and location. The participants will include two (2) Joint Safety and Health Committee representatives (one hourly and one salaried) from each location covered by this CBA, representatives of the USWA Health, Safety and Environment Department, and appropriate representatives from the business unit and corporate organizations. The company will pay the full lost time and expenses for one (1) union member of the JSHC from each location. Additional union representatives may attend at union expense.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060504

PUBLISHED
ALL MASTER AGREEMENT LOCATIONS

## NEUTRALITY

### Section 1. Intent

Over the years, the Company and the United Steelworkers of America ("Union") have developed a constructive and harmonious relation-ship built on trust, integrity, and mutual respect. The Company places high value on the continuation and improvement of its relationship with the Union as well as with all of its employees.

We also know from experience that when both parties are involved in an organizing campaign directed at unrepresented Company employees, there is a risk that election conduct and campaign activities may have a harmful effect on the parties' relationship. Therefore, it is incumbent on both parties to take appropriate steps to insure that all facets of an organizing campaign will be conducted in a constructive and positive manner which does not misrepresent to employees the facts and circumstances surrounding their employment and in a manner which neither demeans the Company or the Union as an organization nor their respective representatives as individuals.

To underscore the Company's commitment in this matter, the Company agrees to adopt a position of neutrality in the event the Union seeks to represent any unorganized production and maintenance employees at facilities of the Company engaged in types of businesses in which the Union currently represents production and maintenance employees under this Master Agreement. This Neutrality Agreement shall only apply to facilities where the Company has an ownership interest greater than fifty percent (50%) and operating responsibility.

Neutrality means that the Company shall neither help nor hinder the Union's conduct of an organizing campaign, nor shall it in providing information or expressing an opinion demean the Union as an organization or its representatives as individuals. Also, the Company shall not provide any support or assistance of any kind to any person or group opposed to Union organization.

Consistent with the above, the Company reserves the right to communicate fairly and factually to employees in the unit sought concerning the terms and conditions of their employment with the Company and concerning legitimate issues in the campaign. Should the Company hold meetings with employees covering an organizing campaign during the campaign period, a union organizer may attend such meetings for the purpose of observation only.

For its part, the Union agrees that all facets of its organizing campaign will be conducted in a constructive and positive manner which does not misrepresent to the employees the facts and circumstances surrounding their employment and in a manner which neither demeans the Company as an organization nor its representatives as individuals.

### Section 2. Notice of Intent to Organize

12/06/06

The Union will give the Company's Director of Industrial Relations written notice of the Union's intent to organize a facility subject to this Neutrality Agreement.

Upon receipt of such notice, the Company shall meet with the Union to exchange information that might be pertinent to an organizing effort. During this meeting, the parties will discuss the scope of the proposed collective bargaining unit, employees to be excluded from the unit, campaign issues, etc. Union access to the plant may also be addressed at this notice of intent meeting. The Company reserves the right to challenge any issues relating to the scope and makeup of the unit sought by the Union by invoking the Dispute Resolution procedure described below. To minimize disputes about the scope of collective bargaining units, the Company and the Union agree that the National Labor Relations Board's case law regarding the composition of collective bargaining units is incorporated into this Neutrality Agreement by reference. Upon reaching an agreement on all outstanding issues, the Company will give the Union a list of the names and addresses of the production and maintenance employees in the agreed-upon proposed collective bargaining unit, as well as a description of their wages and benefits.

Upon receiving the Union's notice of intent to organize, the Company may send a letter to members of the proposed collective bargaining unit describing the neutrality process contained in this Agreement, as well as the results of signing a Union authorization card.

**Section 3.  Campaign Period and Union Access to Company Facilities**

The campaign period shall not exceed forty-five (45) days and shall commence upon the Union's receipt of the names, addresses, and wage and benefit information described above in Section 2. The Company and the Union will agree upon reasonable times and reasonable places at the plant premises where the Union can campaign. The Company and the Union will review all Company and Union campaign literature prior to its distribution.

**Section 4.  Union Authorization Cards**

For purposes of this Neutrality Agreement, only cards signed after the notice of intent has been served may be counted as valid cards. The Union's authorization cards will clearly state that the card may be used for the purpose of obtaining:

(a) an NLRB-sponsored election where a simple majority of votes will create a duty to bargain;

(b) a secret ballot election conducted in cooperation with the Company where a duty to bargain will arise if the Union receives votes from a majority of the eligible voters in the proposed collective bargaining unit; or

(c) recognition on the basis of a card check where a duty to bargain will arise if the Union receives cards from at least sixty-five percent (65%) of the employees in the proposed collective bargaining unit.

USW060506

**Section 5. Struksnes Election**

If, at any time during the campaign period, the Union represents that it has obtained cards from a majority of the employees in the agreed-upon collective bargaining unit, the parties will schedule a secret ballot election to take place no later than seven days from such notice to the Company by the Union. The Company will provide an opportunity for both the Union and the Company to make short presentations to groups of employees in the proposed collective bargaining unit. Such presentations will be reviewed by the parties in advance.

After the presentations to the employees, the employees will be given an opportunity to participate in a secret ballot election for the purpose of determining whether the Union will represent employees in the proposed collective bargaining unit. The election shall be conducted in accordance with Struksnes Construction Company. This means: (1) the Union must formally demand recognition and advise the Company that it has authorization cards from a majority of the employees in the agreed-upon proposed collective bargaining unit; (2) the employees must be told that the purpose of the election is to determine whether the Union has majority status; (3) the Company will give employees assurances that there will be no reprisals for engaging in protected activity; (4) the employees will be polled by secret ballot; and (5) there may be no unfair labor practices or other activity that creates a coercive atmosphere. The Company will recognize the Union as the representative of the proposed collective bargaining unit if a simple majority of the employees in the proposed collective bargaining unit cast votes to be represented by the Union.

If the Union does not obtain votes demonstrating that it represents a majority of the proposed collective bargaining unit, or if the Union does not claim that it represents a majority of the employees in the collective bargaining unit within the forty-five (45) day campaign period, the Union will be barred from filing another notice of intent to organize that facility and from filing an NLRB petition for an election at that facility for twelve (12) months from the date of the Struksnes election or the close of the campaign period.

**Section 6. Card-Check Recognition**

Any time during the campaign period, the Union may demand recognition on the basis of authorization cards if the Union asserts that it has cards from at least sixty-five percent (65%) of the employees in the proposed collective bargaining unit. The authorization cards must be dated subsequent to the notice of intent and comply with the language requirements of Section 4 above. The Company and the Union shall choose one of the following methods to verify the authenticity of the cards: (a) the Company and the Union may mutually agree upon a third party who will count the cards and compare the signatures on the cards to exemplars furnished by the Company; or (b) the Company and the Union shall ask the American Arbitration Association to select an individual to count the cards and compare the signatures on the cards to exemplars furnished by the Company. The individual who counts the cards will only inform the parties whether or not there are valid cards from at least sixty-five percent (65%) of the employees in the agreed-upon collective bargaining unit and shall not inform the Company of the precise number of cards. If the Union obtains valid cards from at least sixty-five percent (65%) of the employees in the

agreed-upon collective bargaining unit, the Company shall recognize the Union as the exclusive collective bargaining representative of such employees without a secret ballot election.

If the Union does not obtain cards from sixty-five percent (65%) of the employees in the proposed collective bargaining unit as a result of the card check, or if the Union does not claim that it has cards from sixty-five percent (65%) of the employees in the proposed collective bargaining unit within the forty-five (45) day campaign period, the Union will be barred from filing another notice of intent to organize that facility and from filing an NLRB petition for an election at that facility for twelve (12) months from the date of the card check or the close of the campaign period.

**Section 7.  Dispute Resolution**

This Neutrality Agreement shall not be subject to the grievance and arbitration provisions or the no strike/no lockout provision of the collective bargaining agreement.  Instead, any disputes arising under this Neutrality Agreement shall be submitted to the Chief Executive Officer of the Company or his/her designee and the International President of the United Steelworkers of America or his/her designee.

If another union begins an organizational effort or claims representation rights, either party may cancel this Neutrality Agreement as it applies to that particular organization campaign.

For the Company:                                          For the Union:


_____                    _____
Joseph Quaglia, Jr                                         Jim Robinson

USW060508


**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

As an accommodation to employees and without contractual obligation, it will be the Company's procedure when an employee doubles over from the last shift of a day terminating approximately at midnight to the first shift of the day immediately following, to compensate the employee at time and one-half for the double-over as an extension of the employee's shift terminating approximately at midnight.

This is to advise you that the Company will not change this procedure during the term of the Labor Agreement dated June 1, 1996.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson

USW060509



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will reconfirm the Company's expression to you in the course of the negotiation of the 1962 Agreement, Section 37, Short Week Benefits, of the SUB provision that it has no desire or intention to change its present policies or practices with respect to the scheduling of the work week.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060510



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During negotiation of our 1974 Agreement, the problem which confronts the Union with regard
to meeting new employees was discussed.

