# EXHIBIT 35

## SETTLEMENT AGREEMENT

The United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO, CLC ("Union"), on behalf of its locals identified herein, and Alcoa Inc. ("Company") agree that the current labor agreements and working rules for the Company's facilities at Alcoa, TN (Local 309); Badin, NC (Local 303); Davenport, IA (Local 105); Gum Springs, AR (Local 5073); Lafayette, IN (Local 115); Massena, NY (Locals 420 and 450A); Point Comfort, TX (Local 4370-01); Rockdale, TX (Local 4895-01); Warrick, IN (Local 104); and Wenatchee, WA (Aluminum Trades Council) shall remain unchanged except as modified below to provide new labor agreements dated June 1, 2010.

The effective date of changes shall be June 1, 2010 unless otherwise specified in this Settlement Agreement or the applicable Attachments. This Settlement Agreement is also subject to ratification by the Union's members.

USW054197

USW054197

# SETTLEMENT AGREEMENT

Alcoa Inc. and the United Steelworkers (USW) International Union and its locals (see below) hereby agree to the following in full and complete settlement of all proposals and issues considered during the 2010 negotiations.

| | |
|---|---|
| Alcoa, Tennessee | Local 309 |
| Badin, North Carolina | Local 303 |
| Point Comfort, Texas | Local 4370 |
| Rockdale, Texas | Local 4895 |

Period of Agreement: June 1, 2010 through May 15, 2014.

| | |
|---|---|
| Attachment 1 | Wages |
| Attachment 2 | Pension, Lump Sums and Signing Bonus |
| Attachment 3 | Pay for Performance |
| Attachment 4 | Health & Welfare and Contributions |
| Attachment 5 | Retiree Health Care |
| Attachment 6 | Compensation Plan for Future New Hires and Rehires |
| Attachment 7 | Cost of Living Adjustment (COLA) and Income Maintenance Allowance (IMA) |
| Attachment 8 | Early Retiree Reinsurance Program |
| Attachment 9 | Investment Commitment |
| Attachment 10 | Joint Efforts Agreement |
| Attachment 11 | Termination of Seniority |
| Attachment 12 | Arbitration Answers |
| Attachment 13 | Team Leader & Team Roles |
| Attachment 14 | Probationary Period |
| Attachment 15 | Procedures for Addressing Employee Safety Concerns |
| Attachment 16 | Annual HS&E Conference Timing |

USW054198
USW054197

| | |
|---|---|
| Attachment 17 | Year-end Vacation Payment |
| Attachment 18 | FMLA Absences & Seniority Adjustments |
| Attachment 19 | Apprentice Rates |
| Attachment 20 | Labor Agreement Administrative Changes |
| Attachment 21 | Administrative Clean-up |

For Union:

_____

_____

_____

_____

_____

_____

For Company:

_____

_____

_____

_____

_____

_____

USW054199

USW054197

**Badin/Pt Comfort/Rockdale/Tennessee**

|        | 6/7/2010 | 6/4/2012 | 6/3/2013 |
|--------|----------|----------|----------|
| JG 1&2 | 17.201   | 17.631   | 18.072   |
| 3      | 17.429   | 17.865   | 18.312   |
| 4      | 17.659   | 18.100   | 18.553   |
| 5      | 17.887   | 18.334   | 18.792   |
| 6      | 18.115   | 18.568   | 19.032   |
| 7      | 18.344   | 18.803   | 19.273   |
| 8      | 18.572   | 19.036   | 19.512   |
| 9      | 18.802   | 19.272   | 19.754   |
| 10     | 19.030   | 19.506   | 19.994   |
| 11     | 19.258   | 19.739   | 20.232   |
| 12     | 19.487   | 19.974   | 20.473   |
| 13     | 19.716   | 20.209   | 20.714   |
| 14     | 19.945   | 20.444   | 20.955   |
| 15     | 20.173   | 20.677   | 21.194   |
| 16     | 20.401   | 20.911   | 21.434   |
| 17     | 20.630   | 21.146   | 21.675   |
| 18     | 20.859   | 21.380   | 21.915   |
| 19     | 21.088   | 21.615   | 22.155   |
| 20     | 21.316   | 21.849   | 22.395   |
| 21     | 21.544   | 22.083   | 22.635   |
| 22     | 21.773   | 22.317   | 22.875   |
| 23     | 22.002   | 22.552   | 23.116   |
| 24     | 22.231   | 22.787   | 23.357   |
| 25     | 22.459   | 23.020   | 23.596   |
| 26     | 22.687   | 23.254   | 23.835   |
| 27     | 22.916   | 23.489   | 24.076   |
| 28     | 23.145   | 23.724   | 24.317   |
| 29     | 23.374   | 23.958   | 24.557   |
| 30     | 23.602   | 24.192   | 24.797   |
| 31     | 23.830   | 24.426   | 25.037   |
| 32     | 24.059   | 24.660   | 25.277   |

ATTACHMENT 1

USW054200

USW054197

Alcoa / USW Master Agreement Negotiations
Company's Last, Best and Final Offer
May 31, 2010

The terms of this offer, including the signing bonus, if not ratified, will expire at 11:59 p.m. on June 30, 2010.

| Term of Agreement | 4 years: June 1, 2010 through May 15, 2014[1] |
|---|---|
| Wage Schedule | July 5, 2010: $1,000 lump sum to all active employees<br><br>June 6, 2011: $1,750 lump sum to all active employees<br><br>June 4, 2012: Two and one-half percent (2.5%) increase to all job grades<br><br>June 3, 2013: Two and one-half percent (2.5%) increase to all job grades |
| Active H&W Benefits effective January 1, 2011 | ▪ Current Master Healthcare Plan with changes specified in Attachment A<br><br>▪ Employee contributions as specified in Attachment B |
| Pension Plan | ▪ $2.00 increase to all pension factors effective for retirements occurring on or after July 1, 2010.<br>▪ 75% Joint Survivor Spouse option as last proposed by Rosati to Burnell |
| Retiree Health Care Letter | ▪ Pre-Medicare-eligible participants: Same medical and prescription drug coverage as active employees (per Attachment A). Increase monthly participant contribution by:<br>   ➢ Additional $10/month effective January 2011;<br>   ➢ Additional $5/month effective January 2013.<br>▪ Medicare-eligible participants: No change to medical plan. Same prescription drug coverage as active employees (per Attachment A). Increase monthly participant contribution by:<br>   ➢ Additional $5/month effective January 2011;<br>   ➢ Additional $5/month effective January 2013.<br>▪ Above-stated premium increases apply to all "USW Locations" but will not apply to "Other USW Locations".<br><br>▪ Existing caps to continue unchanged from 2006 letter.<br>▪ Company will provide annual contribution to Retiree Health Care Account of 3.75 million dollars as of December 31 of each year beginning in 2011 and ending in 2014 for a total of fifteen (15) million dollars.<br>▪ Variable Company contributions are eliminated.<br><br>Revised letter – Attachment D |

---

[1] Letter of Understanding to adjust all relevant May 31 dates to May 15

NOTE: All lump sums subject to applicable payroll tax. Parties to discuss possible deferral to Savings Plan.

**ATTACHMENT 2**

USW054201

USW054197

Alcoa / USW Master Agreement Negotiations
Company's Last, Best and Final Offer
May 31, 2010

| | |
|---|---|
| Surviving Spouse Lump Sum | • $1,000 to surviving spouses of post June 1, 1993 retirees;<br>• $750 to surviving spouses of post June 1, 1993 retirees. |
| Lump Sum Signing Bonus | • $1,250 to all employees who are in active employment status on the date of ratification, or who return to work within thirty (30) days of ratification. Signing bonus will also be paid to all employees who are not at work and receiving workers' compensation or who are on a military leave of absence on the date of ratification. Signing bonus is offered on the condition that tentative agreement is fully endorsed by the USW. Payable in July 2010 pending discussion on Savings Plan deferral.<br><br>• Offer of signing bonus is withdrawn if agreement is not ratified by June 30, 2010. |
| New Employees Hired (or rehired) after July 1, 2010 | • Not eligible for retiree medical coverage. Company will contribute $0.40/hour to savings plan sub-account per Company proposal of 5/24/2010. ***Tentative Agreement*** |
| Cost of Living Adjustment(COLA) | For all Master Labor Agreements, roll the current COLA amounts into existing base rates and eliminate all COLA language from the Labor Agreements effective June 1, 2010. The 53.6 cents per hour for ABG locations currently diverted to the 401(k) savings plan will continue. |
| Performance Pay | Attachment C<br><br>***Tentative Agreement*** |
| Retiree Reinsurance under PP&AHCA | Attachment E |
| IMA | Eliminate from all Agreements<br><br>***Tentative Agreement*** |
| Sickness and Accident (S&A) Benefits | • Effective January 1, 2011, and each January 1 thereafter through May 2014, reduce the 2010 weekly S&A benefit schedule by an amount equal to the average weekly employee healthcare contribution.<br><br>• Effective January 1, 2011, an employee will not be required to pay for healthcare contributions for such period as s/he is receiving S&A benefits.<br><br>***Tentative Agreement*** – Attachment F |

2

USW054202

USW054197

May 29, 2010
**Company Counter Proposal to Union Proposal No. 57 – 75% Optional Surviving Spouse Pension**

Summary of Counter Proposal
Proposed language modifications to reflect the 75% Optional Surviving Spouse Pension required by the Pension Protection Act effective January 1, 2009. In addition, for employees hired before June 23, 2006 and who retire from active service on or after January 1, 2011 (not deferred vested retirements), the reduction applicable for the 75% Optional Surviving Spouse Pension will be 9%. All others will have a reduction based on actuarial equivalent factors.

