UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
EVANSVILLE DIVISION

EDMOND M. BUTCH, on behalf of himself            )
and all other persons similarly situated, *et al.*, )
                                                 )
                          Plaintiffs,            )
                                                 )
                     v.                          )      No. 3:19-cv-00258-RLY-CSW
                                                 )
ALCOA USA CORP., *et al.*,                       )
                                                 )
                          Defendants.            )

**ENTRY ON PARTIES' MOTIONS FOR SUMMARY JUDGMENT AND
DECERTIFYING CLASS**

On December 31, 2019, Defendant Alcoa USA Corporation[1] unilaterally

terminated the life insurance benefits it provided to its retirees.  Plaintiffs are a group of

former Alcoa employees who are now retired and the Unions[2] who represented them in

collective bargaining with Alcoa.  The Plaintiff retirees retired from Alcoa plants after the

1993 CBA took effect.  They fall into two groups which have been certified as classes:

one of retirees who received life insurance paid for by Alcoa (the main class) and another

of those who participated in a voluntary life insurance program where Alcoa gave those

retirees the opportunity to purchase additional life insurance (the sub-class).  Both classes

of retirees contend that Alcoa's removal of life insurance benefits violated their

---

[1] Defendants also include two ERISA plans sponsored and administered by Alcoa for the retiree
plaintiffs—the Retirees Group benefit Plan for Certain Hourly Employees of Alcoa USA Corp.
and the Optional Life Insurance Plan.  For ease of reference, the court refers to the three
defendants as "Alcoa."
[2] Two national Unions that engaged in bargaining with Alcoa for the collective bargaining
agreements at issue in this case are also plaintiffs.

contractual rights established through collective bargaining in violation of Section 301 of

the Labor management Relations Act ("MLRA"), 29 U.S.C. § 185(a) (Counts I and III)

and Section 502(a) of the Employee Retirement Income Security Act ("ERISA"), 29

U.S.C. § 1132(a) (Counts II and IV).

Plaintiffs moved for class certification.  The court granted that motion and

certified the following main class of retirees:

> All retirees of Alcoa USA Corp., its predecessors, or affiliated companies,
> (1) Who were represented by the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union, AFL-CIO/CLC ("USW") or its predecessors while they were employees (or in the case of the Wenatchee, Washington facility were represented by the Aluminum Trades Council of Wenatchee, Washington AFL-CIO ("ATC") or its predecessors while they were employees) and who retired from the following facilities on or after June 1, 1993:
> - Alcoa, Tennessee (GPP Portion, including Tapoco, North Carolina)
> - Badin, North Carolina
> - Baton Rogue, Louisiana
> - Bauxite, Arkansas
> - Frederick, Maryland (retirees on or after October 2, 2001)
> - Gum Springs, Arkansas
> - Hot Springs, Arkansas
> - Lake Charles, Louisiana
> - Louisville, Kentucky (Plant 1)
> - Massena, New York (East Plant and West Plant, GPP Portion)
> - Mobile, Alabama
> - Point Comfort, Texas
> - Richmond, Virginia
> - Rockdale, Texas
> - Troutdale, Washington
> - Warrick, Indiana
> - Wenatchee, Washington
> - Corpus Christi, Texas (Sherwin)
> - Listerhill, Alabama (Reduction Plant)
> - Longview, Washington

- Louisville, Kentucky (Plant 3)
- Torrance, California (Extrusions Plant)
- Fort Meade, Florida (retirees on or after April 20, 1994)
- Bellwood, Virginia (Extrusions Plant) (retirees on or after October 1, 1993)
- Richmond, Indiana (retirees on or after October 1, 1993)

(2) Who were eligible for company-paid life insurance upon their retirement; and,

(3) As to whom Alcoa USA Corp. has terminated company-paid retiree life insurance.

The court also certified the following subclass:

All retirees of Alcoa USA Corp., its predecessors, or affiliated companies,

(1) Who were represented by the USW or its predecessors while they were employees (or in the case of the Wenatchee, Washington facility were represented by the ATC or its predecessors while they were employees);

(2) Who upon their retirement were eligible for one or more forms of "Optional" life insurance, including voluntary, additional voluntary, and supplemental life insurance; and,

(3) As to whom Alcoa USA Corp. has terminated this retiree life insurance.

On July 14, 2023, Plaintiffs filed a motion for summary judgment on Counts I–IV of the Amended Class Action Complaint and on Alcoa's Thirteenth Affirmative Defense, which alleges the retirees waived their claim for life insurance benefits by accepting a cash payment from Alcoa.  About a month later, Defendants filed a cross-motion for summary judgment on the same issues.  The court heard oral argument on those motions on January 25, 2024.  For the reasons that follow, the court now **GRANTS in part** and **DENIES in part** Plaintiffs' motion for summary judgment as to liability[3] and **DENIES** Defendants' cross-motion for summary judgment.

_____

[3] Plaintiffs bring a claim for damages.  (*See* Filing No. 44, Am. Compl. ¶ E).  However, the parties do not discuss the appropriate amount of damages, nor is it obvious from the record

I.   **Background**

Alcoa bargains with collective groups of employees who have formed unions. (*See, e.g.*, Filing No. 173-31, 1993 Alcoa-USW CBA).  These negotiations have resulted in collective bargaining agreements ("CBAs") since at least 1993, which is the earliest relevant date for the purposes of this case.  (*Id.*).  Each of these agreements contain promises by Alcoa to provide its employees with life insurance benefits during their retirements.  (*Id.* at 61 ("The Company will also provide Life Coverage and Surviving Spouse Coverage for such retired employees.")).[4]  The exact scope of these promises is the issue in this case.

The collective bargaining agreements at issue incorporate as contractual terms a plethora of summary plan descriptions (or "SPDs").  (*See id.* at 61 ("Separate Booklets describing these benefits are incorporated herein and made a part of this Agreement."); *see also* Filing No. 173-18, 2019 Warrick & Massena CBA at 61 (same)).  These SPDs describe both the benefits and eligibility requirements of certain programs, including the life insurance programs at issue in this case.  (Filing No. 173-41, 2013 Retiree Life Insurance SPD at 6, 8 (describing "Who Is Eligible" and describing benefit payments that pay out under "company-provided life insurance")).  So for example, the 2013 Retiree Life Insurance SPD explained:

> You are eligible for company-provided life
> insurance if you were: an hourly employee who

---

presented.  Accordingly, the court construes the motion for summary judgment as a motion for summary judgment as to liability.
[4] Throughout this Entry, the court cites to the PDF page number of plan documents and collective bargaining agreements.

> retired on or after June 1, 1993 . . . except for a
> deferred vested retirement, and you are covered
> under the Alcoa Retirement Plan, Plan II; and
> covered by a collective bargaining agreement
> that contains this plan as part of the agreement.

(*Id.* at 5).  It also provided a schedule of life insurance coverages for retirees who retired between 1993 and 1996, 1996 and 2002, 2002 and 2006, 2006 and 2011, and after 2011. (*Id.* at 8).