This will reconfirm the Company's expressed willingness to cooperate in establishing at the local
level appropriate means to alleviate this concern.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 1974 negotiations, concern was expressed over the possibility of wage rate reductions in Potroom job classifications due to the "energy crisis."

This will reconfirm our statement to you that the Company will not reduce wage rates for Potroom job classifications when, due to temporary reductions of power caused by reasons beyond the control of the Company, such power reductions would reduce the additional job grades applicable through Factor 11 of the Wage Manual.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will reconfirm that during the negotiation of our 1977 Labor Agreement, the Company agreed it would give employees as much advance notice as reasonably possible of scheduled overtime.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed:  _____
                    Jim Robinson

USW060513



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will reconfirm that during the negotiation of our 1977 Labor Agreement, the parties agreed that, without contractual obligation or giving the practice status in the grievance procedure, it was desirable that grievances appealed beyond the first step, state the particular Article and Section of the Labor Agreement involved, if applicable, and the name of the grievant(s).  It was further agreed that both parties would make an effort to see that this objective be accomplished.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                          Jim Robinson

USW060514


**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 1980 negotiations of the Labor Agreement, the parties discussed the placement and
retention of handicapped or disabled employees and placement of handicapped applicants.  It
was agreed that as far as possible Article XII-C would be so used, and that such employees
would be considered before applicants.

In the event no agreement is reached through the use of Article XII-C,  the Company may place
such employee or applicant in a job that he or she is able to do.  Such placement of individuals
will only be to the extent necessary to comply with federal or state laws concerning handicapped
persons and is subject to the grievance procedure of the Labor Agreement.

No assignment without agreement between the parties may be made unless it is to comply with
requirements of law.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060515



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the negotiations of our 1980 Labor Agreement, the Union expressed a concern in regard
to the ability of employees working the third or night shift to fulfill their obligations in regard to
jury or witness duty.  Subject to management approval and reasonable notification by the
employee, in application of Article XXVIII, Jury and Witness Pay, the Company will allow an
employee whose regularly scheduled shift is the third or night shift to designate either the day of
or the day after such jury or witness service to be the excused day.  This letter is not intended to
provide any additional days off or compensation other than that provided under Article XXVIII.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the negotiation of the 1977 Agreement, the Union requested that some form of "visible" notification be given to employees on regular vacation whose schedule had been changed during their absence.  This will reconfirm that such will be done when reasonable and practical depending upon the circumstances present at the time.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



ALCOA

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

*During the negotiation of our 1983 Labor Agreement, the Company confirmed that when it
changes jobs listed in Appendix II and/or combines such jobs with each other, it does not do so
for the purpose of eliminating jobs from Appendix II.  The Company will not remove such
changed and/or combined jobs from Appendix II unless they no longer fit the traditional criteria
for inclusion as Appendix II classifications.*

Very truly yours,

Joseph Quagha, Jr.
Director, Industrial Relations

Confirmed: _____

Jim Robinson



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the negotiations of our 1983 Labor Agreement, we discussed the matter of employees laid off as a result of a plant closing.  This will confirm our understanding that Article IX, Paragraph G, subparagraphs 1, 2, and 3 also apply to such employees subject to the results of bargaining between the parties concerning the plant shutdown.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the negotiation of the 1988 Labor Agreement, the parties agreed that if an employee completes three (3) years of accumulated departmental seniority without incurring a disciplinary action, no disciplinary action issued prior to such accumulation period shall be considered by the Company or cited in arbitration in any disciplinary action issued to that employee subsequent to such accumulation period.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060520



PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the negotiation of the 1988 Labor Agreement, the Union expressed a concern with regard to supervisors performing work beyond the scope of the provisions of Article XXI. Supervisors.

In response, the Company reaffirmed its commitment that supervisors shall act in a supervisory capacity and shall not perform work so as to replace regular workers or operators on the job.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                 Jim Robinson

USW060521



PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the negotiation of the 1988 Labor Agreement, the parties discussed how "company
seniority" is applied under Article IX, Paragraph G.

It was agreed that company seniority for an individual's participation in a plant's selection
process for employment as a new employee is the sum of the employee's company seniority in
all plants within the bargaining unit covered by this Agreement, and which has not been
terminated as provided for in Article VIII, Section 17.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the negotiation of the 1993 Labor Agreement, the Union expressed concerns about the Company's handling of employees engaging in *other employment while on medical leave of absence.* This letter confirms our mutual recognition that these concerns can be significantly reduced by improved communications. To satisfy that objective, each location, within 60 days of ratification of the Labor Agreement, will develop a written summary of employee obligations and responsibilities in this regard. The Company and local Union will jointly make that summary available to employees on medical leave. Neither party will *unreasonably withhold its* permission for such employment, provided that such employment is consistent with medical restrictions.

It is further understood that such employee will, as required by the Company, undergo periodic medical reviews by the plant physician to determine whether other employment is consistent with medical restrictions and to determine the employee's capability to perform available in-plant work.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060523


**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During 1993 negotiations, concerns were expressed by the Union that returning a supervisory employee to the bargaining unit under the provisions of Section 35 may result in the displacement of a production and maintenance employee.

The Company commits that when and if any supervisor is returned to the bargaining unit, such return will not result in the layoff of a production or maintenance bargaining-unit employee. Likewise, no supervisor will be returned to the bargaining unit if qualified employees are on layoff from the affected department or from the plant.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 1993 negotiations of the Labor Agreement, the Union expressed concerns that skills gained through non-traditional job assignments or team process training may be used by the Company in determining an employee's retention, restoration or recall.  This letter is to confirm that the Company will not use the provisions of Article XII to retain, recall or restore any employee to a bargaining-unit job based solely on the skills or experience gained from team process training or a non-traditional assignment.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our agreement during 1993 negotiations that the definition of <u>Eligible Earnings</u>
(Section V, item 4 of Appendix IV) shall include the time lost and the straight-time earnings
associated with that lost time at a rate not to exceed 8 hours per day or 40 hours per week for
local union officials who are on an excused absence for union business and who otherwise would
be actively at work.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060526



ALCOA

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the negotiations for the 1993 Labor Agreement, the parties discussed the employees of the Company who were and will be selected or elected to offices of the Union.  The Company's policy is to encourage employees to seek leaves of absence for Union offices because it is in the Company's interest to have Union representatives familiar with the Company facilities they represent.  Both parties recognized that the cost of Company group insurance benefits was a negative factor for employees seeking Union offices.

Therefore, the parties agreed that the Company will provide the group insurance coverages detailed in Article XXIII, subject to the provisions of that Article, to those employees who are on leave of absence pursuant to Article XIV because they have been selected or elected to offices of the Union.  The costs of the insurance coverages will be provided by the Company to the same extent as provided for active employees.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



**PUBLISHED**
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 1996 negotiations, the Union requested that one (1) week of regular vacation time be taken in increments of one day at a time.

If the local parties mutually agree to consider day-at-a-time vacation at their location, the local parties will meet within 90 days of ratification of the Labor Agreement with the goal of designing an efficient, cost-effective day-at-a-time vacation program.

If an agreement is reached in sufficient time, day-at-a-time vacation will be implemented for the 1997 vacation year.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060528



**ALCOA**

PUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 2001 negotiations, the parties discussed the application or modification of Article IX (F) Reduction of Forces and Article XI (D) Recall and Restoration of Forces where applicable. The Company is committed to avoid senior employees being laid off while junior employees are working. Options to accomplish this may include straight seniority bumping exchange of senior employees for junior employees through an orderly transition process such as a roll-in and such other options as may be agreed to by the local parties. The local parties agree that each will work diligently to reach agreement and to find a solution that meets the needs of employees and the business. Neither party shall unreasonably withhold its approval of such application or modification.

Craft employees will not be displaced by other employees unless the employee displacing has been previously classified in the craft and/or meets all the prerequisite qualifications of the job and is presently qualified to perform the craft work involved.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
            Jim Robinson

USW060529



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm that during our 1996 negotiations we agreed that top company seniority for the purpose of layoffs and restoration of forces at Tennessee Operations in fulfillment of the provisions under Section 21 of the Labor Agreement would be applicable to the following Local 309 Union officials:

> President
> Vice-President
> Plant Chairmen

Sincerely,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                   Jim Robinson



PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm that during our 1996 negotiations, the Company stated that it will be its procedure when an employee doubles over from the last shift of any day terminating approximately at midnight to the first shift of the day immediately following, to compensate the employee at time and one-half for the double over as an extension of the employee's shift terminating at midnight. Nothing in this procedure affects the existing 6th and 7th day premium pay handling for continuous operation (Dow Schedule) employees.