**Modifications to Pension Agreement for Employees Hired Before June 23, 2006**

**4.3    Amount of Post-Retirement Surviving Spouse Pension**

(a) The **automatic** surviving spouse's monthly pension under paragraph 4.1(c) or (d) shall be fifty percent (50%) of the retired Employee's basic monthly pension (reduced as provided in paragraph 4.5 **(a) or (b), as applicable**, and not including any supplemental pension) payable at the date of death; except that, in the case of an Employee who shall have retired under paragraph 2.3, who shall have elected for his or her monthly pension to commence as provided under paragraph 3.1(c)(1), and who shall die prior to the commencement of such monthly pension, such surviving spouse pension shall be fifty percent (50%) of the retired Employee's basic monthly pension, reduced as provided in paragraph 4.5(a) and further reduced to its equivalent actuarial value as of the date of such retired Employee's death. (See Table II contained herein.)

(b) **Effective January 1, 2009, a participant may elect a 75% Optional Surviving Spouse Pension. The surviving spouse's monthly pension under such option shall be seventy-five percent (75%) of the retired Participant's basic monthly pension (reduced as provided in paragraph 4.5(c) or (d), as applicable, and not including any supplemental pension) payable at the date of death.**

**4.4    Election or Rejection**

A retired or former Employee who satisfied the requirements of paragraph 4.1(b), (c) or (d) shall automatically be deemed to have elected the surviving spouse pension set forth herein unless he or she shall have specifically rejected in writing with the spouse's notarized written consent such automatic election and shall not have revoked in writing any such rejection prior to the earliest date for which a pension payment is made. **In the event a participant shall have elected the 75% Optional Surviving Spouse Pension in writing within 90 days of retirement and subsequently dies prior to such retirement date, applicable surviving spouse payments will be based on the 75% Optional election on file.**

**4.5    Effect of Election on Retirement Pension**

(a)    The monthly pension (not including any supplemental pension) otherwise payable to a retired Employee who has not specifically rejected the automatic election of the surviving spouse pension set forth in paragraph ~~4.1(c)~~ **4.3(a)** above, shall be reduced by an amount equal to five percent (5%) of such monthly pension.

(b)    The monthly pension (not including any supplemental pension) otherwise payable to a person who has not specifically rejected the automatic election of the surviving spouse pension set forth in paragraph 4.1(b) or 4.1(d) above shall be payable in a reduced amount calculated by subtracting the applicable percentages shown in Table IIIA for the period of Pre-Retirement coverage, then multiplying such monthly pension by the applicable percentage shown in Table III contained herein for Post-Retirement coverage.

(c)    **The monthly pension (not including any supplemental pension) otherwise payable to a retired Employee who has elected the 75% Optional Surviving Spouse Pension set forth in paragraph 4.3(b) above, shall be reduced by the applicable Equivalent Actuarial Value factor based on the age of the participant and spouse at the date of retirement. Effective for retirements on or after January 1, 2011, the monthly pension (not including any supplemental pension) otherwise payable to a retired Employee who has elected the 75% Optional Surviving Spouse Pension set forth in paragraph 4.3(b) above, shall be reduced by an amount equal to nine percent (9%) of such monthly pension.**

(d)    **The monthly pension (not including any supplemental pension) otherwise payable to a person who has not specifically rejected the automatic election of the surviving spouse pension set forth in paragraph 4.1(b) and has elected the 75% Optional Surviving Spouse Pension as set forth in paragraph 4.3(b) above shall be payable in a reduced amount calculated by subtracting the applicable percentages shown in Table IIIA for the period of Pre-Retirement coverage, then multiplying such monthly pension by the applicable Equivalent Actuarial Value factor based on the age of the participant and spouse at the date of retirement.**

(e)    In no event shall the reduction in pension applicable for Post-Retirement coverage options provided for above be greater than the reduction determined based on the Equivalent Actuarial Value of the applicable option.

(f)    "Equivalent Actuarial Value" is based on an interest rate of 5% and the RP 2000 Combined Healthy Mortality Tables (blended 80% male and 20% female for the participant and blended 20% male and 80% female for the spouse).

3

OVER

USW054203

USW054197

**4.6    Effect of Death or Divorce of Spouse on Retirement Pension**

In the event the designated spouse described in paragraph 4.1(c) above shall predecease the retired Employee or they shall be lawfully divorced, and a Qualified Domestic Relations Order (QDRO) states that the surviving spouse pension may be canceled, the retired Employee may cancel the **automatic** surviving spouse pension election **or the 75% Optional Surviving Spouse Pension election for those retiring on or after January 1, 2011** by giving proof of such death or proof of such divorce (including the QDRO) to the Company's Benefits Management Committee. In such cases the retired Employee's monthly pension shall be restored to the amount which would have been payable but for the automatic election of the surviving spouse pension, effective on the first day of the month following the month in which the Company's Benefits Management Committee shall receive such proof. In the case of such divorce, until any such cancellation becomes effective, such designated former spouse shall, notwithstanding the divorce, remain eligible to receive the surviving spouse pension.

### Modifications to Pension Agreement for Employees Hired or Rehired on or After June 23, 2006

**4.3    Amount of Post-Retirement Surviving Spouse Pension**

**(a)** The **automatic** surviving spouse's monthly pension under paragraph 4.1(c) or (d) shall be fifty percent (50%) of the retired Employee's basic monthly pension (reduced as provided in paragraph 4.5 **(a) or (b), as applicable** and not including any supplemental pension) payable at the date of death.)

**(b) Effective January 1, 2009, a participant may elect a 75% Optional Surviving Spouse Pension. The surviving spouse's monthly pension under such option shall be seventy-five percent (75%) of the retired Participant's basic monthly pension (reduced as provided in paragraph 4.5(c) or (d), as applicable, and not including any supplemental pension) payable at the date of death.**

**4.4    Election or Rejection**

A retired or former Employee who satisfied the requirements of paragraph 4.1(b), (c) or (d) shall automatically be deemed to have elected the surviving spouse pension set forth herein unless he or she shall have specifically rejected in writing with the spouse's notarized written consent such automatic election and shall not have revoked in writing any such rejection prior to the earliest date for which a pension payment is made. **In the event a participant has elected in writing to the 75% Optional Surviving Spouse Pension within 90 days of retirement and subsequently dies prior to such retirement date, applicable surviving spouse payments will be based on the 75% Optional election on file.**

**4.5    Effect of Election on Retirement Pension**

(a)    The monthly pension (not including any supplemental pension) otherwise payable to a retired Employee who has not specifically rejected the automatic election of the surviving spouse pension set forth in paragraph 4.1(c) **4.3(a)** above, shall be reduced by multiplying the monthly pension by the applicable percentage shown in Table II contained herein for Post-Retirement coverage.

(b)    The monthly pension (not including any supplemental pension) otherwise payable to a person who has not specifically rejected the automatic election of the surviving spouse pension set forth in paragraph 4.1(b) or 4.1(d) above shall be payable in a reduced amount calculated by subtracting the applicable percentages shown in Table IIA for the period of Pre-Retirement coverage, then multiplying such monthly pension by the applicable percentage shown in Table II contained herein for Post-Retirement coverage.

**(c)    The monthly pension (not including any supplemental pension) otherwise payable to a retired Employee who has elected the 75% Optional Surviving Spouse Pension set forth in paragraph 4.3(b) above, shall be reduced by the Equivalent Actuarial Value factor based on the age of the participant and spouse at the date of retirement.**

**(d)    The monthly pension (not including any supplemental pension) otherwise payable to a person who has not specifically rejected the automatic election of the surviving spouse pension set forth in paragraph 4.1(b) and has elected the 75% Optional Surviving Spouse Pension as set forth in paragraph 4.3(b) above shall be payable in a reduced amount calculated by subtracting the applicable percentages shown in Table IIA for the period of Pre-Retirement coverage, then multiplying such monthly pension by the applicable Equivalent Actuarial Value factor based on the age of the participant and spouse at the date of retirement.**

(e)    In no event shall the reduction in pension applicable for Post-Retirement coverage options provided for above be greater than the reduction determined based on the Equivalent Actuarial Value of the applicable option.

(f)    "Equivalent Actuarial Value" is based on an interest rate of 5% and the RP 2000 Combined Healthy Mortality Tables (blended 80% male and 20% female for the participant and blended 20% male and 80% female for the spouse).

USW054204

USW054197

ATTACHMENT C                                                           Company Proposal
Alcoa / USW Master Agreement Negotiations                                May 30, 2010

## PERFORMANCE PAY

During 2010~~06~~ negotiations, the parties agreed to modify the Performance Pay Plan. The modified plan will provide for participation by hourly employees represented by the Union in the plants located at Davenport, Lafayette, Massena (East and West plants), Warrick, Wenatchee, Point Comfort, Rockdale and Tennessee., ~~Richmond Foil, Louisville 1, and Hot Springs.~~ Hourly employees represented by the Union in plants located at ~~Bauxite, Arkansas,~~ Gum Springs, Badin, and any curtailed operation of the above-named plants~~Louisville 15 and Massena Global Cold Finishing~~ will participate in the Performance Pay Plan set forth in the 2001 Labor Agreement under the terms of that Plan for the term of the 2010~~06~~ Labor Agreement.

### I.    GENERAL

The purpose of Performance Pay is to allow employees to share in profits and the financial impact of operating improvements while focusing employees in a Location on business goals that are critical to the long term success of the Location.  Working together and achieving Location goals will result in increased profitability for the business and monetary reward and security for employees.

Guiding Principles for Performance Pay

-    The design and goals will be consistent with the Location's business strategies and with Alcoa's Vision and Values.

-    The design and goals should support teamwork and employee involvement, be perceived as fair, and be easily understood by employees.

-    The award opportunity will be based on improvement against an objective and verifiable set of measurements for each factor(s) being measured.

-    Performance payouts will supplement the negotiated base level of wages.

### II.    EFFECTIVE DATE

The Performance Pay Plan found in the 2006~~4~~ Labor Agreement will be applicable for the remainder of 2010~~06~~ under the provisions of that plan and will continue to be applicable to employees at those plants specified above. The provisions of this plan will be applicable to all other employees commencing January 1, 2011~~07~~.