The 1993 Life Insurance SPD described a quadripartite division of life insurance. (*See* Filing No. 90-5, 1993 Life Insurance SPD).  The first plan was "Company-Provided Life Insurance," which provided full-time employees with the full cost of life insurance coverage.  (*Id.* at 17).  The remaining three programs were optional and allowed employees to supplement their company-paid coverage.[5]  (*Id.* at 23).  The first of these was contributory life insurance, which allowed employees to select an amount of life insurance equal to one, two, three, or four times their annual compensation.  (*Id.*).  Next, the voluntary life insurance program allowed employees who enrolled in the program before March 1, 1978, to add life insurance beyond the company-paid amount at their own expense.  (*Id.* at 30).  This program would allow coverage to continue "in full to age 65," after which the amount would be reduced, and "[t]he reduced amounts are continued for life."  (*Id.* at 32).  Finally, the supplemental life insurance program allowed employees to buy additional voluntary life insurance based on their annual compensation.  (*Id.* at 33).  Like the voluntary life insurance program, the supplemental program was frozen to

---

[5] Per the retirees' representations, the only optional life insurance program that is subscribed to by the sub-class is the voluntary life insurance program.

those employees who had enrolled in voluntary life insurance before March 1, 1978.

(*Id.*).  In contrast with voluntary life insurance though, if a retiree is at age 65 or over,

their supplemental "life insurance coverage ends." (*Id.* at 34).  Other provisions provided

for contingencies when an employee's or retiree's life insurance ended. (*Id.* at 35).

     Similar SPDs were issued for both life insurance and health insurance for each

collective bargaining agreement. (*See* Filing No. 173-1, 1993 USW Active Employee

SPD; *see also* Filing No. 102-32, 2010 Master SPD).  Following the signing of the 2010

CBA, Alcoa released the 2012 Active Employee SPD that described benefits for "active

full-time hourly employee[s] at an Alcoa location" that were covered by a CBA. (2010

Master SPD at 7).  The next year, Alcoa released an additional life insurance SPD that

described benefits for employees "who retired on or after June 1, 1993." (2013 Retiree

Life Insurance SPD at 6).  Both SPDs were "incorporated in and made part of the

collective bargaining agreements between Alcoa Inc. and the unions listed in the

'Participating Unions' section of this booklet." (*Id.* at 4; *see also* 2010 Master SPD at 4).

     Throughout the years, the Employee Life Insurance SPDs were reissued, with the

most recent being the 2020 Sickness and Accident, Long Term Disability and Life

Insurance Benefits SPD. (Filing No. 173-29, 2020 Active Employee SPD).  Any changes

between the 2020 Active Employee SPD and 2012 Active Employee SPD are

unimportant for the purposes of this case. (*Compare id.*, *with* 2010 Master SPD).  The

2013 Retiree Life Insurance SPD was not updated or supplanted by a newer one.

However, later CBAs agreed to carry forward all parts of the previous collective

bargaining agreements that were not changed. (Filing No. 102-6, 2014 Settlement

Agreement at 2, (agreeing "that the current labor agreements and working rule . . . shall remain unchanged except as modified below to provide new labor agreements"); Filing No. 90-2, 2019 Settlement Agreement at 2 (same); Filing No. 169-25, 2023 Settlement Agreement at 2 (same)).

With these agreements in the background, the retiree class members utilized two life insurance programs—company-paid life insurance (main class) and the voluntary life insurance program (sub-class)—stretching back to at least 1993.  (*See* Filing No. 173-17, Ackerman Decl. ¶ 2).  During the 2019 collective bargaining negotiations, Alcoa proposed terminating retirees' life insurance, which the Unions would not agree too.  (Filing No. 169-8, Storm Dep. at 94–95).  Alcoa dropped the issue, and no changes were made to the contracts relating to life insurance.  (*Id.* at 95–96).  Collaterally—in Alcoa's telling, at least—Alcoa decided to unilaterally eliminate life insurance benefits for the retirees who had not been employees under the current CBA (*i.e.*, they retired before the ratification of the 2019 CBA).  (Filing No. 173-2, Allen Decl. ¶ 2).  This terminated both the company-paid and voluntary life insurance programs.  (*Id.*).

Alcoa announced its intent to terminate all the life insurance plans on December 4, 2019.  (*Id.*).  The next day, Alcoa mailed a letter to affected retirees explaining the termination and enclosing a check to waive the retirees' claims to life insurance.  (*Id.* at ¶ 4).  Retirees had three months to cash the check, or it would be invalidated.  (Filing No. 173-4, Dec. 5 Letter).  The letter also stated the following in bold and underlined text:

> By endorsing and presenting this check for payment, you are agreeing to waive any claims for life insurance coverage from the Company

> after December 31, 2019.  If you do not agree to
> this waiver, you should not endorse, deposit, or
> cash the enclosed check.   You may wish to
> discuss this with your personal financial advisor
> or attorney, before endorsing, depositing, or
> cashing the enclosed check.

(*Id.*).  The check contained a shorter version of this waiver that made clear the retiree

would waive their claims to life insurance by cashing the check.  (Filing No. 173-5,

Check).  Alcoa also set up a telephone hotline to answer retirees' questions and instructed

the hotline workers to tell employees that Alcoa had the right to terminate benefits at its

leisure because the retirees were not covered by the current CBA.  (Filing No. 169-22,

Alcoa Expected Questions at 2).

　　　　When the Unions got wind of Alcoa's plan on December 10, 2019, they responded

by contacting Alcoa to explain that they did not agree that Alcoa had the authority to

unilaterally terminate life insurance benefits and explained they "would probably file a

suit." (Filing No. 169-23, Millsap Dep. at 30–32).  Alcoa expected a lawsuit because of

its actions.  (*Id.*).  Nine days later, Plaintiffs filed this lawsuit challenging the termination

of the life insurance programs for violating the CBAs.  (*See* Filing No. 1, Compl.).  In the

meantime, the Unions took a variety of actions to notify retirees not to sign the checks.

(*See* Filing No. 173-6, Burnell Dep. at 35–36; Filing No. 173-9, SOAR Email; Filing No.

97-7, Butch Dep. at 14, 18–20, 30–35).  Alcoa was served with the lawsuit on December

24, 2019, and mailed a second letter to retirees two days later who had not cashed their

checks.  (Allen Decl. ¶¶ 8–9).  After objection by Plaintiffs' counsel that the prior letters

were misleading, Alcoa sent a third letter explaining that a lawsuit had been filed

challenging Alcoa's ability to terminate the life insurance programs, while also explaining that employees could still waive their claims by cashing the checks.  (Filing No. 16-12, 16-13 at 2–3).  Ultimately, 5,360 retirees, or around 88% of the class, cashed the checks. (Filing No. 173-17, Ackerman Decl. ¶ 16).

## II.    Legal Standard

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  That requires reviewing the record in the "light most favorable to the nonmoving party and draw[ing] all reasonable inferences in that party's favor."  *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009).  When reviewing cross-motions for summary judgment, "we construe all inferences in favor of the party against whom the motion under consideration is made."  *Schlaf v. Safeguard Prop., LLC*, 899 F.3d 459, 465 (7th Cir. 2018) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

The mere existence of an alleged factual dispute is not sufficient to defeat a motion for summary judgment.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986).  That is because "[i]t is not the duty of the court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which [it] relies."  *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008).