The Company agrees that this procedure will remain unchanged during the term of the Agreement.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060531



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm that in applying Paragraph A-3 of Section 15, if after exhausting the voluntary overtime procedures customary to that classification and department it should be necessary to schedule an employee for a shift extension due to the conditions of Paragraph B-1, such employee shall be entitled to the additional four (4) hours' pay at his standard hourly rate provided for in Section 15, Paragraph A-3. The commitment of this letter applies to shift extension situations only.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
            Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm the position of the Company as stated during our 1996 negotiations that the schedule change procedures of Section 15 will not be used to call employees on their scheduled off day within the work week and schedule them to work on that day.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060533



PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the course of our 1996 negotiations, the Company agreed it would not utilize information
provided to the Company by an employee in connection with the employment process, as a basis
for discipline or discharge later than three (3) calendar years subsequent to such employee's date
of hire.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the course of the negotiations of our 1996 Labor Agreement, the questions of when
vacation pay would be paid to those employees requesting advance pay was discussed.

It was agreed that, without a change in contract language, the Company would adopt a policy of
paying such advance pay on the last regular payday before the employee's vacation is scheduled
to begin. Should there be abuse of this procedure, the Company may revert to making such
advance pay on the last day worked before the vacation is scheduled to start rather than the last
regular payday before such vacation is scheduled to start.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060535



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This is to confirm that the Company, during the course of 1996 negotiations, agreed to the
following policy statement:

Alcoholism and drug abuse are recognized by the parties to be a treatable illness.  Without
detracting from the existing rights and obligations of the parties recognized in the other
provisions of this Agreement, the Company and the Union agree to cooperate at the plant level in
encouraging employees afflicted with alcoholism or drug addiction to undergo a program
directed to the objective of their rehabilitation.  Neither job security nor promotional
opportunities should be jeopardized by a request for treatment for either alcoholism or drug use.
Such request and all records shall remain confidential.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson

USW060536



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our understanding reached during our 1996 negotiations concerning employees who are transferred to a new location under Section 23-D of the Labor Agreement and who are subsequently laid off to the street due to a reduction of forces.  The Company agrees in its application of 19-F (Request for Restoration) to apply the company seniority of such employees as of last date of hire at their original location providing the employee does not have broken service.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                 Jim Robinson



ALCOA

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 1996 negotiations, the parties agreed that each Company location shall furnish to the
International Union on or about January 1 and July 1 of each year a list of all active 23D
applications on file. The list will include the name, social security number, and company
seniority date of each employee and the plant from which the employee is laid off.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed:

Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

On an experimental and trial basis the Company will agree that where grievances concerning supervisors working or improper distribution of overtime within a classification are not resolved at Step 2 and are to be arbitrated, they shall be arbitrated in the Expedited Arbitration Procedure unless the appropriate representatives agree to refer such grievance to regular arbitration through regular procedures.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter will confirm our understanding reached during the 1996 negotiations concerning the second step grievance record.

In writing the second step grievance answer, the Company representative will include in his answer the date and place of the meeting as well as the names of the attendees, the grievance number and a brief statement of the parties' positions, and the decision reached.  The Union may within ten (10) days of the issuance of such answer submit to the Company representative a letter detailing any specific comments by the Union.  Such letter shall be incorporated into and become a part of the grievance record.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                Jim Robinson

USW060540



**PUBLISHED**
*USW - ALCOA*

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the course of our 1996 negotiations the Company agreed, without limiting its right to contract out work under the Labor Agreement, to continue its efforts at each location to utilize available equipment and bargaining unit employees on capital work that is to be performed in the plant within their capabilities when that can be accomplished on a timely and cost effective basis. In its considerations, the Company will review with the Union work practices and flexible work assignments for available manpower when action on these issues could reasonably lead to performance of work otherwise to be contracted out with bargaining unit personnel on a cost competitive basis.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060541



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm our agreement during 1996 negotiations that the definition of <u>Eligible Earnings</u> (Section V, item 4 of Appendix VIII) shall include the time lost and the straight-time earnings associated with that lost time at a rate not to exceed 8 hours per day or 40 hours per week for local union officials who are on an excused absence for union business and who otherwise would be actively at work.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
            Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

The parties recognize that, in view of the changes made with respect to Section 36 of the Labor Agreement as a result of our 1986 negotiations, there is some concern regarding fair and consistent application of its provisions. We also realize that the possibility exists for temporary assignments to be used for harassment or discipline purposes and this letter is intended to reaffirm our categorical condemnation of such activity as being counter to the interests and objectives of both the Company and the Union. The Company will take appropriate action to ensure local compliance with this position.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                Jim Robinson


ALCOA

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

The Company will agree that if it fails to comply with the five-day minimum notification time period in Article VII, Paragraph C of the Labor Agreement or notification requirements explicit in the location-specific contracting-out process when they became operative unless there exists conditions which make such notification impractical, sixteen (16) hours' pay at the appropriate standard hourly wage rate shall be paid to the low employee on the overtime list of the classification designated by the local Union. Notwithstanding the Union's right to strike on the merits of contracting out, disputes regarding compliance with the notification procedure shall be subject to the regular grievance and Expedited Arbitration Procedure.

Where grievances concerning the notification procedures referred to above are not resolved at Step 2 and are to be arbitrated, they shall be arbitrated in the Expedited Arbitration Procedure unless the appropriate representatives agree to refer such grievance to regular arbitration through regular procedures. However, the issue shall be limited solely to the notification compliance question and the remedy awarded cannot exceed that provided for in this letter.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060544



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During our 1996 negotiations, the parties agreed that it would be desirable for the local parties to adopt a provision guaranteeing forty (40) hours of work or pay to craftsmen laid off or on short work weeks while outside contractors perform work in the plant with craftsmen of the same craft. The local parties shall address themselves to the desirability of such a local understanding. In doing so, the local parties should consider circumstances under which it would not be practical to provide such protection, such as in relation to major new construction and reconstruction projects, or work not normally done by Bargaining-Unit employees at the plant. The following is provided as a guide for the local parties in developing a more detailed program of implementation at the plant level:

> Should outside contractors perform work in the plant with the use of craftsmen while employees in that craft are on layoff from the plant and not working at another company plant under Section 23-D of the Agreement, and who are qualified and available for work, or working on short work weeks shall be guaranteed forty (40) hours of work or pay each week to the extent of the number of craftsmen engaged in contracting out relative to that craft.

Local parties interested in such a provision are advised to consider such problems as the protection of recall rights, the impact of SUB and unemployment compensation, and the method of determining which of the laid-off employees or employees on short work weeks will receive the guarantee. Any such local agreement shall be subject to the procedures of Section 5-C of the Agreement.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

RE: IMPLEMENTATION PROCEDURE FOR JOINT
CONTRACTING OUT PROCESS GUIDING
PRINCIPLES

I.   RESPONSIBILITY AND REVIEW

The appropriate business-unit president and district director will be responsible to insure that joint,
location-specific, business-based contracting-out processes are established consistent with the
attached guiding principles. They will establish an Oversight Committee functioning at the
corporate/business unit-international union level, for the locations under their jurisdiction which will
review the progress of the process development 60 days, 135 days and 180 days following the
effective date of the Labor Agreement.

II.  PROCESS DEVELOPMENT

A.   Immediately following the effective date of the Labor Agreement a Joint Committee at each
     location sponsored by the operations manager and local union president shall meet to consider
     and determine those items set forth in Item #6 of the Guiding Principles.

B.   The Joint Committee will thereafter proceed to develop and implement a contracting-out process
     for its location in accordance with the Guiding Principles within 180 days of the effective date of
     the Labor Agreement. Such process shall be reduced to writing and will set forth the procedure
     under which the information described in #1 of the Guiding Principles will be obtained by the
     committee. The Joint Committee shall include in its process provisions for (1) initial, on-going
     and annual review of work which is or is being proposed to be contracted out and (2) advance
     notice to the Joint Committee of any work proposed to be contracted out.

C.   The process established at each location shall be documented and reviewed by the sponsors and
     the Oversight Committee. This Oversight Committee will be responsible for monitoring the
     functioning of the Joint Committee and for assisting the Joint Committee and its sponsors as may
     be appropriate.

USW060546

Mr. Jim Robinson
June 1, 2006
Page 2

III. PROCESS OPERATION

Throughout the term of the Agreement the Joint Committee shall review work projects being considered for contracting out in accordance with its process and the Guiding Principles for its location.

Changes in the location process and its operation shall be documented as they are developed so that they may be reviewed by the sponsors and the Oversight Committee.

Following installation of the process at each location, the Oversight Committee will review the development and implementation of the contracting-out process and determine which functions assigned to the contracting-out committee, under Article VII, Paragraphs B, C and D of the Labor Agreement shall be recognized as having been fulfilled through operation of the new process. All other elements of Article VII remain in effect.