### III.    DESIGN

#### 1.    General

A minimal number of financial improvement measures will be identified and established.

The payout to employees for Performance Pay will consist of 20% of the savings associated with improvement as measured against the base for each factor with all factors netted together.

The award opportunity will be based on Location measurements or on a smaller than location basis if agreed to by the parties.

The plan is intended to stimulate improved engagement and problem solving to achieve significant improvement over past performance in cost improvement and productivity.

Plan results will vary by location but will be designed to provide employees a realistic opportunity to earn approximately twice the percentage payout of historical performance in aggregate if performance measurements are achieved.

ATTACHMENT 3

USW054205

USW054197

ATTACHMENT C                                                         Company Proposal
Alcoa / USW Master Agreement Negotiations                           May 30, 2010

At locations with more than one business unit, the Union shall have the right to pool the results of the units with the pool weighted in proportion to reflect the number of employees in each of the units

In the event a plan provides excess or insufficient payout opportunity due to improper design or factors not anticipated during the design, the local parties will meet to discuss and agree to remedial actions necessary to fulfill the intent of properly rewarding employees for their efforts to improve financial performance. In the event the parties are unable to agree, Management will implement the remedial actions necessary to fulfill the intent, consistent with the design criteria described above.

2.  Location Design Process

At each location a joint Company/Union committee will, by November 1, 201006, review, discuss and provide input into the performance measures, weighting, etc. to be applicable for their location. Once these measures are established they will apply during the term of this Agreement, except in the case of U.S. Primary Products employees where measures and weightings will be reviewed and adjusted on an annual basis by November 1 of each year of the Agreement.as set forth below.  Should agreement not be reached, Management will determine and implement the measures, provided however, that such measurements shall be consistent with the design criteria described in III above.

Where performance measures are established for the term of this Agreement, Eexcluding profit based components, modifications to the baselines for Performance Measures will be adjusted to account for inflation in the relevant area and will not be adjusted based on the plan's previous year's performance.  The labor components of the Performance Measures will be adjusted based on the change in the overall unit labor cost (total hourly employment cost) for each quarter plus any COLA increases that occur after June 1, 2006. All other values included in the Performance Measures may be adjusted each quarter and/or annually for the upcoming year by the actual cost inflation experienced by the location or actual margin improvement experienced by the location or, if the actual cost cannot be realistically measured, based on the relevant PPI index.

IV.  DEFINITIONS

For purposes of Performance Pay, the following definitions are established:

1. LOCATION….means a plant location.

2. ELIGIBLE EARNINGS….means the sum of straight-time hourly-base wages (for straight-time hours and overtime hours); straight-time cost-of-living allowance (for straight-time hours and overtime hours); straight-time shift and schedule premiums (for straight-time hours and overtime hours); vacation pay; unworked holiday pay; and jury, witness, and bereavement pay.

The definition of Eligible Earnings for an Eligible Employee who is on disability attributable in whole or in part to his or her employment with the Company, shall include the time lost and the straight-time earnings associated with that time lost at a rate not to exceed 8 hours per day or 40 hours per week.

The definition of Eligible Earnings for an Eligible Employee who is a local union official who is on an excused absence for union business and who otherwise would be actively at work shall include the time lost and the straight-time earnings associated with that lost time at a rate not to exceed 8 hours per day or 40 hours per week.

The period used to determine Eligible Earnings for a Year shall encompass the same payroll weeks used in the determination of the Company's fiscal quarter.

3. ELIGIBLE EMPLOYEE….is an hourly employee covered by this Agreement who had actual hours worked during the payroll weeks disbursed in the quarter and who either had

2

USW054206

USW054197

employee status on the last calendar day of the quarter or whose employee status terminated during the quarter due to death or retirement.

4. PERFORMANCE MEASURES.... are the set of financial and operating measures upon which any payout is based.

## V.    CALCULATION OF THE PERFORMANCE PAY PAYOUT

At the end of each quarter, results will be used to calculate a Performance Pay payout, with attainment against financial Performance Measures as the basis for the payout.

The actual result for each Performance Measure will be compared to its base performance. Twenty percent (20%) of the savings will be distributed to eligible employees as follows:

An individual employee's Performance Pay payout will be calculated by dividing his/her Eligible Earnings by the eligible earnings of all employees participating in the plan and multiplying that result by the total amount of money available for distribution to employees.

~~In addition to the payout yielded by the above calculation an additional payout can result by the use of additional measures for the transition years of 2007, 2008 and 2009. The additional measures are those set forth in the Performance Pay Plan in the 2001 Labor Agreement (prior plan). Any measures utilized will be set on a target of 5% with thresholds and maximum payouts as set forth in the prior plan, provided, however, that the percentages are not to exceed 30%, 20% and 10% for the years 2007, 2008 and 2009 respectively, i.e. if application of the transitional payment would result in a 5% payout, the additional payout as a result of this provision would be 1.5%, 1% and 0.5% for the years 2007, 2008 and 2009, respectively. This transitional payout provision will not be applicable for 2007 to plans designed to pay a target greater than the payout under the existing plan in 2006.~~

## VI.    ADMINISTRATION OF THE PERFORMANCE PAY PLAN

The information necessary to administer the provisions of Performance Pay will be prepared and maintained by the Company. The costs associated with its administration will be borne by the Company.

### Communication

The parties agree that it is important for participants in the Performance Pay Plan to understand the relevant goals, Performance Measures and their potential impact on plant performance and their potential payout opportunities.

### Administration

In the event an employee quits or is terminated during the quarter, no payout shall be paid. In the event of death, disability, retirement or layoff, an employee's award will be calculated on actual Eligible Earnings.

In the event an employee is transferred between Business Unit/Location and his new job is covered by a different plan, the payout shall be pro-rated for the number of whole weeks worked in each unit, based on the employee's job classification for each week.

Payouts will be paid as soon as practical after the close of the quarter.

The determination of accounting policies in regards to Performance Pay shall be at the sole discretion of the Company. Such policies shall be applied in accordance with accounting practices of the Company.

3

USW054207

USW054197

Payments of Performance Pay shall not be considered earnings for any other purpose, except as subject to the applicable statutory taxes on income.

The Compensation Committee of Alcoa's Board of Directors has the authority to make adjustments to results because of unusual events. Business Unit/Location management and bargaining unit representatives will be provided the opportunity to give input for consideration for such adjustments. Such events might include the purchase or sale of business assets that was not planned when goals were set for that year, plant shutdowns, unanticipated reductions in business, etc. It is intended that, once a commitment has been made to goals, changes will not be entertained except in truly unusual situations.

The Performance Pay calculations for each business unit and corporate performance will be communicated to the Union prior to payment.

This Agreement has been reached on the basis that the Union will ensure that, until and only to the extent the information is made available by the Company to the public at large, the information will be disclosed only to those reviewing for the Union the computations related to Performance Pay and neither the Union nor anyone reviewing such information for the Union will make any other disclosure of the information.

Should payment of Performance Pay, or any part of such payment, be required to be included in the regular rate under the Fair Labor Standards Act of any eligible hourly employee, the Company will reduce applicable percentages and adjust individual payout amounts such that the total payout for the applicable Year for each Location for bargaining-unit employees will not be changed by such decision. The parties shall make any and all adjustments to this document as may be necessary from time to time to ensure that the intent and understanding is upheld.

VII.    UNION RIGHT TO REVIEW

The International Union, through the Chair of its Negotiating Committee or his/her designee, shall have the right to review any information concerning the calculation of payouts under the Plan.

In the event that a discrepancy exists between the Company's calculation and the results obtained by the Union's review, the Chairman of the Employee Relations Council (ERC) and the President of the International Union, or his/her designee, shall attempt to reach an agreement to resolve the discrepancy. Should the parties be unable to resolve the dispute, they will select an independent Third Party with the appropriate expertise relative to the dispute, to review each party's position related to the issue being disputed and to render a written opinion concerning the issue.

The opinion rendered by the Third Party will be final and binding on both parties. However, the opinion will not be cited by either party with respect to any other issue except one relating to this Performance Pay Plan.

The costs associated with the Third Party shall be borne equally by the parties.

VIII.    TERM OF THE PLAN

This performance pay plan is applicable only for the duration of the 201006 Labor Agreement and will not be extended to succeeding Labor Agreements.

USW054208

USW054197

Attachment A

| Plan Provisions | Current Design | | Proposed Design | |
|---|---|---|---|---|
| | In-Network | Out-of-Network | In-Network | Out-of-Network |
| Medical Deductible [1] | $250/$500 | $500/$1,000 | $300/$600 | $600/$1,200 |
| Coinsurance [4] | 90% | 70% | 85% | 65% |
| OOP Max [2] | $1,000/$2,000 | $2,000/$4,000 | $1,500/$3,000 | $3,000/$6,000 |
| PCP/Specialist Office Visits [2] | Subject to Deductible/Coinsurance /OOP Max | Subject to Deductible/Coinsurance/ OOP Max | $20 copay PCP / $30 copay Specialist | Subject to Deductible/Coinsurance/ OOP Max |
| Limit of 30 office visits for Chiropractic and Short Term Therapies | No | | Yes | |
| Emergency Room [3] | Subject to Deductible/Coinsurance /OOP Max | Subject to Deductible/Coinsurance/ OOP Max | $75 copay | Subject to Deductible/Coinsurance/ OOP Max; or $75 copay if true emergency |
| Rx Deductible | $50/$100 retail only | | $50/$100 combined retail & mail (only applies to Brand 50% Drug Category) | |
| Retail | | | | |
| Generic | | | | |
| Coinsurance | 80% | | 90% | |
| Minimum | $7.50 | | n/a | |
| Maximum | $40 | | $60 | |
| Brand | | | | |
| Coinsurance | 80% | | 80% or 50% | |
| Minimum | $15 | | n/a | |
| Maximum | $40 | | $60 | |
| Mail Order | | | | |
| Generic | | | | |
| Coinsurance | 80% | | 100% | |
| Minimum | $15 | | n/a | |
| Maximum | $80 | | n/a | |
| Brand | | | | |
| Coinsurance | 80% | | 80% or 50% | |
| Minimum | $30 | | n/a | |
| Maximum | $80 | | $120 | |
| Rx Management | Mandatory Mail Order, Mandatory Generics, No Step Therapy, Prior Authorization, and Managed Drug Limits | | Incentive Mail Order, Mandatory Generics, No Step Therapy, Prior Authorization, and Managed Drug Limits | |
| Dental Deductible | $25/$50 | | Same as current design | |
| Annual Maximum (for all covered services except Orthodontia | $2,000 per person | | Same as current design | |
| Coinsurance | | | | |
| Preventive & Diagnostic | 100% with no deductible* | | Same as current design | |
| Basic Restorative | 85% | | Same as current design | |
| Major Restorative | 50%, no coverage for dental implants | | Same as current design | |
| Oral Surgery | 100% | | Same as current design | |
| Orthodontia (for eligible dependent children to age 19) | 50% to separate lifetime max of $1500 per person | | Same as current design | |