## III.   Discussion

The main class and sub-class of Alcoa retirees bring the same cause of action with different supporting legal theories.  In Counts I (main class) and III (sub-class), they allege that the termination of the life insurance programs violated the CBAs Alcoa signed with the Unions, which supports a cause of action under Section 301 of the LMRA, 29 U.S.C. § 185.  They also allege in Counts II (main class) and IV (sub-class) that because the CBAs created obligations that provided benefits through an ERISA plan, the termination of the life insurance programs constituted a repudiation of negotiated plan terms, which is actionable under Section 502 of ERISA, 29 U.S.C. § 1132.  Both Section 301 of the LMRA and Section 502 of ERISA provide causes of action to plaintiffs when an employer takes actions that violate the terms of a CBA or an ERISA plan.  As a result, this case boils down to whether the removal of the life insurance programs violated the CBAs.

Alcoa does not dispute that it would have violated 29 U.S.C. § 185 and 29 U.S.C. § 1132 if the removal of the life insurance programs violated the CBAs.  It contends instead that the removal of the life insurance programs did not violate the CBAs.  Alcoa also asserts in its Thirteenth Affirmative Defense that checks cashed by 88% of the class to serve as a waiver to any claim for life insurance against Alcoa.

First, the court addresses whether the removal of the company-paid life insurance program violated the CBAs.  Next, the court turns to whether the removal of the voluntary life insurance program violates the CBAs.  Finally, the court addresses whether the waivers should be invalidated on a class-wide basis and whether summary judgment should be granted class-wide to Alcoa because 88% of the class waived their claims.

A.    **Main Class (Counts I & III)**

The main class of Alcoa retirees contends Alcoa promised them life insurance benefits in the 2019 and 2023 CBAs.[6]  In support, they point to "Article XXIII" of those agreements which is the "Group Insurance" provision.  (*See* Filing No. 90-1, 2019 Master CBA at 60).  That clause reads:

> Medical Benefits, Prescription Drug Benefits, Dental Benefits, and Vision Benefits will be provided to eligible active employees and their eligible dependents.  The Company will provide Sickness and Accident, Life Insurance, and Accidental Death and Dismemberment benefits to eligible active employees.  The Company will also provide medical and Prescription Drug Benefits to eligible retirees, surviving spouses, and their eligible dependents and Life Insurance to eligible retirees.
>
> Separate Booklets describing these benefits are incorporated herein and made a part of this Agreement.   Effective January 1, 2020, the agreed upon modifications to all Group Insurance benefits will become effective and incorporated into plan booklets.

(*Id.*).  The retirees contend the language promising "Life Insurance to eligible retirees" gives them a contractual right to life insurance.  Alcoa contends the words "eligible retirees" means only those employees who retire during the CBA.  This dispute presents a straightforward issue of contractual interpretation.

---

[6] The 2023 collective bargaining is materially identical to the 2019 CBA for the purposes of this case.  (*See* Filing No. 169-25, 2023 Master Settlement Agreement (agreeing to carry forward 2019 CBA excepting certain provisions not relevant here)).

The court interprets CBAs "according to ordinary principles of contract law" so long as "those principles are not inconsistent with federal labor policy." *M&G Polymers USA, LLC v. Tackett*, 574 U.S. 427, 435 (2015). "In this endeavor, as with any other contract, the parties' intentions control." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010) (internal quotation marks omitted). "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." 11 R. Lord, *Williston on Contracts* § 30:6 (4th ed. 2012). Only if a term is ambiguous may the court turn to extrinsic evidence for the term's meaning. *See CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018). And a term is only ambiguous if it is reasonably susceptible to two different meanings, *id.* (citing *Williston on Contracts* § 30:4), after considering all the contractual terms, as contract terms must be harmonized where possible, *Barnett v. Ameren Corp.*, 436 F.3d 830, 833 (7th Cir. 2006) ("Contractual provisions must be read in a manner that makes them consistent with each other.").

The dispute here turns on the words "eligible retirees." Consider that term; it consists of an adjective and a noun, with the adjective limiting the noun. *See Weyerhaeuser Co. v. U.S. Fish & Wildlife Serv.*, 139 S. Ct. 361, 368 (2018) (explaining adjectives "modify nouns" by "pick[ing] out a subset of a category that possesses a certain quality"). The ordinary meaning of the word "retiree" is "[a] person who has retired, esp[ecially] permanently from employment." *Retiree*, Oxford-English Dictionary (2d ed. 1989). To be retired means to have "le[ft] office, employment, or service permanently . . . esp[ecially] on reaching pensionable age; to stop working." *Retire*,

Oxford-English Dictionary (2d ed. 1989).  The SPDs similarly define being retired as

"[t]o be eligible for and elect retirement under a company retirement plan."  (2013 Life

Insurance SPD at 10).  There is no indication the parties meant something other than the

common meaning of retiree when agreeing to the 2019 CBA.  Thus, the broad category of

people who the CBA promises life insurance benefits to is any person who permanently

left employment from Alcoa after being eligible for and taking retirement per Alcoa's

regulations.  (*See, e.g.*, *id.*).

        The 2013 Retiree Life Insurance SPD[7] also defines the term "eligible" as it relates

to life insurance.  An employee is "eligible for company-provided life insurance if" the

retiree was (1) "an hourly employee who retired on or after June 1, 1993," (2) was

"covered under the Alcoa Retirement Plan," and (3) was "covered by a collective

bargaining agreement that contains this plan as part of the agreement."  (2013 Life

Insurance SPD at 6).  Another piece of the SPD confirms this.  (*Id.* at 11 ("You are

eligible to participate in the Alcoa life insurance plan as described in this booklet if you

are a retiree who, as an active employee, was covered by a collective bargaining

agreement between Alcoa and one of the unions . . . .")).  There is no dispute that the

---

[7] The parties raise no dispute in the papers that the SPDs are terms of the respective CBAs when they are incorporated by reference.  At oral argument however, Alcoa indicated that not all the terms in a SPD are contractual promises under the collective bargaining agreement as a matter of law under ERISA.  (Filing No. 188, Tr. of Or. Arg. at 68).  This is technically correct but beside the point here: the SPDs and CBAs make expressly clear that the SPDs are part of the CBA between the Unions and Alcoa.  (2019 CBA at 60 ("Separate booklets describing these benefits are incorporated and made a part of this Agreement."); 2013 Life Insurance SPD at 4 ("This booklet is the plan document and summary plan description (SPD) of life insurance benefits, which are incorporated in and made part of the collective bargaining agreements between Alcoa Inc. and the unions . . . ."); *cf.* Alcoa's Br. at 26 (arguing the 2020 Active Employee SPD was "expressly incorporated" with identical language)).

2013 Retiree Life Insurance SPD is incorporated into the 2019 CBA.  Consequently, the word "eligible" restricts the word "retirees" in the CBA to those retirees who retired after June 1, 1993, and were covered by a CBA.  This is essentially duplicative of the plaintiff class here, meaning that the plaintiff class of post-1993 retirees is guaranteed life insurance benefits by the 2019 CBA.