IV. The Oversight Committee will identify facilitation resources. The facilitation resources will be available for use by the locations during the process development phase and initial process operations and as requested thereafter. Facilitators will have access to all necessary information, and the fees and expenses of such resources shall be borne by the Company. Facilitation services will be provided at the request of the Joint Committee and/or the request of the Union or Company representatives on the Committee.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                      Jim Robinson


**ALCOA**

PUBLISHED
ABG - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This letter is to confirm the understanding reached during our 1996 negotiations regarding plant shutdowns at year's end. When any employee fails to meet the holiday pay requirements as set forth in our Agreements, due solely to the Company voluntarily shutting down a plant for one (1) or two (2) weeks at year's end (Thanksgiving is considered to be "year's end"), he shall be considered as having met such requirements for holiday pay purposes for any holidays falling during the shutdown period.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                      Jim Robinson

USW060548


**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our statements to you with regard to the policy which we have followed and
intend to continue following in the application of the Vacation Plan in our labor Agreements for
returning servicemen.  This policy as expressed in a memorandum to all of our plant locations
covered by our labor Agreements is:

> Vacation for such employees should not be scheduled if at all possible until a sufficient
> period after the employee returns to work to establish a base for computing his vacation pay,
> i.e., a minimum of ten (10) weeks and preferably in a calendar quarter succeeding a calendar
> quarter in which the employee has worked ten (10) weeks.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                            Jim Robinson

USW060549

PUBLISHED
USW - REYNOLDS

## IMPLEMENTATION PROCEDURE FOR JOINT
## CONTRACTING OUT PROCESS GUIDING PRINCIPLES

I.     RESPONSIBILITY

The local plant Contracting Out Committee, established in accordance with Article
XVIII, Section 7 of the Labor Agreement ("Joint Team"), shall be responsible for
developing and implementing a joint, location-specific, business-based contracting-out
process that is based upon and consistent with the attached Joint Contracting Out Process
Guiding Principles ("Guiding Principles").

II.    OVERSIGHT TEAM

The Top-Level Committee shall have responsibility for oversight of the Joint Teams, and
shall appoint from its membership an Oversight Team.  This Oversight Team will be
responsible for monitoring the functioning of the Joint Team and for resolving any
disputes arising from the process which cannot be resolved by the Joint Team and the
local plant manager and union president.

III.   PROCESS DEVELOPMENT

Immediately following the effective date of the Labor Agreement, the Joint Team shall
meet to consider and determine those items set forth in Item 6 of the Guiding Principles.
The Joint Team will thereafter develop and implement, within 180 days of the effective
date of the Labor Agreement, a contracting-out process for its location that is based upon
and consistent with the Guiding Principles.  Such process shall be reduced to writing.
The Joint Team shall include in its process provisions for (1) the development of a
procedure under which the information described in Item 1 of the Guiding Principles will
be supplied to the Joint Team, (2) initial, on-going and annual review of work being
proposed to be contracted out and (3) advance notice by the Company to the Union
members of the Joint Team of any work proposed to be  contracted out.  In the initial
review, the Company will furnish to the Joint Team a list of all work which is or is
proposed to be contracted out.

USW060550

IV.     PROCESS OPERATION

During the term of the Labor Agreement, the Joint Team shall be responsible for reviewing work being considered for contracting out, in accordance with its process and the Guiding Principles.  All agreements reached by the Joint Team regarding particular work considered for contracting out and any changes made by the Joint Team in its process shall be reduced to writing.

Following implementation of the process at each location, the Oversight Team will review the development and implementation of the contracting out process and determine which functions assigned to the Contracting Out Committee under Article XVIII, Section 7, Paragraphs 2, 3 and 4 of the Labor Agreement shall be recognized as having been fulfilled through operation of the new process.  All other elements of Article XVIII remain in effect.

V.      FACILITATOR

The Oversight Team will select a Facilitator who will be available for use as requested by the various Joint Teams to assist them in their process development and initial process operation.  The Facilitator will have access to all necessary information, and the fees and expenses of the Facilitator shall be paid by the Company.  Should the Joint Team desire to utilize another Facilitator, they may do so, subject to approval by the Oversight Team.

FOR THE COMPANY:                                FOR THE UNION:

Joseph Quaglia, Jr.                                    Jim Robinson

USW060551



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the life of the current Agreement between Alcoa Inc., the former Reynolds Mining Company, and the United Steelworkers of America, in connection with the application of Section 8, Article XVIII (Grievance Procedure) of the Agreement, the parties agree that all disputes involving those matters set forth in Section 8 which are not resolved at Step No. 4 of the Grievance Procedure shall be reviewed by a Prearbitration Review Board which shall function for all plants and locations to which the Wage Manual is applicable. The Prearbitration Review Board shall attempt to resolve such disputes in accordance with the procedure, principles, and provisions of the Wage Manual within a thirty (30) day period after the referral from Step No. 4 (or within any time extension mutually agreed to between the parties). The Prearbitration Review Board shall include one designated corporate representative of the Company and one designated representative of the Union's International Office in Pittsburgh.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm the understanding that the following letter originally dated
December 13, 1968, will be continued in effect during the term of our labor agreements
effective June 1, 1996:

> "This will confirm the understanding reached during the negotiations of our 1968 Labor
> Agreement relating to Sickness and Accident benefit payments.
>
> "When an instance occurs of an employee receiving weekly Sickness and Accident benefits
> from the Company and at the same time working elsewhere for substantial remuneration, the
> matter will be reviewed by a representative from the International Headquarters of the
> Union and of the Company's Corporate Industrial Relations staff, with the object of
> eliminating such dual compensation."

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson


**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

In regard to Section 5 of Article XXIX of the Labor Agreement, if an employee, after having been notified of recall to employment, cannot, because of extenuating circumstances beyond his control, advise the plant of his intention to return within the three (3) day period and/or return within the seven (7) additional days, he will not be considered terminated with loss of seniority until an investigation is conducted and an attempt is made to settle the matter at the local plant.

In the event the issue is not settled by the local parties, the matter will be referred to the Company's Corporate Director of Human Resources for further consideration.

Very truly yours,

Joseph Quagha, Jr.
Director, Industrial Relations

Confirmed:    Jim Robinson

PUBLISHED
USW - REYNOLDS

## MEMORANDUM OF UNDERSTANDING
## ON
## JUSTICE AND DIGNITY ON THE JOB

During the term of the 1996 Labor Agreement, the following procedure shall be applicable subject
to agreement of the local Union at each plant, and such local agreement must be executed by August
1, 1996.

Disciplinary suspensions of ten (10) days or less, except when such disciplinary suspensions
are for concerted actions or for the purpose of discharge, shall be administrative in nature
and shall not result in the affected employee being removed from active work. Disciplinary
action of this nature will become a part of the employee's personnel record and may be
considered when determining future disciplinary action for the employee. The parties agree
that the administrative nature of this discipline does not minimize the impact of the
disciplinary action or the need for correction of employee conduct. Any disciplinary actions
taken under this Memorandum of Understanding shall be subject to the grievance procedure.

FOR THE COMPANY:

Joseph Quaglia, Jr.

FOR THE UNION:

Jim Robinson

USW060555



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The Company will provide an appropriate medical surveillance program for its employees who may be exposed to hazardous levels of work-connected toxic chemical substances and physical agents as defined by the United States Occupational Safety and Health Administration and the American Conference of Governmental Industrial Hygienists.  OSHA threshold limit values will take precedence over other standards.  The frequency and complexity of the evaluations required to assure the adequate health protection of employees shall be determined by the Corporate Medical Department.  The International Union's consulting physician may contact and discuss the details of the medical surveillance program with the Company's Corporate Medical Director.

The Union agrees to encourage its members to cooperate fully in the medical surveillance program.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                            Jim Robinson



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

It is the policy of the Reynolds Metals Company Medical Department, in the case of an interplant transfer, to have the plant physician from the releasing plant communicate with the plant physician of the receiving plant concerning the physical demands for the prospective job available to the transferee.  It would then be their collective decision as to whether the employee was medically capable of carrying out the essential functions of the new job based upon an examination given to him at the receiving plant.  The standards for such an appraisal would be the same as the standards used throughout the Company on return to work physicals after layoff.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 1996 negotiations, the parties discussed hazards associated with operating in-plant railroads and the potential for incurring serious injuries involving such fixed rail equipment.  In light of the serious accidents that may result from the operation of this equipment the parties believe it would be beneficial for each joint Safety and Health Committee to review their present railroad safety rules and procedures.  Particular attention should be given to identifying pinch points and the manner in which personnel may be operating such equipment.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060558



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The Union has requested, and the Company agrees to provide, notice of any technological change or any change in operations at the earliest possible time to the local Safety and Health Committee.  The Committee shall consider the safety and health implications of the proposed changes and make appropriate recommendations to the Company.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060559



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212 5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The Union has raised the question as to the benefit status of an employee who incurs a work-related compensable illness or injury and subsequently is no longer entitled to Workers' Compensation benefits and the Workers' Compensation Supplement.  If the employee is unable to resume the duties of his employment, he will be paid benefit payments equal to the amount of the nonoccupational *Weekly Sickness and Accident Benefit* he would have been eligible for had the injury been nonoccupational.  Such benefits will continue until he is able to resume the duties of his employment, but not to exceed, when added to the weekly benefits received under the Workers' Compensation Supplement, the maximum benefit provided for nonoccupational disability.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060560



**ALCOA**

PUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

If a pensioner, after retiring on a disability retirement, can meet the medical requirements for the job from which he retired and if he is restored to employee status in accordance with Section VI (A)(3) of the Pension Plan, his departmental seniority, plant service, and vacation service shall be defined as his service from his date of restoration plus the amount of his previously accrued seniority/service at the date of his prior retirement provided the period of such prior retirement is not in excess of eight (8) years.