Other Dental - current
* Except for sealants, which are paid at 85% for covered children up to age 14 and are subject to deductible.
- Crowns covered under Basic Restorative
- Reimbursement of charges from a non-participating provider are subject to R&C @90th percentile

Other Dental - proposed
- Same as current design

| Life/AD&D | $44,000 / $88,000 | | $48,000 / $96,000 | |

ATTACHMENT 4

USW054209

USW054197

**Attachment A Notes**

[1] Does not apply to Preventive Care/Wellness or to Organ Transplants at designated *Centers of Excellence*.

[2] **Copays do not count toward deductible.** Annual out of pocket maximum includes deductible and coinsurance amounts for covered medical expenses each calendar year, excluding copays and prescription drugs and amounts above reasonable and customary (R&C) amount.

[3] The copay applies to all in-network ER visits. The copay applies to an out-of-network ER visits if the visit is deemed an emergency using the *prudent layperson* standard. The copay is waived in-network and out-of-network if admitted.

[4] In-network reimbursement and coinsurance are calculated according to the negotiated amount; the employee is not responsible for any amount in excess of the negotiated rate. Reimbursement for out-of-network services is **65%** after any applicable deductible. Out-of-network and Network-not-available coinsurance is calculated according to the R&C rate; the employee is responsible for any amount in excess of the R&C rate.

USW054210

USW054197

## Master Plan Prescription Drug Benefits

The following chart contains a list of drugs that are subject to the Prescription Drug Utilization Programs. Drugs under the Therapeutic Classes are subject to change. The list provided below is current as of July 1, 2008. For the most current information about drugs included under the programs, call CVS Caremark at 1-888-291-6327 and speak with a representative.

| Drugs Requiring Prior Authorization | | | |
|---|---|---|---|
| **Therapeutic Class** | **Drug Name** | | |
| ADD/Narcolepsy | Adderall | Dexedrine | Provigil |
| | Adderall XR | Dextrostat | Ritalin |
| | Concerta | Focalin | Straterra |
| | Daytrana | Metadate | Vyvanse |
| | Desoxyn | Methylin | |
| Alzheimer's Agents | Aricept | Exelon | Reminyl |
| | Cognex | Namenda | |
| Anabolic Steriods | Anadrol-50 | Oxandrin | Winstrol |
| | Nandrolone | | |
| Anemia Agents | Aranesp | Epogen | Procrit |
| Antifungals | Diflucan | Lamisil | Sporanox |
| Arthritis Agents | Enbrel | Kineret | Remicade |
| | Humira | | |
| Asthma | Xolair | | |
| Botulinum toxins | Botox | Myobloc | |
| Differin—grandfathered for all existing patients forever | | | |
| Gaucher's Disease | Ceredase | Cerezyme | Zavesca |
| Growth Hormones | Genotropin | Norditropin | Serostim |
| | Humatrope | Nutropin | Tev-Reopin |
| | Increlex | Nutropin AQ | Zorbive |
| | IPLEX | Saizen | |
| Interferons | Copegus | Pegasys | Ribasphere |
| | Infergen | PEG-Intron | Ribavirin |
| | Intron-A | Rebetol | Roferon-A |
| Multiple Sclerosis | Avonex | Copaxone | Rebif |
| | Betaseron | Navantrone | Tysabri |
| Osteoporosis | Forteo | | |
| Pain Agents | OxyContin | Stadol | |
| Pigmenting Agents | 8-MOP | Oxsoralen | Oxsoralen-Ultra |
| Psoriasis | Raptiva | Sortiatane | |
| Pulmonary Arterial Hypertension | Revatio | | |
| Tazorac—grandfathered for all existing patients forever | | | |
| Testosterone | Androderm | Striant | Testosterone |
| | Androgel | Testim | |
| Tretinion Topical (after age 35) | Atralin | Retin-A | Tretin-X |
| | Avita | Tretinoin | Ziana |

**Continued on next page.**

Published by Alcoa Benefits.
Copyright © 2008 by Alcoa Inc. All rights reserved.    1
A10-Drug Utilization Chart 7/2008

3

USW054211

USW054197

Drugs under Prescription Drug Utilization Management Programs (Continued)

| Drugs With Managed Limitations | | | |
|---|---|---|---|
| **Therapeutic Class** | **Drug Name** | | |
| **Erectile Dysfunction** | Cialis | Levitra | Viagra |
| **Migrane Agents** | Axert | Imitrex injection vials | Maxalt & Maxalt MLT |
| | Amerge | Imitrex NS 5mg | Migranal NS |
| | Frova | Imitrex NS 20mg | Relpax |
| | Imitrex injection kit | Imitrex tablets (25mg, 50mg & 100mg) | Zomig & Zomig ZMT 2.5mg & 5mg Zomig NS |
| **Pain Agents** | Oxycontin | Stadol NS | |
| **Sedatives and Hypnotics** | Ambien | Halicion (triazolam) | Restoril (temazepam) |
| | Ambien-CR | Lunesta (eszpiclone) | Rozerem |
| | Doral (quazepam) | Prosom (estazolam) | Sonata (zaleplon) |
| | Dalmane (flurazepam) | | |

| Step Therapy Drugs (for Retirees Only) | | | |
|---|---|---|---|
| **Therapeutic Class** | **Drug Name** | | |
| **Cox-2** | Celebrex | | |
| **Proton Pump Inhibitors** | Aciphex | Prevacid | Protonix |
| | Nexium | Prilosec | Zegerid |
| **Eczema** | Elidel | Protopic | |

4

2

USW054212

USW054197

**Attachment  B**

| Coverage Category | Weekly Employee Contributions | | | |
|---|---|---|---|---|
| | 2011 | 2012 | 2013 | 2014 |
| EE Only | $22 | $24 | $30 | $35 |
| Family | $32 | $35 | $42 | $47 |

**Notes:**

Employees may opt-out of the benefits program (medical/rx, dental, and vision) with no contribution.  However, Sickness & Accident coverage will be provided to all employees regardless of enrollment status.

USW054213

USW054197

ATTACHMENT F

June 1, 2010

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Re:    Health Care Coverage During Receipt of Sickness and Accident (S&A) Benefits

Dear Mr. Robinson:

During the 2010 Master Labor Agreement Negotiations, the parties discussed the issue
of employees' health care coverage being terminated due to lack of employee premium
payments while an employee is receiving S&A benefits. As a result of the discussions,
the parties agreed to the following:

1. The weekly S&A weekly benefit schedule in effect for 2010 will be unchanged
   and remain in effect through December 31, 2010.

2. Effective January 1, 2011, the 2010 weekly benefit schedule for S&A payments
   will be reduced by an amount equal to the average weekly employee healthcare
   contribution for 2011. Employees who are receiving an S&A benefit payment on
   January 1, 2011 as the result of a Sickness or Accident that began prior to
   January 1, 2011 or employees who begin receiving an S&A benefit payment as
   the result of a Sickness or Accident on or after January 1, 2011 will receive a
   payment according to the new schedule for 2011.

3. On January 1 of each subsequent year during the term of the successor Labor
   Agreement, the 2010 weekly benefit schedule will be reduced by an amount
   equal to the average weekly employee health care contribution for that year (e.g.
   for 2012, the 2010 S&A weekly benefit schedule will be reduced by the average
   weekly employee health care contribution for 2012). The new rate will be
   applied in the same manner as specified in Paragraph 2 above for employees
   who are receiving an S&A benefit that originated in the prior year or who begin
   receiving S&A benefit payments as the result of a Sickness or Accident that
   begins on or after January 1 of that year.

4. Effective January 1, 2011, an employee will not be required to make health care
   payment contributions for the period of time covered by S&A payments that he
   receives and coverage will not be terminated for such employee during that
   period of time.

5. On or promptly after December 1, 2010 and on or promptly after each
   December 1 thereafter during the term of the Labor Agreement, the Company
   will meet with the Union to review the amount the rates will be reduced for the
   following year (the average weekly employee health care contribution) and how
   such rates were calculated.