This conclusion is confirmed by the structure of the SPDs.  There are three SPDs incorporated into the 2019 CBA: the 2020 Employee Benefits SPD, the 2013 Retiree Health Insurance SPD, and the 2013 Retiree Life Insurance SPD.  (*See* 2020 Employee Benefits SPD at 4 ("This booklet is . . . incorporated in and made part of the collective bargaining agreement[] . . . ."); 2013 Retiree Life Insurance SPD at 4 (same); 2013 Retiree Health SPD at 4 (same)).  Predictably, the 2020 Employee SPD deals with life insurance benefits for employees.  (2020 Employee Benefits SPD at 35–38).  Crucially, it also addresses how those benefits function when that employee retires, and what those benefits look like for the term of the 2019 CBA.  (*Id.* at 38 ("If you retire . . . at age 62 or older, the amount of your Company-provided life insurance is reduced to $7,500.")).  The 2013 Retiree Life Insurance SPD provides life insurance benefits to retirees too.  (2013 Retiree Life Insurance SPD at 6–8 (explaining benefits and that "[y]our company-provided life insurance coverage begins on the day you retire" with different levels of benefits depending on when the employee retired, which stretches as far back as 1993)).

Alcoa's theory—that the 2013 Retiree Life Insurance SPD applies only to employees who will retire during the term of the 2019 CBA instead of post-1993 retirees—renders the 2013 Retiree Life Insurance SPD superfluous because the 2020

14

Employee Benefits SPD already provides retirement life insurance benefits for retirees. *But see, e.g.*, *Binks Mfg. Co. v. Nat'l Presto Indus., Inc.*, 709 F.2d 1109, 1116 (7th Cir. 1986) ("[A] written contract should be given a construction that harmonizes all the various parts of the contract so that no provision is conflicting with, or repugnant to, or neutralizing of any other.") (internal quotation marks omitted).  If, as Alcoa affirmatively contends, the 2020 Employee Benefits SPD provides for retirement benefits for employees who will retire during the 2019 CBA, then the 2013 Retiree Life Insurance SPD must provide retirement benefits for a different group, else it would be duplicative of the 2020 Employee Benefits SPD.  And the only possible group that could be is the group expressly described by the 2013 Retiree Life Insurance SPD: those who retired after June 1, 1993, from the variety of plants listed in the agreement.  (2013 Retiree Life Insurance SPD at 12 (listing a variety of plants for retirees "who retired on or after June 1, 1993")).

An astute observer might recognize the term 'eligible' does not have a set meaning within the context of the 2019 CBA because it modifies different groups like "active employees," "dependents," and "retirees."  (2019 Master CBA at 61).  There is nothing unusual or unworkable about this because each of the SPDs clarifies what eligible means for each group.  For example, the 2020 Employee Benefits SPD describes the eligibility for active employees, (2020 Employee Benefits SPD at 7), while the 2013 Retiree Life Insurance SPD provides differing eligibility requirements for retirees and spouses, (2013 Retiree Life Insurance SPD at 6).  The overarching promise in the 2019 CBA, however, is to promise life insurance whenever a retiree is eligible, and there is nothing about the

usage of the term 'eligible' in relation to active employees that undermines the class of eligible retirees as defined by the 2013 Retiree Life Insurance SPD.

There is one wrinkle: the 2019 CBA states in a "recognition provision" that the contract's "provisions" will:

> apply solely to those employees of the Company at its plants located at Warrick, Indiana; and Massena, New York, for whom the Union has been certified as the exclusive bargaining agency by the National Labor Relations Board, or for whom the company has recognized the Union as the exclusive bargaining agency.

(2019 Master CBA at 9). Alcoa seeks to emphasize that the agreement applies "solely to . . . employees" but not retirees. (*Id.*). This misreads the focus of this provision, which should be placed on the part of the sentence explaining the terms apply only to those who have had "the Union" as their exclusive bargaining agency. (*Id.*).

There are a few contextual clues that foreclose Alcoa's argument. First, the 2019 CBA is between the Union and Alcoa but contemplates that there may be employees of Alcoa who are *not* members of the Union. (2019 Master CBA at 14–15 (discussing procedures for new employees that are not required to become members of the unions in certain states)). The recognition provision then differentiates between the different types of Alcoa workers who might consider themselves "employees," and carves out a subset of employees that get benefits under the contract. This makes sense because the provision does not limit the term "employee" in any way other than that the Union represents them and that they be from a particular plant. Keeping in mind that a retiree *cannot* be an employee, the provision is seeking to exclude non-union and non-Warrick and Messana

16

employees, rather than addressing retirees at all.  Put another way, the language "solely

. . . to those employees" contrasts 'those employees' (union) against 'other employees'

(non-union), rather than contrasting employees against retirees.

Another important clue buoying that conclusion is that the 2019 CBA quite clearly

does not apply solely to employees as it expressly provides benefits to retirees.  (*See* 2019

Master CBA at 60 (explaining "eligible retirees" shall have life insurance benefits)).

Indeed, the 2019 CBA has a provision expressly referring to a group of post-1993 retirees

who could not possibly be employees for the ratification of the agreement.  (*Id.* at 135

("[T]he Company will maintain its program of medical and prescription drug benefits . . .

for post May 31, 1993, retirees.)).[8]  As a definitional matter, retirees are excluded from

the category of employee through the ordinary meaning of those two terms.  *Compare*

*Retiree*, Oxford-English Dictionary (2d ed. 1989) (defining retiree as one who has

"permanently" left "employment"), *with Employee*, Oxford-English Dictionary (2d ed.

1989) ("A person who works for an employer.").  The same is true as a matter of federal

labor law.  *Allied Chem. & Alkali Workers of Am, Loc. Union No. 1 v. Pittsburgh Plate*

*Glass Co., Chem. Div.*, 404 U.S. 157, 168 ("The ordinary meaning of 'employee' does not

include retired workers; retired employees have ceased to work for another for hire.").

As a result, the only way to harmonize the recognition provision with the provisions

expressly providing benefits to retirees is to understand the recognition provision as

---

[8] Alcoa contends that this is not termed as an article of the collective bargaining agreement and so is not covered by the recognition provision.  However, the recognition provision applies to "provisions," not articles.  (2019 CBA at 10).  And there is no dispute the Retiree Healthcare Letter is a provision of the current collective bargaining agreement.

dealing with different types of employees instead of differences between employees and retirees.

The parties agree that the 2019 CBA provides benefits to retirees, not just employees.  (*See* Filing No. 172, Defs.' Br. in Supp. of Cross-Motion at 26 (explaining the term 'eligible retirees' guarantees benefits to "future retirees").  The difference is that Alcoa contends the recognition provision requires reading the term "eligible retirees" to mean "eligible future retirees," while the retirees contend the term "retirees" is only limited by the word "eligible."[9]  Recall the discussion above about how adjectives limit nouns to only include a category of that noun with a certain quality.  *Weyerhaeuser*, 139 S. Ct. at 368.  Alcoa's proposed reading inserts an additional, atextual adjective.  And contrary to Alcoa's contentions, this hidden limitation is not suggested by the recognition provision because both Alcoa's and the retirees' constructions require reading the recognition provision as applying to more than just employees.  In other words, if the recognition provision truly means provisions apply solely to employees but not retirees, then any person who retires no longer receives any benefits and Alcoa and the retirees are incorrect.