Such employee shall be placed in accordance with his seniority and ability as though the employee had been absent because of sickness.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                     Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA & REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This is to confirm that the Company, during 1996 negotiations, agreed to the following matters:

PCB CONTROL PROGRAM

For the purpose of protecting worker health the Company shall continue its control program for handling and disposing of oils containing polychlorinated biphenyls (PCB's). This program will include, but not be limited to, provisions for testing devices that may contain PCB's, air, and soil sampling, labeling, protective clothing and respirator program, proper training for handling PCB's.

The Local Union Co-Chairman of the Safety and Health Committee or the International Union Safety and Health Department may request in writing from a single source designated by the Company current information as to the program for PCB control.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA & REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This is to confirm that the Company, during 1996 negotiations, agreed to the following matters:

SAMPLING

The Company will continue its program of periodic in-plant air sampling and noise testing under the direction of qualified personnel.  Where the Union Co-Chairman of the Safety and Health Committee reasonably believes there is a significant on-the-job health hazard due to in-plant air pollution, or noise, the Company will make appropriate tests and investigations that are reasonable and necessary and will notify the Union Co-Chairman of the Safety and Health Committee when such a test is to take place.  A report based on such tests and investigations will be reviewed and discussed with the Union Co-Chairman.  For such surveys conducted at the request of the Union Co-Chairman, a written summary of the sampling and testing results and the conclusions of the investigation will be provided to the Union Co-Chairman.

The Company shall provide the Union Co-Chairman, or the Joint Safety and Health Committee, upon request, copies of specific environmental or employee exposure tests or survey reports.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson


**ALCOA**

**PUBLISHED**
USW - ALCOA & REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This is to confirm that the Company, during 1996 negotiations, agreed to the following matters:

**TOXIC MATERIALS**

Where the Company uses materials at levels considered to be toxic under normal conditions of use, or where employees might be exposed to unusual concentrations of toxic materials through accident, it shall inform the affected employees what hazards, if any, are involved and what precautions shall be taken to insure the safety and health of the employees. Upon the written request of the Union Co-Chairman of Safety and Health Committee, the Company shall provide in writing requested information from material safety data sheets, if they are available to the Company, or their equivalent on toxic substances to which employees are exposed in the work place; provided that when the information is considered proprietary, the Company shall so advise the Union Co-Chairman, and provide sufficient information for the Union to make further inquiry.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

PUBLISHED
USW - ALCOA & REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This is to confirm that the Company, during 1996 negotiations, agreed to the following matters:

MEDICAL RECORDS

Employee medical record files shall be maintained under the control of the Medical Department or a licensed physician, under conditions of confidentiality appropriate to ethical medical practice.  An employee's medical record file shall not be released to any individual without the informed written consent of the employee, except where legally required or in grievance and arbitration proceedings, litigation, benefits proceedings, or medical studies.  The Medical Department may provide medical opinions, prognoses, or recommendations to the Company or to the Union, without the consent of the employee, where such information does not contain specific diagnoses or details, and where such information is necessary to the Company as the employer or the Union as the employee representative.  Whenever the company physician detects a medical condition which, in his judgment, requires further medical attention, the company physician shall advise the employee of such condition or to consult with his personal physician.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060565



**ALCOA**

PUBLISHED
USW - ALCOA & REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This is to confirm that the Company during 1996 negotiations agreed to the following matters:

The Company recognizes the special need to provide appropriate safety and health training to all
employees.  The Company presently has safety and health training that provides either the training
described below or the basis for such training as it relates to the needs of the Company and its
various plants.

Training programs shall recognize that there are different needs for safety and health training for
newly hired employees, employees who are transferred or assigned to a new job and employees
who require periodic retraining.

A.  Training of Newly Hired Employees

Newly hired employees shall receive training in the general recognition of safety and health
hazards, the applicable Labor Agreement provisions, and the purpose and function of the
Company's Safety (Health) and Medical Departments, the local Safety Committee and the
International Union Safety and Health Department.  In addition, upon initial assignment to
their duties, they shall receive necessary training on the nature of the operation or process, the
safety and health hazards of their duties, safe working procedures, the purpose, use and
limitations of personal protective equipment required, and other controls or precautions
associated with their duties.

B.  Training of Other Employees

The necessary training of employees, other than those newly hired by the Company shall be
directed to the hazards of the duties to which they are assigned.  Such training shall include
hazard recognition, safe working procedures, purpose, use and limitations of special personal
protective equipment required and any other appropriate specialized instruction.

C.  Retraining

As required by an employee's duties and assignment area, periodic retraining as necessary
shall be given on safe working procedures, hazard recognition, and other necessary procedures
and precautions.

USW060566

Mr. Jim Robinson
June 1, 2006
Page 2

The Union Co-Chairman of the Safety (and Health) Committee and the International Union
Safety and Health Department or a designee shall, upon request, be afforded the opportunity to
review the training program for newly hired employees at the plant level.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



ALCOA

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

The Company and the Union recognize their mutual interest in the continuing economically competitive performance of plant and major operating departments.

However, in light of the potential, far-reaching impact which a permanent shutdown of a plant or major operating department may have on affected employees, a Plant Closing Program shall be established, as follows:

(1)     The Company shall provide ninety (90) days' written notice, if circumstances permit, to the International Union of its intention to permanently close a plant or major department. In the event of such notice, the parties shall immediately commence discussions regarding the impact which the closing will have on affected employees. At the Union's request, the Company shall explain the basis for its decision to close a plant or major operating department.

Without being obligated to bargain over its decision to permanently close a plant or major operating department, the Company shall consider any proposals of the Union which may either postpone or avoid the necessity for the closing, or which may minimize the adverse consequence of the closing for affected employees.

(2)     If a plant or major operating department is to be permanently shut down, the Company and the Union will designate appropriate representatives at the location to coordinate such activities as:

-     liaison with federal, state, and local governmental officials who have some relationship to the assistance of affected employees in an effort to focus governmental support for the affected employees;

-     personal contact with affected employees to assess needs and personal preferences in terms of assistance.

Mr. Jim Robinson
June 1, 2006
Page 2

(3)    The Company will make available informational services to affected employees
       concerning applicable benefit programs and job opportunities possibly available at other
       plants of the Company covered by the Labor Agreement.  The Company shall also
       cooperate with the state unemployment service, area business organizations, and other
       appropriate private or public employment agencies in an effort to secure job placements
       with other employers.


Very truly yours,


Joseph Quaglia, Jr.
Director, Industrial Relations


Confirmed: _____
                    Jim Robinson



**Alcoa**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our agreement during 1996 negotiations that the laboratories and x-ray providers under contract with any of the Company's network administrators agree to accept the negotiated fee as full payment.  The employee is protected from paying charges in excess of this negotiated fee, or "balance billing".

In any instance where a provider persists in balance billing employees for excess charges, the Company agrees to require that the network administrator contact these providers to demand that the billing be ceased.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060570


**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter will confirm the following understanding reached during the negotiations of the 1996 Labor Agreement.