USW054214

USW054197

Very truly yours,

Mr. Kevin O'Brien
Director, HR/IR Services

Confirmed:

_____          _____
Jim Robinson                                              Date
United Steelworkers

7

USW054215
USW054197

ATTACHMENT D

Company Proposal, 5/31, 9:00 pm

## RETIREE HEALTH CARE

Effective January 1, ~~2007~~ 2011 and through December 31, 201~~0~~4, the Company will maintain its program of medical and prescription drug benefits, subject to the modifications and required individual Participant premiums summarized on Appendix A ("Program") for post May 31, 1993 retirees, spouses and surviving spouses of retirees who were hired prior to June 1, 2006 and retire from the "USW Locations" listed below ("Current Participants"), and "Other USW Locations" listed below ("Other Participants") (Current Participants and Other Participants are herein referred to as "Existing Participants") ~~subject to the modifications to the Program and required individual Participant premiums summarized on Appendix A~~. Employees hired on or after June 1, 2006 and before June 1, 2010 and retire from a current USW Location as of May 31, 2010 ("New Participants") will also be eligible for the Program, but will not be eligible for the Retiree Health Care Account. (Existing Participants and New Participants are herein referred to as ("Participants"). Notwithstanding anything to the contrary, the Current Participants and claims costs attributable to Frederick, MD (Eastalco) shall be limited to post October 1, 2001 retirees, spouses and surviving spouses of retirees, and such Participants shall be covered by the Program, effective January 1, 2007. Non-spouse eligible dependents will also continue to be eligible for coverage under the Program, but will not be treated as "Participants" for purposes of this Agreement. Employees hired on or after June 1, 2010 will not be eligible for the Program or the Retiree Health Care Account.

### Guaranteed Company Contributions

Notwithstanding the foregoing, and disregarding the Medicare Part B premium reimbursements provided for on Appendix A, the annual per capita cost of the Company under the Program will be limited to the following amounts: $7,767 for each pre-Medicare Current Participant, and $6,121 for each pre-Medicare Other Participant ("Pre-Medicare Caps"), $3,389 for each post-Medicare Current Participant, and $2,334 for each post-Medicare Other Participant ("Post-Medicare Caps") (the Pre-Medicare Caps and Post-Medicare Caps together are the "Cap"). Notwithstanding the above, the annual per capita cost of the Company under the Program for the Frederick MD (Eastalco) facility will be limited to the following amounts: $6,341 for each pre-Medicare Participant, and $2,962 for each post-Medicare Participant.

### Number of Participants and Participant Categories:

For the purposes of this agreement, Participants shall be divided into the following categories:

A.    Pre-Medicare Existing Participants USW Locations

B.    Medicare Eligible Existing Participants USW Locations

C.    Pre-Medicare Existing Participants Other Locations

D.    Medicare Eligible Existing Participants Other Locations

E.    Pre-Medicare New Participants

F.    Medicare Eligible New Participants

1

ATTACHMENT 5

USW054216

USW054197

Company Proposal, 5/31, 9:00 pm

## Benefit Plans

For all Participants, the Program shall be as follows:

Participants under age 65 who are not eligible for Medicare are covered under the same medical and prescription drug coverage (excluding premiums) as outlined in the June 1, ~~2006~~ 2010 Settlement Agreement between the parties covering USW Master Agreement Locations.

Participants age 65 and over or who are eligible for Medicare are covered under the same prescription drug coverage (excluding premiums) as outlined in the June 1, ~~2006~~ 2010 Settlement Agreement between the parties covering USW Master Agreement Locations. The medical coverage for such participants shall remain unchanged.

## Participant Premiums

Participant premiums, as summarized on Appendix A, and plan redesign will be used to reduce the overall cost of the Program for all Participants covered by this Program. The parties agree to discuss any increases to the premiums during the term of this agreement.

## Company Contributions

The Company agrees to provide annual contributions equal to $3.75 million as of December 31 of each year beginning in 2011 and ending in 2014.

## ~~Variable Company Contributions~~

~~Medicare Subsidy Contribution~~

~~The Company agrees to provide an annual contribution equal to 50% of the Medicare Part D Subsidy projected to be received by the Company for the Participants covered by this agreement for the period June 1, 2006 through May 31, 2010, subject to adjustment for the actual amount received ("Medicare Subsidy Contribution"). The Medicare Part D Subsidy will be based on the Company's actual reimbursement reduced by external administrative expenses relating to the collection of the subsidy. For the term of this agreement, the Medicare Subsidy Contribution will be contributed to the Account, as described below and used to reduce the cost of this Program.~~

~~Performance Contribution~~

~~Finally, in addition to Participant premiums, the Cap, and the Medicare Subsidy Contribution, the Company will provide a Performance Contribution ("Performance Contribution"), which shall consist of a Fixed Performance Contribution and a Variable Performance Contribution.~~

~~The Company agrees to make a fixed contribution of $30 million ("Fixed Performance Contribution").~~

~~The "Variable Performance Contribution" shall be equal to $2,375 per 3 month period ($9,500 annual equivalent) for each dollar the average 3 month price of aluminum is greater than $1,900 per metric tonne, but less than or equal to $2,500 per metric tonne, and $3,000 over 3 month period ($12,000 annual equivalent) for each dollar the average price of aluminum is greater than $2,500 per metric tonne. The average price will be determined by taking the 3 month average of~~

2

USW054217

USW054197

Company Proposal, 5/31, 9:00 pm

~~the London Metal Exchange daily cash settlement prices (i.e. daily cash offered price) for high grade aluminum for each market day during the applicable 3 month period beginning on June 1, 2006 through May 31, 2010 as published by The Wall Street Journal.~~

~~The Performance Contribution will be credited to a non-interest bearing record keeping account. The Company agrees to a minimum Variable Performance Contribution of $20 million with a maximum Variable Performance Contribution of $50 million.~~

~~Notwithstanding the foregoing, employees hired on or after June 1, 2006 will not be eligible for the Medicare Subsidy Contribution or the Performance Contribution or any Medicare Part B reimbursement.~~

**Retiree Health Care Account**
The Company agrees to ~~create a~~continue the non-interest bearing account ("the Account") for Existing Participants which shall be the sum of: (i) the Balance in the Account as of May 31, 2010 (as adjusted per the Per Capita Claims Cost Determination and Reconciliation methodologies), (ii) Company Contributions, and (iii) Participant Premiums~~, (ii) Medicare Subsidy Contributions, and (iii) Performance Contributions~~. The balance of the Account will apply ~~beyond 2010,~~ to offset costs for the Program until the account is exhausted.

**Program Costs**
In the event that prior to December 31, ~~2010~~2014, in a given Measuring Period the average projected per capita claims cost of the Program (including administrative expenses) exceeds the ~~sum of: (i) the~~ amount of the Cap (plus, for Existing Participants only~~,~~ ~~and (ii)~~ the per capita share of the Account), the excess cost will be borne by the Participants. Their participant premiums will be increased for any excess costs of the Program.

**Per Capita Claims Cost Determination**
For purposes of determining the per capita claims cost of the Program, prior to June 1, 2007 and each July 1 thereafter, the Company will:

(i)    Collect medical and prescription drug claims with dates of service during the most recent consecutive twelve-month period from January 1 through December 31 ("Measurement Period") and paid through the end of February 28 of the following year. The medical claims will be adjusted to reflect changes in plan design, and claims incurred during the Measurement Period but not paid as of February 28 of the following year (prescription drug claims will be assumed fully incurred as of February 28). This adjustment will be based on a factor developed from medical claims incurred during the prior Measurement Period and paid through the end of the current measurement period, as compared to the amount paid through February 28 of the current Measurement Period.

(ii)    Determine annual costs on a per Participant basis by dividing the incurred claims by the weighted average number of Participants enrolled in the Program during the Measurement Period. While claims for other non-spouse eligible dependents will be used in the calculation, non-spouse eligible dependents will not be included in the denominator in the 'per Participant' cost calculation.

3

USW054218

USW054197

(iii)    Project the Measurement Period's incurred claims costs into the target calendar year (the year these costs will be used for contributions) using appropriate medical and prescription drug trend rates as defined by Hewitt Associate's (or its successor's) internal trend expectations and the appropriate number of months of trend.

(iv)    Add administrative costs to the incurred claims. These administrative costs will be those established by the claim and benefit outsourcing administrators and subject to review for reasonableness.

(v)    Develop the appropriate per capita claims cost per Participant. The claims data and enrollment counts should be based on all Participants enrolled in the plan during the Measurement Period. These calculations will be performed separately for pre-Medicare and post-Medicare eligible Participants. The parties will evaluate whether it is appropriate to merge plan experience for Current Participants and Other Participants.

The foregoing information will be provided to the Union by May 1 of the prior year to which the per capita claims cost data will apply. Within 30 days of delivering the foregoing information, the Union will inform the Company of any dispute it may have as to the data.

**Reconciliation**
In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is less than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be added to the Account.

In the event that the actual per-capita claims cost of the Program measured in a Measurement Period is greater than the Cap as described above, the difference (multiplied by the number of Participants enrolled in the relevant category) will be deducted from the Account.

**Dispute Resolution**
The International Union, through the Chair of its Negotiating Committee or his/her designee, will have the right to review any information, calculation or other matters concerning this Agreement. In the event of a dispute between the parties regarding this agreement, the Chairman of the Employee Relations Council (ERC) and the President of the International Union, or his/her designee, will attempt to reach an agreement to resolve the discrepancy. Should the parties be unable to resolve the dispute, they will select an independent Third Party with the appropriate expertise relative to the dispute, to review each party's position related to the issue being disputed and to render a written opinion concerning the issue by July 1 of the year in question. In no event will a dispute delay the Company's annual enrollment process, but the dispute resolution will be applied through prospective adjustments to the Program. The opinion rendered by the Third Party will be final and binding on both parties. However, the opinion will not be cited by either party with respect to any other issue except ones relating to this Agreement. The costs associated with the Third Party will be borne equally by the parties.

**Deferral and Re-enrollment**

4

USW054219

USW054197

Company Proposal, 5/31, 9:00 pm

Participants may elect to defer participation in the Program based on the availability of other health care coverage. Participants who lose coverage from other sources will be allowed to enroll (or reenroll) in the Program immediately upon notice and payment of the applicable premium.

Participants who elect to defer participation will be given the opportunity to enroll (or reenroll) in the Program during the next annual enrollment period.

Participants who withdraw or whose coverage is terminated for failure to make the required premium contribution, will be allowed to enroll (or reenroll) in the Program after six months without coverage under the Program.

**Communication**
The parties will, in good faith, attempt to develop a joint communications strategy to notify Participants of the changes to the Program and applicable premiums by September 1, ~~2006~~2010.