Consider the hypothetical of an employee who is a future retiree, meaning they were employed by Alcoa when the 2019 CBA went into effect but will retire soon after.

---

[9] It is also demonstrably not the case that the number of employees is frozen at the time the contract was put in force.  The collective bargaining agreement has express terms governing new employees who would be governed by the agreement, (2019 CBA at 15 ¶¶ I–J), and governing retirees, (*id.* at 61, 135).  That means the contract contemplates that the number of employees will grow and shrink as new employees are added and old employees are lost to retirement.

At the ratification of the 2019 CBA, there is no issue.  As soon as that employee retires however, they cease to be an employee and they immediately become a retiree as a matter of federal labor law, which shunts them outside the scope of the contract.  Not only does this leave the language promising benefits to retirees as a dead letter, which violates the rule against superfluity, *Barnett*, 436 F.3d at 833 ("Contractual provisions must be read in a manner that makes them consistent with each other."), but it would also violate federal labor law because retiree benefits for current employees is a mandatory subject of bargaining, *Allied Chem.*, 404 U.S. at 176–82.  The consequence of this is that the recognition provision does not favor any construction of the term 'eligible retiree' over another because that provision says nothing about retirees in the first place.

To conclude, the CBA unambiguously promises life insurance benefits to eligible retirees.  The term "eligible retirees" unambiguously includes employees who retired after June 1, 1993, pursuant to an Alcoa retirement plan and were covered by a CBA between Alcoa and the Unions.  Because Alcoa terminated the company-paid life insurance plan despite its contractual promise to the contrary, it was in breach of the 2019 CBA and remains in breach of the 2023 CBA.  Summary judgment in favor of the main class of retirees on Counts I and II of the Amended Class Action Complaint is appropriate.

## B.    Sub-Class

The sub-class of retirees is a little different; the sub-class claims a vested interest in the benefits provided by a voluntary life insurance program that has not allowed new

enrollment since 1978.[10]  The sub-class prevails on the plain language of the 1993 CBA, which plainly and unambiguously guarantees them a right to the voluntary life insurance program.[11]

As stated previously, courts "interpret collective-bargaining agreements, including those establishing ERISA plans, according to ordinary principles of contract law, at least when those principles are not inconsistent with federal labor policy." *Tackett*, 574 U.S. at 435.  "In this endeavor, as with any other contract, the parties' intentions control." *AnimalFeeds Int'l*, 559 U.S. at 682 (internal quotation marks omitted).  "Where the words of a contract in writing are clear and unambiguous, its meaning is to be ascertained in accordance with its plainly expressed intent." *Williston on Contracts* § 30:6.

The default rule is "contractual obligations will cease, in the ordinary course, upon termination of the bargaining agreement," where that bargaining agreement contains an express provision terminating the contract.  *Litton Fin. Printing Div., Litton Bus. Sys., Inc. v. NLRB*, 501 U.S. 190, 207 (1991).  However, the parties are free to agree to provide benefits following the expiration of a CBA.  *Pabst Brewing Co., Inc. v. Corrao*, 161 F.3d 434, 439 (7th Cir. 1998) (explaining benefits surviving a CBA "depend[s] entirely on the

---

[10] The court's order approving this sub-class included "[a]ll retirees of Alcoa . . . [w]ho upon their retirement were eligible for one or more forms of 'Optional' life insurance, including voluntary, additional voluntary, and supplemental life insurance."  (Filing No. 117, Class Certification Order at 23).  The retirees indicate and Alcoa does not contest that all of the members of the sub-class are participants of the voluntary life insurance program rather than the supplemental or contributory programs.

[11] To the extent any sub-class members retired after the 1993 collective bargaining agreement expired, Alcoa promised them lifetime benefits and concedes it never again bargained over those benefits, meaning it agrees it did not bargain for the removal of the vested benefits.  The court notes that the parties have not submitted any evidence that any members of the sub-class retired after the expiration of the 1993 CBA.

contract between the company and employees").  Such an agreement, however, cannot be inferred from silence.  *Tackett*, 574 U.S. at 442.  Rather, an agreement to vest benefits must be stated in "explicit terms" or through any "implied terms of the expired agreement."  *Id.* at 443 (Ginsburg, J., concurring) (quoting *Litton Fin. Printing*, 501 U.S. at 203); *see also CNH Indus. N.V. v. Reese*, 583 U.S. 133, 139 (2018) (reversing the Sixth Circuit's determination that healthcare benefits had vested because "[t]he Sixth Circuit did not point to any explicit terms, implied terms, or industry practice suggesting" benefits vested for life" (citing *Tackett*, 574 U.S. at 443–44 (Ginsburg, J., concurring))); *Stone v. Signode Indus. Grp. LLC*, 943 F.3d 381, 385 (7th Cir. 2019) (Hamilton, J.) ("The contract may also provide for vesting through implied terms.").

Application of these rules leads inexorably to the conclusion that the Unions and Alcoa agreed to provide the voluntary life insurance benefits to the sub-class for the rest of the retirees' lives.  To start, the 1993 CBA contains a general durational clause.  (1993 CBA at 8).  As a result, the default rule is that unless the CBA provides a different term for the voluntary life insurance program, Alcoa's obligation to provide benefits terminated with the agreements.  *Cherry v. Auburn Gear, Inc.*, 441 F.3d 476, 481 (7th Cir. 2006).  The 1993 CBA does, however, create a different term for the voluntary life insurance program when the 1993 Life Insurance SPD states that life insurance under the voluntary life insurance program would be "continued for life."  (1993 Life Insurance SPD at 33).  This language clearly and expressly indicates the parties agreed the voluntary life insurance program would continue for the life of the retiree.  Consider

*Bidlack v. Wheelabrator Corporation*, 993 F.2d 603, 608 (7th Cir. 1993),[12] where the Seventh Circuit explained a clause providing that benefits "shall be continued for the spouse after the death of the retiree" was vague but could reasonably "be thought a promise to retired employees that they and their spouses will be covered for the rest of their lives" because "the provision does not say 'when they die or the collective bargaining agreement expires, whichever occurs first,' but simply when they die."  The provision here is similar but more definite.  Instead of saying benefits shall be continued in an indeterminate sense, the contract states exactly how long benefits will run: for life.  As a result, retirees' dependents have a vested interest in the voluntary life insurance program through the express and unambiguous terms of the 1993 CBA.

      Another key indicator is that other benefits programs specify when they end, unlike the voluntary life insurance program.  For example, the supplemental life insurance program explains "[i]f you are age 70 . . . life insurance . . . [will] end."  (1993 Life Insurance SPD at 34).  Similarly, the voluntary life insurance program states accidental dismemberment and death coverage under the voluntary program "ends at retirement" immediately after explaining "[l]ife insurance . . . amounts are continued for life."  (*Id.* at 32).  Alternatively, the contributory life insurance program is silent as to how long it lasts, indicating it does not survive the expiration of the 1993 CBA.  (*Id.* at

---

[12] Alcoa questions the continuing vitality of *Bidlack* following the Supreme Court's decisions in *Tackett* and *Reese*.  The Seventh Circuit has continued to apply *Bidlack*, as well as the rest of its precedent, because "*Tackett* and *Reese* are consistent with the approach we have taken for decades."  *Stone*, 943 F.3d at 385 (citing *Cherry*, 441 F.3d at 481 (in turn citing *Bidlack*, 993 F.2d at 606–07)).  Alcoa's attempt to distinguish *Stone*'s language is unpersuasive.