> The Company will transmit to the International Union each month, a list of the names, addresses, ages, dates of hire, and social security numbers of all employees on check-off, indicating whether they are actively employed or on layoff and if the latter the date of such layoff.  The list will be transmitted electronically unless it is not feasible to do so.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter will confirm our discussions during 1996 labor negotiations regarding group insurance conversion privileges of laid-off bargaining-unit employees whose group insurance coverage has expired.  The Company agreed that it would consider any proposals you might have to enhance these privileges so long as they are (1) within the confines of the present plan, and (2) do not increase the costs to the Company of such conversion.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed:

Jim Robinson

USW060572



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This is to confirm the understanding reached during the 1996 labor negotiations that coverages provided under the Group Benefits Plan will be incorporated by reference into the Summary Plan Description booklet and distributed to active employees pursuant to the United Steelworkers Agreement dated June 1, 2001.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                  Jim Robinson

USW060573



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter will confirm our understanding, reached in connection with recent collective bargaining negotiations, that the Company will provide the USWA with a complete list of all assets held by the pension trusts established to provide benefits to USWA members.  This list is to be provided annually within 60 days after the end of each fiscal year.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                     Jim Robinson



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh. PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The Company shall indemnify the Union and hold it harmless against final judicial orders for
back pay in cases in which:  1) the Company is held to have discharged an employee without just
cause and 2) the Union is held to have breached its duty of fair representation to the same
employee as a result of its processing of said employee's discharge grievance; provided,
however, that the foregoing indemnification shall not apply in cases where the Union's breach of
the duty of fair representation is caused by the Union's negligence in failing to appeal a
grievance to the next step in the procedure in a timely fashion.  The Union shall be responsible at
its own cost and expense for their defense of breach of duty suits and it shall cooperate fully with
the Company in defending all such suits.  A judicial order will not be considered final until all
appeal procedures are complete or the parties agree to forego further appeals.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 1996 negotiations the parties agreed that the respective Union and Company Chairmen will meet periodically with appropriate Company officials to be informed of foreign and domestic investments.  At such meetings the Company will provide pertinent data and information on expenditures to facilitate intelligent discussion of the subject.

Very truly yours,

Joseph Quatela, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060576



UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

RE: RIGHT TO BID ON SALE OF FACILITY

Dear Mr. Robinson:

In connection with the recently completed negotiation between United Steelworkers of America
("USWA") and the Company:

1) a) Before the Company enters into a legally binding agreement to sell through a negotiated
transaction, as a going concern, a facility at which a majority of the work force is represented
by the USWA and covered by the recently negotiated master bargaining agreement (a
"Facility"), it shall advise the USWA in writing of its intent to sell the Facility as a going
concern. The USWA shall hold such notice in confidence and not disclose it to any person
except (specify USWA officials), and their investment and legal advisors, all of whom shall
be under a similar obligation of confidentiality. The parties may agree to modify or waive
this confidentiality obligation.

b) Subject to the USWA and the Company entering into a Confidentiality Agreement, as
contemplated in paragraph 2 below, the Company will provide the USWA with information
generally provided to other prospective purchasers.

2) "Confidentiality Agreement" as used herein shall mean a written agreement which is
reasonably acceptable to the Company and entered into between the Company and a
prospective purchaser (including, if applicable, the USWA) governing the furnishing,
confidential treatment and use of any non-public, proprietary and/or confidential information,
whether written or oral, which the company may provide to a prospective purchaser
regarding the Company and/or Facility the company may offer for sale. In the event the
Company and the USWA are unable to agree upon, and execute, such a Confidentiality
Agreement, the Company shall not be obligated to deliver to the USWA any of said non-
public, proprietary and/or confidential information.

3) The terms of this letter shall not apply to: (i) a stock sale, or any other transaction in which
the collective bargaining agreement with respect to the facility is assumed by the prospective

USW060577

Mr. Jim Robinson
June 1, 2006
Page 2

purchaser; (ii) a sale of the Facility not as a going concern; (iii) a transaction which the Company retains a 50% or greater interest in the Facility; (iv) a joint venture; (v) a transaction in which the Facility is being sold together with other assets of the company and (vi) an unsolicited offer.

4) Subject to Items 1-3 above, the USWA shall be given a seven (7) day opportunity to notify the Company that it will submit a bid and the Company and union will decide on a reasonable deadline for a bid submission on the sale of the Facility. The Company reserves the right to reject or accept any bid, including a USWA bid, in its discretion.

5) This agreement may not be transferred or assigned by the USWA except that its rights may be assigned to and exercised by an acquisition entity established by, or for the benefit of, the appropriate USWA-represented employees; and, further provided, that said employees shall own, directly or indirectly, through an employee stock ownership (or similar) plan, not less than fifty-one percent (51%) of the voting equity interest in such acquisition entity.

If the foregoing confirms our mutual understandings and agreement, please sign and return to me the duplicate original copy of this letter agreement at your earliest convenience.

Very truly yours,

Joseph Quaglia Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our understanding during 1996 negotiations regarding Certified Registered
Nurse Anesthetists.  The parties agreed to modify the healthcare plan to extend coverage to
Certified Registered Nurse Anesthetists.  Benefits for all anesthesia-related services will be
limited to the amount of benefits otherwise payable if the anesthesia service was provided and
billed for only by an anesthesiologist.  This total benefit limit will apply whether the services are
billed by a hospital or by the CRNA directly.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060579



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm our understanding during 1996 negotiations regarding dental sealants.
Coverage will be provided for dental sealants at an 85% benefit level, subject to all limitations,
exclusions, and other terms of the dental plan. Specific limits applicable to sealants are as
follows:

- Coverage will be limited to non-carious, non-restored first and second permanent molar
  teeth for children under the age of 14.

- Sealant benefits do not include any repair or replacement of a sealant on any tooth within
  five years of its application.

Very truly yours,

Joseph Quaglia Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060580



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During 1996 negotiations, the Union raised concerns about the ability of EAPs to refer
employees to facilities that are paid on an in-network basis.  The Company agrees that
coordination of EAPs with behavioral health programs is important and that the Company will
work to ensure that the EAP and Behavioral Health Care Program are working cooperatively to
refer patients on an in-network basis.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060581



UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006


Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm our agreement during 1996 negotiations that radial keratotomy and other
surgery to correct refractive errors is not a covered expense under the Plan unless vision is not
correctable to 20/40 with eyeglasses or contact lenses.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations


Confirmed: _____
Jim Robinson

USW060582



**UNPUBLISHED**
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our understanding during the 1996 negotiations the pre-Medicare retirees who retired prior to June 1, 1993 will have the same managed behavioral health as active employees in the same area.  The prescription drug plan will continue to apply to all current retirees.  Those retirees without a local pharmacy will submit a paper claim for reimbursement at actual cost less deductibles and copayments.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____

Jim Robinson

USW060583



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm our understanding during the 1996 negotiations regarding reciprocity for interplant transfers. It is recognized that full plan benefits are not available to employees who transfer to a new managed care network administrator and a network is not available to all family members. In such situations, Alcoa agrees to provide reimbursement to employees who are subject to Out-of-Network benefits. Following the end of the calendar year in which the reduced level of benefits were paid, any employees who are deemed to have qualified for this special payment may present copies of benefit statements reflecting the Out-of-Network penalty to their Human Resources Office, and the Company will reimburse them for this amount.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060584



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our agreement during 1996 negotiations regarding Sickness and Accident
Benefits.

When an employee has provided written notice or proof of disability to the claims administrator
and a dispute arises, a dispute resolution process will be provided (third physician review) in the
event of a dispute relative to an employee's eligibility for Sickness and Accident benefits.
During the dispute resolution process, an employee's Sickness and Accident benefits will be paid
on a continuous basis provided the employee makes arrangements, by signing an authorization
form, to allow the Company to recover any excess of Sickness and Accident benefits.

To resolve a dispute over Sickness and Accident benefit eligibility, a physician approved by both
the employee's treating physician and the Company will review all medical records relating to
the disputed claim and issue an opinion as to the employee's ability to return to work.  The third
physician's opinion will determine the employee's eligibility to continue benefit payments.  All
expenses associated with the review process will be borne by the Company.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
            Jim Robinson

USW060585



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This letter confirms our understanding regarding the offering of Medicare HMOs to retirees and family members who are eligible for Medicare.

It is agreed that such HMOs will be offered on a voluntary basis.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060586



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the course of the 2001 Labor Agreement negotiations, the parties agreed on the substantive changes that would need to be made to the existing Alcoa/USWA Summary Pan Descriptions (SPD) for FlexChoice Spending Accounts, Health Care Agreement, Sickness and Accident Life Insurance Agreement and the Retiree Healthcare Handbook.

The parties agreed that due the short time period allowed for the completion of negotiations, it would be impracticable to complete the drafting of revised SPDs. As a result, the parties agreed to work together after the completion of negotiations to compete the finalization of SPDs. The following process will be followed:

- The Company will incorporate the agreed upon substantive changes and also add additional communications that are now required to be in full compliance with federal regulatory requirements.

- These draft SPDs would then be reviewed with the members of the Alcoa/USWA Joint Health Care Committee for input and revision prior to finalization. The parties will work together in good faith to resolve all issues.

- If there are issues that remain unresolved after these discussions, they will be referred to the Company's Director of Industrial Relations and the Chairman of the USWA's Bargaining Committee for resolution.

The Company will pay for one representative from each Master Agreement location to attend the meetings associated with this process. It is anticipated that it will take from two to four meetings to resolve all issues.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060587


**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the course of the 2001 Labor Agreement negotiations, the Company agreed to provide Rx plan participants with a 14-day supply at a retail pharmacy with no deductible or co-pay when the Mail Order supplier is "out-of-stock". The Mail Order supplier will then provide the full 90-day prescription when the drug becomes available and the mail order co-payment will apply.