**Litigation**
~~Agreement pertaining to closed and sold locations is contingent upon withdrawal and settlement of pending lawsuit.~~To the extent a court ruling affecting the Program changes the Company's obligations under this agreement, the parties agree to negotiate over the impact of the ruling.

**Collective Bargaining Obligation**
The parties agree that the subjects of Participant Premium, plan design, and Company Contributions, ~~Medicare Subsidy Contribution and Performance Contributions~~ set forth in this letter will be mandatory subjects of bargaining in any negotiations commencing prior to December 31, ~~2010~~2014.

| USW Locations: | Other USW Locations: |
|---|---|
| Alcoa, TN | Listerhill, AL |
| Badin, NC | Bellwood, VA Extrusions Plant |
| Baton Rouge, LA | Bristol, VA End Plant |
| Bauxite, AR | Corpus Christi, TX |
| Davenport, IA | Fort Meade, FL |
| Gum Springs, AR | Houston, TX Can Plant |
| Hot Springs, AR | Kansas City, MO Can Plant |
| Lake Charles, LA | Longview, WA |
| Lafayette, IN | Louisville, KY Plant 3 |
| Lebanon, PA | Chicago, IL |
| Louisville, KY Plants 1 & 15 | Richmond, IN |
| Massena, NY East & West Plants | Salisbury, NC Can Plant |
| Point Comfort, TX | Seattle, WA Can Plant |
| Richmond, VA | Tampa, FL Can Plant |
| Rockdale, TX | Torrance, CA Extrusions Plant |
| Troutdale, OR | |
| Warrick, IN | |
| Wenatchee, WA | |

5

USW054220

USW054197

Company Proposal, 5/31, 9:00 pm

| Mobile, AL | |
| Frederick, MD (Eastalco) | |

## APPENDIX A

**Pre-Medicare coverage will be the same medical and prescription drug coverage as active employees.  Post-Medicare coverage will be the same medical coverage as of May 31, 2010 and same prescription drug coverage as active employees.**

## MONTHLY PER PARTICIPANT PREMIUM CONTRIBUTIONS FROM JANUARY 1, 2011 THROUGH DECEMBER 31, ~~2010~~ 2014

### ~~CURRENT PARTICIPANTS~~ USW Location Existing Participants (each retiree, spouse, or surviving spouse)~~.~~

| Year | 2011 | 2012 | 2013 | 2014 |
| Pre-Medicare | $85 | $85 | $90 | $90 |
| Post-Medicare | $45 | $45 | $50 | $50 |

~~Pre-Medicare - $75 per participant (each retiree, spouse, or surviving spouse)~~
~~Post-Medicare - $40 per participant (each retiree, spouse, or surviving spouse)~~

### ~~OTHER PARTICIPANTS~~ Other Location Existing Participants (each retiree, spouse, or surviving spouse).

| Year | 2011 | 2012 | 2013 | 2014 |
| Pre-Medicare | $150 | $150 | $150 | $150 |
| Post-Medicare | $75 | $75 | $75 | $75 |

~~Pre-Medicare - $150 per participant (each retiree, spouse, or surviving spouse)~~
~~Post-Medicare - $75 per participant (each retiree, spouse, or surviving spouse)~~

### NEW PARTICIPANTS
Pre-Medicare and Post-Medicare Premiums for each year of this agreement will be the projected per capita claims cost of the Program (including administrative expenses) for each group minus the amount of the applicable cap for each group.  To the extent the cap exceeds the cost, the New Participant will not pay a premium.

To the extent a Participant elects available HMO coverage in lieu of the Program that costs more than per capita claims cost for the Program, the Participant will pay the additional HMO cost.

## MEDICARE PART B PREMIUM REIMBURSEMENT:

All Medicare Part B reimbursements are capped at current amounts:

Participants retired on or after June 1, 1993 but prior to January 1, 1994, $88.50
Participants retired on or after January 1, 1994 but prior to April 1, 2002, $46.10
Participants (excluding new hires after June 1, 2006) retired on or after April 1, 2002, $88.50
New hires on or after June 1, 2006, None

6

USW054221

USW054197

Company Proposal, 5/31, 9:00 pm

Participants retired from the Frederick MD (Eastalco) facility, $50

7

USW054222

USW054197

June 1, 2006


Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Re:    Compensation Plan for Future New Hires and Rehires

Dear Mr. Robinson:

Employees hired or rehired after June 1, 2010 will not be eligible for retiree medical benefits.
Upon successful completion of one (1) year of employment, and beginning on his/her first
anniversary date, the employee will be eligible to receive a Company contribution into his/her
individual 401(k) savings plan account of forty cents ($0.40) per hour worked. A separate sub-
account will be established within the employee's savings plan account for these contributions,
and the funds in this sub-account will not be available to the employee for withdrawal or loans.
Contributions to the sub-account will be placed in a professionally managed investment fund,
which is automatically adjusted based on the employee's projected retirement age. The
employee will have the right to change the investments of this fund if they so choose. The
employee's sub-account will be available for withdrawal upon retirement or termination of
employment for any reason.

Very truly yours,



Kevin F. O'Brien
Director, Industrial Relations


Confirmed: _____
                  Jim Robinson

ATTACHMENT 6

USW054223

USW054197

Alcoa / USW Master Agreement Negotiations
Company's Last, Best and Final Offer
May 31, 2010

| | |
|---|---|
| Surviving Spouse Lump Sum | • $1,000 to surviving spouses of post June 1, 1993 retirees;<br>• $750 to surviving spouses of post June 1, 1993 retirees. |
| Lump Sum Signing Bonus | • $1,250 to all employees who are in active employment status on the date of ratification, or who return to work within thirty (30) days of ratification. Signing bonus will also be paid to all employees who are not at work and receiving workers' compensation or who are on a military leave of absence on the date of ratification. Signing bonus is offered on the condition that tentative agreement is fully endorsed by the USW. Payable in July 2010 pending discussion on Savings Plan deferral.<br><br>• Offer of signing bonus is withdrawn if agreement is not ratified by June 30, 2010. |
| New Employees Hired (or rehired) after July 1, 2010 | • Not eligible for retiree medical coverage. Company will contribute $0.40/hour to savings plan sub-account per Company proposal of 5/24/2010. *Tentative Agreement* |
| Cost of Living Adjustment(COLA) | For all Master Labor Agreements, roll the current COLA amounts into existing base rates and eliminate all COLA language from the Labor Agreements effective June 1, 2010. The 53.6 cents per hour for ABG locations currently diverted to the 401(k) savings plan will continue. |
| Performance Pay | Attachment C<br><br>*Tentative Agreement* |
| Retiree Reinsurance under PP&AHCA | Attachment E |
| IMA | Eliminate from all Agreements<br><br>*Tentative Agreement* |
| Sickness and Accident (S&A) Benefits | • Effective January 1, 2011, and each January 1 thereafter through May 2014, reduce the 2010 weekly S&A benefit schedule by an amount equal to the average weekly employee healthcare contribution.<br><br>• Effective January 1, 2011, an employee will not be required to pay for healthcare contributions for such period as s/he is receiving S&A benefits.<br><br>*Tentative Agreement* – Attachment F |

ATTACHMENT 7

USW054224

USW054197

ATTACHMENT E

COMPANY PROPOSAL 5/31 9.00AM

During the 2010 contract negotiations, the parties discussed the Early Retiree Reinsurance
Program under the Patient Protection and Affordable Care Act ("Rebate Program").

To the extent the company receives a reimbursement under the Rebate Program attributable to
any Participant in the Retiree Health Care Program under this agreement ("rebate"), the company
agrees to apply that rebate to reduce the actual per capita claims cost in the Measurement Period
of the year in which the final rebate is received (subject to any reconciliation adjustments that
may be required by the government and reduced by external administrative expenses relating to
the collection of the rebate). Such reduction shall only apply to the actual final amount of any
rebate attributable to Participants covered under the Retiree Health Care Program in the year in
which it is received. To the extent the company receives less than 100% of eligible rebates, the
company will apply the pro-rata share of the actual amount of the rebate it receives in the
foregoing sentences.

If the final regulations of the Rebate Program impact the actual amount of the rebates received
by the Company, the application of the rebates under this agreement will be adjusted
accordingly.

ATTACHMENT 8

USW054225

USW054197

Company Counter Proposal
May 30, 2010

June 1, 2010

Mr. Jim Robinson
Director, USW District 7 and
Chairman of the Alcoa Master Bargaining Committee
United Steelworkers
1301 Texas Street
Gary, IN 46402

Dear Mr. Robinson:

This letter will confirm that the parties discussed the competitiveness of the Master Agreement
locations and the importance of maintaining and modernizing these facilities. The Master
Agreement locations continue to face major competition from both domestic and foreign
operations. This letter will confirm that the Company agrees to maintain and invest in the plants
covered under the master agreement so as to keep the facilities capable of meeting market
needs, subject to overall changing economic and market conditions. It is the intention of the
company to develop new products during the term of this agreement that will benefit many of
these locations.

The Top Level Committee will periodically review such investments, new product introductions
and expenditures in light of economic and market conditions.