26–29).  When the parties wanted a particular benefit to expire at a particular time, they said so.  Conversely, when the parties wanted coverage to continue for life, they said so. Here, they said so for the voluntary benefits program that Alcoa unilaterally terminated, which constitutes a violation of the 1993 CBA.

Alcoa's counterarguments are unavailing.[13]  First, Alcoa points to a line of Seventh Circuit caselaw that has explained that a term promising "lifetime" benefits does not necessarily create an obligation to provide lifetime benefits.  *See, e.g.*, *Vallone v. CNA Fin. Corp.*, 375 F.3d 623, 632–33 (7th Cir. 2004) (holding a promise to provide "lifetime benefits" meant "good for life unless revoked or modified").  These cases are inapposite because the driving factor behind these decisions are that the contracts simultaneously promised lifetime benefits and reserved the company's right to modify or eliminate benefits in separate contractual terms.  *Id.* at 633 (explaining its holding was "particularly plausible" because "the contract documents include a reservation of rights clause"); *see also UAW v. Rockford Powertrain, Inc.*, 350 F.3d 698, 704 (7th Cir. 2003) ("We must resolve the tension between the lifetime benefits clause, and the plan termination and

---

[13] Alcoa appears to contend that the 1993 collective bargaining agreement only promises benefits to employees employed during the term of that contract, and it continuously argues it never bargained over benefits for retirees who had already retired at the time the agreement was ratified.  The evidence cannot be read to support these contentions.  Alcoa and the Unions agreed to incorporate into the 1993 collective bargaining agreement provisions that *explicitly* promised benefits to a group whose membership had been frozen since 1978, which included people who had already retired.  Importantly, because that group was frozen, the 1993 agreement is all that is necessary to resolve the sub-class—which consists only of retirees in the frozen pre-1978 voluntary life insurance program—claims.  To the extent later agreements are necessary, Alcoa concedes it never again bargained over retiree life insurance, and so did not bargain for the removal of these benefits.  (Tr. of Or. Arg. at 33 ("Alcoa has never ever, not once, negotiated for existing retirees as part of a CBA with the exception of the health care letter . . . .")).

reservation of rights clauses, by giving meaning to all of them.").  "The reason" for these holdings "is that benefits described as 'lifetime' are not really vested when the same contract also reserves the right to revoke them, because the only proper construction of the two seemingly conflicting provisions is that the 'lifetime' benefits are 'good for life unless revoked or modified.'"  *Barnett*, 436 F.3d at 833 (quoting *Vallone*, 375 F.3d at 633).

Cases going the other way underscore this.  Consider *Bland v. Fiatallis North America, Incorporated*, 401 F.3d 779 (7th Cir. 2005).  There, the Seventh Circuit explained that "lifetime language" could create vested benefits because "the plan documents" did not "contain . . . such limiting language" that "allow[ed] an employer to modify or terminate retiree welfare benefits."  *Id.* at 780.  It even stated the rule explicitly: "[U]nder *Vallone* and its antecedents, the presence of 'lifetime' language . . . defeats summary judgment" so long as that language is "uncontradicted by the agreement read in its entirety."  *Id.* at 786–87.  The Seventh Circuit made the same point after *Tackett* and *Reese*, when it distinguished *Vallone*, *Barnett*, and *Rockford Powertrain* as being cases "that addressed contracts that included both 'lifetime' language and reservation-of-rights clauses expressly allowing alteration or termination of benefits."  *Stone*, 943 F.3d at 387.  Other circuits also follow this rule.  *See Bland*, 401 at 787 ("This holding is consonant with the decisions of other circuits." (citing *Abbruscato v. Empire Blue Cross & Blue Shield*, 274 F.3d 90, 98 (2d Cir. 2001))).

Any argument that the Supreme Court's decision in *Reese* abrogated the rule that reservation of rights clauses are required to prevent the vesting of lifetime benefits is

incorrect.  While the Supreme Court in *Reese* did not take notice of any reservation of rights language, that was because that case concerned a contract that contained *no* language vesting benefits.  *Reese*, 583 U.S. at 140 ("No provision specified that the healthcare benefits were subject to a different durational clause.").  Thus, the Supreme Court held that the contract was silent as to vesting and proceeded no further in the analysis than to look at the general durational clause.  *Id.* at 140 (emphasizing that "[w]hen a collective-bargaining agreement is merely silent on the question of vesting," benefits do not vest).  The reservation of rights analysis comes *after* a court finds some language that suggests lifetime benefits.  *See Bidlack*, 993 F.2d at 608 (noting "the agreements are not silent on the issue" of vesting because the terms of the agreements suggested "a promise to retired employees that they and their spouses will be covered for the rest of their lives"); *cf. Vallone*, 375 F.3d at 634 (distinguishing *Bidlack* because "*Bidlack* did not involve the situation here where 'lifetime' benefits were granted by the employer while the right to terminate or modify them was reserved").

The ultimate rule is this.  If the CBA contains no language that suggests benefits vest, then benefits do not vest.  *See Reese*, 583 U.S. at 135–36; *Tackett*, 574 U.S. at 441–42; *see also Stone*, 943 F.3d at 385 (reading this as the holding of *Reese* and *Tackett*).  If there is language that could be read to provide lifetime benefits, that language must be read as not vesting benefits if there is other language suggesting the company has reserved its right to terminate benefits.  *See Vallone*, 375 F.3d at 633; *Rockford Powertrain*, 350 F.3d at 704.  But where the CBA contains language suggesting benefits vest and contains no language reserving the company's right to terminate benefits,

25

benefits will vest. *Bland*, 401 F.3d at 785–86 (contrasting cases with "lifetime" language and no reservation of rights clause to cases without any lifetime language and cases with reservation of rights clause); *Stone*, 943 F.3d at 385 (same).

Alcoa has not pointed to any reservation of rights clause here and has failed to contest Plaintiffs' assertion that the 1993 CBA does not contain any reservation of rights language. (*See, e.g.*, Tr. of Or. Arg. at 57). The court has already described how the CBA specifically provided for voluntary life insurance benefits that survive the termination of the contract. As a result, this case falls comfortably with the *Bland*-type of cases.

Alcoa next points to language in the 1993 Life Insurance SPD that discusses contingencies if a retiree's "plan ends." (1993 Life Insurance SPD at 36). It contends this language evinces the intent of the parties to end the voluntary life insurance program. Not so. Of the three types of plans, two can end; the supplemental life insurance plan states this expressly and the contributory life insurance plan must be read as ending at the end of the contract under *Tackett*. It is hornbook law that "[a] contractual interpretation that gives reasonable meaning to all of the terms in an agreement is preferable to an interpretation which gives no effect to some terms." *GNB Battery Techs., Inc. v. Gould, Inc.*, 65 F.3d 615, 622 (7th Cir. 1995). Reading the provision in the 1993 Life Insurance SPD allowing retirees to purchase a personal plan in the event their plan ends as Alcoa suggests would nullify the "for-life" language applicable only to the voluntary life insurance program. By contrast, reading this language as providing contingencies only for the plans that can end harmonizes each provision of the contract.