In cases where the Mail Order supplier is not able to fill the prescription due to the fault of the manufacturer (manufacturer back order), the 90 prescription will be filled at the retail pharmacy and the 90-day mail order co-payment will apply.

In either situation, the Rx supplier will contact the participant within five days of receipt of the claim to let them know that the prescription is "out-of-stock" or on "manufacturer back order".

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the course of the 2001 Labor Agreement negotiations, the parties agreed that it would be best if the Company's Health Care Network providers made payments directly to Out-of-network providers rather than making those payments directly to employees.  The parties have agreed to jointly explore options with Alcoa's Health Care Network providers to see whether this process can be established in the future.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
              Jim Robinson

USW060589



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the course of the 2001 Labor Agreement negotiations, the Company reviewed their intent for Reasonable & Customary (R&C) determination.  The Company has instructed it's select vendors to process all out-of-network claims at the 90th percentile of HIAA.  We will continue to utilize the 90th percentile of HIAA if vendor changes are made.

Very truly yours,

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060590



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 1996 negotiations, the Union expressed concern regarding the Company's treatment of dividends in the Alcoa Stock Fund. The Company commits to provide the Union with a written explanation of the unit accounting method used by the trustee of the Alcoa Stock Fund, and the timing of the dividend payments to the trust. We will also provide communication to employees concerning these matters. The Company commits to investigate the feasibility of producing a more detailed statement, on demand, as needed.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax:1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our agreement during 1996 negotiations regarding Pension Administrative
Issues:

1.  The Company and the Union agree to eliminate the 85% limitation.

2.  The Company and the Union agree to eliminate the deduction for Workers'
    Compensation payments.

3.  The Company and the Union agree to replace the Summary of the Pension Agreement
    with the Summary Plan Description.  The Pension Agreement will be distributed along
    with the SPD.

4.  The Company and the Union agree to allow certain restored pension service to be used
    for retirement eligibility in addition to benefit accrual.  The Company will provide a list
    of affected individuals.  In no instance will this result in a reduction in benefit.

5.  The Company and the Union agree to continue discussions regarding changes to the
    Pension Agreement for "Modified Tacking" on a prospective basis, as long as no one
    loses an accrued benefit.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060592


**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 1996 negotiations, the parties reviewed that area of our relationship which has been constructively developed over more than twenty years and which has addressed itself to potential safety and health hazards, particularly those in the area of heat stress.

This is to reaffirm the Company's intent to continue the advancement of that relationship under the auspices of the corporate Safety and Health and the corporate Industrial Relations Departments and the International Unions appropriate headquarters representatives.

Nothing herein modifies any existing obligations of the parties at the local level.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060593



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

Attached is a list of hourly employees who are impacted by the restoration of service agreed to during 1996 negotiations.  Also attached is a draft of the letter which will be sent to each affected individual in the month of June.

Please call Mary Ellen Lammel at 412/553-2288 if you have further questions concerning this matter.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060594



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the 2001 contract negotiations, the parties discussed the competitiveness of Master Agreement locations. Master Agreement locations continue to face major competition from both domestic and global operations. Both parties recognize that long-term survival and potential growth in these locations will only result if we can find better ways to work together. Future success will be determined by our ability to make change at accelerated rates.

Leaders of both institutions believe that the Master Agreement locations should drive toward or continue to be world-class operations in terms of safety, productivity and workers' job satisfaction. Furthermore, the leaders believe that the full adoption of the Partnership Agreement and the Alcoa Production System (APS) will be enablers in this process. Toward this end, the leaders of both institutions have agreed to pilot two experiments involving APS adoption at two mutually agreed to operations. In addition, the leaders believe that over time by adopting APS, employees will gain greater job satisfaction and additional security. Furthermore, success will lead to greater levels of compensation and the parties believe that through the full adoption of Partnership/APS, employees will gain greater long-term security and operations will have the potential for added growth.

Given this background the Top Level Committee agrees and commits to the following:

**Goal:**
In its basic form, APS requires product to the customer; on demand, one by one, defect free and at the lowest cost. To accomplish this it is important that the pilots provide a system that will enable the right employee, with the right skills, to be available in the right place, at the right time.

**Sites:**
There will be at least two pilots.

**Charge:**
The local parties will jointly attend an Alcoa University. This training will provide the group with a common foundation in the Alcoa Production System. Once the flowpath has been properly designed, the local parties will identify the critical jobs at the named sites. These jobs will be analyzed in terms of APS requirements and if necessary the jobs will be redesigned.

USW060595

Mr. Jim Robinson
June 1, 2006
Page 2

Following this evaluation and redesign, the parties will assess the required skills for these critical jobs. Finally, the parties will be required to review and determine appropriate methods that can be used for future job bidding and selection. The adoption of new methods shall be respectful of seniority.

**Resources:**
It is understood by the parties, that these pilots will require resources to enable the local parties to examine or benchmark other models and to gain expertise in APS. Outside resources will be provided by the company, as necessary.

**Measures:**
The local parties should establish appropriate measurements to evaluate the effectiveness of the respective pilots. Examples of such measures might include: safety performance, generation of problem solving ideas, increase in weighted average job grade, reduction in overall scrap, productivity improvements, elimination in waste, reduced costs, and improved job satisfaction.

**Oversight and Timing:**
These pilots will commence immediately and the involved locations will make periodic reports to the respective location Plant Steering Committee. In addition, joint progress reports will be provided to the Top Level Committee on a quarterly basis. Locations must demonstrate rapid and significant progress to continue as a pilot.

**Safeguards:**
The parties agree that employment security is both a priority objective of the cooperative partnership agreement and APS. Therefore the Company reaffirms its commitments outlined in the employment security provision of the Partnership Agreement.

The Top Level Committee recognizes that the implementation of APS is a long-term process and involves continuous learning. Mistakes should not be viewed as failure, but as opportunities for improvement. The parties' intent is that the learning gained in these pilots will spread rapidly across all locations participating in this agreement.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson

USW060596



**ALCOA**

UNPUBLISHED
ALL MASTER AGREEMENT LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This letter will confirm our discussions and agreement regarding references by the Company to the parties' Partnership Agreement and Productivity agreements (APS) during USWA organizing campaigns. In these discussions, the Company has explained that, having bargained for the USWA's agreement to Partnership and Productivity, the Company does not intend to use those agreements, or their consequences or effects, in any manner adverse to the Union's organizing efforts.

Accordingly, in exchange for the Union's willingness to enter into Partnership Agreements and Productivity (APS) agreements, the Company commits and agrees that in the event the USWA seeks to represent Company employees, the Company will not reference the Partnership or Productivity (APS) agreements between the parties, or the consequences to or effects of these agreements, in any communications to employees the USWA is seeking to represent.

Neither party will utilize this letter or understanding in the grievance or arbitration procedure.

If the foregoing accurately states our understandings and agreement, please confirm by signing below.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                      Jim Robinson



**ALCOA**

UNPUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212 5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This will confirm our agreement that under the 2001 Labor Agreement, employees at Davenport, Lafayette, Massena, and Warrick will have 53.6¢ per hour worked deposited in the 401(k) savings plan. The 53.6¢ is diverted from the Cost-of-Living Adjustment that became effective March 3, 1986, and is otherwise not payable under the 2001 Labor Agreement.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
Jim Robinson



**UNPUBLISHED**
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This is to confirm our understanding that the claims procedure in the Aluminum, Brick and Glass Workers Health Care Agreement will be revised to include a grievance procedure as follows:

"An employee problem, complaint, or grievance concerning health care coverages (medical, dental, prescription drug, behavioral health, dental, and vision) will be handled under the grievance and arbitration provisions of your collecting bargaining agreement".

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060599



UNPUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will reconfirm that during the course of our 1977 negotiations, the parties discussed the application of seniority as related to equal employment opportunities for all employees in our bargaining unit.  The Joint Committee established under the Memorandum of Understanding dated February 1, 1976, shall continue to review the application of seniority as it relates to the equal opportunity requirements of the various Civil Rights, Handicapped and Vietnam Era Veterans laws.

It was agreed that if exceptions to the application of seniority are necessary to assure the rights of protected individuals, they will be implemented.  Such exceptions may include, but are not limited to, Apprentice Programs, promotions, movements within a line of progression and transfers between departments.

Before implementing such an exception, the Company will discuss the matter with local Union representatives.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



UNPUBLISHED
ABG - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm our agreement during the 1996 negotiations regarding pension service.
Effective October 1, 1996, the calculation of pension service will be amended to include "days".
Under no circumstance will an employee be adversely affected by this change.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
            Jim Robinson



UNPUBLISHED
USW - ALCOA

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During our discussions of the 1996 Settlement Agreement we agreed to specifically list the Local Unions on that agreement. No local union designations are given for the New Kensington, Pennsylvania, or Marshall, Texas, plants which are shutdown.