Sincerely,


Kevin O'Brien
Director, Industrial Relations




Confirmed:     _____
                Jim Robinson




ATTACHMENT 9

USW054226

USW054197

ATTACHMENT # I

COMPANY PROPOSAL
MAY 31, 2010

**APPENDIX XI. Joint Efforts Agreement**

1. The Company and Union hereby agree to establish a jointly administered public policy fund (Public Policy Fund) meeting the following guidelines.

    a. Purpose and Mission: The purpose of the Fund shall be to:

        (1) support public policies promoting the specific interests of the Alcoa plants represented by the Union on such subjects as energy, health care, currency valuation, and other matters of importance to the parties that promote the long-term viability of these locations and security for the workforce; and

        (2) to contribute to and promote greater cooperation between labor and management; and

        (3) to assist the Company and Union in solving problems of mutual concern that are not susceptible to resolution through collective bargaining.

    b. The Public Policy Fund will pursue its mission through labor-management cooperative endeavors such as public and political education, issue advocacy, research and the coordination of such activities with other likeminded groups.

    c. The Public Policy Fund shall not make political contributions nor become involved in political campaigns.

    d. The Public Policy Fund will conduct its work in a non-partisan manner.

    e. The Fund will have a six-person Governing Committee, with three members of the Committee appointed by the Chief Executive Officer of the Company and three by the International President of the Union.

    f. ~~The Company will finance the Public Policy Fund by allocating $750,000 to the fund in each of the following years: 2007, 2008, 2009 and 2010. The allocations will be made no later than May 31 of each year.~~
    The Company will contribute, no later than September 30, 2010, the amount required to bring the Fund balance to three million dollars ($3,000,000.00) on the date such contribution is made. The Company will have no further obligation to finance the Public Policy Fund during the term of the 2010 Master Labor Agreement.

    g. All activities of the Public Policy Fund and expenditures from the Public Policy Fund shall be subject to approval by the Governing Committee.

    h. The Governing Committee will develop a report form to track accrued obligations and expenditures on a regular basis.

2. Industry-Wide Committee

    a. The Company agrees to join an Industry-Wide Labor/Management Committee (IWC) effective on the agreement of at least one other major aluminum Company's agreement to join such committee.

    b. The parties agree that the IWC will serve as a focal point for industry-wide joint activities as agreed to by the parties. The parties will continue to pursue other activities separately as appropriate.

    c. The IWC will have a Governing Board consisting of an equal number of Union and Company representatives. The Board will be co-chaired by the President of the USW and a CEO (or his designee) selected by the participating companies.

    d. All activities conducted under the banner of the IWC shall be approved by the Governing Board.

ATTACHMENT 10

USW054227

USW054197

## Applicable to Alcoa, TN, Badin, Point Comfort, and Rockdale Agreements

Article VIII, Section 19
Renumber Paragraph H as Paragraph I, add Paragraph H as an additional paragraph covered by the renumbered Paragraph I, and add the following as new Paragraph H:

For employees hired or rehired on or after July 1, 2010:  Is absent from work because of layoff for a period of five (5) years.

## Applicable to Davenport, Lafayette, Massena (West), and Warrick Agreements

Article VIII, Section 17
Add New Paragraph G:

For employees hired or rehired on or after July 1, 2010:  Is absent from work because of layoff for a period of five (5) years.

## Applicable to Gum Springs Agreement

Article XXV, Section 5
Add New Paragraph G:

For employees hired or rehired on or after July 1, 2010:  Is absent from work because of layoff for a period of five (5) years.

## Applicable to Wenatchee Agreement

Article XI, Section B
Add New Paragraph 6:

For employees hired or rehired on or after July 1, 2010:  Is absent from work because of layoff for a period of five (5) years.

## Applicable to Massena East Agreement

Article IX, Section 5
Add New Paragraph (h):

For employees hired or rehired on or after July 1, 2010:  Is absent from work because of layoff for a period of five (5) years.

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 11

USW054228

USW054197

Union Proposal # 2e. Arbitration Answers

## Applicable to Alcoa, TN, Badin, Point Comfort, and Rockdale Agreements:

Add new sentence in Appendix V, Paragraph 1 with:

**Grievances involving other significant issues may be given priority for hearing by agreement between the parties. Both parties will exercise reason and sound judgment in jointly determining whether such grievances should be given priority.**

## Applicable to Davenport, Lafayette, Massena (West), and Warrick Agreements:

Article XIX Section 28
At the end of the last paragraph, revise the last sentence and add a new sentence

Grievances concerning termination of seniority, under Section 17, Paragraphs C and E and grievances concerning dismissal, or discharge under Article XVI shall be given **first** priority for hearing. **Grievances involving continuing liability or other significant issues may be given priority for hearing by agreement between the parties. Both parties will exercise reason and sound judgment in jointly determining whether such grievances should be given priority.**

Article XIX Section 29 Awards
Insert as a new paragraph

**Any arbitration decision for dismissal, discharge, and termination grievances must be rendered within 45 days after receipt of the transcript of hearing and any post-hearing submissions.**

## Applicable to Wenatchee Agreement

Article XXX Section C Duties of the Board
At the end of the last paragraph, revise the last sentence and add a new sentence

Grievances concerning termination of seniority, dismissal, or discharge shall be given **first** priority for hearing. **Grievances involving continuing liability or other significant issues may be given priority for hearing by agreement between the parties. Both parties will exercise reason and sound judgment in jointly determining whether such grievances should be given priority.**

Article XXX
Insert as a new paragraph in D. Awards

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 12

USW054229

USW054197

Union Proposal # 2e. Arbitration Answers

Any arbitration decision for dismissal, discharge, and termination grievances must be rendered within 45 days after receipt of the transcript of hearing and any post-hearing submissions.

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

2

USW054230

USW054197

Co. Proposal # 4 – Team Leader & Team Roles

**Applicable to All Agreements**

Delete Team Leader Appendix or Addendum in each Agreement and replace with the following:

1.    The parties recognize the benefit and importance of teams and team roles including the leader position. It is agreed that to further those objectives and principles, the Company may establish a leader position or other job title as locally determined appropriate..   It is the desire of the Company and the Union that the local parties effectively work together as it relates to the team process to determine the number of roles within the team; the work group or team; and the accountabilities of each. The duties will be performed by employees selected from the bargaining unit and such individuals will remain in the bargaining unit. It is recognized that not all locations may establish the leader position and/or team roles. However, if the leader position and/or team roles are established, the following agreement will govern unless modified by agreement between the local union and local management.

2.    The leader position will perform duties as a working member of the team. The duties of the leader position may also include such other duties as coordinating operations; problem solving; coaching and or teaching; leading and developing standardized work; assisting in ABS efforts; restoring product flow; engaging the team; measuring and tracking performance; planning; procuring; scheduling the team; insuring the development of team members; assisting in EHS responsibilities; and performing administrative work . The leader position will not discipline nor have any responsibility or duties related to payroll.

3.    The  leader position shall receive a standard hourly wage rate equal to six (6) job grades higher than the highest evaluated job grade (plus, if receiving, applicable convention(s) but not including the three (3) job grades for team roles and not including the increased job grade(s) for Non-Traditional Assignments) of the job classifications in the leader classification's team. The duties of the leader position will not be considered as duties for wage evaluation purposes. Time worked and job grade paid in the leader position will count for pension job grade determination.   Upon leaving the leader position, pay will revert to the appropriate job grade of the classification held by the employee.

4.    The selection and/or the development process for the leader position will include the following unless modified by agreement between the local Union and local Management. Where the local union and local management have agreements in place for the development and/or selection of the leader position the terms of such agreements shall remain in effect unless modified by agreement between the local union and local management.

May 29, 2010 PM                                                                                    Page 1

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 13

USW054231

USW054197

Co. Proposal # 4 – Team Leader & Team Roles

a. A vacancy will be posted for a leader position opening in the department where such opening exists. Applicants for transfer from other departments will not be considered.

b. Employees within the department who bid on such openings will be provided with information outlining the selection process and other source information.

c. Employees who bid on such openings must be knowledgeable in the defined area of responsibility.

d. The selection process will also include an interview. The interviewers will consist of a member of management from the department where the opening exists and a member appointed by the Union.

e. The senior qualified bidder who meets the above qualifications and who passes the interview will be selected.

f. Those employees not selected will be provided feedback to prepare them for future opportunities.

g. Training will be provided to the successful bidder, area supervision, and team members to identify their various roles. Successful completion of the training is a requirement of the leader position.

i. The management within the department (Coaches) will assist the employee in the leader position or in a team role to be successful in fulfilling the requirements of the leader position or a team role. If needed, a development plan will be developed . If the management of the department determines the performance of the employee has not improved after ninety (90) days, the employee will be removed from the leader position or team role.


.5.    Team roles may be developed and implemented in the team.. Members of the team who are selected to perform a role within the team will continue to perform the duties of their regular job classification. Examples of a team role may include duties in EHS, quality, scheduling, or continuous improvement. Employees performing team roles shall receive a standard hourly wage rate equal to three (3) job grades higher than the highest evaluated job grade (plus, if receiving, applicable convention(s) but not including the six (6) job grades for the leader position or three (3) job grades for team roles and not including the increased job grade(s) for Non-Traditional Assignments) of the job classifications in the team. The duties performed in a team role will not be considered as duties for wage evaluation purposes. Time worked and job grade paid in the team role assignment will count for pension job grade determination. Upon leaving the team

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

2

USW054232

USW054197

role, pay will revert to the appropriate job grade of the classification held by the employee.

7.      It is understood that the work performed by the leader position, in team roles or as team members in no way establishes the exclusive jurisdiction of such work within a bargaining unit or between bargaining unit and non-bargaining unit employees.

8.      The negotiating Co-Chairs at the location shall each appoint one person to serve on a joint oversight committee in a joint oversight capacity and serve as the contact point for insuring a smooth and successful implementation.    The joint oversight committee shall resolve any disputes.  Any unresolved issues shall be submitted to the negotiating Co-Chairs or their designees for resolution.  If the Co-Chairs are unable to resolve such issue, it may be appealed to the grievance/arbitration procedure pursuant to the provisions of the Labor Agreement.