Alcoa also argues the provision granting life insurance benefits for life is actually a term for calculating a retirees' premium payments, not a grant of benefits.  This misreads the relevant language, which provides that "[i]f you're retired and age 65 or over, here's how *your coverage* works:" a retirees' "[l]ife insurance is reduced at age 65 by 75%.  The reduced amounts are continued for life . . . .  Your payments are based on $.60 per thousand per month for the reduced amount of insurance in effect."  (1993 Life Insurance SPD at 33 (emphasis added)).  The 1993 Life Insurance SPD makes clear that it is the amount of life insurance (i.e., the payout) that is continued for life when it is describing a retiree's *coverage*, not their premium.  While the 1993 Life Insurance SPD does discuss what a retiree will pay for that amount of life insurance, that is a separate from the clause promising life insurance coverage for life.  This argument is not a reasonable reading of the 1993 Life Insurance SPD.

This leads Alcoa to its final redoubt.  Alcoa argues that the clause providing coverage for life means for the life of the CBA.  The Seventh Circuit has explained the contract need not use magic words to vest contractual rights.  *Bidlack*, 993 F.2 at 607 ("We reject the extreme position[] . . . that the contract must either use the word 'vest' or must state unequivocally that it is creating rights that will not expire when the contract expires.").  And the ordinary meaning of the term "for life" means "for the life of the retiree."  Only where there is a reservation of rights clause does a promise for life reasonably mean something else.  *See, e.g.*, *Barnett*, 436 F.3d at 833–34.  By specifying a length of benefits other than the one laid out in the general durational clause, the contract specifies that the parties intended a duration *other* than the one provided in the general

27

durational clause, mainly as defined by the life of the retiree.  *Reese*, 583 U.S. at 140 (noting courts "would simply apply the general duration clause" only if "an agreement does not specify a duration for healthcare benefits in particular").  In short, the plain language of the parties' contracts gives the sub-class voluntary life insurance benefits for the rest of their lives.

Finally, the parties do not spend any time discussing who is a member of the sub-class and when and from where they retired.  Considering the 1993 CBA and 1993 Life Insurance SPD discussed by the parties applies only to six facilities,[14] the court's holding extends solely to retirees from those six facilities.  The court takes no position on a hypothetical participant in the voluntary life insurance program that retired from a facility that is not one of the six covered by the 1993 Life Insurance SPD because the parties do not spend any significant time discussing that possibility or offering evidence that such a hypothetical class member exists.  With this understanding, summary judgment for the sub-class of retirees is appropriate on Counts III and IV of the Amended Class Action Complaint because Alcoa unilaterally terminated the vested benefits under the voluntary life insurance program.

### C.   Waiver (Alcoa's Thirteenth Affirmative Defense)

Having said all this, retirees from both classes have a problem: many signed and cashed checks agreeing to waive any claim for life insurance.  (*See* Sample Check ("By endorsing, you are agreeing to waive any claims for life insurance coverage from the

---

[14] These six facilities are: Alcoa, Tennessee; Badin, North Carolina; Bauxite, Arkansas; Mobile, Alabama; Point Comfort, Texas; and Rockdale, Texas.  (1993 Life Insurance SPD at 3).

Company after December 31, 2019.  If you do not agree to this waiver, you should not endorse, deposit or cash this check.")).  Alcoa contends in its Thirteenth Affirmative Defense that by signing the checks and accepting a cash payment, the retirees have waived any entitlement to life insurance benefits.  The retirees tender three class-wide theories for why the waiver should be invalidated.  First, the waivers cannot be valid under the LMRA as the retirees argue that statute prohibits the waiver of claims under CBAs.  Second, the waivers should be invalidated under ERISA because Alcoa breached its fiduciary duties as a plan administrator in its communications seeking waiver.  And third, the waiver should be invalidated for being improper communications under Federal Rule of Civil Procedure 23.  The first two arguments are amenable to class-wide resolution, but the retirees are incorrect that either argument provides a basis for invalidating the waivers.  The last however presents individualized factual issues in the current posture and consequently cannot be resolved on a class-wide basis.  The court takes each argument in turn.

First, the LMRA does not prohibit an individual represented by a union from waiving their contractual right to benefits.[15]  By default, "[a] party may waive any provision, either of a contract or of a statute, intended for his benefit."  *Shutte v. Thompson*, 82 U.S. 151, 159 (1873); *see also United States v. Mezzanatto*, 513 U.S. 196, 200–01 (1995) (affirming the continuing validity of *Shutte*).  The retirees have not cited a

---

[15] Throughout their argument, the retirees frame the waiver as Alcoa "unilaterally" lessening the effect of their breach.  This is not correct.  A waiver of claims definitionally needs two parties acting bilaterally, through an offer by Alcoa and the knowing and voluntary acceptance of the retiree.

case where a court has held this presumption is not applicable in the LMRA context or that the LMRA prohibits waiving claims.  The cases the retirees cite for this proposition are cases wherein a prearranged private contract conflicts with part of the CBA, rather than dealing with situations where a party has waived its rights under a CBA.  *See, e.g.*, *J.I. Case Co. v. NLRB*, 321 U.S. 332, 338 (1944) (explaining an individual employment contract signed before the CBA between employer and employee could not be a waiver of the terms of the CBA); *cf. Baker v. Amsted Indus., Inc.*, 656 F.2d 1245, 1248–49 (7th Cir. 1981) (explaining an employer and "individual employee" cannot agree to terms that "bar collective bargaining" or "waive benefits" for the bargaining group because "terms and conditions of employment can be arranged only by the majority representative").  Taken to its logical conclusion, the retirees' argument would prevent any employee from settling their claims once filed, as they would necessarily be giving *something* up that they contend is guaranteed by the contract.  That would create immense strain on judicial resources and uncertainty for plaintiffs and defendants.  As no authority supports the idea that the LMRA should be used to invalidate the waiver of claims on a class-wide basis, this argument fails.

The argument that ERISA requires vacating the waivers faces an identical problem.  Like others who have made this argument, "Plaintiffs offer no authority for" their contention that a waiver of statutory rights is never enforceable when "the defendant breached its fiduciary duty by even seeking [waiver]."  *Schuman v. Microchip Tech. Inc.*, No. 16-cv-5544, 2023 WL 5498065, at *8 (N.D. Cal. Aug. 23, 2023).  Such a rule would also impede the strong public policy of allowing parties to settle suits.  These two reasons

are sufficient to determine that class-wide invalidation of the waivers is not appropriate under ERISA.  This is not to say that the allegedly misleading communications that allegedly breached ERISA are not relevant—they might be relevant to any individual's decision to sign the check—they just do not provide a class-wide basis for invalidating the waivers.