This will confirm our agreement that the failure to list those facilities on the Settlement Agreement shall not adversely affect the rights, if any, of individuals who worked at those facilities. In the event a dispute arises as to the rights, if any, of such individuals, it shall be resolved as though those local union numbers had been included on the Settlement Agreement.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

USW060602



ALCOA

UNPUBLISHED
ABG REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This is to confirm that the Aluminum Worker Plants covered by the National Negotiations may at their options choose to incorporate into their labor agreement the attached Seniority and Recall provisions negotiated with the Steelworkers in the 1996 Master Agreement as a substitute for your current language.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

UNPUBLISHED
ABG REYNOLDS

INSERT

ARTICLE XXV SENIORITY

Section 5 (C)

*Insert after "is laid off in excess of five years in any one layoff if the employee has less than five (5) years of service":*

Unless the employee gives notice as provided herein;

*Insert at the end of the sentence:*

Unless the employee gives notice as provided herein.  To comply with the notice requirement of this section, an employee may extend his seniority on a year-to-year basis by notifying the Company and the Union by certified mail postmarked between October 1 and October 31 of each year that he desires to retain his seniority rights for an additional year.



UNPUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

This will confirm that the United Steelworkers of America and Reynolds Metals Company agree to incorporate this addendum into the SUBSTANCE ABUSE PROGRAM negotiated in 1987-1988 between the parties.  Notwithstanding any other provisions or language in the existing, agreed to Policy and Procedures, the following shall control:

1.  Employee off-the-job involvement with alcohol and drugs will not be a violation of this Policy as long as that involvement does not impact the employee's ability to perform his/her duties in a safe and productive manner.

2.  Wherever "Company premises" is used it will include supplied parking lots.

3.  Alcohol which has the seal unbroken and which is contained in a private vehicle shall not be considered a violation of the Policy.

4.  All blood and urine tests shall be performed by a certified laboratory.

5.  Wherever the phrase "reasonable suspicion" is used it shall mean reasonable suspicion as measured by objective standards identified in Attachment 1 of the Procedures.

6.  Any disciplinary actions taken under this Policy and Procedures shall be subject to the grievance and arbitration procedure including the right to challenge whether or not "reasonable suspicion" existed prior to confrontation or demand to search or testing.  If it is determined that "reasonable suspicion" did not exist, then any subsequent disciplinary action shall be considered invalid.  The Company shall have the burden of proof to prove "reasonable suspicion."

7.  Where an employee who has been found in violation of this Policy has previously voluntarily enrolled in Reynolds Employee Assistance Program, that employee will, nevertheless, be entitled to enter a Memorandum of Agreement under this Policy.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson

UNPUBLISHED
USW - REYNOLDS

## UNION LEAVE

A.    The Company recognizes that it previously granted certain Employees Union-related

leaves of absence without pay that commenced prior to June 1, 1996.  These leaves were

for the sole purpose of conducting legitimate Union business as full-time Union officials.

The participant status of these Employees under the Pension Plan for Hourly Employees

(Pension Plan) and the Employee Group Benefit Plan (Benefit Plan) shall remain the

same as it was on May 31, 1996 for the duration of those leaves.


B.    Where the Company grants an Employee a Union-related leave of absence without pay

that commences subsequent to May 31, 1996 for the sole purpose of conducting

legitimate Union business as a permanent full-time Union official, the Employee shall

not, during the period of such leave, accrue pension service under the Pension Plan.  An

Employee on such a leave shall also not be eligible for group life insurance coverage

under the Benefit Plan nor health-related benefits under the Benefit Plan (presently

hospital, medical, vision and dental coverage).  An Employee shall not be considered a

permanent full-time Union Official during any period of probation for Union office not

exceeding twelve (12) months.


C.    Upon the termination of a leave of absence to assume a permanent full-time Union

position, the employee's pension service under the Pension Plan and other benefits under

the Benefit Plan, shall recommence when the Employee:  (1) returns to active

employment in the collective bargaining unit, (2) goes on layoff, or (3) goes on a leave of

absence not related to Union business.  Upon the termination of such a leave, the

Employee shall be assigned his prior seniority and service dates for purposes of job assignments, layoffs and vacations. The Employee, however, shall not be eligible for any other type of hourly benefit or payment that accrued during the period of such a leave.

D.    An Employee granted a leave of absence to assume a Union office on a probationary basis shall, during such leave, continue to be: eligible for group life insurance coverage; eligible to receive health-related benefits under the Benefit Plan; and shall be retroactively credited with pension service under the Pension Plan for the probationary period, if the Employee does not qualify for pension service under the Union's Pension Plan at the end of the probationary period. An Employee on leave of absence to fill a permanent full-time Union office shall be covered under this paragraph "D" during any period of probation for the Union office not exceeding twelve (12) months. The Union shall provide the Company with timely notice about the termination of any Union official's probationary period.

For the Company:

Joseph Quaglia, Jr.

For the Union:

Jim Robinson



**ALCOA**

UNPUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

The following matters were resolved pertaining to Article XX, Safety and Health.

The Union affirms that it is the Company's responsibility to provide for the safety and health of its employees and that the Union's role in this regard will be advisory and supportive in promoting safe and healthful practices and programs.  Further, the Union affirms that it will make every reasonable effort to encourage the cooperation of its representatives and members with such practices and programs and will discourage premature and/or unnecessary appeals to governmental bodies to intervene in the resolution of any issues.

The Company has established procedures that, in effect, indemnify and hold harmless the Union and its officers, agents, and employees and the local committees which are functioning in the bargaining units covered by the labor agreement from any and all claims and suits for damages, concerning safety and health, including any claims in which the Union, its committees, officers, agents and employees are alleged to have been solely, severally or jointly negligent based upon either acts of omission or commission, but not including any claim based upon an agreement by the Union to indemnify or insure employees of the Company, against illness or injury, including death, when such claims are based on any injuries or illnesses, including death, of employees of the Company and such injuries or illnesses arise or grow out of and in the course of the employment of such employees by the Company.

The obligation of the Company to indemnify the Union shall be subject to the following conditions:

1. The Union shall give the Company immediate notice of any pertinent claim made against the Union, its committees, officers, agents and employees and shall effectively tender to the Company control of the defense and settlement of such claim; and

2. The Union, its committees, officers, agents and employees shall cooperate fully with the Company, at no expense to the Company, in the investigation and defense of all such claims, and shall take no action prejudicial to the successful defense of any such claims; and

Mr. Jim Robinson
June 1, 2006
Page 2

3. The Company shall have all rights of defense, set-off, counter-claim and subrogation in connection with such claims which may be available to the Union, its committees, officers, agents and employees and any necessary person shall execute such instruments as may be reasonable and appropriate to enable the Company to exercise such rights; and

4. The Company shall have no duty to indemnify the Union, its committees, officers, agents, or employees against any claim resulting in whole or in part from the failure or refusal of a number of members of the Union to use equipment or procedures established and made known to the employees by the Company; and

5. On and after July 1, 1996, the Company may terminate on thirty (30) days' notice its duty to indemnify. Notice of such termination shall not relieve the Company of any obligation to indemnify against any claim of which the Company had notice before giving the Union notice of termination. If not terminated by notice given prior thereto, this duty to indemnify shall terminate at midnight, May 31, 2001, unless extended by the express, mutual agreement of the Union and Company.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                        Jim Robinson



**ALCOA**

UNPUBLISHED
USW - REYNOLDS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN  46402

Dear Mr. Robinson:

During the course of the negotiations of our 1996 Labor Agreement, the parties discussed
reflecting the Company's 401 (k) contribution on the employee's pay stub each week.  The
Company agrees to make every effort to have this payroll function complete by July 1, 1996 and
the information reflected on the pay stubs starting thereafter.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                     Jim Robinson

USW060610



**ALCOA**

NEW
SOME MASTER AGREEMENT
LOCATIONS

**Alcoa**

201 Isabella St at 7th St Bridge
Pittsburgh, PA 15212-5858 USA
Tel: 1 412 553 4545
Fax: 1 412 553 4498

June 1, 2006

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

During the 2001 contract negotiations, the parties discussed the voluntary Universal Life and
Cancer Insurance offered to employees of Richmond Foil and Louisville 1. These plans are
voluntary and have been offered through payroll deduction.

The Company agrees to continue such payroll deductions for employees who were enrolled as of
September 27, 2001. Payroll deductions for voluntary Universal Life and Cancer will not be
offered to any employees after September 27, 2001.

Very truly yours,

Joseph Quaglia, Jr.
Director, Industrial Relations

Confirmed: _____
                    Jim Robinson