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

USW054233

USW054197

**Applicable to Alcoa, TN, Badin, Point Comfort, and Rockdale Agreements**

Article VIII. Section 31:
Insert as a new Paragraph between existing paragraphs;

**For new employees hired on or after June 1, 2010 there shall be a probationary period of ninety (90) days of actual work during which time any new employee shall be entitled to all rights granted under this Agreement, except during such time the Company shall have the sole discretion of discharging or transferring such employee.**

**Applicable to Davenport, Lafayette, Massena (West), and Warrick Agreements**

Article VIII. Section 18:
Insert as a new Paragraph after existing paragraph;

**For new employees hired on or after June 1, 2010, for the purpose of good selection, the Company shall have the right to place employees on trial for their first ninety (90) days worked in order to determine whether they should be kept as an employee. The Union shall have no right to contest a termination made within the probationary period.**

**Applicable to Gum Springs Agreement**

Article VII.:
Insert as a new Paragraph after the first existing paragraph;

**For new employees hired on or after June 1, 2010 there shall be a probationary period of ninety (90) days of actual work during which time any new employee shall be entitled to all rights granted under this Agreement, except during such time the Company shall have the sole discretion of discharging or transferring such employee.**

**Applicable to Wenatchee Agreement**

Article VII. Section C.:
Insert as a new Paragraph after existing paragraph;

**For new employees hired on or after June 1, 2010, for the purpose of good selection, the Employer shall have the right to place employees on trial for their first ninety (90) days worked in order to determine whether they should be kept as an employee. The Union shall have no right to contest a termination made within the probationary period.**

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 14

USW054234

USW054197

Co. Proposal # 9 – Probationary Period

**Applicable to Massena East Agreement**

Article IV.:
Insert as a new Paragraph after existing paragraph;

**For new employees hired on or after June 1, 2010 there shall be a ninety (90) working day standard probationary period for any new employee during which time the Company shall have the sole discretion of discharge or transferring such employee.**

May 27, 2010 AM                                                    Page 2

THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS

2

USW054235

USW054197

# REVISED UNION PROPOSAL 1A
## Procedures for Addressing Employee Safety Concerns
### May 28, 2010

**Commitment Applicable for all Agreements**

During the negotiations of the 2010 Labor Agreement the parties had discussions concerning the importance of having a process to effectively deal with employee concerns of potential unsafe conditions in the workplace. The parties agreed that each location should have such a process and that it should be jointly developed, documented and communicated to all employees. To that end the parties agreed, where such guidelines have not already been jointly developed, to work together to mutually develop such local guidelines during the first year of the 2010 Labor Agreement. The local guidelines are not intended to replace the Safety and Health Articles of the existing Agreements. Rather it is intended to reinforce the existing guidelines set forth under those Articles.

ATTACHMENT 15

USW054236

USW054197

**Commitment Applicable for all Agreements**

During the 2010 negotiations the parties discussed the Union's desire to schedule USW/Alcoa Joint Health, Safety, and Environmental Conference at the same time of as the USW's Annual Health, Safety and Environment Conference. The parties agreed that on a trial basis the USW and Alcoa HS&E conference leadership can schedule the conference at the same time. It is also understood that currently the timing of our joint meeting is set by mutual agreement and such agreement would continue to be required for future meetings.

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 16

USW054237

USW054197

Co. Proposal # 7 – Year-end Vacation Payment

**Applicable to Alcoa, TN , Badin, Point Comfort, and Rockdale Agreements**

Article XVII Section 62, Paragraph 2:
New paragraph (d)

Any unpaid, accrued vacation will be paid out no earlier than the second payroll week in December for each calendar year covered by this Article.

**Applicable to Davenport, Lafayette, Massena (West), and Warrick Agreements**

Article VII Section F, Paragraph 2:
New paragraph (d)

Any unpaid, accrued vacation will be paid out no earlier than the second payroll week in December for each calendar year covered by this Article.

**Applicable to Gum Springs Agreement**

Article XIX Section 7, Paragraph (B):
New Paragraph (iv)

Any unpaid, accrued vacation will be paid out no earlier than the second payroll week in December for each calendar year covered by this Article.

**Applicable to Wenatchee Agreement**

Article XXIV Section F, Paragraph 2:
New Paragraph d.

Any unpaid, accrued vacation will be paid out no earlier than the second payroll week in December for each calendar year covered by this Article.

**Applicable to Massena East Agreement**

Article VIII 6, Paragraph (b)
New Paragraph (4)

Any unpaid, accrued vacation will be paid out no earlier than the second payroll week in December for each calendar year covered by this Article.

---

May 28, 2010 AM                                                                     Page 1

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 17

USW054238

USW054197

**New Letter in all Agreements**

During the negotiations of the 2010 Labor Agreement the parties discussed the issue of seniority adjustments for employees who are on properly authorized Family Medical Leave (FMLA).    The Company agreed that it would not adjust an employee's Departmental Seniority as a result of an employee having taken such leave of absence from the Company.

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 18

USW054239

USW054197

**Applicable to All Wage Manuals & Apprentice Agreements**

# ADDENDUM TO APPRENTICE RATE PROGRESSIONS

The following Table from the ABG Wage Manual of May 20, 1996 is hereby revised to reflect new starting rates and progressions. The new rates will become effective for apprentice programs commencing after June 1, 2010.

Section X – Apprentice Rate Progressions
The three (3) years apprentice or training rate progression for apprentice programs commencing after June 1, 2010 will be as follows:

Training Periods

| 1 | 2 | 3 | 4 | 5 | 6 | Prob* | Job Grade |
|---|---|---|---|---|---|---|---|
| 14 | 15 | 16 | | | | | 16 |
| 14 | 15 | 16 | 17 | | | | 17 |
| 14 | 15 | 16 | 17 | 18 | | 14 | 18 |
| 14 | 15 | 16 | 17 | 18 | | 15 | 19 |
| 14 | 15 | 16 | 17 | 18 | 18 | 16 | 20 |
| 14 | 15 | 16 | 17 | 18 | 18 | 17 | 21 |
| 14 | 15 | 16 | 17 | 18 | 18 | 18 | 22 |
| 14 | 15 | 16 | 17 | 18 | 19 | 19 | 23 |
| 14 | 15 | 16 | 17 | 18 | 19 | 20 | 24 |
| 14 | 15 | 16 | 17 | 19 | 20 | 22 | 25 |
| 14 | 15 | 16 | 17 | 19 | 21 | 23 | 26 |
| 14 | 15 | 16 | 18 | 19 | 22 | 24 | 27 |
| 14 | 15 | 16 | 18 | 20 | 23 | 25 | 28** |
| 14 | 15 | 16 | 18 | 20 | 24 | 26 | 29 |
| 14 | 15 | 16 | 18 | 20 | 25 | 27 | 30 |
| 14 | 15 | 16 | 18 | 20 | 26 | 28 | 31 |

\*   Probationary rate applicable to newly hired journeymen for period not to exceed six months.

\*\*  Machinists who bid for the Toolmaker classification shall remain at Grade 28 for 6 months and progress to Grade 29 for an additional 6 months before going to the classification rate of Grade 31.

TA  5/26/10
5/26/10
5/26/10

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 19

USW054240

USW054197

## Commitment Applicable for all Agreements

During the 2010 negotiations the parties agreed to the following:

1. Changes and/or additions to the language for the new 2010 Labor Agreements shall be published in bold print,

2. Letters of Understanding published in back of the 2010 Labor Agreements shall be labeled with a subject heading describing the contents of the letter, and

3. The 2010 Labor Agreements shall include a Table of Contents that includes the Letters of Understanding identified in # 2 above.

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 20

USW054241
USW054197

**Applicable to Davenport, Lafayette, Massena (West), and Warrick Agreements**

**Article XXII,**
**Section 36, Paragraph 5.(a)**

The amount of an employee's Weekly Benefit (subject to the provisions of Paragraph 6 through 10 of this Section and Paragraph 3 of Section 38) shall be 28 hours time an employee's vacation rate (as determined in **Article VII** of the Labor Agreement) at the time of layoff minus.......

**Section 38, Paragraph 3.(d)**

Notwithstanding Paragraphs 3(b) and (c) above, the Company guarantees that all Weekly Benefits payable under the Plan shall be paid in full to employees who are in Tier II or Tier III. To the extent that Weekly Benefits to such employees are reduced pursuant to Paragraphs 3(b) and (c), the Company shall advance to the trust fund the amount by which the Weekly Benefits paid to such employees pursuant to Paragraphs 3(b) and (c) need to be supplemented to provide full payment. The Company shall maintain a separate record of such advances. In any month in which there is an outstanding balance of such advances, and the Available Benefit Limit would otherwise exceed the Maximum Benefit Limit, the Company may reduce the additions which would otherwise be made to the Available Benefit Limit pursuant to Paragraph 2, but such reduction shall not reduce the Available Benefit Limit below the Maximum Benefit Limit. Any such reduction in the additions which would otherwise be made to the Available Benefit Limit shall be recorded as a credit against the outstanding balance of advances made pursuant to this paragraph.

**Applicable to Alcoa, TN, Badin, Point Comfort, and Rockdale Agreements**

**Article XV,**
**Section 57, Paragraph 3.(d)**

Notwithstanding Paragraphs 3(b) and (c) above, the Company guarantees that all Weekly Benefits payable under the Plan shall be paid in full to employees who are in Tier II or Tier III. To the extent that Weekly Benefits to such employees are reduced pursuant to Paragraphs 3(b) and (c), the Company shall advance to the trust fund the amount by which the Weekly Benefits paid to such employees pursuant to Paragraphs 3(b) and (c) need to be supplemented to provide full payment. The Company shall maintain a separate record of such advances. In any month in which there is an outstanding balance of such advances, and the Available Benefit Limit would otherwise exceed the Maximum Benefit Limit, the Company may reduce the additions which would otherwise be made to the Available Benefit Limit pursuant to Paragraph 2, but such reduction shall not reduce the Available Benefit Limit below the Maximum Benefit Limit. Any such reduction in the additions which would otherwise be made to the Available Benefit Limit shall be recorded as a credit against the outstanding balance of advances made pursuant to this paragraph.

*TA  5/25/10 GMCSM*
*5/26/10*
*GP*

*THE COMPANY RESERVES THE RIGHT TO ADD TO, MODIFY, AND OR DELETE FROM ANY AND ALL PROPOSALS*

ATTACHMENT 21

USW054242

USW054197