Third, the argument that Rule 23 is sufficient to invalidate the waivers on a class-wide basis also fails.  "To the extent that the district court is empowered . . . to restrict certain communications in order to prevent frustration of the policies of Rule 23, it may not exercise [that] power without a specific record showing by the moving party of the particular abuses" that would violate Rule 23.  *Gulf Oil Co. v. Bernard*, 452 U.S. 89, 102 (1981) (quoting *Coles v. Marsh*, 560 F.2d 186, 189 (3d Cir. 1977)).  In other words, the court may restrict communications with the class or putative class where the defendant has engaged in (or threatens to engage in) "coercive, misleading, or other abusive communications."  *Reid v. Unilever U.S., Inc.*, 964 F. Supp. 2d 893, 926 (N.D. Ill. 2013).  But even where such communications are committed, the court must give "explicit consideration to the narrowest possible relief which would protect the respective parties."  *Gulf Oil Co.*, 452 U.S. at 102.  This means the class faces an incredibly high bar to show the waivers should be invalidated on a class-wide basis under Rule 23.

The default rule is that defendants "may normally enter into settlements with individual potential class members prior to class certification."  Newberg on Class Actions § 9:7 (5th ed. 2013) (collecting cases).  In most circumstances, it is not appropriate to invalidate individual settlement agreements.  *See Tolmasoff v. Gen. Motors,*

31

*LLC*, No. 16-11747, 2016 WL 3548219, at *15 (E.D. Mich. June 30, 2016) (discussing

cases).  That is particularly so given the "general policy . . . in favor of [the] settlement of

litigation by compromise and settlement procedures."  *Du Puy v. U.S. Dep't of Lab.*, 519

F.2d 536, 541(7th Cir. 1975).  Only when the defendant engages in communications that

significantly mislead the recipient does it become appropriate to consider a class-wide

vacatur of any waivers.  *See, e.g.*, *Brodsky v. HumanaDental Ins.*, No. 1:10-cv-3233,

2016 WL 5476233, at *12 (N.D. Ill. Sept. 29, 2016) (invalidating waivers where the

waiver failed to notify putative class members of the class action over six years after the

class action was filed).

    The record does not support that level of misconduct on the part of Alcoa

regarding the class.  As an initial matter, only Alcoa's second communication raises any

specter of misconduct because Alcoa's first communication occurred prior to the filing of

the lawsuit and the third communication disclosed the suit.  Moreover, nothing in the

record establishes the whole class did not have notice of the lawsuit, which undermines

the retirees' theory that the second communication misled the retirees into believing the

lawsuit did not exist.  To be sure, Alcoa's second communication did not mention the

lawsuit filed seven days earlier.  But that is not a substitute for evidence demonstrating

the class was unaware of the putative class action; the Unions undertook a series of steps

to raise awareness of the suit, so many could have been aware.[16]  (*See* Burnell Dep. at

35–36; SOAR Email; Butch Dep. at 14, 18–20, 30–35).  Additionally, the retirees have

---

[16] Given that this is a reason to deny Plaintiffs' motion for summary judgment, this factual
inference is properly drawn against the Plaintiffs.

not shown why invalidating the waivers is the narrowest possible relief.  On this record, a singular communication that may not have mislead class members is not a basis to invalidate the waivers on a class-wide basis.

This cuts the other way too.  Alcoa cannot establish that every class member who cashed the checks did so knowingly and voluntarily, particularly given that no evidence establishes every member of the class knew of the impending lawsuit.  *See Howell v. Motorola, Inc.*, 633 F.3d 552, 559 (7th Cir. 2011) (explaining "for a release to be valid, the party must sign it knowingly and voluntarily").  Contrary to Alcoa's suggestion, it is not enough to have evidence that some retirees knew of the pending lawsuit and had sufficient knowledge to waive their rights.  Such a holding would deprive unnamed retirees of due process as it would bind non-parties without a "full and fair opportunity to litigate" their claims.  *See Montana v. United States*, 440 U.S. 147, 153–54 (1979) (explaining how applying preclusion when a party has a sufficient opportunity to litigate fosters "reliance on judicial action").  Such an application of *res judicata* "runs up against the 'deep-rooted historic tradition that everyone should have his own day in court.'" *Taylor v. Sturgell*, 553 U.S. 880, 892–93 (2008) (quoting *Richards v. Jefferson Cnty.*, 517 U.S. 793, 798 (1996)).  To the extent Alcoa did not provide these retirees with the key context necessary to make a knowing and voluntary waiver, the waiver would not be valid.  But this inquiry turns on the unique circumstances, knowledge, and decisions of each of the 4,970 retirees that cashed the checks and is not workable in the context of the class.

In sum, summary judgment is not appropriate for either party on a class-wide basis on the issue of waiver set forth in Alcoa's Thirteenth Affirmative Defense.[17]  Keeping the class together following this order would create "a massive series of individualized analyses."  *Groussman v. Motorola, Inc.*, No. 10 C 911, 2011 WL 5554030, at *4 (N.D. Ill. Nov. 15, 2011) (denying class certification).  Any retiree who signed and cashed the check waiving their right to life insurance—whether members of the main or sub-class—will be decertified from this class action.

## IV.   Conclusion

For the foregoing reasons, the court **EXCLUDES** from the classes any member of the main class or sub-class who signed and cashed a check purporting to waive their claim to life insurance.  This includes named plaintiff Ellison, but none of the other named plaintiffs.  Plaintiff Ellison shall remain in the case in an individual capacity.

The court also finds that the protection of these excluded class members' due process rights requires that a separate notice of this order be issued to each of them.  The notice should explain the basis for the court's ruling and the fact that Defendants intend to raise waiver as an affirmative defense to the excluded individuals' claims for benefits. The notice should explicitly encourage each excluded class member to seek legal advice concerning the issues presented by this case.  The parties are **ORDERED** to meet and

---

[17] Only one named plaintiff, Martin L. Ellison, signed and cashed the check.  (*See* Filing No. 97-9, Ellison Dep. at 23).  However, the parties spend no time discussing whether he knowingly and voluntarily waived his rights.  Consequently, the court does not address whether he validly waived his claims.  The parties' motions shall be denied without prejudice as to Plaintiff Ellison.

confer on the text of this additional notice and submit a draft for the court's approval by **April 29, 2024.**

Additionally, the court **GRANTS in part** and **DENIES in part** Plaintiffs' Motion for Summary Judgment as to liability (Filing No. 168) for the Main Class and Sub-class of retirees. The Motion is **GRANTED** on Counts I–IV of the Amended Class Action Complaint, and it is **DENIED** with respect to Alcoa's Thirteenth Affirmative Defense. The court **DENIES** Defendants' Cross-Motion for Summary Judgment (Filing No. 171) with respect to the Main Class and Sub-class of retirees on Count I–IV. It is **DENIED as moot** on the Thirteenth Affirmative Defense. Finally, Plaintiffs' and Defendants' Motions for Summary Judgment are **DENIED without prejudice** with respect to Plaintiff Ellison. **IT IS SO ORDERED** this 25th day of March 2024.

RICHARD L. YOUNG, JUDGE
United States District Court
Southern District of Indiana

Distributed Electronically to Registered Counsels of Record.